JENNER & BLOCK LLP
Todd C. Toral
515 South Flower Street, Suite 3300
Los Angeles, CA 90071
(213) 239-5100

Richard Levin
Jacob D. Alderdice
Carl N. Wedoff
1155 Avenue of the Americas
New York, New York 10036
(212) 891-1600

*Counsel for Mark Long, Colin Foran, Naomi Lackaff,
Aaron Nonis, Don Norbury, and Mark Yeend, on behalf
of Neon Machine, Inc.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re:* | Chapter 11 |
| THE 4D FACTORY, LLC, *et al.*, | No. 23-11618 (MEW) (Subchapter V Cases) |
| *Debtor.*[1] | (Jointly Administered) |

### NEON SHAREHOLDERS' MOTION FOR AN ORDER DECLARING AUTOMATIC STAY INAPPLICABLE, OR IN THE ALTERNATIVE, GRANTING RELIEF <u>FROM AUTOMATIC STAY</u>

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are 4D Factory Inc. (6770), and The 4D Factory LLC's (8935). As used herein, the "Debtor" refers to The 4D Factory LLC.

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................................. 1

JURISDICTION AND VENUE ............................................................................................... 4

BACKGROUND ...................................................................................................................... 4

I.  The Neon Shareholders Form Neon to Create Neon's Flagship Video
Game, Shrapnel. ................................................................................................... 4

II.  Griffin and Polychain Invest in Neon in Exchange for Future Equity. ............... 5

III.  The Terms of the SAFEs Require Neon's Board to Issue the Preferred
Stock. .................................................................................................................... 7

A.  The SAFEs. ............................................................................................... 7

B.  There is No Dispute the Triggering Event Converting the SAFEs
to Preferred Stock has Occurred. ............................................................. 8

C.  Director Defendants Javarone, Honour, and Horowitz Fail to
Issue Preferred Stock as Required by the Automatic Conversion
of the SAFEs and Harm Neon. ................................................................. 9

IV.  The Neon Shareholders Filed the Derivative Action Against the
Individual Directors Defendants, Not Against the Debtor. ................................. 12

RELIEF REQUESTED ........................................................................................................... 13

I.  The Automatic Stay Does Not Apply. ................................................................ 13

A.  Subsections 362(a)(1) and (6) Do Not Apply Because the
Derivative Action Involves Post-petition Conduct by a
Non-Debtor. ........................................................................................... 14

i.  The Derivative Action is Asserted Only Against
Non-Debtors, on Behalf of a Non-Debtor Corporation. ............... 15

ii.  The Derivative Action Is Not Against the Debtor, Seeks
Nothing from the Debtor, and Arose After the
Commencement of this Chapter 11 Case. ................................... 18

B.  Section 362(a)(3) Does Not Apply to Stay the Derivative
Action. .................................................................................................... 20

i.  The Derivative Action Does Not Seek to Obtain
Possession or Control of Estate Property. ................................... 21

ii.  The Derivative Action Merely Seeks Corporate
Recognition of Already-Vested Preferred Shares. ....................... 24

II.  Cause Exists to Lift the Automatic Stay ............................................................ 25

CONCLUSION ....................................................................................................................... 29

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*In re 48th St. Steakhouse, Inc.*,
   835 F.2d 427 (2d Cir. 1987)..................................................................................21

*A.H. Robins Co. v. Piccinin*,
   788 F.2d 994 (4th Cir. 1986) ...............................................................................16

*In re Bidermann Indus. U.S.A., Inc.*,
   200 B.R. 779 (Bankr. S.D.N.Y. 1996)..................................................................16

*In re Cicale*,
   2007 WL 1893301 .................................................................................................28

*Ebin v. Kangadis Fam. Mgmt. LLC*,
   45 F. Supp. 3d 395 (S.D.N.Y. 2014).....................................................................18

*In re Fogarty*,
   39 F.4th 62 (2d Cir. 2022) ....................................................................................21

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
   328 F. Supp. 2d 439 (S.D.N.Y. 2004)...................................................................15

*In re HBL SNF, LLC*,
   635 B.R. 725 (Bankr. S.D.N.Y. 2022).......................................................27, 28, 29

*IBEW Loc. Union 481 Defined Contribution Plan & Tr. on Behalf of GoDaddy,
   Inc. v. Winborne*,
   301 A.3d 596 (Del. Ch. 2023)...............................................................................20

*Kreisler v. Goldberg*,
   478 F.3d 209 (4th Cir. 2007) ................................................................................23

*Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC*,
   2014 WL 4783008 (S.D.N.Y. Sept. 25, 2014).......................................................18

*In re Manville Forest Prods. Corp.*,
   209 F.3d 125 (2d Cir. 2000)..................................................................................19

*In re Marine Pollution Servs.*,
   99 B.R. 210 (Bankr. S.D.N.Y. 1989).....................................................................15

*Mark Long, Colin Foran, et al v. Cort Javarone, et al*,
   No. 2023-1186 (Del. Ch.) .....................................................................................13

*In re Markley*,
    460 B.R. 793 (Bankr. D. Kan. 2011) ...........................................................................14, 17

*In re Mazzeo*,
    167 F.3d 139 (2d Cir. 1999)......................................................................................26

*In re Neuman*,
    128 B.R. 333 (S.D.N.Y. 1991).................................................................................17

*of ODP Corp. v. Allen*,
    277 A.3d 296 (Del. Ch. 2022).................................................................................19

*In re Panther Mtn. Land Devel., LLC (In re Panther Mtn. Land Devel., LLC)*,
    686 F.3d 916 (8th Cir. 2012) ...................................................................................23

*Picard v. Fairfield Greenwich Ltd.*,
    762 F.3d 199 (2d Cir. 2014)...............................................................................21, 22

*Plaintiff Funding Holding, LLC v. Blue Ocean Partners LLC*,
    2023 WL 3506142 (S.D.N.Y. Apr. 18, 2023).........................................................15

*Queenie, Ltd. v. Nygard Int'l*,
    321 F.3d 282 (2d Cir. 2003)...............................................................................14, 16

*In re Rey*,
    2019 WL 1077007 (Bankr. S.D.N.Y. Mar. 7, 2019) ...............................................25

*In re Rodgers*,
    333 F.3d 64 (2d Cir. 2003)......................................................................................25

*In re Roman Cath. Diocese of Rockville Ctr., New York*,
    651 B.R. 622 (Bankr. S.D.N.Y. 2023) ....................................................................16

*In re SDNY 19 Mad Park, LLC*,
    2014 WL 4473873 (Bankr. S.D.N.Y. Sept. 11, 2014) .............................................15

*In re Sonnax Indus., Inc.*,
    907 F.2d 1280 (2d Cir. 1990)...................................................................26, 27, 28, 29

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004) ...........................................................................17, 20, 22

*In re Trados Inc. S'holder Litig.*,
    73 A.3d 17 (Del. Ch. 2013).....................................................................................24

*Variable-Parameter Fixture Dev. Corp. v. Morpheus Lights, Inc.*,
    945 F. Supp. 603 (S.D.N.Y. 1996)..........................................................................18

**Statutes**

11 U.S.C. 362(a)(3)..................................................................................................................24

11 U.S.C. § 362(a) ............................................................................................... *passim*

11 U.S.C. §§ 362(a)(1) & (6)...........................................................................................19, 20

11 U.S.C. § 362(a)(3)........................................................................................................3, 20

11 U.S.C. § 362(d)(1) ......................................................................................................4, 25

28 U.S.C. §§ 157 and 1334 ..................................................................................................4

28 U.S.C. § 157(b)(2) ..........................................................................................................4

28 U.S.C. §§ 1408 and 1409 ................................................................................................4

Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend (together, the "**Neon Shareholders**"), by their attorneys, as and for their motion (the "**Motion**") for entry of an order declaring that the automatic stay does not apply, or, in the alternative, granting the Neon Shareholders relief from the automatic stay to continue certain state court litigation, in which the Neon Shareholders are the plaintiffs, state as follows.

## PRELIMINARY STATEMENT

1.      On November 27, 2023, the Neon Shareholders filed a derivative action on behalf of Neon Machine, Inc. ("**Neon**")—the innovative gaming studio they had co-founded together and operated for over two years—in the Delaware Court of Chancery, where Neon's corporate bylaws required such a lawsuit be filed (the "**Derivative Action**").  The Neon Shareholders filed the Derivative Action against three directors of Neon's Board who, together, control the Board and are acting to serve their own personal interests while exposing Neon to significant harm: Cort Javarone, Scott Honour, and Steven Horowitz (collectively, the "**Director Defendants**").

2.      The Derivative Action concerns Simple Agreements for Future Equity ("**SAFEs**") entered into by Neon and its key outside investors and approved by Neon's Board, in which those investors funded Neon with millions of dollars in investments and in return received the contractual right to the automatic issuance of preferred shares in Neon upon the occurrence of certain triggering events.  Yet when those events occurred, the Director Defendants—each of whom owns equity in the Debtor and holds his seat on Neon's Board due to the Debtor's ownership of 60% of Neon's common stock—have refused to recognize the SAFE conversion, because doing so could, if the outside investors take additional independent actions, lead to the Director Defendants' loss of control of Neon's Board.  And when the Neon Shareholders and those outside investors made repeated demands that the automatic conversion of the SAFEs be recognized, the

Director Defendants retaliated by removing Neon's CEO, replacing him with one of the Director Defendants themselves, and taking harmful actions to Neon as it approaches a crucial product launch, including attempting to limit Neon's expenditures. Those actions occurred within the last few weeks (after this chapter 11 case began) and remain ongoing.

3.      In light of the imminent and ongoing harm to Neon at a critical moment in its existence, the Neon Shareholders filed a motion to expedite the Derivative Action, which the Delaware Chancery Court was prepared to hear on December 12, 2023. However, on the evening of last Thursday, November 30, 2023, counsel for the Debtor in this proceeding sent a letter to the Neon Shareholders and their counsel, claiming that their lawsuit violates the automatic stay issued in this proceeding pursuant to 11 U.S.C. § 362(a), making several threats, and demanding they withdraw the Derivative Action by noon the following day. The Derivative Action did not name the Debtor as a defendant, nor did it seek any relief that would assess damages, require action, or declare rights of the Debtor, nor did it seek relief that would be passed through to the Debtor in any way. Rather, the November 30 letter appeared to allege a willful violation of the automatic stay because the Debtor is a 60% owner of Neon's common stock, and the Neon Shareholders' success in the Derivative Action could result in the dilution of that stake.

4.      While the Neon Shareholders are confident that the claims in the November 30 letter are unfounded and incorrect in multiple ways as a matter of fact and law, they take seriously the charges made in the letter, and thus seek a holding from this Court that the automatic stay does not apply or, alternatively, relief from the stay, if the Court were to find it applicable.

5.      As explained in more detail below, the automatic stay does not apply to the Derivative Action. The Debtor's letter cites three automatic stay provisions: sections 362(a)(1), (3), and (6). Yet subsections (a)(1) and (6) expressly apply only to actions against the *debtor* and

2

only to claims that arose *before* the debtor's filing of its petition. The Derivative Action was not filed against the Debtor or any entity with whom the Debtor shares an interest such that the Debtor could be found to be the real party defendant, and it arose based in large part on post-petition conduct. Thus, these subsections do not apply based on their express terms.

6.     Section 362(a)(3), applying the stay to an action seeking to take control or possession of the property of the estate, is also inapplicable. The Debtor claims that the Derivative Action must be stayed because it seeks the dilution of the value of the Debtor's interest in Neon. This is simply not true. The Delaware lawsuit seeks to prevent imminent and critical harm to Neon, a non-debtor, caused by its non-debtor directors. Moreover, section 362(a)(3) does not apply to a possible dilution in value of shares—such a speculative or even factually likely impact does not qualify; the impact on the debtor's estate must be legally certain. Finally, even if the SAFE holders' preferred shares in Neon are recognized, that does not, as a factual matter, reduce the Debtor's stake in Neon—it was a 60% common stock owner before those shares vested, and will be a 60% owner after that conversion is formally recognized.

7.     The Neon Shareholders respectfully request that this Court deny the Debtor's bad faith, tactical ploy of forcing them to abandon their urgent and necessary action to save the innovative and successful corporation they have built. The Director Defendants are abusing their positions, and now, having filed for chapter 11, the Debtor is attempting to further insulate them from accountability. Such a result is not permitted under the law. Alternatively, if the Court somehow finds the automatic stay applicable, the Neon Shareholders submit that relief from the stay is well warranted.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.  This

Motion is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue is proper under 28 U.S.C.

§§ 1408 and 1409.

9.      The statutory predicates for the relief sought herein are 11 U.S.C. § 362(d)(1), Rule

4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-1

of the Local Bankruptcy Rules for the Southern District of New York.

## BACKGROUND

### I.      **The Neon Shareholders Form Neon to Create Neon's Flagship Video Game, Shrapnel.**

10.     Each of the six Neon Shareholders are veterans of the video game and technology

industries.  Declaration of Jacob D. Alderdice ("**Alderdice Decl.**") Ex. 1 (Verified Complaint)

("**Compl.**") ¶ 33. Before launching Neon, they worked together at Home Box Office, Inc.

("**HBO**") in the Interactive and Immersive Group.  *Id*.

11.     In April 2020, the Neon Shareholders left HBO to found Neon Media, LLC, a

production company focused on developing narrative-driven interactive media.  *Id.* ¶ 34.  In

September 2020, the Debtor acquired a majority stake in Neon Media, LLC, in exchange for a

promise to fund Neon Media, LLC's operations. *Id.* ¶¶ 35, 37.  Over the course of the following

year, the Debtor's and Mr. Javarone's funding of Neon Media, LLC was insufficient and prevented

the entity's projects from being fully developed. *Id.* ¶ 37.

12.     In August 2021, the Neon Shareholders incorporated Neon in Delaware. *Id.* ¶ 38.

They launched Neon to create an entity with formal corporate protections that would support

outside fundraising and provide critical runway for launching a flagship, stand-out video game.

*Id.*. Neon Shareholder Mark Long—a 27-year veteran of the video game industry—was the CEO of Neon at its founding. *Id.* ¶ 19.

13.    At the start, the Neon Shareholders funded Neon with approximately $550,000 of their own funds that they pooled together to get Neon off the ground. *Id.* ¶ 39. They worked with limited resources to create Neon's flagship video game "Shrapnel" and during this time some of the Neon Shareholders went months without a salary. *Id.* ¶¶ 39, 41-46.

14.    Director Defendant Javarone was made aware of these launch efforts, but neither he nor the Debtor invested any funds, time, or ideas into them. *Id.* ¶ 40.  Nevertheless, certain of the Neon Shareholders recognized that the Debtor had a prior stake in Neon Media and, thus, the Debtor received the same 60% stake of Neon, with the Neon Shareholders holding most of the remainder. *Id.*

15.    Shrapnel is a narrative driven, science-fiction action, first-person-shooter video game.  *Id.* ¶ 41.  Its innovations include a blockchain technology that powers an in-game cryptocurrency token-based ecosystem in which players can use the tokens to (i) purchase items in the game, (ii) transfer the tokens outside the game on a public blockchain, and (iii) create their own content in the game which can be "minted" as a non-fungible token that can be "sold" to other players for tokens. *Id.* ¶¶ 39, 41-46. The Neon Shareholders needed a reliable source of funding to execute their vision for "Shrapnel." *Id.* at ¶¶ 42, 46-47.

## II.    Griffin and Polychain Invest in Neon in Exchange for Future Equity.

16.    Shrapnel's innovative concepts attracted the attention of some of the most knowledgeable, successful, and deep-pocketed investors in the video game and blockchain industries.  *Id.* ¶ 46.  Neon Shareholders Mark Long and Don Norbury engaged in a series of fundraising meetings selling interest in Neon and Shrapnel.  *Id.* ¶ 47.  Neither Mr. Javarone nor the Debtor had any role or input in any of the fundraising.  *Id.*

17.    Seeing Neon's potential, in September 2021, Griffin Gaming Partners II, L.P. ("**Griffin**") and Polychain Ventures II LP ("**Polychain**") agreed to invest $8 million in Neon in exchange for future equity in Neon.  *Id.* ¶ 48.

18.    These agreements were formalized through industry-standard bilateral contracts called SAFEs, in which Griffin and Polychain each received future equity in Neon in exchange for their substantial investments, with the SAFEs structured so that the equity would vest in the form of preferred shares of Neon upon the occurrence of certain events.  *Id.* ¶ 49.

19.    Griffin and Polychain's investments came at a critical time for Neon.  *Id.* ¶ 51.  The investments enabled the Neon Shareholders to finally acquire office space, hire other talented employees, and begin high quality development of Shrapnel.  *Id.*  In addition to infusing Neon with much needed cash, representatives from Griffin and Polychain routinely consulted with the Neon Shareholders to share insight on Shrapnel's blockchain technology, additional fundraising, and the overall development of the Shrapnel game.  *Id.* ¶ 52.

20.    In stark contrast to Griffin and Polychain's active involvement with developing Neon, Mr. Javarone was absent.  *Id.* ¶ 53.  He never once visited the company's new offices, had no interactions with any Neon personnel, and declined to attend any of the weekly meetings that Neon Shareholder Mr. Long held with Griffin and Polychain representatives.  *Id.*

21.    Once Neon was up and running, the Neon Shareholders needed a significant amount of additional funding to continue development of their flagship product, Shrapnel. Between April 2022 through August 2023 the Neon Shareholders raised an additional $20 million in Series A funding for Neon.  *Id.* ¶ 57.  Neon was able to raise these additional funds by entering into additional SAFEs with Griffin and Polychain. *Id.* ¶¶ 57-59.  The SAFEs were approved by Neon's Board. *Id.* ¶ 64.

III.    **The Terms of the SAFEs Require Neon's Board to Issue the Preferred Stock.**

    A.    **The SAFEs.**

22.    Under the terms of the SAFEs,[2] Griffin and Polychain invested cash into Neon in exchange for future equity in Neon. *Id.* ¶¶ 48-49, 57. Griffin and Polychain fully paid their obligations under the SAFEs upon their substantial investments into Neon. *Id.*

23.    A central feature of SAFEs is their "Automatic Conversion" to an agreed-upon amount of preferred equity upon the occurrence of certain events; in this case, "[i]f, by the date that is sixty (60) days after Network Launch, (i) this instrument has not terminated and (ii) no Qualified Financing has occurred, then, at 8:00 a.m. PT on the date that is sixty-one (61) days after Network Launch, this instrument will automatically convert into that number of shares of a newly created series of the Company's preferred stock." *Id.* ¶ 60; Alderdice Decl. Ex. 2 at Section 1(a).

24.    The SAFEs have not and were never terminated and no "Qualified Financing," as defined in the SAFEs, occurred. Compl. ¶ 61.

25.    Pursuant to Section 141(f) of the General Corporation Law of Delaware, the Neon Board adopted and approved multiple resolutions related to the SAFEs that were issued on September 29, 2021, and September 30, 2021, to Griffin and Polychain in the aggregate principal amount of $8 million. *Id.* ¶ 62.

26.    In January 2023, with Neon having engaged in additional fundraising in the months before and planning on engaging in additional fundraising in the months to come, the Neon Board of Directors—including Mr. Javarone—again approved the SAFEs in substance and form, including additional SAFEs with Griffin and Polychain. *Id.* ¶ 63; Alderdice Decl. Ex. 4 (Board Consent and Resolutions).

---

[2] The SAFE contracts dated September 29, 2021 with Griffin, and September 30, 2021, with Polychain are attached as Exhibit 2 of the Alderdice Declaration.

27.    Pursuant to those resolutions approving the SAFEs, the Board resolved that "each of the officers of the Corporation is authorized to do or cause to be done any and all such further acts and to execute and deliver any and all such additional documents as such officer may deem necessary or appropriate in order to carry into effect the purposes and intent of the foregoing resolutions." Compl. ¶ 64.

**B.      There Is No Dispute the Triggering Event Converting the SAFEs to Preferred Stock Has Occurred.**

28.    The "Network Launch"—the key trigger within the SAFEs— was defined by the SAFEs as a "bona fide transaction or series of transactions pursuant to which the Token Issuer issues the native Token associated with access to and use of the Network." *Id.* ¶ 66.

29.    Neon worked with a third-party partner and separately with Avalanche, a prominent blockchain platform, to support the creation of a unique token related to Shrapnel—the SHRAP token. *Id.* ¶ 68.

30.    Building up to the Network Launch, on February 17, 2023, the Shrapnel "subnet" was created: a network of blockchain validators on which the SHRAP token, identified by a specific code to 18 decimal places, would be made available. *Id.* ¶ 73. Next, on March 17, 2023, the first native token (referred to as the SHRAP "gas" token) was generated on the Shrapnel subnet. *Id.* Additional token transactions built up over the following month, and on April 29, 2023, three billion SHRAP tokens were generated. Soon after, SHRAP tokens were airdropped to potential players of Shrapnel, who were able to use those tokens for purposes related to the game, such as creating their own "Callsigns," or forms of identification within the game. *Id.* ¶ 75.

31.    Accordingly, by April 29, 2023 at the latest—if not earlier—the Network Launch as defined in the SAFEs had occurred: there had been a series of transactions pursuant to which

the native token associated with access to and use of the Shrapnel network had been issued. *Id.*
¶ 76.

32.     Because the Avalanche blockchain is a decentralized, peer-to-peer network, each transaction that occurs on the blockchain is recorded and available publicly. Accordingly, each step leading to the Network Launch and subsequent transactions involving the SHRAP token on the Shrapnel network are fully available and verifiable with reference to publicly available online tools. *Id.* ¶ 72.

33.     There is no way in which this launch can be disputed. Even if the native token were insufficient (and it is sufficient, according to the plain language of the SAFEs), the clear and substantial evidence of the SHRAP token being minted and used on the Shrapnel network has never been disputed. *Id.* ¶ 77.

**C.     Director Defendants Javarone, Honour, and Horowitz Fail to Issue Preferred Stock as Required by the Automatic Conversion of the SAFEs and Harm Neon.**

34.     In August 2023, Defendant Javarone, a director on Neon's Board but having invested no time or funds into Neon, approached Neon's CEO Mr. Long about having the Debtor's common shares in Neon bought out, due to his need for liquidity to satisfy the Debtor's creditors. *Id.* ¶ 81. Mr. Long refused, because Neon was engaged in critical fundraising as it prepared for its product launch, and having its common shares repurchased would be a distraction. *Id.*

35.     In retaliation for that refusal, Mr. Javarone subsequently removed Mr. Long from Neon's Board of Directors, and replaced him with Director Defendant Scott Honour, an individual with equity in the Debtor, but no prior experience in video games, the blockchain industry, or Neon. *Id.* ¶ 82. Mr. Honour's appointment meant that Mr. Javarone had a 3-2 voting majority on the Board, as the Board also included Ned Sherman, a former director who had been appointed as

a 4D-designated member of the Board but has since resigned during the course of these events.  *Id.*
¶¶ 84, 90.

36.     On September 14, 2023, Neon received a letter from Griffin (the "**Griffin Demand
Letter**") demanding that Neon honor its contractual obligations pursuant to the SAFEs and "issue
preferred shares of the [Neon]'s preferred stock to Griffin, in accordance with SAFEs." Alderdice
Decl. Ex. 5.

37.     At the direction of the 4D-designated directors, the Neon Board ignored Griffin's
demand letter. And despite repeated demands from the other Neon Board Directors and the Neon
Shareholders, the Director Defendants continued to refuse to recognize the automatic conversion
of the SAFEs.  Compl. ¶ 85.

38.     On October 5, 2023, the Neon Board convened a special meeting. At the meeting,
the Board majority members—Javarone, Honour, and Sherman—first voted to appoint Mr.
Honour as Chairman of the Board and then voted to make "Chairman" an official officer position
and approved Honour as Neon's "Executive Chairman."  *Id.* ¶ 87.  At the same meeting, the
demand was made again on the Board to recognize the conversion of the SAFEs. Mr. Honour
stated that they needed additional time to "carefully consider" whether the Network Launch had
occurred and whether the SAFEs had converted. He provided no reason to believe that either event
had not, in fact, occurred. *Id.* ¶ 88.

39.     Shortly after that meeting, on October 10, 2023, the Debtor commenced this chapter
11 case of the Bankruptcy Code and elected to proceed under subchapter V.  *Id.* ¶ 89.

40.     On October 16, 2023, former director Ned Sherman resigned from the Board,
without stating a reason for doing so.  *Id.* ¶ 90.  Shortly thereafter, Javarone and Honour replaced
Mr. Sherman with Defendant Horowitz, another equity holder in the Debtor. *Id.*

41.     By that time, each of the three Director Defendants was appointed by the Debtor and was demonstrating signs of acting to benefit their own personal self-interest or the interest of the Debtor over that of Neon.  Each of the Director Defendants held and hold equity in the Debtor, and they were and are concerned that if the SAFEs were converted and the preferred shares were issued, as the contracts require, Griffin and Polychain would take subsequent actions, including the conversion of those preferred shares into common, that would lead to the dilution of the Debtor's common shares in Neon and the loss of control of the Board. *Id.* ¶ 86.

42.     On November 7, 2023, with Neon facing significant potential liability from its outside investors, a recalcitrant Board acting contrary to Neon's best interests, and the holder of the majority of its common stock in bankruptcy, Neon, acting through Mr. Long as CEO, engaged the undersigned counsel to provide advice to Neon and guide it through these issues.  *Id.* ¶ 91.

43.     Soon after, Neon, through counsel, sent a letter to Mr. Javarone explaining the potential harm to Neon based on its refusal to recognize the SAFE conversion.  *Id.* ¶ 92.  The letter was also sent to the Debtor's counsel, due to the indications that Mr. Javarone was acting, in fact, as an agent of the Debtor.  Alderdice Decl. Ex. 6 (November 10 Letter).  Although the letter clearly stated that Neon's recognition of the SAFE conversion owed to its non-debtor outside investors would not violate the automatic stay pursuant to 11 U.S.C. § 362(a), the letter noted that Neon would consider, in an abundance of caution, seeking relief from the stay regarding the "ongoing dispute over whether 4D is and remains a Neon majority stockholder of the voting capital of Neon." *Id.*  The letter requested a meet and confer to discuss these pressing issues.

44.     Neither Mr. Javarone nor the Debtor's counsel responded to the letter.  Instead, the Director Defendants proceeded to immediately retaliate against Mr. Long for this action and his repeated demands to the Board that Neon abide by its contractual obligations to its key investors.

Thus, on November 13, 2023, the Director Defendants voted to suspend Mr. Long as CEO and appointed Mr. Javarone as his putative interim replacement and terminated Neon's engagement of counsel. Compl. ¶ 93.

45.     As "interim CEO," Mr. Javarone immediately began taking actions that have harmed and will continue to harm Neon, including attempting to seize control of Neon's bank accounts, prohibiting any expenditure over $5,000 without his and Mr. Honour's approval, and threatening to discipline key Neon officers. *Id.* ¶ 94.  Moreover, the Board continues to refuse to recognize the SAFE holders' contractual rights to preferred shares in Neon, thus exposing Neon to significant legal liability and cutting off any future, critical fundraising as it approaches the launch of its flagship product this month.

**IV.    The Neon Shareholders Filed the Derivative Action Against the Individual Directors Defendants, Not Against the Debtor.**

46.     On November 27, 2023, the Neon Shareholders brought a derivative action on behalf of Neon in the Delaware Chancery Court against Neon's Directors Cort Javarone, Scott Honour, and Steve Horowitz for breaching their fiduciary duties owed to Neon and its shareholders (the "Derivative Action").[3] *See generally* Compl. The Debtor in the instant bankruptcy is *not* a party in the Derivative Action, nor would it be a proper party.

47.     The primary relief sought in the Derivative Action is for an order declaring the SAFEs have automatically converted and requiring the Director Defendants to recognize the conversion. *Id.* ¶¶ 134-140.

48.     As discussed above, the Director Defendants are acting out of self-interest, as each held and holds equity in the Debtor and each was appointed by the Debtor. They were and are

---

[3] *Mark Long, Colin Foran, et al v. Cort Javarone, et al*, No. 2023-1186 (Del. Ch.).  Neon's corporate bylaws expressly provide that any derivative action brought on behalf of Neon must be filed in Delaware Chancery Court.

concerned that if the SAFEs are converted and the preferred shares are issued, as the contracts require, Griffin and Polychain would take subsequent actions that would lead to the dilution of the Debtor's common shares in Neon and the loss of control of the Board. *Id.* ¶ 86. Because Neon, as a corporation, has no interest in who its shareholders or directors are, these actions by the Director Defendants to entrench themselves in the majority are not in the interests of Neon or its other shareholders, but only in their own interests, contrary to their fiduciary duties as Neon directors and majority shareholder.

49.    On November 30, 2023, at 7:30 pm E.S.T., counsel for the Debtor sent a letter to the Neon Shareholders and their counsel claiming that the Derivative Action was filed in violation of sections 362(a)(1), (3), and (6), making a number of other threats, and demanding that the Neon Shareholders drop their lawsuit by 12:00 p.m. E.S.T. the following day. *See* Alderdice Decl. Ex. 7 (November 30 Spence Letter). The Neon Shareholders, through counsel, responded to the Debtor's counsel by letter less than 24 hours later. *See* Alderdice Decl. Ex. 8 (December 1 Jenner Letter).

50.    Concurrently with the submission of this Motion, the Neon Shareholders have asked the Delaware Chancery Court to postpone the hearing on the motion to expedite proceedings and hold that motion in abeyance, so that this Motion can be heard and resolved before proceeding further in the Derivative Action.

**RELIEF REQUESTED**

## I.    The Automatic Stay Does Not Apply.

51.    The Neon Shareholders filed their complaint in Delaware Chancery Court because it is a derivative action filed on behalf of a non-debtor Delaware corporation by non-debtor shareholders, against three non-debtor directors of that corporation, to prevent imminent ongoing harm to that non-debtor corporation. *See Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir.

2003) (holding that automatic stay provisions generally apply only to debtors)*; In re Markley*, 460 B.R. 793, 796–98 (Bankr. D. Kan. 2011) (holding that the "bankruptcy court does not have jurisdiction over the derivative causes of action brought on behalf of a non-debtor corporation against non-debtor defendants" where debtor was 60 percent shareholder of non-debtor corporation).

52.    In seeking to stay the Derivative Action, the Debtor has claimed that three subsections of Section 362 of the Bankruptcy Code apply. Under those subsections, the Debtor's petition operates as a stay of:

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the *debtor* that was or could have been commenced *before* the commencement of the case under this title, or to recover a claim against the *debtor* that arose *before* the commencement of the case under this title; . . .
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate; . . . [and]
>
> (6) any act to collect, assess, or recover a claim against the *debtor* that arose *before* the commencement of the case under this title.

11 U.S.C. § 362(a) (emphases added).  However, as explained below, each of these provisions do not apply to the Derivative Action.

**A.    Subsections 362(a)(1) and (6) Do Not Apply Because the Derivative Action Involves Post-petition Conduct by a Non-Debtor.**

53.    Subsections 362(a)(1) and (a)(6) are inapplicable by their own express terms, for two separate and independent reasons: (1) they each stay actions against only the debtor—or parties that are effectively the same as the debtor—which the Derivative Action undisputedly is not; and (2) they each stay actions only where they seek to collect, assess, or recover a claim against the debtor that arose prior to the commencement of this case, which the Derivative Action also undisputedly does not.

14

i.      **The Derivative Action is Asserted Only Against Non-Debtors, on Behalf of a Non-Debtor Corporation.**

54.     The purpose of the automatic stay is to provide the debtor with "breathing room" from creditors and prevent creditors from pursuing their own remedies against the debtor. *In re Marine Pollution Serv.*, 99 B.R. 210, 215 (Bankr. S.D.N.Y. 1989).  It protects only the debtor. Consistent with the statute's purpose and express text, in the ordinary case, "courts in this Circuit have regularly refused to extend a debtor corporation's § 362(a) stay to its non-debtor officers and principals." *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 328 F. Supp. 2d 439, 441 (S.D.N.Y. 2004).

55.     However, in "unusual circumstances," a court may extend the stay to cover non-debtor entities. *In re SDNY 19 Mad Park, LLC*, 2014 WL 4473873, at *2 (Bankr. S.D.N.Y. Sept. 11, 2014); *see also Plaintiff Funding Holding, LLC v. Blue Ocean Partners LLC*, 2023 WL 3506142, at *1 (S.D.N.Y. Apr. 18, 2023). But in doing so, courts in this district require unusual circumstances because extension of the stay is "extraordinary." *Id*. The Second Circuit has held that those "unusual circumstances" exist only where a claim against a non-debtor will have an "*immediate* adverse economic consequence for the debtor's estate." *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287–288 (2d Cir. 2003) (emphasis added).  These circumstances include: (1) a "claim to establish an obligation of which the debtor is a guarantor"; (2) "a claim against the debtor's insurer"; and (3) "actions where there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant." *Id.* (internal quotation marks and citations omitted).  Neither of the first two examples are relevant here—the Derivative Action is neither a claim to establish an obligation of which the Debtor is a guarantor, nor is it a claim against the Debtor's insurer.  And, as explained below, the third circumstance is not present

15

either.[4] Even in these three circumstances, the extension is not automatic, and without a court order extending the stay, it does not apply. *In re Bidermann Indus. U.S.A., Inc.*, 200 B.R. 779, 782 (Bankr. S.D.N.Y. 1996).

56.     For the stay to apply to an action against a third-party defendant, the "identity of interest" between the debtor and third-party defendant must be one where "the debtor may be said to be the real party defendant *and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor*." *In re Roman Cath. Diocese of Rockville Ctr., New York*, 651 B.R. 622, 648 (Bankr. S.D.N.Y. 2023) (emphasis in original) (quoting *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)).  One "illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case." *Id.* (declining to extend automatic stay to affiliated entities being sued for practices shared by the debtor, and which actions would rely on discovery from the debtor).

57.     Whether the Derivative Action against the non-debtor Director Defendants of Neon meets this bar is not a close call.  The Derivative Action asserts no claims against the Debtor, would result in no judgment against the Debtor, and seeks no relief whatsoever, whether damages, injunction, or declaratory, from the Debtor, directly or indirectly.  Neon's founders, shareholders, and officers bring the Derivative Action on behalf of Neon, a non-debtor corporation, against Neon's directors, to prevent continuing harm to Neon.  *See, e.g.*, *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1036 (Del. 2004) (describing the derivative suit as an "accountability mechanism" which "enables a stockholder to bring suit on behalf of the

---

[4] Based on the Debtor's letter, it is not clear if the Debtor even contends that it could be considered "the real party defendant" in the Derivative Action, but to be clear, this Motion addresses that argument.

corporation for harm done to the corporation").  Although the three Director Defendants hold

equity stakes in the Debtor and were designated as Neon directors by the Debtor, and one is the

Debtor's Managing Member, they are being sued solely in their capacity as Neon directors; indeed,

no other result could be contemplated by a derivative action.  In the only reported case of which

Plaintiffs are aware that speaks to this question, a District of Kansas bankruptcy court held that it

did not have jurisdiction over "derivative causes of action brought on behalf of a non-debtor

corporation against non-debtor defendants," where, as here, the debtor was a 60 percent controlling

shareholder of that non-debtor corporation.  *In re Markley*, 460 B.R. at 797.[5]

58.      As relief for the benefit of the non-debtor Neon, the Derivative Action seeks: (1)

the recognition of the SAFE holders' already-vested rights to preferred shares in Neon; (2) the

restoration of Mr. Long as Neon's CEO in place of the inexperienced, unqualified, and uninvolved

Javarone; and (3) compensatory damages for Neon from the Director Defendants.  None of these

requests for relief would require a finding or judgment against the Debtor.  The SAFEs are bilateral

contracts between Neon and its investors; the Debtor is a stranger to those contracts, neither a

party, nor a guarantor or beneficiary.  Recognition of the SAFEs' automatic conversion will result

in no finding or judgment against the Debtor of any kind.  Neither will restoring Neon's founder

and long-time CEO into his rightful position at Neon.  Finally, seeking damages from a debtor's

non-debtor principal (as well as two other non-debtors) does not amount to a judgment against the

debtor.  *See, e.g.*, *Ebin v. Kangadis Fam. Mgmt. LLC*, 45 F. Supp. 3d 395, 398 (S.D.N.Y. 2014)

---

[5]  By contrast, in *In re Neuman*, 128 B.R. 333 (S.D.N.Y. 1991), the derivative plaintiffs sued both a non-debtor corporation *and* the debtor himself, and the derivative action specifically demanded that the debtor himself be removed from the corporation and that the non-debtor corporation *be enjoined from consummating the agreement with the chapter 11 trustee*.  *Id.* at 335.  Though the district court affirmed the application of the automatic stay in that case due to the clear and direct impact on the debtor, the court reversed a finding that the violation was willful due to the presence of the non-debtor corporation as a defendant. *Id.* at 337–38.

(holding that the stay did not apply to damages claims against debtor's officers and principals); *Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC*, 2014 WL 4783008, at *4 (S.D.N.Y. Sept. 25, 2014) (declining to extend automatic stay to fraud claims seeking damages against debtor's CEO because the plaintiffs sought to hold him directly liable "on the basis of his personal actions"); *Variable-Parameter Fixture Dev. Corp. v. Morpheus Lights, Inc.*, 945 F. Supp. 603, 607 (S.D.N.Y. 1996) (holding that the automatic stay did not apply to damages claims against the debtor's principal and sole shareholder).

59.     In short, the Derivative Action is a lawsuit for the benefit of Neon, a non-debtor, with the sole purpose of ensuring Neon's survival.  It has not been brought against the debtor and is thus not stayed by Sections 362(a)(1) or (a)(6).

### ii.     The Derivative Action Is Not Against the Debtor, Seeks Nothing from the Debtor, and Arose After this Chapter 11 Case Began.

60.     Sections 362(a)(1) and (a)(6) do not stay the Derivative Action for the separate and additional reason that they apply only to claims against the debtor or to collect, assess, or recover a claim against the debtor.  11 U.S.C. §§ 362(a)(1) & (a)(6). The Derivative Action does not name the Debtor as a defendant and, in seeking relief against the Director Defendants to prevent or remedy harm to Neon, seeks nothing from the Debtor. Even to the extent that the Derivative Action seeks to require Neon to issue the preferred shares, the action seeks nothing from the Debtor, because the shares issue from Neon, not the Debtor.

61.     In addition, the Derivative Action seeks to remedy breaches of fiduciary duty by the three Director Defendants inflicting harm on Neon, which occurred after this case began. To the extent the Derivative Action is even indirectly against the Debtor, the claims arose post-petition.

18

62.    "A claim will be deemed to have arisen pre-petition if the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation . . . under the relevant non-bankruptcy law." *In re Manville Forest Prods. Corp.*, 209 F.3d 125, 129 (2d Cir. 2000) (internal quotation marks omitted).  In Delaware, a derivative claim brought on behalf of a corporation against its directors becomes ripe "if litigation sooner or later appears to be unavoidable and where the material facts are static." *Garfield on behalf of ODP Corp. v. Allen*, 277 A.3d 296, 315 (Del. Ch. 2022).  The "plaintiff's cause of action accrues at the moment of the wrongful act." *Id.* at 318.

63.    The Neon Shareholders' claims arise from the Director Defendants' harmful post-petition conduct.[6]  On November 13, 2023, the Director Defendants retaliated against Neon Shareholder Mr. Long in response to his raising their failure to recognize the SAFE conversion. They suspended Mr. Long as CEO and replaced him with Director Defendant Javarone.  Since that date, Mr. Javarone has been engaging in actions that are harming Neon, including attempting to control Neon's bank accounts and limit expenditures over $5,000 in advance of Neon's critical product launch later this month.  *See* Compl. ¶¶ 98–99.  Plainly, the Neon Shareholders' claims arising from that conduct, *see id.* ¶¶ 119–133, arose after the Debtor's October 10 petition date. Moreover, even as to their claims related to the Director Defendants' failures to recognize the SAFE conversion, it is a necessary element for the Neon Shareholders to allege that any demand on the Director Defendants to pursue those claims on behalf of Neon would be futile.[7]  The Director

---

[6] One Director Defendant—Defendant Horowitz—was not even appointed as a director on Neon's Board until October 16, 2023—six days after the Debtor's bankruptcy filing.  Plainly, all claims against him could not have arisen prepetition. Compl. ¶ 90.

[7] *IBEW Loc. Union 481 Defined Contribution Plan & Tr. on Behalf of GoDaddy, Inc. v. Winborne*, 301 A.3d 596, 618 (Del. Ch. 2023) ("To establish demand futility, the plaintiff must plead facts supporting a reasonable inference that" a majority of the Board "could not act disinterestedly or independently on a demand.")

Defendants' post-October 10 actions, including the retaliation against Mr. Long and additional disloyal actions harming Neon to support their outside interests in the Debtor, have solidified that futility.[8]

64.     Thus, in addition to not applying because the Neon Shareholders' claims are not against the Debtor, sections 362(a)(1) and (6) do not apply because their claims in the Derivative Action seek nothing from the Debtor, and they arose after the Debtor's commencement of this case.

### B.      Section 362(a)(3) Does Not Apply to Stay the Derivative Action.

65.     Section 362(a)(3) stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3). By arguing that the effect of the Derivative Action would be to dilute the Debtor's stock in Neon or its value, the Debtor appears to be invoking this subsection.  Yet errors of both fact and law prevent the contention from remotely resembling the type of act to "obtain possession" or "control over" estate property sufficient to warrant a stay.

66.     Second Circuit law sets forth a clear dichotomy for whether "actions taken against third parties" adversely impact estate property such that they are stayed: actions that are "*legally certain*" to "diminish[] or eliminate[]" estate property are stayed, while actions that are merely "*factually likely*" to do so are not.  *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 208 (2d Cir. 2014) (emphases added); *see also In re Fogarty*, 39 F.4th 62, 75 (2d Cir. 2022) ("The automatic

---

[8] The Director Defendants' actions against Neon do not constitute the operation of the business of the Debtor, which is only a majority shareholder of Neon. However, to the extent that the Debtor might argue that it does, the Debtor, which is not a defendant in the Derivative Action, supports the Derivative Action. The directors of a Delaware corporation owe fiduciary duties to the corporation, not to the majority shareholder when minority shareholders are present. *See, e.g.*, *Tooley*, 845 A.2d at 1036.  If the Defendant Directors claim to be acting for the Debtor rather than in Neon's interest, they admit their breach of fiduciary duty and validate the Neon Shareholders' Derivative Action against them.

stay does not bar 'actions taken against third parties that are only factually likely, as opposed to legally certain, to impact estate property.'"). For example, the termination of a third party's lease that would "inevitably" result in the "destruction of [a debtor's] subtenancy" would violate the automatic stay; that is a legally certain result of that third-party action. *In re 48th St. Steakhouse, Inc.*, 835 F.2d 427, 431 (2d Cir. 1987). On the other hand, lawsuits recovering funds from non-debtor affiliates that would be likely, as a factual matter, to hinder a trustee's ability to recover funds for the debtor's estate, do not constitute a stay violation. *Picard*, 762 F.3d at 208.

67. Because any adverse impact on the Debtor's property—including its shares of Neon common stock—is far from legally certain (and in fact, not even factually likely), subsection 362(a)(3) does not stay the Derivative Action. Moreover, to the extent there is such an impact on the Debtor, it already occurred when the SAFE holders' rights to preferred equity automatically converted as of June 29, 2023—over three months before this case began.

> ### i. The Derivative Action Does Not Seek to Obtain Possession or Control of Estate Property.

68. As noted above, the Neon Shareholders bring the Derivative Action on behalf of Neon against the non-debtor Director Defendants, to prevent ongoing harm to Neon by holding its directors accountable for their breaches of fiduciary duties owed to the non-debtor Neon and its minority shareholders. For several independent reasons, this action is not an impermissible attempt to "obtain possession" or "exercise control over property of the estate."

69. First, the Derivative Action's principal purpose, and the reason it was brought when it was, is to prevent and/or remedy harm to Neon and its shareholders. *See Tooley*, 845 A.2d at 1036 (describing how, as distinguished from direct claims, derivative claims are brought only for "harm done to the corporation," and how "the recovery, if any, must go to the corporation"). The crux of the relief sought in the Derivative Action is to restore stability to Neon—including by

21

restoring the CEO who founded Neon, operated it for two years with the other Neon Shareholders, and brought Neon to the critical edge of a highly anticipated product launch scheduled for later this month.  *See* Compl. ¶¶ 41, 47, 52, 71, 82, 119–127.  That relief bears no connection to obtaining possession of or exercising control over any property of the estate.  Although the Derivative Action also seeks to require the Board to issue the preferred shares, that matter was already pending and did not prompt the Neon Shareholders to file the Derivative Action. Only the Defendant Directors' harmful actions did.

70.    Second, even if the sole relief sought by the Derivative Action was for Neon to recognize the SAFE holders' rights and issue the preferred stock, that remedy still does not amount to an act to obtain possession of or exercise control over property of the Debtor's estate.  To the extent, if any, that issuing the preferred stock could reduce the value of the Debtor's shares in Neon's common stock, that is not a cognizable impact under well-established law.  In *Picard*, the Second Circuit held that even where separate lawsuits against non-debtor affiliated entities were likely to reduce the pool of funds from which the trustee could recover through fraudulent conveyance actions, that was not a sufficient impact on estate property; only a "legally certain" impact is subject to the stay.  762 F.3d at 208.

71.    Similarly, in *Kreisler v. Goldberg*, 478 F.3d 209 (4th Cir. 2007), the court held that a lessor's ejectment action against the debtor's non-debtor subsidiary was not subject to the stay, even where that ejectment action impacted the value of the debtor's interest in the subsidiary.  *Id.* at 214 (noting that just as the "automatic stay does not prevent a non-debtor company from taking an action that might affect the value of a debtor's stock," the stay does not protect the debtor from losses of value in its subsidiary); *see also Nat'l Bank of Ark. v. In re Panther Mtn. Land Devel., LLC (In re Panther Mtn. Land Devel., LLC)*, 686 F.3d 916, 922 (8th Cir. 2012) (action against

non-debtor property improvement district—in which the debtor owned property, the value of which could be reduced—was not subject to the stay).

72.     In short, the mere reduction in the value of the Debtor's interest in Neon cannot be a violation of the automatic stay; it is far from a "legally certain" impact, and in fact may not even be a "factually likely" impact (which would still not violate the stay).  Any number of events could impact the value of a debtor's share in non-debtor entities, such as commercial success or failure, natural disasters or epidemics, supply shortages, and so on.  These various factual possibilities potentially impacting the value of the Debtor's shares, do not all trigger violations of the stay.

73.     *Third*, even if the reduction of value of the Debtor's interests in Neon could be a violation of the stay (and it is not), the Derivative Action should not be stayed because even issuing the preferred Neon shares to the SAFE holders expressly does *not* result in the reduction of the Debtor's stake in Neon or in its value.  Before the automatic conversion of the SAFEs into preferred shares of Neon, the Debtor owned 60 percent of Neon's common stock.  Compl. ¶ 40. Following that automatic conversion into Neon <u>preferred shares</u> for the SAFE holders, the Debtor remains a 60 percent owner of Neon's common stock.  Neon's recognition of the SAFE holders' existing contractual rights, which are senior to the Debtor's common stock holdings, to Neon preferred shares, which are also senior to the Debtor's common stock holdings, would not reduce either the value or the amount of those holdings at all.[9]

---

[9] *See, e.g.*, *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 39 n.8 (Del. Ch. 2013) (noting that "preferred stock is senior in defined respects to common"); William W. Bratton & Michael L. Wachter, *A Theory of Preferred Stock*, 161 U. Pa. L. Rev. 1815, 1878 (2013) (noting that preferred stock is a "senior claim" over common stock).

74.     Thus, the recognition of the SAFEs is not only not "legally certain" to impact estate property—as a factual matter, it does not impact estate property at all.  Subsection 362(a)(3) does not apply and does not stay the Derivative Action.

> **ii.     The Derivative Action Merely Seeks Corporate Recognition of Already-Vested Preferred Shares.**

75.     Finally, even if converting the SAFEs into preferred shares of Neon for the SAFE holders constituted an impact on estate property sufficient to trigger the stay (which, for the various reasons above, it is not), the Debtor has the additional problem that the conversion had already occurred by June 29, 2023—over three months before the Debtor's commencement of this case. The Derivative Action seeking mere corporate recognition of that conversion, well after the fact, does not violate the stay.

76.     By its plain terms, the automatic stay of Section 362(a) applies only to property interests held by the estate at the time of the debtor's filing.  *See* 11 U.S.C. 362(a)(3) (applying upon filing to property of the estate).  Thus, where the debtor has already lost the legal right to property before filing, and all that remains post-petition is a "ministerial act" to recognize that loss of a right, the automatic stay does not apply.  *In re Rodgers*, 333 F.3d 64, 69 (2d Cir. 2003) (holding that the mere "ministerial act" of transferring debtor's deed after her bankruptcy filing did not implicate the debtor's property interests where the sale of the real property occurred at a pre-petition auction); *see also In re Rey*, 2019 WL 1077007, at *2 (Bankr. S.D.N.Y. Mar. 7, 2019) ("The pertinent provisions of the automatic stay only prevent interference with property of the estate after the petition is filed.").  Because the SAFE holders' contractual rights to Neon preferred shares *automatically* vested as of June 29, 2023, any impact those rights would have on the Debtor occurred as of that date.  The Derivative Action merely seeks Neon's corporate recognition of the SAFE holders' existing rights to preferred shares, which itself does not trigger the stay.

* * *

77.     All automatic stay provisions the Debtor cites as cause for staying the Derivative Action—including subsections 362(a)(1), (3), and (6)—simply do not apply.   The Neon Shareholders respectfully request that this Court promptly reject the Debtor's attempt to force the Neon Shareholders to drop their necessary and urgent action to save the corporation they founded and operate, and to issue an order declaring that the automatic stay does not apply to the Derivative Action.

## II.     Cause Exists to Lift the Automatic Stay.

78.     Even if the Court decides that the automatic stay applies to the Derivative Action, which it does not, there are ample grounds to grant relief from the stay.   Section 362(d) provides that on request of a party in interest and after notice and a hearing, the court "shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—for cause . . . ."   11 U.S.C. § 362(d)(1).

79.     The Second Circuit has identified twelve factors that may be relevant in deciding whether cause exists to lift the automatic stay to allow litigation to proceed in another forum:

(1) whether relief would result in a partial or complete resolution of the issues;

(2) lack of any connection with or interference with the bankruptcy case;

(3) whether the other proceeding involves the debtor as a fiduciary;

(4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;

(5) whether the debtor's insurer has assumed full responsibility for defending it;

(6) whether the action primarily involves third parties;

(7) whether litigation in another forum would prejudice the interests of other creditors;

(8) whether the judgment claim arising from the other action is subject to equitable subordination;

(9) whether the movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;

(10) the interest of judicial economy and the expeditious and economical resolution of litigation;

(11) whether the parties are ready for trial in the other proceeding; and

(12) impact of the stay on the parties and the balance of the harms.

*In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990). Not all *Sonnax* factors are relevant in every case. *In re Mazzeo*, 167 F.3d 139, 143 (2d Cir. 1999). Here, the third, fifth, and eighth factors are either irrelevant or weigh in favor of lifting the stay—the Derivative Action does not involve the debtor as a fiduciary, the Debtor's insurer need not defend it (because it is not a party), and there will be no judgment claim or judicial lien against or avoidable by the Debtor (for the same reason). The remaining factors *all* weigh in favor of lifting the stay.

80.     Regarding the first *Sonnax* factor, the Neon Shareholders would receive complete relief for their claims if the stay were lifted so they could pursue the Derivative Action. If the Delaware Court of Chancery determines that the Director Defendants violated their fiduciary duties to Neon's shareholders and orders the Directors to recognize the conversion of the SAFEs and reinstate Mr. Long as Neon's CEO, among other relief sought in the Complaint, the imminent and ongoing harm to Neon will be remedied. Thus, the first factor weighs heavily in favor of lifting the stay.

81.     Regarding the second *Sonnax* factor, the Derivative Action will not interfere with the Debtor's bankruptcy case. As explained above, and despite the Debtor's baseless assertions to the contrary, the Derivative Action does not involve the Debtor's interests. The Derivative Action does not name the Debtor as a party, assert claims against the Debtor, request damages from the Debtor, or request injunctive relief from the Debtor. *See In re HBL SNF, LLC*, 635 B.R. 725, 723 (Bankr. S.D.N.Y. 2022) (holding that litigation would not interfere with bankruptcy case where debtor would not be named as a party in the disputed litigation between non-debtors). The mere *possibility* that the Derivative Action may affect the value of the Debtor's interest in Neon does

not legally interfere with the bankruptcy proceedings. *See supra* at 71–73. Accordingly, the second factor weighs in favor of lifting the stay.

82.     Regarding the fourth *Sonnax* factor, the Derivative Action is proceeding in the Delaware Chancery Court, the "preeminent business court" in the country. *See Delaware Corporate Law*, DELAWARE.GOV, https://corplaw.delaware.gov/delaware-court-chancery-supreme-court/ (last visited Dec. 2, 2023). Since the Court of Chancery sits in equity, *id.*, it is best positioned to provide the Neon Shareholders the equitable relief that they seek for the Director Defendants' violation of their fiduciary duties—that is, Neon's recognition of the conversion of the SAFEs and reinstatement of Mr. Long as CEO. Therefore, the fourth factor weighs in favor of lifting the stay.

83.     Regarding the sixth *Sonnax* factor, the Derivative Action involves only third parties—namely, non-debtor Neon, non-debtor Director Defendants, and non-debtor Neon Shareholders. *HBL*, 635 B.R. at 735 (granting relief from the stay where, in part, the disputed litigation would "primarily involve third parties" to the bankruptcy). Accordingly, the sixth factor weighs in favor of lifting the stay.

84.     Regarding the seventh *Sonnax* factor, litigating the Derivative Action would not prejudice the interests of the Debtor's creditors. Simply put, the Debtor's creditors have no legal interest in Neon's contractual obligation to recognize the SAFEs or the corporate governance dispute that has resulted from Neon's refusal to do so. Thus, the seventh factor weighs in favor of lifting the stay.

85.     Regarding the tenth *Sonnax* factor, since the Delaware Chancery Court has extensive experience with the key issues in the Derivative Action—namely, breaches of fiduciary duty by corporate directors and the grant of equitable relief to remedy those wrongs—it would

promote judicial economy to grant relief from the stay and allow that litigation to proceed.  *See In re Artisanal 2015, LLC*, No. 17-12319 (JLG), 2017 WL 5125545, at *12 (Bankr. S.D.N.Y. Nov. 3, 2017) (granting relief from the stay in part because the state court's familiarity with the issues in the disputed litigation would serve "judicial economy").  Therefore, the tenth factor weighs in favor of lifting the stay.

86.    Regarding the eleventh *Sonnax* factor, although the Neon Shareholders filed the Derivative Action just one week ago, they simultaneously filed a motion for expedited proceedings to request a trial in three months.  Alderdice Decl. Ex. 3 (Motion to Expedite).  Since the trial would be rapidly approaching if the Court grants relief from the stay and because the Derivative Action involves a "relatively straight forward" application of the SAFEs' plain meaning, the eleventh factor also weighs in favor of lifting the stay.  *See In re Cicale*, No. 05-14462 (AJG), 2007 WL 1893301, at *4 (Bankr. S.D.N.Y. Jun. 29, 2007) (granting order to vacate the stay in part because the disputed foreclosure was a "relatively straight forward proceeding that will not require a great deal of trial preparation").

87.    Finally, regarding the twelfth *Sonnax* factor, the Debtor will not be affected by the Derivative Action, but Neon's Shareholders, as well as Neon itself, will be irreparably harmed if the proceedings in Delaware are not allowed to continue immediately.  As discussed *supra*, on the one hand, the Debtor's interests are not implicated in the Derivative Action because the relevant parties are all non-debtor entities.  On the other hand, Neon and Neon's Shareholders are experiencing operational, reputational, and legal harm due to the Director Defendants' failures to abide by their fiduciary duties and instead pursue their own personal interests and benefits, exposing the company to contractual liabilities from these third-party investors and hindering the company's fundraising efforts.  To make matters worse, Neon and its shareholders are suffering at

28

the worst possible moment in the company's history: *the launch of its flagship video game*.  The balance of harms tips heavily in favor of granting relief from the stay.  *See HBL*, 635 B.R. at 735 (granting relief from the stay where the debtor would "not be affected by the litigation" and the non-debtor entity would be harmed by its inability to exercise its remedies against the non-debtor if the stay were not lifted).

88.    Because eight *Sonnax* factors weigh heavily in favor of granting relief from the stay and because the other four are irrelevant to the analysis, and to the extent the Court determines that the automatic stay applies at all, the Court should grant relief from the stay to Neon and the Neon Shareholders and permit the Derivative Action to proceed.

## CONCLUSION

WHEREFORE, the Neon Shareholders respectfully request that the Court enter an order, substantially in the form of the proposed order concurrently filed with this Motion, and grant such other and further relief as may be just and proper.

Dated: December 4, 2023

Respectfully submitted,

By: /s/ *Todd C. Toral*

JENNER & BLOCK LLP
Todd C. Toral
515 South Flower Street, Suite 3300
Los Angeles, CA 90071
(213) 239-5100
ttoral@jenner.com

Richard Levin
Jacob D. Alderdice
Carl N. Wedoff
1155 Avenue of the Americas
New York, New York 10036
(212) 891-1600
rlevin@jenner.com
jalderdice@jenner.com
cwedoff@jenner.com

*Counsel for Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend, on behalf of Neon Machine, Inc.*