**Spence Law Office, P.C.**
Robert J. Spence, Esq. (RS3506)
Attorneys for the Debtors and
Debtors-in-Possession
55 Lumber Road, Suite 5
Roslyn, New York 11576
Tel.:(516) 336-2060

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 4D Factory, Inc., *et al.*,[1] | (Subchapter V) |
| | Case No. 23-11618 (MEW) |
| Debtors. | (Jointly Administered) |

**DEBTORS' OBJECTION TO MOTION BY MINORITY SHAREHOLDERS FOR AN ORDER DECLARING AUTOMATIC STAY INAPPLICABLE, OR IN THE ALTERNATIVE, GRANTING RELIEF FROM AUTOMATIC STAY**

4D Factory, Inc. and The 4D Factory LLC ("4D LLC"), debtors and debtors-in-possession (the "Debtors") in the above captioned matters, by their counsel, Spence Law Office, P.C., respectfully submit this Objection (the "Objection") to the *Motion for an Order Declaring Automatic Stay Inapplicable, or In the Alternative, Granting Relief from Automatic Stay* [ECF 28] (the "Stay Motion") filed by the minority shareholders of Neon Machine, Inc. ("Neon"): Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend (together, the "Minority Shareholders").

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are 4D Factory Inc. (6770), and The 4D Factory LLC (8935).

**PRELIMINARY STATEMENT**

1. Debtor 4D LLC is the majority shareholder of Neon—a vital asset for the Debtors' reorganization. The Minority Shareholders are attempting to seize control of Neon's Board of Directors in order to improperly call a triggering event for the issuance of additional stock to themselves. If the Minority Shareholders succeed in these efforts, they acknowledge it will dilute the Debtor's interest in Neon by more than 50% and strip the Debtor of millions in value and any ability to protect the remainder, imperiling the Debtors' reorganization and ability to emerge from chapter 11.

2. In furtherance of this corporate takeover, the Minority Shareholders filed a derivative action in the Delaware Court of Chancery (the "Derivative Action"), more than one month after the Debtors filed for chapter 11 relief before this Court and in derogation of the automatic stay against acts to exercise control over property of the estate. The Minority Shareholders have also used their Derivative Action to level blatantly false accusations against the Debtors and the CEO of Debtor 4D LLC, Cort Javarone.

3. The Minority Shareholders' Stay Motion seeks, on an expedited basis, this Court's approval of their campaign to strip the estate of value and parade falsehoods about the Debtors and Mr. Javarone. For the reasons described below, the Stay Motion should be adjourned and, ultimately, denied.

4. First, the Stay Motion is not ripe for adjudication and no urgency exists to circumvent due process and procedural protections. The Minority Shareholders mispresent the state of play regarding the alleged "Network Launch" in April 2023 as the trigger event for the "automatic" issuance of preferred stock to the Minority Shareholders. The Debtors dispute that a Network Launch occurred and object to the Minority Shareholders' attempt to prove a Network

Launch in summary fashion using rank hearsay. These and other allegations made in support of the Stay Motion are not accompanied by any evidence. The Minority Shareholders cannot establish a right to relief from the automatic stay based on a letter from a self-interested party unilaterally alleging that a Network Launch occurred. The Minority Shareholders' hearsay evidence should be disregarded.

5.  The Debtors served the Minority Shareholders with subpoenas to appear at the hearing and produce documents responsive to the parties' dispute. Counsel for the Minority Shareholders informed the Debtors they would not accept service of the subpoenas, would not comply with the subpoenas, and were not going to produce witnesses at the evidentiary hearing they requested on an expedited basis. The Minority Shareholders should not be permitted to stonewall requests for documents and attempts to cross-examine witnesses, while requesting that the Court enter emergency stay relief based on hearsay and contested allegations.

6.  The Debtors should be permitted to conduct discovery into the Minority Shareholders' claims and assertions. The Debtors propose a 60-day adjournment comprised of a 45-day discovery period to conduct document discovery and depositions, with the evidentiary hearing on the Stay Motion continued to a date not less than 15 days after the close of discovery. During the 15-day interim period, the parties should cooperate on an orderly presentation of evidence, including the submission of witness and exhibit lists to the Court.

7.  <u>Second</u>, the Debtors are confident the evidence will establish that the Stay Motion should be denied. The Simple Agreements for Future Equity (the "<u>SAFEs</u>") that Neon entered into with Griffin Gaming Partners II, L.P. ("<u>Griffin</u>") and Polychain Ventures II LP ("<u>Polychain</u>") defined the Network Launch as "a bona fide transaction or series of transactions pursuant to which the Token Issuer [Neon] issues the native Token associated with access to and uses of the

3

Network."[2]  As previewed in the Declaration of Ryan Hong, attached hereto as **Exhibit A** (the "Hong Declaration"), the circumstances of the September 14, 2023 letter from Griffin (the "Griffin Letter") alleging the Network Launch were suspicious: the letter was sent in September 2023, claiming for the first time that the Network Launch occurred in April and that the SAFE holders automatically converted to preferred stock in June.  *See* Hong Declaration ¶ 8.  This appears to be nothing more than a play to wrest control of Neon from the Debtors.

8.    The evidence will also show that the Minority Shareholders' actions are harmful to the Debtors and will interfere with their stock in Neon—property that is vital to their reorganization.  The Debtors are actively engaged with the Subchapter V Trustee and their secured lender, MEP Capital, to formulate a plan of reorganization, and their current stake in Neon is integral to the Debtors' ability to repay MEP Capital under a plan.  The Minority Shareholders should not be permitted to continue prosecuting the Derivative Action for the purpose of obtaining a ruling that would significantly disrupt the Debtors' exit strategy, if not completely foreclose it.

9.    The Debtors also expect that the evidence uncovered through discovery and depositions will establish a clear record refuting the Minority Shareholders' baseless accusations, including but not limited to the Minority Shareholders' unsupported (and incorrect) statements that:

- Mr. Javarone had no investment in Neon, nor involvement in Neon's launch or operations.  Complaint ¶ 5.

- Mr. Javarone and the Neon Directors (as defined below) did not contest that the "Network Launch" had occurred yet failed and refused to trigger the issuance of preferred shares.  Complaint ¶ 13. (See, generally, Hong Declaration)

---

[2]    Capitalized terms within the quoted text are defined in the SAFEs.

4

- Mr. Javarone, as interim CEO of Neon, acted to benefit himself, including to seize control of Neon's bank accounts in order to "satisfy his personal debts." Complaint ¶ 16.

- Mr. Javarone and the Neon Directors breached their fiduciary duties and engaging in gross negligence by failing to recognize automatic conversion under the SAFEs. Complaint ¶ 116. (See, generally, Hong Declaration)

These allegations are false.

10. The Debtors request that the Court deny the Stay Motion or adjourn the evidentiary hearing on the Stay Motion for approximately sixty (60) days, until February 11, 2024, so that the Debtors may seek discovery from the Minority Shareholders (or third-party witnesses) and adequately prepare and present their case in opposition.

## BACKGROUND

11. Debtor 4D LLC is the parent company of a diverse group of affiliates engaged in media, the video game industry, and marketing and sales of content over mobile carrier networks. Debtor 4D Factory, Inc. is 100% owned by 4D LLC.

12. On October 10, 2023 (the "Petition Date"), the Debtors filed petitions for relief under subchapter V of chapter 11 of the Bankruptcy Code. On November 2, the Court entered an order directing joint administration of the Debtors' chapter 11 cases [ECF 16].[3]

13. The Debtors filed their bankruptcy cases primarily due to their inability to resolve debts owed to their secured lender, MEP Capital, after 18 months of growth and acquisition, on the one hand, and the loss of several opportunities due to breach of contract and circumvention, on

---

[3] The Minority Shareholders' Stay Motion refers to Debtor 4D LLC in the singular. Given the joint administration of the Debtors' chapter 11 cases, this Objection refers to the Debtors in the plural, unless otherwise noted.

the other hand. The Debtors' assets include 4D LLC's approximately 60% controlling ownership of Neon.[4] 4D LLC's shares in Neon are valued at approximately $19,000,000, based on the last capital investment round of $20,000,000 that closed in October 2023 (placing a total value for Neon's equity at approximately $70 million).[5] The Debtors' equity in Neon is one of their largest assets.

14. On November 10, 2023, Debtors' counsel and the CEO of 4D LLC, Cort Javarone, received correspondence from counsel for the Minority Shareholders (who was then acting as counsel for Neon itself). *See* Stay Motion Ex. 6. By this letter, Mr. Toral, currently counsel for the Minority Shareholders, asserted, among other things, that (1) on September 14, Neon received the Griffin Letter claiming that, consistent with the terms and conditions of the SAFE between Neon and Griffin, a Network Launch had occurred; (2) sixty-one (61) days had passed since the Network Launch, and therefore Griffin's SAFE had automatically converted to shares of preferred shares in Neon; and (3) Javarone and two others on Neon's Board of Directors, Scott Honour and Steve Horowitz (collectively with Javarone, the "Neon Directors") were potentially violating Neon's bylaws by failing to recognize the automatic conversion. *Id.* Neon's counsel (apparently acting in the interests of the Minority Shareholders) requested a meet-and-confer with the Debtors, counsel and the Subchapter V Trustee. *Id.*

15. While Mr. Toral, acting as Neon's counsel said he would proceed to request relief from the stay in an "abundance of caution" in his November 10, 2023 letter, without making an

---

[4] The Minority Shareholders have a vesting interest in up to 40% of the common stock in Neon which vests over a 4- year period. They are 2 years into the 4-year vesting period, and thus it is the Debtors' understanding that 20% of their common stock is fully vested. So while the Debtors believe they currently hold 80% of common stock in Neon based on this vesting schedule, and reserve all rights to claim 80% common stock ownership, for purposes of this Objection and the Stay Motion and to avoid a disagreement on stock ownership interests, it is assumed herein that the Debtor has at least a 60% ownership interest.

[5] *See* Complaint, ¶ 3 ("Neon's present valuation is $70 million and its token market cap exceeds $500 million.")

6

appearance before this Court, on November 27, 2023, the Minority Shareholders, acting through Neon's now former counsel, filed the Derivative Action purportedly on behalf of Neon, in flagrant breach of the Automatic Stay. *See* Stay Motion Ex. 2 (the "Complaint"). Neon is named in the lawsuit as a "nominal defendant." The Complaint makes baseless and inflammatory allegations that the Neon Directors caused Neon to violate and breach its contractual obligations to its outside investors, and that they are attempting to raid Neon's coffers so that Mr. Javarone can pay back his personal debts. The Complaint foreshadows the outcome of the Derivative Action expected by the Minority Shareholders:

> "…if the SAFE holders take additional actions following the SAFE conversion, **there is a likelihood that 4D's controlling share in Neon will be diluted from 60% to approximately 19%, which would have the additional effect of allowing the SAFE holders to control the Neon Board of Directors**"

Complaint at ¶ 110 (emphasis added).

16. On November 30, 2023, Debtors' counsel sent a letter to the Minority Shareholders informing them that the Derivative Action was filed in violation of the Automatic Stay, and demanding that they abandon their claims and withdraw their complaint in the Derivative Action by 12:00 p.m. the next day. *See* Stay Motion Ex. 7.

17. The Minority Shareholders did not withdraw the Complaint. On December 4, 2023, the Minority Shareholders filed the Stay Motion before this Court. The Stay Motion reiterates the frivolous allegations in the Derivative Action. Notably, however, the Stay Motion provides no evidentiary support for those allegations. The Minority Shareholders argue that (1) the Automatic Stay does not apply to the Derivative Action because the Derivative Action (A) involves post-petition conduct by a non-Debtor entity and "seeks nothing from the Debtor," and (B) does not involve property of the Debtor's estate, but "[m]erely" seeks corporate recognition of already-vested preferred shares; and (2) in the alternative, cause exists to lift the Automatic Stay.

7

18. Most importantly here, as the Minority Shareholders allege in the Stay Motion, in September 2021, Griffin and Polychain agreed to invest $8 million in Neon. Stay Motion ¶ 17. Their investments were formalized through the SAFEs, which provided that, upon occurrence of a Network Launch, and the passing of sixty (60) days without the termination of the SAFEs or the occurrence of a "Qualified Financing," the SAFEs would automatically convert into a new series of Neon preferred shares. *Id.* at ¶¶ 22, 23. The number of preferred shares that Griffin and Polychain would each receive would be equal to the amount of their investments divided by the "Liquidity Price," as defined in the SAFEs. *See* Stay Motion Ex. 2. Griffin and Polychain could then later convert their preferred shares into common stock of Neon at any time. If Griffin and Polychain elected to convert their shares, the Debtors' ownership interest in Neon would automatically dilute from a 60% controlling interest to no more than 26% (or less—the Complaint claims 19%), "which would have the additional effect of allowing the SAFE holders to control the Neon Board of Directors." *See* Complaint ¶ 110. The value of the Debtor's equity would become immediately subordinated to the SAFE investments, including investments which *were never authorized by the Board*. (Hong Declaration, ¶11). This would make it possible that the Debtors will never see a return on their stake in Neon.

19. In support of the facts alleged in the Stay Motion, the Minority Shareholders filed the Declaration of Jacob D. Alderdice [ECF 28-1] and several exhibits, including (1) redacted copies of the SAFEs entered between Neon and Griffin, and between Neon and Polychain (Exhibit 2); (2) a single "Action by Written Consent of the Sole Director of Neon Machine, Inc." dated January 13, 2023 (Exhibit 4); and (3) communications between counsel for the Debtors and counsel for the Minority Shareholders.

20. The Minority Shareholders also filed a motion to schedule an expedited hearing and shorten notice with regard to the Stay Motion [ECF 32] (the "Motion to Shorten"). On December 4, the Court granted the Motion to Shorten and set (i) the deadline to object to the Stay Motion for December 11, 2023 at 4:00 p.m. (Eastern time), and (ii) the hearing for December 13, 2023 at 11:00 a.m. (Eastern time).

21. Following the Court's order granting the Motion to Shorten, on December 7, the Debtors sent the subpoenas of Mr. Long and Mr. Norbury (the "Subpoenas") to counsel for the Minority Shareholders.[6] The Subpoenas are attached hereto as **Exhibit B**. The Debtors included with the Subpoenas a list of documents for Mr. Long and Mr. Norbury to produce that the Debtors required for the December 13 hearing. However, when Debtors' counsel sought to serve the Subpoenas, counsel for the Minority Shareholders refused to accept service, and informed Debtor's counsel that they had objections to the Subpoenas. Counsel for the Minority Shareholders has not responded to the correspondence or the Subpoenas.

22. Further, on December 8, 2023, counsel for the Minority Shareholders informed Debtors' counsel in a Zoom conference that they would put no witnesses forward at the hearing, and would rely on the papers submitted. Knowing that there are significant factual issues underlying the Stay Motion, the Minority Shareholders have simply sought to shut down any development of a factual record, and have this Court grant relief under the Stay Motion based on their word alone.

---

[6] To be absolutely clear, the Debtors sought to subpoena two of the named plaintiffs in the Derivative Action, on whose behalf the Stay Motion was filed, for attendance at a hearing that they requested on their own expedited timeframe.

**OBJECTION**

I. **Request for Adjournment.**

23. The Debtors dispute the Minority Shareholders' arguments that the Automatic Stay is inapplicable or should be lifted. The Automatic Stay's application here depends, in part, on whether the alleged Network Launch occurred, which the parties dispute. The Court cannot resolve that dispute without evidentiary submissions. The Minority Shareholders have refused to present witnesses, refused to produce documents, and ask this Court to award expedited relief based on false accusations, and hearsay attached to declarations of counsel. This should not be permitted.

24. The Debtors respectfully request that the Court (1) adjourn the hearing on the Stay Motion for approximately sixty (60) days, to February 11, 2024, to permit the Debtors and the Minority Shareholders sufficient time to conduct discovery and take depositions, and (2) prohibit the use of the Minority Shareholders' exhibits to the Stay Motion without providing the Debtors with the opportunity to address their objections to the exhibits on the record and seek witness testimony before the Court.

II. **The Automatic Stay Protects Debtors From Actions to Impair or Interfere with Estate Property.**

25. The Automatic Stay pursuant to section 362(a) of the Bankruptcy Code is "one of the most fundamental debtor protections provided by the bankruptcy laws." *Midlandtic Nat'l Bank v. N.J. Dep't of Envt'l Prot.*, 474 U.S. 494, 503 (1986). The Automatic Stay prohibits, among other things, acts to exercise control over the property of a debtor's estate and any act to collect, assess, or recover a claim against a debtor that arose before the petition date. *See* 11 U.S.C. §§ 362(a)(3), (6). A debtor need not prove that a party intends to violate the stay—only a general intent in taking actions which have the effect of violating the automatic stay is necessary. *In re Marine Pollution*

10

*Serv., Inc.*, 99 B.R. 210, 217 (Bankr. S.D.N.Y. 1989). At a hearing to consider relief from the Automatic Stay, the moving party has the burden of proof on the issue of the debtor's equity in property. *See* 11 U.S.C. § 362(g)(1).

26. Several kinds of acts can be said to "impair" or "interfere" with estate property such that that they can plausibly amount to the "exercise [of] control," including litigation or other legal action that could, or did, indirectly destroy or transfer control of the debtor's property. *See e.g.*, *ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260-61 (3d Cir. 2006) (arbitration award that effectively terminated debtor's insurance coverage); *Licensing by Paolo, Inc. v. Sinatra (In re Gucci),* 126 F.3d 380, 392 (2d Cir. 1996) (trademark litigation against non-debtor sublicensee of debtor licensor); *48th Street Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th Street Steakhouse, Inc.)*, 835 F.2d 427, 430-31 (2d Cir. 1987) (termination of non-debtor's lease, which also terminated debtor's sublease); *In re Extraction Oil & Gas, Inc.*, No. 20-11548, 2020 WL 7074142, at *4 (Bankr. D. Del. Dec. 3, 2020) (litigation to enjoin non-debtors' fulfillment of contract with debtor). In *In re Prudential Lines Inc.*, 928 F.2d 565 (2d Cir. 1991), the Court found that the somewhat ministerial act by a non-debtor entity of taking a worthless stock deduction on a tax return, would effectively eliminate the value of the net operating loss carryforward to the debtor and thus have an adverse impact on the debtor's reorganization. (citing *In re 48th St. Steakhouse, Inc.*, 835 F.2d 427 (2d Cir. 1987)).

27. It is well established in the Second Circuit that even if the action in question is taken against a non-debtor, the Court must examine the effect of the action, and if that effect "would inevitably have an adverse impact on property of the bankrupt estate, such action should be barred by the automatic stay." *In re 48th Street Steakhouse, Inc.*, 835 F.2d at 431. In *48th Street Steakhouse*, the debtor assigned its lease to an entity called ISH, with the consent of the debtor's

11

landlord. *Id*. at 428–29. The debtor sub-leased the space from ISH, which was the nominal tenant. The debtor and its parent company filed for chapter 11 bankruptcy. *Id*. The landlord rejected debtor's attempt to cure the lease arrears, demanded of ISH that ISH pay the arrears, and served a default notice and intent to terminate the lease on ISH. *Id*. The bankruptcy court found that debtor's interest in the lease was property of the estate, and that the landlord's attempt to terminate the lease violated the automatic stay, pursuant to § 362(a)(3). *Id.* at 429. Affirming the bankruptcy court, the Second Circuit noted that even a mere possessory interest in real property triggers the automatic stay. *Id.* at 430. The Second Circuit held, "[i]f action taken against the non-bankrupt party would inevitably have an adverse impact on property of the bankrupt estate, then such action should be barred by the automatic stay." *Id.* at 431.

**III.    Key Factual Issues in Connection with the Automatic Stay Remain Undeveloped.**

    **A.    The Assertion That the Automatic Stay Does Not Apply Here Involves a Fact-Intensive Inquiry into Allegations for Which the Minority Shareholders Provide No Evidence in Admissible Form.**

    28.    The Minority Shareholders' argument that the Automatic Stay does not apply to the Derivative Action pursuant to section 362(a)(3) relies on the assumption that a Network Launch has occurred under the SAFEs that caused them to automatically convert to preferred shares in Neon, and that the Derivative Action merely seeks "the recognition of the SAFE holders' already-vested rights to preferred shares in Neon." Stay Motion ¶ 58. The Minority Shareholders claim that it is allegedly not "legally certain" or "factually likely" that Griffin and Polychain would further convert their preferred shares to common stock in Neon, thus diluting the Debtors' stake in Neon. Further, the Minority Shareholders argue that "to the extent there is such an [adverse] impact on the Debtor, it already occurred when the SAFE holders' rights to preferred equity automatically converted as of June 29, 2023…" *Id.* at ¶ 67.

12

29. While it is farcical for the Minority Shareholders to claim it is not "factually likely" that Griffin and Polychain would convert any preferred shares to common stock, that issue is neither here nor there. The Minority Shareholders' basic premise is faulty. They glaze over the fact that they have not demonstrated a Network Launch occurred under the SAFEs. They also ignore the fact that, if a court determines that a Network Launch did occur, and that no Qualified Financing of the Company occurred within 60 days of it, the SAFEs (a majority of which were never authorized by the Board to be issued in the first place) would automatically and immediately convert into preferred shares of Neon to the substantial detriment of the Debtors' estates. The Debtors must proceed with discovery to investigate these factual issues.

30. It is not clear that a Network Launch occurred at all. The Minority Shareholders purport that the Network Launch occurred on April 29, 2023. However, the only evidence that the Minority Shareholders offer for this vital point is the Griffin Letter. For all the significance the Minority Shareholders ascribe to the Network Launch, they offer nothing to demonstrate it occurred except one letter delivered almost five months later. According to the Hong Declaration, there is substantial evidence that the Network Launch never occurred and, at best, the Network Launch was in open dispute at the time these Bankruptcy Cases were filed.

31. There are other relevant issues regarding the SAFEs and the Network Launch that the Minority Shareholders' exhibits do not even begin to address and for which the Debtors must seek answers. For example, if the Network Launch had in fact occurred, Mr. Long's actions to enter into additional SAFEs without Board approval after June 29, 2023—such as the $20 million in "Series A" SAFEs issued in October 2023—would certainly be an issue for the Board to address. *See* Hong Declaration, ¶¶ 12-14. Additionally, while the Minority Shareholders allege the all-

13

important Network Launch has already occurred, the game has yet to be launched, and as of October 3, 2023 there were only eight (8) total holders of SHRAP tokens. *See id.* at ¶ 11.

32. The Minority Shareholders also make several unsupported assertions separate from the Network Launch question to support their arguments, all which necessitate a fact-intensive analysis by this Court of whether the Automatic Stay should apply. For example, the Minority Shareholders assert that the relief they seek in the Derivative Action—recognition of the SAFEs' automatic conversion, restoration of Mr. Long as CEO of Neon , and damages from the Neon Directors—does not amount to a judgment against the Debtors. *See* Stay Motion ¶ 58. Further, the Minority Shareholders argue that the "principal purpose" of the Derivative Action is not to "obtain possession" or "exercise control over property of the estate," but rather to "restore stability to Neon," and that the Network Launch issue did not prompt the Minority Shareholders to file the Derivative action; "[o]nly the Defendant Directors' harmful actions did." *Id.* at ¶¶ 68-69. The Minority Shareholders assert no facts to support these statements. And as noted above, the Minority Shareholders' own Complaint states their intent to dilute the Debtors' common stock in Neon, and that the Debtors' estates stand to lose all of their value. *See* Complaint ¶ 110. Noting that even the amount of dilution is to be determined and would have to be negotiated in order to issue preferred equity, the Debtors believe the evidence will show that the Minority Shareholders' actions are harmful to the Debtors and will interfere with their stock in Neon, in clear violation of the Automatic Stay. The Debtors also believe that the evidence will serve to refute the Minority Shareholders' most scandalous allegations that they level against the Debtors and the Neon Directors without any evidentiary support in the Stay Motion and in the Complaint.

33. At minimum, the Debtors expect a more substantial evidentiary record from the Minority Shareholders before they seek relief from the Automatic Stay that would substantially

14

impair the value of assets necessary to the Debtors' reorganization. Indeed, the Debtors have sought to discover and test the Minority Shareholders' evidence by attempting to serve Subpoenas upon Mr. Long and Mr. Norbury, requesting documents and communications related to the drafting of the SAFEs and the circumstances surround the purported Network Launch. Rather than fulfilling their legal obligation to respond to these requests, the Minority Shareholders have simply refused to cooperate or respond, without explanation.

34. The Minority Shareholders focus incorrectly on the hypothetical conversion of Griffin and Polychain's preferred shares into common stock of Neon to argue that the adverse effect to the Debtors of the Derivative Action would not be "legally certain." Because they assume they are factually correct that a Network Launch has occurred, the Minority Shareholders overlook the true adverse result of the Derivative Action: a conversion of the SAFEs into preferred shares in Neon. If a Network Launch has occurred, and no Qualified Financing of Neon occurred within 60 days of the alleged Network Launch, there is no legal or factual question that the Griffin and Polychain SAFEs will convert to preferred shares in Neon. At that precise moment, the Debtors' controlling equity in Neon becomes jeopardized, and Griffin and Polychain are given the singlehanded authority to issue preferred shares on terms of their own liking and convert those shares into common stock at any time, destroying the Debtor's value in this asset.

35. The Debtors must have the opportunity to develop a factual record through written discovery and depositions. The Debtors have not been given that opportunity, despite their best efforts. Therefore, the Debtors request the Court grant a modest adjournment of the hearing on the Stay Motion, for approximately sixty (60) days, to permit preparation for a proper evidentiary hearing.

    **B.**     **The Minority Shareholders Fail to Develop a Record Demonstrating That Cause Exists to Lift the Automatic Stay.**

36. In the alternative, the Minority Shareholders argue that they are entitled to relief from the Automatic Stay pursuant of section 362(d) of the Bankruptcy Code. The Second Circuit has identified twelve factors that are considered relevant to lifting the automatic stay and allowing litigation to proceed in another forum. *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990). Those factors are:

(1) whether relief would result in a partial or complete resolution of the issues;

(2) lack of any connection with or interference with the bankruptcy case;

(3) whether the other proceeding involves the debtor as a fiduciary;

(4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;

(5) whether the debtor's insurer has assumed full responsibility for defending it;

(6) whether the action primarily involves third parties;

(7) whether litigation in another forum would prejudice the interests of other creditors;

(8) whether the judgment claim arising from the other action is subject to equitable subordination;

(9) whether the movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;

(10) the interest of judicial economy and the expeditious and economical resolution of litigation;

(11) whether the parties are ready for trial in the other proceeding; and

(12) impact of the stay on the parties and the balance of the harms.

37. The Minority Shareholders claim that all of the *Sonnax* factors either weigh in favor of lifting the Automatic Stay, or are "irrelevant." However, the Minority Shareholders' assessment of the factors again relies on the faulty and disputed assumption that the Network Launch occurred. *See* Stay Motion ¶ 81 (claiming that the Derivative Action will not interfere with the Debtors' bankruptcy case because it "does not involve the Debtor's interests"); ¶ 84 (claiming that the

Derivative Action would not prejudice the interests of the Debtor's other creditors because they "have no legal interest in Neon's contractual obligations to recognize the SAFEs or the corporate governance dispute that has resulted from Neon's refusal to do so"); ¶ 87 (claiming that the Derivative Action will not affect the Debtors because "the Debtor's interests are not implicated in the Derivative Action because the relevant parties are all non-debtor entities"). But because the occurrence of the Network Launch is in dispute, an adverse ruling in the Derivative Action would necessarily prejudice the Debtors and interfere with their bankruptcy cases.

38. Other factors do not support the Minority Shareholders. The Minority Shareholders claim that the eleventh *Sonnax* factor ("whether the parties are ready for trial in the other proceeding") weighs in their favor, when their Derivative Action was *filed two weeks ago*. *See id.* at ¶ 86. The Derivative Action will not, in fact, involve a "'relatively straight forward' application of the SAFE's plain meaning…" *Id.*

39. Similarly, the Minority Shareholders claim the fourth *Sonnax* factor ("whether a specialized tribunal with the necessary expertise has been established") weighs in their favor without demonstrating any special expertise of the Delaware Chancery Court over this Court to resolve the issues between the parties. *See id.* at ¶ 82. At a minimum, the Minority Shareholders' *Sonnax* argument requires more factual development through discovery, depositions and an evidentiary hearing.

**IV.   The Minority Shareholders Cannot Be Permitted to Rely On Exhibits Without Entry Into the Evidentiary Record.**

40. The Minority Shareholders have further sought to force their Stay Motion through this court by opting not to address any evidence or put any witnesses forward at the scheduled hearing. To the extent the Minority Shareholders rely on the limited evidence in the form of hearsay documents attached to counsel declarations, the Debtors object to such evidence. The

17

"Verified Complaint" submitted with the Motion establishes nothing and does not include a sworn verification. The Debtors must be afforded the opportunity to cross-examine witnesses submitting direct testimony, which the Minority Shareholders have thus far refused to permit and for which there is now insufficient time to prepare given the close proximity of the expedited hearing. Each of the Minority Shareholders' exhibits should be stricken and denied admission into evidence.

## RESERVATION OF RIGHTS

41.     The Debtors reserve the right to amend and/or supplement this Objection as necessary, including without limitation to file subsequent pleadings to address any objections to the Minority Shareholders' exhibits, any responses to pleadings filed by the Minority Shareholders with regard to the Automatic Stay, any further exhibits or evidence presented by the Minority Shareholders, or any other pleading made by the Minority Shareholders in these chapter 11 cases; and in particular, the Debtors reserve all rights to seek contempt and sanctions against the Minority Shareholders and/or their counsel for, among other things, violation of the stay and any ongoing failure to respond to the Subpoenas or any other subpoenas the Debtors may issue. Finally, the Debtors reserve their rights to seek to disqualify Jenner & Block based on a conflict of interest in connection with Jenner & Block's prior representation of Debtors' non-debtor affiliate, Neon.

**CONCLUSION**

42. The Debtors oppose the Stay Motion and respectfully request that the Court (i) adjourn the hearing on the Stay Motion until February 11, 2024 to permit discovery, and ultimately, deny the Stay Motion; (ii) strike and deny admission of each of the Minority Shareholders' exhibits to their Stay Motion; and (iii) grant such other and further relief as the Court deems just and proper.

Dated: December 11, 2023　　　　　　　　　Respectfully submitted,
　　　　　Roslyn, New York

　　　　　　　　　　　　　　　　　　　　　SPENCE LAW OFFICE, P.C.
　　　　　　　　　　　　　　　　　　　　　Attorneys for the Debtors

　　　　　　　　　　　　　　　　　By:　　*/s/ Robert J. Spence*＿＿＿＿＿＿＿＿
　　　　　　　　　　　　　　　　　　　　　Robert J. Spence, Esq.
　　　　　　　　　　　　　　　　　　　　　55 Lumber Road, Suite 5
　　　　　　　　　　　　　　　　　　　　　Roslyn, New York 11576
　　　　　　　　　　　　　　　　　　　　　Tel.: (516) 336-2060