JENNER & BLOCK LLP
Todd C. Toral
515 South Flower Street, Suite 3300
Los Angeles, CA 90071
(213) 239-5100

Richard Levin
Jacob D. Alderdice
Carl N. Wedoff
1155 Avenue of the Americas
New York, New York 10036
(212) 891-1600

*Counsel for Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend, on behalf of Neon Machine, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| *In re:* | Chapter 11 |
|---|---|
| THE 4D FACTORY, LLC, *et al.*, | No. 23-11618 (MEW) (Subchapter V Cases) |
| *Debtor.*[1] | (Jointly Administered) |

**NEON SHAREHOLDERS' REPLY BRIEF REGARDING
NEON SHAREHOLDERS' MOTION FOR AN ORDER DECLARING AUTOMATIC
STAY INAPPLICABLE, OR IN THE ALTERNATIVE, GRANTING RELIEF
<u>FROM AUTOMATIC STAY</u>**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are 4D Factory Inc. (6770), and The 4D Factory LLC's (8935). As used herein, the "Debtor" refers to The 4D Factory LLC.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT...................................................................................................................................4

CONCLUSION..............................................................................................................................14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re 48th Street Steakhouse, Inc.*,
  835 F.2d 427 (2d Cir. 1987)...........................................................................................4, 5, 7

*Acands, Inc. v. Travelers Cas. & Sur. Co.*,
  435 F.3d 252 (3d Cir. 2006)....................................................................................................8

*In re Adelphia Commc'ns Corp.*,
  2006 WL 1559437 (S.D.N.Y. June 7, 2006) .........................................................................9

*In re Escobar*,
  457 B.R. 229 (Bankr. E.D.N.Y. 2011)..................................................................................10

*In re Extraction Oil & Gas, Inc.*,
  2020 WL 7074142 (Bankr. D. Del. Dec. 3, 2020)..................................................................9

*In re Gucci*,
  126 F.3d 380 (2d Cir. 1997)....................................................................................................8

*KREISLER V. GOLDBERG*,
  478 F.3D 209 (4TH CIR. 2007)......................................................................................5, 7, 8

*Mark Long, et al. v. Cort Javarone, et al*,
  No. 2023-1186-MTZ (Del. Ch. Nov. 27, 2023) (verifications attached to
  complaint) .............................................................................................................................11

*IN RE PANTHER MTN. LAND DEVEL., LLC*,
  686 F.3D 916 (8TH CIR. 2012)..............................................................................................5

*Picard v. Fairfield Greenwich Ltd.*,
  762 F.3d 199 (2d Cir. 2014).............................................................................................2, 4, 5

*IN RE PRUDENTIAL LINES INC.*,
  928 F.2D 565 (2D CIR. 1991) ......................................................................................5, 8, 9

*Queenie, Ltd. v. Nygard Int'l*,
  321 F.3d 282 (2d Cir. 2003).....................................................................................................1

*Sellers v. M.C. Floor Crafters, Inc.*,
  842 F.2d 639 (2d Cir. 1988)...................................................................................................12

*In re Sonnax Indus., Inc.*,
  907 F.2d 1280 (2d Cir. 1990)...........................................................................................13, 14

**Statutes**

11 U.S.C. § 362(a) ...........................................................................................................................1

11 U.S.C. § 362(a)(3).......................................................................................................................2

11 U.S.C. § 362(a)(6).......................................................................................................................1

11 U.S.C. § 362(e) .........................................................................................................................10

Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend (collectively, the "**Neon Shareholders**") submit this reply memorandum of law in further support of their motion ("**Motion**") for entry of an order declaring that the automatic stay does not apply, or, in the alternative, granting the Neon Shareholders relief from the automatic stay to continue certain state court litigation, in which the Neon Shareholders are the plaintiffs.

## PRELIMINARY STATEMENT

1. The Derivative Action against Cort Javarone, Scott Honour, and Steven Horowitz (collectively, the "**Director Defendants**"), three non-debtor directors of Neon's Board, does not violate the automatic stay pursuant to 11 U.S.C. § 362(a). It does not name or seek relief from the Debtor, nor does it seek the recovery of estate property; rather, it is an action brought on behalf of a non-debtor, Neon, to prevent ongoing harm to that entity at the most critical moment of its existence—the lead-up to the launch of its flagship product. These are far from the "unusual circumstances" in which the protections of Section 362(a) extend to non-debtors. *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003).

2. In its opposition, the Debtor focuses only on subsections (3) and (6) of Section 362(a). *See* ECF No. 42 ("Opp.") ¶ 25. But the Debtor does not make out a case for why either subsection applies. And it cannot do so in any legally cognizable manner.

3. Subsection 362(a)(6) does not apply because it only stays acts to "recover a claim against the *debtor*." 11 U.S.C. § 362(a)(6) (emphasis added). Here, the Debtor admits that the Derivative Action was filed only against non-debtors, on behalf of a non-debtor. What is more, the Debtor does not argue that there is "such identity between the debtor and the third-party defendants that the debtor may be said to be the real party defendant." *Queenie*, 321 F.3d at 288. Indeed, the Debtor cites no authority in support of this subsection and appears not to press the argument beyond a single mention.

1

4.     Instead, the Debtor emphasizes Section 362(a)(3) in arguing that the Derivative Action amounts to an attempt to "obtain possession of" or "exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The Debtor argues that because the Derivative Action seeks an order requiring Neon to recognize its existing contractual obligations to its outside investors and convert their SAFEs into preferred shares of Neon as those contracts require, the Debtor's controlling equity in Neon will be "jeopardized," and thus the stay applies. Opp. ¶ 34. But "jeopardy" (and there is none based on the Derivative Action) is an insufficient basis to find that an action against a non-debtor amounts to exercising control over estate property sufficient to warrant the stay. The law requires much more than the Debtor's speculation about future events. It requires an immediate and "legally certain" adverse impact; mere jeopardy based on potential future action by third parties is simply insufficient. *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 208 (2d Cir. 2014).

5.     To sidestep the fact that it cannot meet, let alone overcome, the applicable legal standard, the Debtor seeks delay and discovery, including by citing two subpoenas (each annexing 30 requests for production and demanding testimony at the hearing on the Motion of Neon executives, each of whom resides in Seattle, Washington) it emailed to counsel after 9:00 PM Eastern Time on Friday, December 8, 2023. And despite sending the Neon Shareholders correspondence on November 30 that argued that the Derivative Action violated the stay and threatening sanctions, the Debtor now says it needs a sixty-day adjournment, along with extensive discovery, to somehow prove that the stay applies. This is not the law.

6.     What is more, all of the discovery the Debtor now seeks appears to relate solely to its putative need to defend against the Derivative Action, including its claim that the "Network Launch" never occurred. At bottom, the Debtor is seeking to litigate the Derivative Action in this

2

Bankruptcy Court, rather than in the Delaware Chancery Court where Neon's Articles of Incorporation designate, before the question whether the stay even applies is decided.

7. But no discovery, delay, or witness testimony is required to resolve the central questions key to this Court's resolution of the Motion, including whether the issuance of Neon preferred stock results in the possession of estate property. As the Debtor admits, it does not. Thus, whether the automatic stay applies can and should be resolved as a matter of law by the Court, and without its having to grapple with and resolve claims and defenses that are now or should shortly be before the Delaware Chancery Court. Of course, the Director Defendants may still rely on whatever factual and legal defenses they can conjure, but those questions are properly addressed by the Delaware Chancery Court.

8. The Neon Shareholders brought the Motion to address the cloud of the automatic stay the Debtor threatened applied. They did so out of respect for this Court's statutory and equitable authority and so that they may, if the Motion is granted, proceed expeditiously in Delaware Chancery Court to obtain vital relief for the business they founded and operate. The Debtor's main response, after having steered the Neon Shareholders into this forum upon threat of sanctions, is to seek delay and to impose additional costs. But the Court need not seriously contend with either the request for delay or the related discovery the Debtor says it needs to justify the delay. On the contrary, the Court has substantial discretion and abundant legal authority to declare that the automatic stay does not apply or, alternatively, to lift the stay so that the Neon Shareholders can proceed briskly in the Delaware Chancery Court where all of the non-debtor parties, including Neon Shareholders and the Director Defendants, agreed that such a dispute would be resolved.

# ARGUMENT

**I.    The Derivative Action Has No Legally Certain Impact on Debtor and Does Not Violate the Stay.**

9.    Second Circuit authority sets forth a clear dichotomy for deciding whether "actions taken against third parties" adversely impact estate property such that they are stayed pursuant to Subsection 362(a)(3): actions that are "*legally certain*" to "diminish[] or eliminate[]" estate property are stayed, while actions that are merely "*factually likely*" to do so are not. *Picard*, 762 F.3d at 208 (emphases added).

10.    Here, the Debtor relies primarily on *In re 48th Street Steakhouse, Inc.*, 835 F.2d 427 (2d Cir. 1987), but does not explain why that case supports a stay of the Derivative Action. *See* Opp. ¶ 27. Indeed, as explained in the Motion, that case is inapposite because unlike here, the action against the non-debtor (termination of a lease) had the inevitable and immediate legal effect of terminating the debtor's subtenancy. Mot. ¶ 66 (discussing *48th St. Steakhouse*, 835 F.2d at 431). No relief sought by the Neon Shareholders has such an inevitable legal effect on the Debtor.

11.    The following table identifies Second Circuit and other out-of-circuit but persuasive case law showing when an action taken against non-debtors has a legally certain impact on estate property sufficient to trigger the stay (in red) as compared to when it has only a factually likely impact on estate property, at best, such that it does not trigger the stay (in green).

4

| Case | Relief Sought Against Non-Debtor(s) | Effect on Debtor | Did it Violate the Stay? |
|---|---|---|---|
| *In re 48th Street Steakhouse, Inc.*, 835 F.2d 427 (2d Cir. 1987) (cited by the Debtor) | Termination of non-debtor's lease. | Debtor was subtenant of non-debtor; debtor's subtenancy was **immediately destroyed** upon the termination of the non-debtor's lease. | **Yes.** The immediate legal effect of the non-debtor lease termination "inevitably" led to the "destruction" of the debtor's property (the subtenancy). *Id.* at 431. |
| *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199 (2d Cir. 2014) | Recovery of damages through settlements against non-debtor feeder funds affiliated with the debtor (including, *e.g.*, a $50 million settlement). | The amount that the Trustee could recover for the estate through fraudulent conveyance claims against the non-debtor feeder funds was significantly reduced. | **No.** The adverse impact on the debtor's estate was only "factually likely," at best, and not "legally certain," as in *48th Street Steakhouse*. *Id.* at 208. |
| *In re Prudential Lines Inc.*, 928 F.2d 565 (2d Cir. 1991) (cited by the Debtor) | Non-debtor parent sought to take a "worthless stock deduction" | Debtor subsidiary would, as a matter of law, immediately lose its right to carryforward a net operating loss ("NOL") it could use to offset future income. | **Yes.** The Court held that the deduction would "have the legal effect of diminishing or eliminating property of the bankrupt estate," because if the parent took the worthless stock deduction, the debtor would immediately lose its NOL. *Id.* at 574. |
| *Kreisler v. Goldberg*, 478 F.3d 209 (4th Cir. 2007) | Ejectment of non-debtor subsidiary based on overdue rent | Debtor suffered a loss in value of its wholly owned subsidiary, and was unable to sell the underlying property (owned by the subsidiary) at auction. | **No.** The "loss of the property affected only the *value* of [the debtor's] interests," whereas the "nature and extent of [the debtor's] interest" in its subsidiary remained the same. *Id.* at 214–15. |
| *In re Panther Mtn. Land Devel., LLC*, 686 F.3d 916 (8th Cir. 2012) | Action declaring property improvement districts created by debtor to be invalid. | The improvement districts were created specifically for property owned by the debtor; without the districts, the estate property would be less valuable to buyers. | **No.** Nothing in the record showed that the "possible elimination [of the districts] would effectively divest the Debtor of a property interest." *Id.* at 926. |

5

12. In its opposition, the Debtor makes clear that it does not and cannot dispute that the conversion of the SAFEs will not have an immediate legal adverse effect on the Debtor. For example, the Debtor admits that if the SAFEs convert, SAFE holders Griffin and Polychain receive preferred shares of Neon, which they could "then *later* convert . . . into common stock of Neon at any time." Opp. ¶ 18 (emphasis added); *see also id.* ¶ 34 (alleging that at the moment the SAFEs convert to preferred shares in Neon, the Debtor's "controlling equity in Neon becomes *jeopardized*" due to actions Griffin and Polychain could subsequently take (emphasis added)).

13. The Derivative Action seeks to ensure that Neon satisfies its outstanding obligations to its tier-one outside investors, and prevent the ongoing harm being done by the majority of its Board. *See* Mot. Ex. 1 (Verified Complaint) ("**Compl.**") ¶¶ 17, 95–97, 134. No SAFE holders, including Griffin and Polychain, are parties to that action, and nowhere in the Verified Complaint do the Neon Shareholders seek to force any SAFE holders to convert their preferred shares into common. Whatever may happen in the future is pure speculation. But however that speculative future may unfold, there is no reason to believe that the non-party, tier-one investor group will not be guided by the Bankruptcy Code, including the automatic stay. To argue otherwise conflates a whole host of independent decisions and actions that may never occur into a current basis to thwart the Derivative Action that does not presage that result at all. This is not the law.

14. The case law draws a clear line: actions that have the inevitable and immediate result of diminishing estate property are subject to the stay, whereas even a likely future impact on estate property does not. Pursuant to this line, even accepting the Debtor's questionable account of the effects that the Derivative Action could have on it, there is no requested relief sought in the Derivative Action that violates the stay, as the following table shows:

6

| Relief Sought in Delaware Action | Effects on Non-Debtor(s) | Effect on 4D/Debtor | Does it Violate the Stay? |
|---|---|---|---|
| Declaratory/Injunctive Relief recognizing the conversion of the SAFEs to preferred stock | Neon would have to issue preferred stock to the SAFE holders consistent with its contractual obligations; no additional shares of common stock would be issued. | 4D's share of common stock would remain at 60%. According to the Debtor, 4D's controlling equity is "jeopardized" because the SAFE holders could take future action to convert their preferred shares to common and take control of the Board. | **No.** Any effect on 4D's interests in Neon is not a "legally certain" immediate impact; the possibility of future actions by Griffin and Polychain—not parties here—does not trigger the stay. |
| Injunctive Relief restoring Mark Long as CEO of Neon | Neon's founding CEO would be restored to the position he held from its founding through November 13, 2023. | 4D's principal, Cort Javarone, would no longer be "interim CEO" of Neon, but there is no impact on the debtor 4D. | **No.** There is no immediate impact on 4D in any way, let alone a legally certain adverse effect. |
| Compensatory Damages and Attorneys' Fees | Damages assessed against the defendants would be distributed to Neon. | No effect on 4D; only its principal could be liable for damages. | **No.** *See* ECF No. 28 ¶ 58 (cases providing that damages claims against a debtor's principal are not barred by the automatic stay). |

15.    The Fourth Circuit's decision in *Kreisler* is instructive. There, a plaintiff sought the ejectment of a non-debtor that was the wholly owned subsidiary of the debtor, an act that was likely to cause that subsidiary, an asset of the debtor, to lose value. 478 F.3d at 214. The court cited *48th Street Steakhouse* when it observed that an action that "effectively . . . depri[ved] a debtor of an interest in property" violates the stay, as opposed to "merely affecting an asset's value." *Id.* In *Kreisler*, as is the case here, the "nature and extent of [the Debtor's] interest" in Neon "remains unchanged"—the Debtor remains a controlling 60% common stockholder. *Id.* A reduction in value of those shares due to the possibility—or even likelihood—of future action by

7

the SAFE holders does not change the fact that there is no immediate adverse impact. *See also id.* at 214 (noting that courts "have held that an automatic stay does not prevent a non-debtor company from taking an action that might affect the value of a debtor's stock").

16. Moreover, whether or not the SAFE conversion is recognized, the Debtor's interest in Neon always remains subject to the SAFE holders' contractual rights to equity, which they obtained after investing millions of dollars into Neon in September 2021 and early 2023. *See* Mot. ¶¶ 22, 73. Even as holding contractual rights to preferred, the SAFE holders have senior claims over 4D's common stock interests. *See, e.g.*, Haft, Haft & Hudson, Introduction, 2 Venture Cap. & Small Bus. Fin. § 1:1 ("[C]ommon stock is subordinated or 'junior' to the contractual rights represented by preferred stock and debt."). Thus, the Debtor was subject to the risk of future dilution before filing for bankruptcy, as the Debtor was plainly aware, *see* ECF No. 19 at 2 (noting that the Debtor's common stock ownership in Neon was "subject to possible dilution"). As the Debtor admits, the Derivative Action does not change that fact—if the Neon Shareholders obtain their requested relief, the Debtor remains subject to future, not current, dilution of its common stock.

17. None of the other cases cited by the Debtor justify the extension of the stay to the Derivative Action. *See* Opp. ¶ 26. For example, in *Acands, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252 (3d Cir. 2006), the underlying action subject to the stay was against the debtor itself (termination of the debtor's insurance coverage), so there was no question that the stay was triggered. *Id.* at 260. In *In re Gucci*, 126 F.3d 380 (2d Cir. 1997), the court *assumed* that certain actions taken against trademark licensees of the debtor violated the stay, and instead analyzed the separate question (irrelevant to this Motion) of whether those stay violations prevented the violator from being a "good faith purchaser" of estate property. *Id.* at 392. And in *In re Prudential Lines*,

8

the court held that a non-debtor parent should be prevented from taking a "worthless stock deduction" that would have the immediate effect of eliminating the debtor's carryforward net operating loss. 928 F.2d at 574; *see also In re Extraction Oil & Gas, Inc.*, 2020 WL 7074142, at *4 (Bankr. D. Del. Dec. 3, 2020) (holding that claims against non-debtor for tortious interference with contract which directly impacted debtor's contractual relationships were barred by the stay).

18.   In summary, the Debtor fails to identify a legally certain adverse effect on estate property, as required by governing law, and has not cited a single case supporting extension of the stay to the present context. Accordingly, and for the reasons stated in the Motion, the Neon Shareholders respectfully request that the Court hold that the automatic stay does not apply to the Derivative Action.

## II.   This Motion Should Be Resolved Without Further Delay and Discovery.

19.   Lacking any sound legal basis to stay the Derivative Action, the Debtor asserts that "key factual issues . . . remain undeveloped," and thus it needs a 60-day adjournment of the hearing, during which time it intends to pursue document requests, take depositions, and develop witness testimony related to the Derivative Action, such as whether the Network Launch occurred. Opp. ¶¶ 28, 32–35. Setting aside the question whether the request for an adjournment is a mere tactical device, discovery and witness testimony are not required to decide the Motion.

20.   First, a "bankruptcy court is not required to hold any hearing—much less a full evidentiary hearing—on a motion for relief from an automatic stay." *In re Adelphia Commc'ns Corp.*, 2006 WL 1559437, at *5 (S.D.N.Y. June 7, 2006). "Rather, a hearing associated with a motion to lift an automatic stay is meant to be quick and not a drawn-out adversarial affair." *Id.* (holding that bankruptcy court did not err by declining to grant a further evidentiary hearing beyond the first initial hearing). "Congress intended that stay relief litigation be summary in fashion and expeditious in time. This is due in part to the stay being an injunction imposed by the

mere filing of a bankruptcy case, and the recognition that granting stay relief returns the parties to the auspices of a court of competent jurisdiction to determine, on the merits, the relative rights, liabilities and responsibilities of the parties." *In re Escobar*, 457 B.R. 229, 236 (Bankr. E.D.N.Y. 2011).

21.  In light of its clear interest in expediency, Congress imposed a requirement that stay relief motions be heard and determined within thirty days from the filing of the motion, unless the court determines within such thirty days that the party opposing stay relief has demonstrated a "reasonable likelihood" that it will prevail at the conclusion of a final hearing; such a final hearing is to then be held within thirty days thereafter. 11 U.S.C. § 362(e). The Debtor's request for an extension goes well beyond the 30-day period, and it does so in an attempt to turn this expedited proceeding into litigation on the merits of the claims and defenses in the Derivative Action.

22.  Second, the central question on which the Debtor seeks discovery (claiming it must be answered for the Motion to be decided) is whether the "Network Launch" occurred. *See* Opp. ¶¶ 29–30. But this question need not be resolved by this Court at all to resolve this Motion. After the requested delay and discovery, only two answers to that question are possible: (1) the Network Launch occurred, in which case—as the Debtor admits—the immediate result is that the SAFEs will convert into preferred shares of Neon, and it will take additional, independent actions from non-party SAFE holders like Griffin and Polychain to convert those shares into common stock, thus diluting the Debtor's controlling equity. *See* Opp. ¶ 34. As set forth above, this result cannot violate the stay. Or (2) the Network Launch did not occur, in which case, the automatic stay is not triggered because none of the purportedly triggering events claimed by the Debtor would occur. Accordingly, no matter the outcome of the question, the automatic stay is left undisturbed. Neither adjournment nor discovery can impact this logic.

10

23. Third, though Debtor protests that the Neon Shareholders have not submitted sufficient evidence to support their Motion, Debtor does not dispute the validity or authenticity of the documents submitted *with* the Motion, including the SAFEs themselves, the Board resolution approving the SAFEs in substance and form, nor even many of the key allegations of the Neon Shareholders' verified complaint.[2] The Debtor instead mischaracterizes the evidence supporting the Motion. For example, Debtor argues that the "only evidence that the Minority Shareholders offer" to prove the Network Launch occurred (which, again, need not be resolved by this Court) is the letter sent by SAFE holder Griffin. Opp. ¶ 30. This is false. The Verified Complaint lays out, with citation to publicly available evidence accessible online, why the occurrence of the Network Launch cannot be reasonably disputed. Compl. ¶¶ 66–78.

24. Fourth, the Debtor's sole evidentiary support for its position is a declaration that comes *not from* any of the central witnesses on the defense side of the Derivative Action—such as any one of the Director Defendants—but from Ryan Hong, Esq., a partner in the law firm of Michelman & Robinson LLP's mergers and acquisitions group. *See* ECF No. 42-1 ("**Hong Decl.**"). Mr. Hong's claimed qualifications to offer fact testimony consist of having purported to act as outside counsel to Neon's Board for about 2.5 months—beginning when Director Defendant Javarone removed Mark Long from Neon's Board in late August 2023, and until his firm was replaced by the Board on November 13, 2023. Hong Decl. ¶ 1; Compl. ¶ 93. As counsel, Mr. Hong attests that he was "asked to investigate whether a 'Network Launch' had occurred." Hong Decl. ¶ 9. But Mr. Hong was not involved in the negotiation of any SAFEs, has no personal knowledge of the Network Launch, and has no relevant expertise in the blockchain issues related

---

[2] The Debtor argues that the Verified Complaint cannot be relied upon because it "does not include a sworn verification." Opp. ¶ 40. But, as Delaware law requires, each Neon Shareholder filing the Verified Complaint submitted a signed and notarized verification that was filed on the docket. *Mark Long, et al. v. Cort Javarone, et al,* No. 2023-1186-MTZ (Del. Ch. Nov. 27, 2023) (verifications attached to complaint).

to the Network Launch, the video game industry, or any other relevant facts. Mr. Hong professes only to be "Special Counsel" to Neon's Board, hired by the Board after Director Defendant Javarone installed a controlling majority onto the Board. *See* Compl. ¶ 82. He is an outside lawyer hired to investigate and support the Director Defendants' position, not a relevant fact witness capable of offering testimony based on personal knowledge, and is certainly not a qualified expert capable of rendering an opinion that this Court may find appropriate or useful. Accordingly, the Neon Shareholders respectfully request that the Court strike the Hong Declaration or, at minimum, disregard it and/or accord it no weight. *See, e.g.*, *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639 (2d Cir. 1988) (striking affidavit from counsel that was not based on personal knowledge).

25. But there is more. Mr. Hong's lack of understanding, qualifications, and knowledge make it unsurprising that there are numerous errors throughout his declaration. For example, he contends that the generation of tokens on April 29, 2023 was a "*de minimis* test of the Shrapnel subnet system," but this ignores that the April 29 transaction generated **three billion SHRAP tokens**, which were then used soon after by Shrapnel players to create their own "Callsigns," or identification tags for their game play. *See* Compl. ¶ 75. Contrary to Mr. Hong's personal "understanding" (the underlying basis for which is not specified), there was and is abundant publicly available evidence for the occurrence of the Network Launch. *See* Compl. ¶ 73–77.

26. Finally, the Debtor's arguments regarding its subpoenas for documents and witness testimony evince some level of gamesmanship, rather than a legitimate contention that the stay applies. Specifically, the Debtor claims it has "sought to discover and test" the evidence by "attempting to serve Subpoenas upon Mr. Long and Mr. Norbury," but the Neon Shareholders—according to the Debtor—have not "fulfill[ed] their legal obligation to respond to these requests," and have "refused to cooperate or respond, without explanation." Opp. ¶ 33. This is wildly

12

imaginative. In fact, the Debtor omits the key fact that Debtor's counsel first sent the subpoenas to counsel for Mr. Long and Mr. Norbury via email at 9:32 PM Eastern Time, on **Friday, December 8, 2023.** Plainly, there is no obligation to respond to subpoenas that were not properly served and that demand testimony and responses to thirty document requests on four days' notice.

27. Moreover, the Neon Shareholders did not "refuse[] to cooperate, without explanation." On the contrary, counsel for the Neon Shareholders explained to Debtor's counsel that it was improper to demand documents and witness testimony on only a few days' notice. Accordingly, Debtor's requests for discovery should be viewed as little more than tactical devices deployed in service of delay and obfuscation. That discovery is unnecessary to resolve the Motion is clear. That discovery in the Delaware Action can and should be undertaken to resolve the claims and any future defense is equally clear.

### III. Cause Exists to Lift the Stay.

28. In the Motion, the Neon Shareholders showed why, even if the Court were to find that the stay applies, they are entitled to relief from the stay pursuant to the factors set forth in *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990). *See* Mot. ¶¶ 78–88. Eight of the twelve factors weigh in favor of relief from the stay, and four are irrelevant to the analysis. *Id.*

29. The Debtor barely contests much of the Neon Shareholders' weighing of the factors. The Debtor primarily argues that said weighing was based "on the faulty and disputed assumption that the Network Launch occurred." Opp. ¶ 37. Again, that is untrue—the Neon Shareholders are keenly aware that the Director Defendants dispute that Network Launch occurred. But in their view, they are doing so in bad faith, which is why, at least in part, the Derivative Action became necessary. The Motion's weighing of the *Sonnax* factors took that dispute and its need for resolution in Delaware Chancery Court into account. *See* Mot. ¶¶ 80-81. Contrary to the Debtor's

13

Pg 18 of 19

contention, the fact of that dispute does not change, for example, the fact that "the relevant parties" to the Derivative Action "are all non-debtor entities." *See* Opp. ¶ 37 (citing Mot. ¶ 87).

30.  The Debtor also argues that the Neon Shareholders did not "demonstrate[e] any special expertise of the Delaware Chancery Court over this Court to resolve the issues between the parties." Opp. ¶ 39. But the Delaware Chancery Court, as the "preeminent business court" in the country, is where Neon's Articles of Incorporation expressly selected as the venue for any derivative action. *See* Mot. ¶ 82; Compl. ¶ 32.

31.  Because, as the Debtor barely disputes, the *Sonnax* factors weigh heavily in favor of the Neon Shareholders, to the extent the Court determines that the automatic stay applies at all, the Neon Shareholders respectfully request that the Court grant relief from the stay to Neon and the Neon Shareholders and permit the Derivative Action to proceed.

## CONCLUSION

WHEREFORE, the Neon Shareholders respectfully request that the Court enter an order, substantially in the form of the proposed order filed with the Motion (ECF No. 31), and grant such other and further relief as may be just and proper.

Dated: December 12, 2023  Respectfully submitted,

By: /s/ *Todd C. Toral*

JENNER & BLOCK LLP
Todd C. Toral
515 South Flower Street, Suite 3300
Los Angeles, CA 90071
(213) 239-5100
ttoral@jenner.com

Richard Levin
Jacob D. Alderdice
Carl N. Wedoff
1155 Avenue of the Americas
New York, New York 10036
(212) 891-1600
rlevin@jenner.com
jalderdice@jenner.com
cwedoff@jenner.com

*Counsel for Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend, on behalf of Neon Machine, Inc.*

15