**Spence Law Office, P.C.**
Robert J. Spence, Esq. (RS3506)
Attorneys for the Debtors and
Debtors-in-Possession
55 Lumber Road, Suite 5
Roslyn, New York 11576
Tel.:(516) 336-2060

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
In re:

|  |  |
|---|---|
|  | Chapter 11 |
|  | (Subchapter V) |
| 4D Factory, Inc., et al., | Case No.: 23-11618 (MEW) |
|  | (Jointly Administered) |

Debtors. [1]
------------------------------------------------------------X

### THE DEBTORS' CHAPTER 11 PLAN OF REORGANIZATION UNDER SUBCHAPTER V OF CHAPTER 11 OF THE BANKRUPTCY CODE

_____

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number, are 4D Factory Inc. (6770), and The 4D Factory LLC (8935).
.

1

# INTRODUCTION[2]

## SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS

This Chapter 11 Plan of 4D Factory., Inc., et al. (the "Debtors"), under Subchapter V of Chapter 11 of the Bankruptcy Code (the "Plan") is submitted by the Debtors pursuant to Bankruptcy Code §§1189 and 1190. 4D Factory, Inc. ("4D Inc.") and its affiliated Debtor, The 4D Factory, LLC ("4D LLC"), are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Under Bankruptcy Code §§ 1191(c) and (d), the Debtors will fund the Plan payments to creditors utilizing its Disposable Income for a period of one (1) to three (3) years depending on business factors, as noted in the projections annexed hereto as Exhibit A and Exhibit B (the "Projections"). In addition, payments to creditors will be made, as they become available, from Sale of Assets, Loan Refinancing, or recovery from the Causes of Action. Based on the Projections and the other means of implementing the Plan, the Debtors expect to pay the Allowed Claims in full inside of three years.

The Plan provides for payment of Allowed Administrative Expenses, Allowed Priority Claims, including Priority Tax Claims, Allowed Secured Claims, and Allowed Other Priority Claims in accordance with the Bankruptcy Code, and provides for the payment of certain amounts to Allowed Unsecured Claims.

Pursuant to section 1190 of the Bankruptcy Code, this plan provides a discussion of the Debtors': (a) history, business operations, capital structure, events leading to their decline, and their restructuring efforts; (b) liquidation analysis; and (c) ability to satisfy payments proposed under the Plan.

The Plan also provides other pertinent information and details regarding, *inter alia*, the treatment of claims and interest under this Plan and the means for its implementation. Any agreements and documents which are referenced in the Plan are incorporated as if set forth in full therein and will be filed with the United States Bankruptcy Court for the Southern District of New York, as applicable.

This Plan is a contract between the Debtors and all of their creditor constituencies. It provides the mechanism, timing, and details of all treatment and payment of creditor claims. The information contained in this document is designed to provide creditors of the Debtors with information to enable them to make an informed judgment concerning the method by which the Debtors plan to remain a going concern post-Confirmation and provide recoveries to creditors. If

---

[2] Capitalized terms used in this introduction, but not otherwise defined herein, shall have the meanings ascribed to them in the body of the Plan.

the Bankruptcy Court confirms the Plan, it will be binding on the Debtors, their creditors, equity holders, and other interested parties.

The Debtors submit that Confirmation of the Plan will provide the best possible return to holders of Claims against the Debtors and is in the best interests of the Debtors, their creditors and their bankruptcy estates.

***THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE IN FAVOR OF THIS PLAN****.*

### Company Overview

4D Inc. is the New York based affiliate of 4D LLC, the parent company of a group of affiliates engaged in media technology, the video game industry, and marketing and sales of content over mobile payment platforms. Founded in 2017, 4D LLC and their non-debtor affiliates (collectively, the "Company"), inter alia, are engaged in acquiring platforms and applications developed from the Debtors' global sources of deal flow and intellectual property ("IP") to execute a strategy in the mobile industry. 4D Inc. was formed shortly prior to the Petition Date in connection with the Managing Member's relocation to New York, to facilitate capital raising, and in anticipation of a potential bankruptcy filing in the Southern District of New York. 4D Inc. signed the agreement for the Debtors' office location on 57th Street in New York City. 4D LLC maintains an office in Key West, Florida co-located with its principal investor.

### Company History

The parent company, 4D LLC, is structured as a holding company, enabling ownership of IP and assets to be combined and realize enterprise value and multiple liquidity events for the benefit of all stakeholders. 4D LLC acquired a majority stake in the game developer and non-debtor affiliate Neon Media, LLC in 2020, which commenced development of a video game based on branded IP, *Foundation*, now approximately 85% complete, funded with over $5 million by 4D LLC. Throughout 2021, 4D LLC also invested in a project at Neon Media, *Shrapnel*, that was spun out into an affiliate of the Company, Neon Machine in October 2021, maintaining 4D LLC as the majority shareholder, which has since been funded with approximately $28 million by venture capital and other investors.

In 2021, 4D LLC forged a critical partnership with, and signed a contract to acquire, an approximate $500 million mobile technology company, expected to be closed with $275 million in cash plus stock, which 4D LLC then proceeded towards closing based on a firm underwritten loan offer of $315 million plus a written offer from a public single purpose acquisition company ("SPAC") with $268 million in trust. Subsequently the SPAC failed to deliver any capital commitments and instead, acting with others, circumvented 4D LLC, signing a deal in November 2022 with the mobile technology company directly, leading to substantial damages (which 4D LLC started to recover in 2023) based on binding contracts with non-circumvention provisions including liquidated damages. This is a substantial asset to utilize both for repayment of debt and recovery of the substantial damage to 4D LLC.

Following and in response to the aforementioned circumvention, in January 2023, 4D LLC acquired 100% of the equity of UK-based mobile payments company, Centili, Ltd. ("Centili"), now 4D LLC's core operating company.

### The Debtors' Organizational Structure

4D LLC is the Wyoming limited liability parent holding company of three operating companies: Neon Media LLC is a Washington State limited liability company, Neon Machine Inc. is a Delaware corporation and Centili Ltd. Is a United Kingdom limited corporation.

### The Debtors' Business Operations

The Debtors are headquartered in New York, New York. 4D Inc. has a single officer and 4D LLC has two officers and directors, with minimal overhead as all employees are at the operating companies. As noted above, the Company is, through its affiliates, engaged in media technology, the video game industry, and marketing and sales of content over mobile platforms.

#### *THE GAMING BUSINESS (NEON MACHINE INC., NEON MEDIA, LLC)*

In July 2020, 4D LLC acquired the games team that had been laid off by Warner Bros. and their *startup* company, Neon Media, LLC, a WA LLC. Mark Long, the team leader at the time, had pitched 4D LLC that the team would bring valuable entertainment rights and financing prior to signing. At signing, the team in fact brought no rights, games, capital or other value into the Company, and needed approximately $140,000/month to cover overhead (all salaries). In the deal signed, Long agreed to control by 4D LLC as the Manager of a single Manager-managed LLC. 4D LLC committed to invest $2.3 million total into Neon, and also agreed to treat the games team as partners vesting them into a substantial 40% equity stake in the Company (at least twice the typical "acquihire" percentage). 4D LLC ultimately invested over $6 million in Neon Media's team and its projects.

On February 2021, Mr. Long orchestrated the resignation of the entire team from Neon Media en masse to force 4D LLC's hand to (1) fund their first project, *Foundation*, in addition to the funds 4D LLC had committed to invest, before he had raised any project financing to fully fund the budget, (2) to consent to flip the agreed control at Neon Media from 4D LLC control and 60%/40% to the reverse, and (3) to deposit $1.4 million into an account Mr. Long controlled. Thankfully, Mr. Long's plan was prevented shortly after it began by a letter from 4D LLC counsel to the team explaining their duties as members. 4D LLC understood from that moment how precarious it would be trying to govern Mr. Long and his team going forward. This

was a foreshadowing of what is happening now at Neon Machine[3] where the return on investment can best be monetized by 4D LLC for the benefit of all Creditors.

Neon Machine Inc. was a spinout from Neon Media and was created to develop a second project, the blockchain based game *Shrapnel*. 4D LLC is a founding and majority shareholder of the Neon Machine with at least 60% ownership held in Common stock. Full vesting of management units will reduce 4D LLC's stake to 60% by September 2025. 4D LLC controls the Company through 3 of 5 Board seats. $28 million has been invested by third parties as "SAFEs" (simple agreements for future equity), recently closing at a valuation of $70 million for the Company. (See: https://www.axios.com/pro/media-deals/2023/10/25/shrapnel-developer-neon-machine-nets-20m-series-a). Upon conversion of SAFEs to stock based on certain events, 4D LLC's fully diluted stake would be approximately 26%.

Recently, 4D LLC learned of material corporate actions that had been taken throughout 2023 without notice to or approval by the Board, and asserted its control to replace Directors, improve governance and expand information access. 4D LLC is currently enforcing its rights to improve financial controls and governance and taking steps to optimize value at the direction of the Board while awaiting full year 2023 financial information.

*Shrapnel* is an integrated blockchain-based system for "creators" to design and offer for sale virtual assets as NFTs they can monetize to make money from their gameplay, plus a "tokenized" currency known as "SHRAP" that can be exchanged for US$. According to management at Neon Machine, "Neon's [Neon Machine's] present valuation is $70 million and its token market cap exceeds $500 million."[4] 4D LLC owns 480,927,488 SHRAP tokens and the current trading value of a "SHRAP" token is approximately $0.28, making the current market value of 4D LLC's SHRAP token over $134 million. The monthly income from selling a nominal amount of this asset over time, (under 1% of average monthly market volume) are a key source for repayment in the Plan that can retire obligations well ahead of the five-year schedule.


### THE MOBILE CONTENT PLATFORM BUSINESS (CENTILI, LTD.)

100% of Centili, Ltd. was acquired by the 4D LLC in January 2023. Centili, Ltd. is the 4D LLC's core operating company, which was acquired as an alternative platform to execute the 4D LLC's strategy in the Mobile Industry two months after the circumvention of the 4D LLC on its prior deal that led to the large claim referenced above and in the Schedules. Centili's global reach is in fact twice that of the prior acquisition target's.

---

[3] In reaction to the Board of Neon Machine Inc. suspending Mr. Long as CEO, with pay, based on among other things, Mr. Long's failure to cooperate with the Board and acts taken without Board approval, Mr. Long and his team commenced a lawsuit in Delaware on November 27, 2023 against the three (3) Board members appointed by 4D LLC to attempt to wrest control of Neon Machine Inc. from 4D LLC.

[4] This is a sworn statement from the complaint filed by Mr. Long and his team in Delaware on November 27, 2023.

Established in 2012, Centili, Ltd. developed a technology platform enabling content and services to be offered and sold directly to mobile customers with payments bundled into their mobile phone bills, effectively enabling mobile content and services to be distributed through global Telcos. Today, the Company has its payment technology integrated into the systems of approximately 280 Carriers in 80 countries globally, a footprint that is among the largest in the Industry. Coupled with a full suite of related services and capabilities, the Debtors believe Centili, Ltd. offers the most compelling value proposition in the industry. Since the buyout, 4D LLC worked with management to enhance the platform business and rebrand the product and service. In just six months since rolling out the upgraded platform in the market, the pace of deals signed and going to contract with large, "Tier 1" partners, the most coveted contracts in the Industry, proves the new offering is being seen by customers as best-in-class as the Company is winning business competing with much larger rivals. Booked and pipeline business points to revenue from the platform business expanding sharply in 2024 with strong profitability and long-term contracts that will support consistent growth over the next five years and beyond. The revenues from these long-term contracts are a key source of repayment in the Plan.

Additionally, the company is launching distribution of its own licensed products to drive a proven high-margin product business, which the team's historical record demonstrates returns that can be expected to reliably generate cash to service debts and scale the Company.

The Company's capital raise activities (overseen by 4D LLC) are specifically designed to finance working capital to enable Centili to execute highly valuable, long-term exclusive contracts and its direct-to-consumer product business. The Projections attached hereto as Exhibit A for the parent company (4D LLC) are based solely on the former (long-term contracts at Centili) and fund payments under the Plan with as little as $500,000 in new capital closed. (See also, Exhibit B, projections for Centili). An early investor of 4D LLC has committed to fund this amount at Confirmation and has additionally provided $200,000 in financing to Centili since the Petition Date, demonstrating the continued support for the Company by its equity stakeholders. In fact, since June of 2023, $900,000 in capital has been funded to 4D and Centili by equity stakeholders of the Debtors, and this commitment brings the total to $1.4 million invested to support growth.

Following the transition period of 2023, cutting costs, sunsetting legacy unprofitable business, and pivoting to the scalable, proven profitable business lines above, the Company's operating performance is on track from a near $3 million loss in 2022 prior to take-over by 4D LLC (due to heavy investment in the product development that the Company is now monetizing), to a sub-$1 million loss in 2023, to strong profits expected in 2024 while scaling revenues dramatically.

Finally, the Company's proprietary technology platform and contracts, coupled with Debtors' management's expertise and the above traction make it an attractive merger partner. While the Company can clearly grow organically, management may move ahead with one of several M&A deal opportunities on its table in early 2024, that would add substantial positive cash flow to support faster growth, as well as the parent company's Chapter 11 Plan.

### The Debtors' Capital Structure

From 2018 to the present, the Debtors raised over $6 million in equity securities and $4 million in a secured loan between Neon Media, LLC and MEP.   4D LLC guaranteed the obligation to MEP and paid over $1.2 million in interest and fees for Neon's debt service. $4,157,000 in aggregate is owed to retire the debt.  4D LLC pledged all of its assets including its stock and equity interests in Centili, Ltd, Neon Media, LLC and Neon Machine Inc. as collateral for the MEP debt.

In addition, the Debtors have approximately $600,000 in aggregate unsecured non-contingent liabilities in trade payables, counterparty contract claims, and certain employee related claims.

### Circumstances Leading to These Chapter 11 Cases

The Debtors filed their bankruptcy cases primarily due to 4D LLC's inability to resolve the debt owed its secured lender after two years of both growth and acquisition, several opportunities lost due to breach of contract and circumvention, and to protect the assets in which it had invested. 4D LLC holds valuable assets but due to the acquisition and growth and the cash needs of its acquisition, and the unexpected circumvention and loss of related investment capital, 4D LLC was unable to come to terms with MEP and the filing was necessary to preserve assets.   The Debtors' assets consist of ownership of Centilli Limited, a UK company, Neon Media, LLC a Washington company and Neon Machine, Inc. ("NEON") a Delaware company.

### Cost Reduction Initiatives

In an attempt to right-size their financial and operational affairs, the Debtors engaged in a series of cost reduction measures.  These cost reduction efforts are set forth below.

#### *Closing of Offices and Reduction in Force*

In an effort to stabilize its business, the Company closed its offices and ceased its operations in a high rent zone of Miami, FL and co-located at a primary stakeholder's FL office instead. The Debtors corporate office is now on a month-to-month lease arrangement.  As a further component of their cost reduction efforts, the Debtors laid off all officers and consultants with the exception of its Chairwoman and CEO (who are deferring compensation) and instead focusing activities at and supporting the management team of its non-debtor operating companies.  The reductions and Deferrals have reduced 4D LLC's payroll expenses by over $100,000/month.

#### *Miscellaneous Cost Saving Measures*

As a further means of preserving liquidity, the Debtors have terminated all trade services that are not essential to their basic operations.

**Events in the Chapter 11 Cases:**

On October 12, 2023, Charles Persing was appointed the Subchapter V Trustee.

On November 2, 2023, the Bankruptcy Court entered an Order (ECF 16) authorizing the Joint administration of these bankruptcy cases.

On November 27, 2023, the Bankruptcy Court set January 8, 2023 as the deadline for filing claims against the Debtors.

On November 29, 2023, the Bankruptcy Court entered an Order (ECF Doc. No. 25) authorizing the Debtor's retention and employment of Spence Law Office, P.C. as the Debtor's attorney in the Bankruptcy Case.

On December 4, 2023, certain minority shareholders of Neon Machine, Inc. filed a motion (ECF 28) for a declaration that the automatic stay does not apply to the lawsuit they filed in Delaware or, in the alternative, to lift the automatic stay.  After a hearing, the Bankruptcy Court entered an Order (ECF 50) on December 26, 2023 granting limited relief from the automatic stay to allow a narrowed action to proceed subject to the Order not to change the controlling interests at Neon Machine, Inc.

*The Debtors' Plan*

The Debtors' plan is currently focused first on the Projections from its core operating company, Centili Ltd. and from the 4D LLC Projections illustrating the anticipated sales of 4D LLC's *SHRAP* Tokens.  The Debtors have been working with the lender and the Subchapter V Trustee on a consensual plan and the Debtors' plan options are not limited to Centili, as the shares and crypto-currency it owns in Neon Machine alone are valued, respectively, at approximately $19 million based on the last investment round of $20 million that closed in October 2023, and over $130 million based on the current market trading price.  The sale of a portion of 4D LLC's assets in Neon Machine Inc. is proposed as a viable and important additional source under the Plan, chiefly because the asset has a liquid trading market where the value can be monetized on any given day, and it will fund larger monthly payments and complete all plan payments sooner, within one year rather than three years.  Indeed, Secured Creditor MEP was the first to propose, in April 2023, that the Debtor utilize its value in Neon Machine to repay debt; however, in the last four months the value and market to monetize those assets has become far more visible and accessible and it is now possible to do so.

Given the Debtors' are not operating but rather holding companies, their cash position depends on upstream distributions from its operating companies, liquidity events from the sale of shares or assets in those businesses, or investments made by third parties.  The Debtors have been receiving capital investment from Cort Javarone during the bankruptcy cases that have allowed them to sustain operations.  Further, Centili has been financed by $200,000 in loans from Mr. Javarone's management company during this period.

Following substantial business development traction at Centili in the past six months, which saw the number of long-term lucrative platform deals signed more than double with a pipeline to more than double again in 1Q 2024, the conditions are strong to close a new round of growth capital investment, which the Debtors moved last quarter to begin arranging. Currently management is negotiating with multiple parties to fund Centili to scale faster and realize the maximum income and value creation from the deals signed and in the pipeline. Additionally, Centili received a written offer to merge with a public company that values Centili at $65 million at closing, which would also provide permanent long-term capital for growth. Management is confident that the strong execution at Centili will result in closing a meaningful capital round in the near term, in which case the pace of Centili growth and Plan payments shown on the projections attached would accelerate. Nevertheless, the budget shows satisfaction of Plan payments with as little as $500,000 in new funding, which has been committed by a stakeholder of the Debtor.

The Debtors believe that their Disposable Income, Sale of Neon Machine crypto-currency tokens and/or equity, proposed investments in Centili, and pursuit of and recovery from Causes of Action, will provide creditors and stakeholders with a 100% recovery – undoubtedly far greater recoveries than a liquidation. Significantly, as noted above, the Debtors believe that the proceeds generated from any or all of the forgoing options will provide for efficient and meaningful recoveries to holders of Allowed Claims in these Chapter 11 Cases. Allowed Claims will receive a 100% recovery under this Plan.

Accordingly, the Debtors believe that the Plan under any or all of the options outlined herein will maximize the value of the Assets for all parties in interest in these cases.

# ARTICLE I.

# DEFINITIONS AND INTERPRETATION

**Section 1.1**    **Definitions.**

The following terms, when used in this Plan or any subsequent amendments or modifications thereof, and in addition to those terms defined in the text of the Plan, shall have the respective meanings hereinafter set forth.

1.01. Administrative Claim" means any Claim under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation: (a) the actual, necessary costs and expenses incurred by the Debtors after the Petition Date of preserving the Estates or operating the Debtors' business; (b) Allowed Claims pursuant to section 503(b)(9) of the Bankruptcy Code; and (c) any Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court.

1.02. "Administrative Claims Bar Date" means the date that is sixty (60) days after notice of entry of the Confirmation Order is filed with the Bankruptcy Court or such later date as may be established by order of the Bankruptcy Court.

1.03.  "Allowed" with respect to a Claim, means the extent to which a Claim: (a) is not disallowed or expunged by stipulation or Final Order of the Bankruptcy Court; (b) is not objected to within the period fixed by the Plan or established by the Bankruptcy Court, if the Claim (i) was scheduled by a Debtors pursuant to the Bankruptcy Code and the Bankruptcy Rules in a liquidated amount and not listed as contingent, unliquidated, or disputed, or (ii) was timely filed (or deemed timely filed) pursuant to the Bankruptcy Code, the Bankruptcy Rules, or any applicable orders of the Bankruptcy Court; (c) for which an objection has been filed, but such objection has been withdrawn or determined by a Final Order (but only to the extent such Claim has been allowed); (d) determined to be valid by the Debtors; or (e) is otherwise allowed by Final Order, including, without limitation, the Confirmation Order, after notice and a hearing.  A proof of Claim that is not timely filed (or not deemed timely filed) shall not be "Allowed" for purposes of distribution or voting under the Plan.

1.04.  "Assets" means all assets of the Debtors of any nature whatsoever, including, without limitation, all property of the Estates pursuant to section 541 of the Bankruptcy Code, Cash (including any Sale Proceeds, if applicable), Causes of Action, stock and equity ownership in affiliates and subsidiaries, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and proceeds of all of the foregoing.

1.05.  "Asset Financing" means any financing to provide working capital secured by the Debtors or Reorganized Debtors, as applicable, for any or all of their Assets.

1.06.  "Asset Financing Proceeds" means the cash proceeds deriving from an Asset Financing transaction.

1.07.  "Asset Financing Transaction" means, collectively, the various transactions contemplated under an Asset Financing agreement to effectuate a financing of any or all of the Debtors' Assets.

1.08.  "Asset Purchase Agreement" means an Asset Purchase Agreement for the sale of any or all of the Debtors' Assets between the Debtors and any Buyer, together with all exhibits, appendices, supplements, documents, and agreements ancillary thereto, in each case as amended, modified, or supplemented from time to time.

1.09.  "Assigned Contracts" means any executory contracts and unexpired leases assumed by the Debtors and assigned to any Buyer pursuant to the Confirmation Order and/or an Asset Purchase Agreement.

1.10.  "Assumption Schedule" means the schedule of Executory Contracts, which shall include proposed Cure Amounts, as such schedule may be amended, modified, or supplemented from time to time by the Debtors.

1.11.  Available Cash" means, (i) any Cash Distributions held in the Disputed Claims Reserve Account for the benefit of a holder of a Disputed Claim, which is subsequently Disallowed, in whole or in part; (ii) any *de minimis* Distributions; (iii) any amount represented by an undeliverable Distribution; or (iv) any voided checks.

1.12. "Bankruptcy Code" means title 11 of the United States Code, as amended, in effect and applicable to the Chapter 11 Cases concerning the Debtors.

1.13. "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York or such other court having jurisdiction over the Chapter 11 Cases.

1.14. "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court of the United States, as amended, in effect and applicable to the Chapter 11 Cases.

1.15. "Bar Date" means (i)January 8, 2024, the date fixed by the Bankruptcy Court as the last date by which all Persons and entities must have filed proofs of claim against the Debtors and (ii)April 8, 2024, the date fixed by the Bankruptcy Court as the last date by which all governmental entities must have filed proofs of claim against the Debtors, unless the Bankruptcy Court has set a different date by which a specific Creditor must file a proof of Claim, in which case it means, for the specific Creditor, such different date set by the Bankruptcy Court in the order approving such Bar Date or otherwise.

1.16. "Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are required or authorized by law to be closed.

1.17. "Buyer" means any prospective purchaser who enters into an asset purchase agreement approved by the Bankruptcy Court for the purchase of any or all of the Debtors' assets.

1.18. "Cash" means cash and cash equivalents in U.S. dollars.

1.19. "Causes of Action" means any and all Claims, rights, actions, choses in action, suits, causes of action, Liens, judgments and damages belonging to the Debtors or their Estates and any and all liabilities, obligations, covenants, undertakings and debts owing to the Estates, whether arising prior to, or after, the Petition Date and in each case whether known or unknown, in law, equity or otherwise, including, without limitation, receivables and those Claims and actions to avoid or recover pre-petition or post-petition transfers of money or property pursuant to applicable bankruptcy and non-bankruptcy law.  Causes of action include but are not limited to the breach of contract claims listed in the Debtors' Schedules against Gamemine LLC and Gamemine Europe ($3.4MM claim per Debtors' Schedules) and Goal Acquisitions Sponsor Corp. et al., ($100MM claim per Debtors' Schedules).

1.20. "Chapter 11 Cases" means the cases commenced by the Debtors on October 10, 2023 under subchapter V of chapter 11 of the Bankruptcy Code, jointly administered under case number 23-11618 (MEW).

1.21. "Claim" means: (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

1.22. "Claims Reconciliation Process" means the process to reconcile all Claims asserted against the Debtors with the Debtors' books and records, including any objections to Claims filed by the Debtors, which the Debtors will commence immediately after the Bar Date.

1.23. "Class" means a category of Claims or Interests described in Article II hereof.

1.24. "Collateral" means any property or interest in property of the Estates subject to an unavoidable Lien to secure the payment or performance of a Claim.

1.25. "Confirmation" means the Bankruptcy Court's confirmation of the Plan in accordance with section 1129 of the Bankruptcy Code.

1.26. "Confirmation Date" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket corresponding to the Chapter 11 Cases.

1.27. "Confirmation Hearing" means the hearing held by the Bankruptcy Court, as it may be continued from time to time, to consider Confirmation.

1.28. "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan, or any amendment thereto, pursuant to section 1129 of the Bankruptcy Code, and any findings of fact and conclusions of law contained in the Confirmation Order or a separate document entered substantially contemporaneously therewith.

1.29. "Creditor" means any Person who: (a) holds a Claim against the Debtors that arose prior to the Petition Date; (b) holds a Claim against the Debtors, which arose after the Petition Date, other than an Administrative Claim of the type specified in Bankruptcy Code section 503(b); or (c) holds a Claim against the Debtors of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i).

1.30. "Cure Amounts" means any amount the Debtors believe is required to be paid pursuant to section 365(b) of the Bankruptcy Code to cure any defaults under the Assigned Contracts listed on an Assumption Schedule.

1.31. "Disallowed" means, when referring to a Claim or Interest, a Claim (including a claim listed by the Debtors in their Schedules) or Interest, or any portion of a Claim or Interest, which has been disallowed or expunged by a Final Order.

1.32. "Disposable Income" shall have the meaning given to it in Bankruptcy Code § 1191(d), as projected and set forth in Exhibit A.

1.33. "Disputed Claim" means a Claim that is not an Allowed Claim nor a disallowed Claim, and is any Claim, proof of which was filed, or an Administrative Claim or other unclassified Claim, which is the subject of a dispute under the Plan or as to which Claim the Debtors or Reorganized Debtors, as applicable, have interposed a timely objection and/or a request for estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018 or other applicable law, which dispute, objection, and/or request for estimation has not been withdrawn or determined by a Final Order, and any Claim, proof of which was required to be filed

by order of the Bankruptcy Court, but as to which a proof of claim was not timely or properly filed (or deemed timely or properly filed).

1.34. "<u>Disputed Claims Reserve</u>" means an appropriate reserve to be established and administered by the Debtors or Reorganized Debtors, as applicable.

1.35. "<u>Distribution</u>" means any distribution made pursuant to the terms of this Plan.

1.36. "<u>Distribution Address</u>" means the address set forth in the applicable proof of claim, as such address may have been updated pursuant to Bankruptcy Rule 2002(g).  If no proof of claim is or has been filed with respect to a particular Claim, "Distribution Address" means the address set forth in the Debtors' Schedules, as such address may have been updated pursuant to Bankruptcy Rule 2002(g).

1.37. "<u>Distribution Date</u>" means any date on which a Distribution is made to holders of Allowed Claims under this Plan, or as otherwise agreed.  The first Distribution shall occur on or as soon as practicable after the Effective Date or as otherwise agreed by the Debtors or Reorganized Debtors, as applicable.  Subsequent Distributions shall occur as soon after the first Distribution Date as the Debtors or Reorganized Debtors, as applicable, shall determine, but with such final Distribution Date occurring approximately one year and one month after the Effective Date.

1.38. "<u>Effective Date</u>" means the Date on which this Plan shall take effect, which date shall be a Business Day on or after the Confirmation Date on which all conditions precedent to the effectiveness of the Plan specified in Article IX, have been satisfied, or, if capable of being waived, waived, which date shall be specified in a notice filed by the Debtors.

1.39. "<u>Encumbrances</u>" means, collectively, any and all security interests, Liens, pledges, Claims, levies, charges, escrows, encumbrances, options, rights of first refusal, transfer restrictions, conditional sale contracts, title retention contracts, mortgages, hypothecations, indentures, security agreements or other agreements, arrangements, contracts, commitments, understandings or obligations of any kind whatsoever, whether written or oral.

1.40. "<u>Estates</u>" means the Debtors' estates created pursuant to section 541 of the Bankruptcy Code upon the Petition Date.

1.41. "<u>Excluded Assets</u>" means the Assets of the Debtors excluded from the Sale, with the meaning ascribed to such term in an Asset Purchase Agreement.

1.42. "<u>Exculpated Parties</u>" means each of the following in its capacity as such, and only in its capacity as such: (a) the Debtors' Professionals, advisors, attorneys, Representatives, officers, trustees, employees (acting in such capacity), and directors; (b) the Trustee; and (c) Buyer (if any), its Affiliates, and its and their respective professionals, advisors, attorneys, representatives, directors, managers, officers, employees, managers, principals, members, agents, consultants, equity holders (regardless whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns.

1.43. "Fee Claim Deadline" means the deadline for all Professionals or other Persons to file an application for final allowance of compensation and reimbursement of Professional Fee Claims for services rendered before the Effective Date, which deadline shall be the date which is thirty (30) days after the Effective Date or sixty (60) days from entry of the Confirmation Order, whichever is greater.

1.44. "Fee Application" means the final fee application and/or an application for payment of reasonable fees and expenses filed under section 503(b) of the Bankruptcy Code by any parties seeking payment of Professional Fee Claims and/or reimbursement of expenses, as applicable, which shall be filed in accordance with Section 4.2(c)(ii) hereof.

1.45. "Final Order" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending; *provided, however*, if an appeal, or writ of certiorari, reargument or rehearing thereof has been filed or sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, further, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.46. "General Unsecured Claim" means a Claim that is not an Administrative Claim, a Professional Fee Claim, a Priority Tax Claim, or a Secured Claim.

1.47. "Guarantors" means The 4D Factory LLC and _____.

1.48. "Impaired" means any Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.49. "Interest" means the rights and interests as of the Petition Date of any Person in the Debtors.

1.50. "Lien" means any charge against, security interest in, Encumbrance upon, or other interest in property to secure payment of a debt or performance of an obligation

1.51. "Person" means any individual, corporation, partnership, association, joint venture, limited liability company, limited liability partnership, estate, trust, unincorporated organization or governmental unit or subdivision thereof or other entity.

1.52. "Petition Date" means October 10, 2023, the date the Debtors filed their voluntary petitions for relief under subchapter V of chapter 11 of the Bankruptcy Code.

1.53. "Plan" means this chapter 11 plan and any exhibits annexed hereto and any documents delivered in connection herewith, as the same may be amended or modified from time to time by

any duly authorized amendment or modification pursuant to section 1190, 1191 and 1129 of the Bankruptcy Code and the Bankruptcy Rules.

1.54.    "Plan Implementation Transactions" means the Reorganization, Asset Sale, Asset Financing, pursuit of and recovery from Causes of Action, and other transactions designed to implement the Plan as described in Article IV.E of the Plan.

1.55.    "Plan Implementation Proceeds" means that portion of Sale Proceeds, Asset Financing Proceeds, or recovery from Causes of Action, which are reserved for making distributions under the Plan.  For all such transactions, the Plan Implementation Proceeds shall be equal to the following percentages of net proceeds of all closed transactions as follows:

> The lesser of 75% or the payoff amount of Allowed Claim balance wherein the net proceeds realized by the Debtors or the Reorganized Debtors are between $200,000 and $5.5MM;

1.56. "Plan Proponent" means the Debtors.

1.57. "Plan Supplement" means any documents, agreements, schedules, and exhibits, specified in this Plan, to be filed with the Bankruptcy Court no later than seven (7) days prior to the Voting Deadline, provided that the Debtors may amend such Plan Supplement at any time prior to the Confirmation Hearing.

1.58. "Priority Claims" means all Priority Non-Tax Claims and Priority Tax Claims.

1.59. "Priority Non-Tax Claim" means a Claim or a portion of a Claim, which is entitled to priority under section 507(a) of the Bankruptcy Code, other than Administrative Claims and Priority Tax Claims.

1.60. "Priority Tax Claim" means a Claim or a portion of a Claim, which is entitled to priority under sections 502(i) or 507(a)(8) of the Bankruptcy Code.

1.61. "Pro Rata" means, at any time, the proportion that an Allowed Claim bears to the aggregate amount of all Claims in a particular Class at such time, including Disputed Claims at such time (a) as calculated by the Debtors on or before any Distribution Date; or (b) as determined or estimated by the Bankruptcy Court.

1.62. "Professionals" means an entity (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327 and 363 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

1.63. "Professional Fee Claims" means any Claim of (a) a Professional, retained in the Chapter 11 Cases, pursuant to sections 327 and 363 of the Bankruptcy Code for compensation or reimbursement of costs and expenses relating to services incurred after the Petition Date, but prior to and including the Effective Date, when and to the extent any such Claim is Allowed by the

Bankruptcy Court pursuant to sections 329, 330, 331, and 503(b) of the Bankruptcy Code, or (b) a Person seeking compensation and reimbursement pursuant to section 503(b)(4) of the Bankruptcy Code.

1.64. "Released Party" means each of the following in their capacity as such, and only in their capacity as such: (a) the Debtors' officers, directors, Professionals, advisors, attorneys, and Representatives; (b) the Trustee.; and (c) [if applicable] the Buyer, its Affiliates, and its and their respective professionals, advisors, attorneys, representatives, directors, managers, officers, employees, managers, principals, members, agents, consultants, equity holders (regardless whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns.

1.65. "Reorganized Debtors" means the Debtors, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date.

1.66. "Representative" means any person who is authorized to act on behalf of another.

1.67. "Sale" means the transaction between the Debtors or Reorganized Debtors, as applicable, and prospective Buyer(s) pursuant to which the Debtors or Reorganized Debtors, as applicable, are selling any or all of their Assets to the Buyer(s) free and clear of all Liens, Claims, Interests and Encumbrances pursuant to section 1123(a)(5) of the Bankruptcy Code, as set forth in the Confirmation Order and any Asset Purchase Agreement.

1.68. "Sale Proceeds" means the cash proceeds deriving from an Asset Purchase Agreement.

1.69. "Sale Transaction" means, collectively, the various transactions contemplated under an Asset Purchase Agreement to effectuate a Sale.

1.70. "Schedules" means the Schedules of Assets and Liabilities and Statement of Financial Affairs for the Debtors filed by the Debtors with the Bankruptcy Court on November 13, 2023, pursuant to Bankruptcy Rule 1007, and any amendments thereto.

1.71. "Secured Claim" means a Claim secured by a Lien on any Asset of the Debtors, or right of setoff, which Lien or right of setoff, as the case may be, is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non bankruptcy law, but only to the extent of the value, pursuant to section 506(a) of the Bankruptcy Code, of any interest of the holder of the Claim in property of the Estates securing such Claim.

1.72. "Secured Creditor" means MEP Capital Holdings III, L.P..

1.73. "Trustee" means Charles Persing, the trustee appointed under subchapter V of title 11 of the Bankruptcy Code by the United States Trustee for Region 2.

1.74. "U.S. Trustee" means the United States Trustee for Region 2.

1.75. "Unclassified Claims" means Administrative Claims and Priority Tax Claims

1.76.  "Voting Deadline" means [_____, 2024 at 5:00 p.m. (Eastern)], the deadline established for holders of Claims to deliver a ballot to accept or reject this Plan relating to the solicitation of votes with respect to this Plan.

**Section 1.2    Rules of Interpretation and Time Periods.**

Unless otherwise specified, all section, article, and exhibit references in the Plan are to the respective section in, article of, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. Words denoting the singular number shall include the plural number and vice versa, as appropriate, and words denoting one gender shall include the other gender.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**Section 1.3    Application of Definitions and Rules of
                Construction Contained in the Bankruptcy Code.**

Words and terms defined in section 101 of the Bankruptcy Code shall have the same meanings when used in the Plan unless a different definition is given in the Plan.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.

**Section 1.4    Other Terms.**

The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.

## ARTICLE II. CLASSIFICATION OF CLAIMS AND INTERESTS

**Section 2.1    Classification and Treatment Generally**

Pursuant to sections 1122, 1123 and 1190 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests which are placed in a particular Class for  all purposes under the Plan, as set forth herein.

**Section 2.2 Unclassified Claims - Administrative Claims and Priority Tax Claims**.

As provided by section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims shall not be classified under the Plan and shall instead be treated separately as Unclassified Claims on the terms set forth in Article IV of the Plan.

**Section 2.3    Criterion of Class.**

A Claim is in a particular Class only to the extent that the Claim qualifies within the description of that Class and is in a different Class to the extent that the remainder of the Claim qualifies within the description of the different Class.

**Section 2.4    Debtors Claims and Interests.**

The Classes of Claims against and Interests in the Debtors shall be:

(a)    **Class 1 –Secured Claims.**

The Class 2 Claims shall consist of the Secured Claims against the Debtors

(b)    **Class 2 – Priority Non-Tax Claims.**

The Class 2 Claims shall consist of the Priority Non-Tax Claims against the Debtors.

(c)    **Class 3 – General Unsecured Claims.**

The Class 3 Claims shall consist of the General Unsecured Claims against the Debtors.

(d)    **Class 4 – Interests.**

The Class 4 Interests shall consist of all Interests in the Debtors.

## ARTICLE III. IDENTIFICATION OF IMPAIRED CLAIMS AND INTERESTS UNDER THE PLAN

**Section 3.1    Impaired Classes of Claims.**

There are no impaired Classes under the Plan.

**Section 3.2    Impairment Controversies.**

If a controversy arises as to whether any Claim or Interest, or any Class of Claims or Interests, is Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

## ARTICLE IV.

## SUBCHAPTER V PLAN CONFIRMATION REQUIREMENTS

Subchapter V of chapter 11 of the Bankruptcy Code requires that the Debtors provide their creditors with sufficient information to analyze the Plan in order to make an informed decision regarding their vote on the Plan.

Pursuant to sections 1129, 1190 and 1191 of the Bankruptcy Code, the Bankruptcy Court must find that:

- the Plan satisfied the "***best interest of creditors test***" – requiring that creditors receive more under the Plan they would if the Debtors were liquidated under chapter 7 of the Bankruptcy Code;

- the Plan is "***fair and equitable***" – requiring that the Plan must provide distributions to creditors greater than the liquidation value of the Debtors' Estates and no less than the projected "Disposable Income" of the Debtors, as defined in section 1191(d) of the Bankruptcy Code over a certain commitment period; and

- the Debtors will be, or are reasonably likely to be, able to make the payments promised under the Plan – or that the Plan is feasible.

To satisfy these requirements, the Plan provides projections, and a liquidation analysis.

**Section 4.1    Best Interest of Creditors - Liquidation Analysis.**

Pursuant to section 1129(a)(7) of the Bankruptcy Code, for this Plan to be confirmed, each creditor must either have voted to accept the Plan (or be deemed to have accepted this Plan), or this Plan must provide for each creditor to receive at least as much as it would as of the Effective Date if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date. A detailed liquidation analysis prepared by the Debtors with the assistance of their advisors is set forth in Exhibit C to this Plan. The liquidation analysis provides a listing and analysis of all of the Debtors' assets and liabilities. The Debtors and their advisors have concluded that a liquidation of the Debtors' assets would result in a risk of achieving a recovery of $4.5 million or less for the satisfaction of the Allowed Claims which would result in a 0% distribution to general unsecured creditors.  The assumptions for the liquidation analysis are contained in Exhibit C.

**Section 4.2    The Plan is Fair and Equitable**

Pursuant to section 1191(c) of subchapter V of the Bankruptcy Code, the Debtors' plan must provide a payout to creditors of all of the Debtors' disposable income over a 3 to 5 year commitment period ("Disposable Income"). Accordingly, as its first option to implement the Plan, the Debtors will fund the Plan payments to creditors utilizing its Disposable Income for a period of three (3) years as reflected in the projections annexed hereto as Exhibits A and B (the "Projections").  Based upon the analysis prepared by the Debtors with the assistance of their advisors, the Debtors' projected Disposable Income post Effective Date over a 3-year period is more than the sum total of the Allowed Claims against the Debtors' estates and therefore, is sufficient to fund the Plan. This analysis is contained at Exhibit A to this Plan. For the Plan to be confirmed, the Debtors must provide creditors with a distribution that is more than the Liquidation Value. Sections 1191(c)(2)(A) and (B) of the Bankruptcy Code allow the Debtors to make distributions over a period of between 3 to 5 years under a plan. Section 1191(c)(2)(A) also authorizes a debtor to make a lump sum payment that is equal to the present value of what would be the multi-year distribution.

The Plan provides for distributions to creditors greater than the Liquidation Value. The Plan provides a distribution to creditors that is a multiple of the Liquidation Value.

Under the Bankruptcy Code, the Debtors can confirm the Plan in one of two ways: (i) on a consensual basis under sections 1191(a) and 1129(a) of the Bankruptcy Code—this requires that the unsecured creditors in Class 3 vote in favor of the Plan by at least 2/3 in dollar amount and more than 1/2 in number of the Allowed Claims in the Class; or (ii) on a non-consensual basis under section 1191(b) of the Bankruptcy Code—under this section the Plan would be confirmed under the "cram down" provisions of the Bankruptcy Code. In either case, the Debtors are able to satisfy the requirement of section 1129(a)(8) of the Bankruptcy Code because there are no impaired Classes under the Plan.

**Section 4.3**     **Plan Feasibility.**

Sections 1191(c)(3)(A)(i) and (ii) of the Bankruptcy Code require that the Debtors "be able to make all payments under the plan; or that there is a reasonable likelihood that the debtor will be able to make all payments under the plan." The Plan satisfies these requirements. As discussed herein, the Debtors or Reorganized Debtors, as applicable, intend to fund the monthly distributions under the Plan primarily by utilizing the Disposable Income generated from Centili, Ltd., and from monthly sales of a liquid asset - currency it holds that is associated with the game platform at its operating subsidiary Neon Machine backstopped by funding, as and when such funding occurs, from Plan Implementation Proceeds from Sale of other Assets, Asset Financing, or recovery from the Causes of Action.   Under the Plan, sufficient funds exist to pay all Allowed Priority and Administrative Claims and Secured Claims in full as required by the Bankruptcy Code in monthly payments from Disposable Income, as further supplemented by the aforementioned Sale of Assets, other Financing, or recovery from the Causes of Action.

SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1193 OF THE BANKRUPTCY CODE, FEDERAL RULE OF BANKRUPTCY PROCEDURE 3019 AND THIS PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE, OR WITHDRAW THIS PLAN PRIOR TO ITS EFFECTIVE DATE.

**ARTICLE V.**

**PROVISIONS FOR TREATMENT OF UNCLASSIFIED
CLAIMS UNDER THE PLAN**

**Section 5.1**     **Unclassified Claims.**

As set forth below, the Administrative Claims and Priority Tax Claims shall be treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively.

**Section 5.2** **Treatment of Administrative Claims.**

       (a)     _Allowance of Administrative Claims_.  An Administrative Claim is defined

in the Plan and means any Claim under sections 503(b) and 507(a)(2) of the Bankruptcy Code including, without limitation, (a) the actual and necessary post-petition costs and expenses incurred by the Debtors in preserving the Estates or operating their business, (b) Allowed Claims pursuant to section 503(b)(9) of the Bankruptcy Code, and (c) any Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a final order of the Bankruptcy Court.

(b)     Payment of Allowed Administrative Claims.  Subject to the Bar Date and other provisions in the Plan and except to the extent the Debtors and the holder of an Allowed Administrative Claim agree to different and less favorable treatment, the Debtors shall pay, in full satisfaction and release of such Claim, to each holder of an Allowed Administrative Claim, Cash, in an amount equal to such Allowed Administrative Claim, on the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date on which such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable.

(c)     Administrative Bar Date.

(i)     General Provisions.   Except as provided below for Professionals requesting compensation or reimbursement for Professional Fee Claims, requests for payment of Administrative Claims must be filed no later than sixty (60) days after notice of entry of the Confirmation Order is filed with the Bankruptcy Court or such later date as may be established by order of the Bankruptcy Court. Holders of Administrative Claims who are required to file a request for payment of such Claims and who do not file such requests by the Administrative Claims Bar Date, shall be forever barred from asserting such Claims against the Debtors or Reorganized Debtors, as applicable, or their respective property, and the holder thereof shall be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, or recover such Administrative Claim.

(ii)     Professionals. All Professionals or other Persons requesting compensation or reimbursement of Professional Fee Claims for services rendered before the Effective Date (including compensation requested by any Professional or other entity for making a substantial contribution in the Chapter 11 Cases) shall file an application for final allowance of compensation and reimbursement of expenses no later than the Fee Claim Deadline. Objections to applications of Professionals or other entities for compensation or reimbursement of expenses must be filed no later than twenty-one (21) days after any such application is filed. All compensation and reimbursement of expenses allowed by the Bankruptcy Court shall be paid by the Debtors or Reorganized Debtors, as applicable, to the applicable Professional or other entities requesting compensation or reimbursement of Professional Fee Claims as soon as is practicable after any such Professional Fee Claims are Allowed.  Each

21

Professional or other Person that intends to seek payment on account of a Professional Fee Claim shall provide the Debtors with a statement, by no later than three (3) days after entry of the Confirmation Order, of the amount of estimated unpaid fees and expenses accrued by such Professional up to the date of such statement, the amount of fees and expenses that each such Professional expects to incur from such date through the Effective Date, and the amount of fees and expenses that each such Professional expects to incur from such date in connection with the preparation and prosecution of each such Professional's Fee Application. For the avoidance of doubt, the estimate included in such statement shall not be a cap and any amount that exceeds the estimate shall still be treated as a Professional Fee Claim payable to such Professional.

**Section 5.3**    **Treatment of Priority Tax Claims.**

Subject to the Bar Date and other provisions in the Plan and except to the extent the Debtors and the holder of an Allowed Priority Tax Claim agree to different and less favorable treatment, the Debtors or Reorganized Debtors, as applicable, shall pay, in full satisfaction and release of such Claim, to each holder of an Allowed Priority Tax Claim, Cash, in an amount equal to such Allowed Priority Tax Claim, on the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable.  Allowed Priority Tax Claims shall be paid in Cash.

**PROVISIONS FOR TREATMENT OF CLASSIFIED CLAIMS<br>AND INTERESTS UNDER THE PLAN**

**Section 5.4**    **Treatment of Classified Claims and Interests.**

The Classes of Claims against and Interests in the Debtors shall be treated under the Plan as follows:

    (a)    **Class 1 –Secured Claims - MEP.**

Secured Claims consist of any Claim secured by a Lien on any Asset of the Debtors, or right of setoff, which Lien or right of setoff, as the case may be, is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, but only to the extent of the value, pursuant to section 506(a) of the Bankruptcy Code, of any interest of the holder of the Claim in property of the Estates securing such Claim. Holders of Allowed Claims in Class 1 are unimpaired under the Plan.  Each holder of an Allowed Secured Claim is deemed to have conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code and is therefore not entitled to vote to accept or reject the Plan in its capacity as a holder of such Claim.

Provided that the holder of a Class 1 Claim has not yet been paid, on the later of (i) the Effective Date and (ii) for Claims in Class 1 that were Disputed Claims on the Effective Date and have thereafter become Allowed Secured Claims, immediately following the date upon which such Claims became Allowed Secured Claims, or as soon thereafter as is practicable, holders of each such Allowed Secured Claim shall receive (a) equal monthly payments over a term of sixty (60) months at the non-default rate under the promissory note(s), with such payments supplemented by Plan Implementation Proceeds, or (b) such other treatment as may be agreed upon by the Debtors and the holder of such Allowed Secured Claim, or as may otherwise be provided in the Bankruptcy Code.

MEP shall retain its lien(s) until its Allowed Secured Claim is paid in full under the Plan, however, as and when Plan Implementation Transactions close, MEP shall release its lien(s) in part to facilitate such transactions which are directly related to assets secured by MEP's lien(s) and which require the release of such lien(s).

### (b)    Class 2 -  Priority Non-Tax Claims

Priority Non-Tax Claims consist of any Claim afforded priority under section 507(a) of the Bankruptcy Code that is not an Administrative Claim or Priority Tax Claim.  Each holder of an Allowed Priority Non-Tax Claim is deemed to have conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code and is therefore not entitled to vote to accept or reject the Plan in its capacity as a holder of such Claim.

Provided that the holder of a Class 2 Claim has not yet been paid, on the later of (i) the Effective Date and (ii) for Claims in Class 2 that were Disputed Claims on the Effective Date and have thereafter become Allowed Priority Non-Tax Claims, immediately following the date upon which such Claims became Allowed Priority Non-Tax Claims, or as soon thereafter as is practicable, holders of each such Allowed Priority Non-Tax Claims shall receive (a) Cash in an amount not to exceed the amount of such Allowed Priority Non-Tax Claim or (b) such other treatment as may be agreed upon by the Debtors and the holder of such Allowed Priority Non Tax Claim, or as may otherwise be provided in the Bankruptcy Code.

### (c)    Class 3 - General Unsecured Claims.

General Unsecured Claims consist of any Claim that is not a Non-Tax Priority Claim,  an Administrative Claim, a Professional Fee Claim, a Priority Tax Claim, or a Secured Claim.  The Class 3 Allowed Claims are estimated to total approximately $500,000. The holders of Allowed Class 3 Claims will receive their distributions from Disposable Income over the life of the Plan (60 months) payable in monthly or quarterly payments at the discretion of the Reorganized Debtors, and from Plan Implementation Proceeds after payment in full of Allowed Administrative Expense Claims, the Priority Tax Claim, and Allowed Secured Claims.  Holders of Class 3 Claims will receive distributions equal to 100% of their Allowed Claims.  Holders of Claims in Class 3 are not Impaired.  Each holder of General Unsecured Claim is  conclusively presumed to accept

the Plan under section 1126(f) of the Bankruptcy Code and is therefore not entitled to vote to accept or reject the Plan in its capacity as a holder of such Claim.

      (d)    **Class 4 – Interests.**

Class 4 consists of the holders of the equity interests in the Debtors. The holder of the Class 4 Interest will receive no distributions under the Plan on account of equity interest in the Debtor. However, holders of Interests will retain their equity interest in the Debtors after the confirmation of the Plan. Holders of the Class 4 Interest are unimpaired under the Plan and are deemed to accept the Plan.

**Section 5.5**    **Reservation of Rights Regarding Claims.**

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors or Reorganized Debtors, as applicable, rights, defenses, and counterclaims, both legal and equitable, with respect to any Claims, including, but not limited to, all rights of setoff or recoupment.

# ARTICLE VI.

## ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR INTERESTS

**Section 6.1**    **Classes Entitled to Vote.**

There are no impaired classes under the Plan.

**Section 6.2**    **Class Acceptance Requirement.**

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan.

# ARTICLE VII.

## IMPLEMENTATION OF THE PLAN

**Section 7.1**    **Implementation of the Plan.**

The Debtors or the Reorganized Debtors, as applicable, shall fund distributions under the Plan with Cash on hand and Disposable Income generated by the operation of the Reorganized Debtor. Cash payments to be made pursuant to the Plan will be made by the Disbursing Agent.

Each distribution and issuance referred to the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance; provided, that to the extent that a term of the Plan conflicts with the term of any such instruments or other documents, the terms of the Plan shall govern. The Confirmation Order shall and shall be deemed to, pursuant to sections 1123, 1141 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to begin making payments to Allowed Claims from Disposable Income in accordance with the Plan and to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Plan Implementation Transactions.

## Section 7.2    Plan Implementation Transactions.

Before, on, and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall, among other things, enter into any transaction, and shall take any action as may be necessary or advisable to effectuate the Plan Implementation Transactions or any other transaction or action contemplated herein, including, to the extent applicable  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and Plan Supplement; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other organizational documents pursuant to applicable law; (4) the execution and delivery of any certificates or articles of incorporations, by-laws, or such other applicable analogous formation or shareholder documents (if any) of the Reorganized Debtors (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); (6) the execution and consummation of the Ace Settlement and resolution and settlement of the Secured Lender Claim, (7) all other actions that the Debtors or Reorganized Debtors, as applicable, determines to be necessary or advisable, including making filings or recordings that may be required by applicable law in connection with the Plan.

## Section 7.3    Plan Funding Mechanism.

The Plan shall be funded from the Disposable Income, Plan Implementation Proceeds, and any other Assets of the Estates, except as expressly set forth herein.

## Section 7.4    Establishment of Reserves.

At least three (3) days prior to the Confirmation Hearing, the Debtors shall file with the Bankruptcy Court a notice that reflects the proposed amounts of the Disputed Claims Reserve.

**Section 7.5**    __Corporate Action__.

The Plan will be administered by the Debtors or Reorganized Debtors, as applicable, and all actions taken under the Plan shall be taken in accordance with the provisions of the Plan.

**Section 7.6**    __Corporate Existence.__

Except as otherwise provided in the Plan, or other documented incorporated in the Plan or the Plan Supplement, on the Effective Date, the Debtors shall, as Reorganized Debtors, continue to exist after the Effective Date as a legal entity, with all the powers of a corporation, limited liability company, partnership, or other form of Entity, as the case may be, pursuant to the applicable law in the jurisdiction in which the Debtors are incorporated or formed, and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under applicable law.

After the Effective Date, the Reorganized Debtors' governance documents may be amended or modified in accordance with its respective terms without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

**Section 7.7**    __Closing of the Chapter 11 Cases__.

After all Disputed Claims filed against the Debtors or Reorganized Debtors, as applicable, have become Allowed Claims or have been Disallowed, and the Reorganized Debtors have substantially consummated the Plan, or at such earlier time as the Reorganized Debtors deem appropriate, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**Section 7.8**    __Distributions to Holders of Claims and Interests__.

(a)    __Estimation of Claims__.

The Debtors may, at any time, request that the Bankruptcy Court estimate any Claim not expressly Allowed by the terms of the Plan and otherwise subject to estimation under section 502(c) of the Bankruptcy Code and for which the Debtors may be liable under the Plan, including any Claim for taxes, to the extent permitted by section 502(c) of the Bankruptcy Code, regardless of whether any party in interest previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim pursuant to section 502(c) of the Bankruptcy Code at any time prior to the time that such Claim becomes an Allowed Claim. If the Bankruptcy Court estimates any contingent or unliquidated Claim, the estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. The foregoing objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated by the Bankruptcy Court and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

(b)    <u>No Recourse.</u>

Notwithstanding that the Allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount for which after application of the payment priorities established by the Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no Claim holder shall have recourse against the Debtors or Reorganized Debtors, as applicable, the Estates, the Trustee, or any of their respective professionals, consultants, officers, directors, or members or their successors or assigns, or any of their respective property.  Except as specifically stated otherwise in the Plan, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code.

**THE ESTIMATION OF CLAIMS AND ESTABLISHMENT OF RESERVES UNDER THE PLAN MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS IF THE ESTIMATION IS MADE SOLELY FOR THE PURPOSE OF ESTIMATING A MAXIMUM LIABILITY FOR RESERVE PURPOSES, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS.**

(c)    <u>Automatic Disallowance and Expungement of Certain Claims</u>. On the Effective Date, all Claims filed after the applicable Bar Date that were required to be filed in advance of such Bar Date and under the terms of the order relating thereto, shall be expunged and disallowed without any further notice to or action, order, or approval of the Bankruptcy Court.

(d)    <u>Distribution on Account of Allowed Claims.</u>

Following the Effective Date and in accordance the Plan, Distributions shall be made as follows:

On the Effective Date, or as soon as practicable thereafter, the Debtors shall establish: the Disputed Claims Reserve with Cash in an amount to be determined by the Debtors or Reorganized Debtors, as applicable.

On the Effective Date, or as soon as practicable thereafter, the Cash shall be distributed to holders of certain Allowed Administrative Claims by the Debtors or Reorganized Debtors, as applicable. Except as expressly set forth in the Plan, upon satisfaction of the Allowed Secured Claim, the Debtors or Reorganized Debtors, as applicable, shall distribute Cash in an amount not to exceed the amount of each such unpaid (i) Allowed Administrative Claim plus interest and each Professional Fee Claim, until such Claims are satisfied in full; and Allowed Priority Tax Claim plus interest, until such Claims are satisfied in full.

(e)    <u>Disputed Claims Reserve.</u>

(i)    <u>Objection to Claims</u>. Unless otherwise ordered by the Bankruptcy Court, on and after the Effective Date, the Debtors or Reorganized

Debtors, as applicable, shall have the exclusive right to make, file, and prosecute objections to and settle, compromise, or otherwise resolve Disputed Claims, except that as to applications for allowances of Professional Fee Claims, objections may be made in accordance with the applicable Bankruptcy Rules by parties in interest.  Subject to further extension by the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, shall file and serve a copy of any such objection upon the holder of the Claim to which an objection is made on or before the latest to occur of:  (i) 180 days after the Effective Date and (ii) such other date as may be fixed by the Bankruptcy Court either before or after the expiration of the 180 day time period.    Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if made (a) in accordance with Federal Rule of Civil Procedure 4, as modified, and made applicable by Bankruptcy Rule 7004;  (b) by first-class mail, postage prepaid, on the signatory of the proof of claim or other representative identified in the proof of claim or any attachment thereto at the address of the Creditor set forth therein;  or (c) by first-class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in the Chapter 11 Cases.  From and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may settle or compromise any Disputed Claim or Cause of Action without further order of the Bankruptcy Court.

(ii)     <u>Resolution of Disputed Claims</u>. No Distribution or payment shall be made on account of a Disputed Claim until such Disputed Claim becomes an Allowed Claim.

(iii)    <u>Establishment of Disputed Claims Reserve</u>.  On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall establish and fund the Disputed Claims Reserve with Cash in an amount to be determined by the Debtors or Reorganized Debtors, as applicable, (or as otherwise required by order of the Bankruptcy Court). The Disputed Claims Reserve shall be administered by the Debtors or Reorganized Debtors, as applicable.

(iv)     <u>Duties in Connection with Disputed Claims</u> The Debtors or Reorganized Debtors, as applicable, shall object to, settle, or otherwise resolve Disputed Claims, and shall make Distributions to holders of Disputed Claims that subsequently become Allowed Administrative Claims or Allowed General Unsecured Claims, in accordance with the Plan from the Disputed Claims Reserve.

(v)      <u>Distribution when a Disputed Claim is Resolved</u>. On the next Distribution Date following the date upon which a Disputed Claim is ultimately Allowed, the holder of such Claim shall receive from the Disputed Claims Reserve any amounts attributable to such Claim, in

accordance with the Plan.  Any Cash held in the Disputed Claims Reserve for the benefit of a holder of a Disputed Claim, which is subsequently disallowed, in whole or in part, shall become Available Cash for distribution in accordance with the provisions of the Plan.

(vi)    <u>No Distributions from Litigation Recoveries to Defendants</u>.  If a litigation recovery on account of a Cause of Action is obtained by the Debtors or Reorganized Debtors, as applicable, such defendant shall not be entitled to share directly or indirectly in the proceeds from such litigation recovery, including, but not limited to, any recoveries pursuant to section 502(h) of the Bankruptcy Code.

**Section 7.9 <u>Miscellaneous Distribution Provisions</u>.**

(a)    <u>No Distribution in Excess of Allowed Amount of Claim</u>.  Notwithstanding anything to the contrary herein or in the Plan, no holder of an Allowed Claim shall receive in respect of such Claim any Distribution in excess of the amount of such Allowed Claim plus interest as provided herein.

(b)    <u>*De Minimis* Distributions</u>.  The Debtors or Reorganized Debtors, as applicable, shall not be required to make any Cash payment of less than twenty-five dollars ($25.00).

(c)    <u>Allocation of Payments</u>.  Amounts paid to holders of Allowed Claims in satisfaction thereof shall be allocated first to the principal amounts of such Claims, with any excess allocated to interest, if any, that has accrued on such Claims but remains unpaid.

(d)    <u>Timing of Distributions</u>.  Each Distribution shall be made on the relevant Distribution Date therefore and shall be deemed to have been timely made if made on such date or within ten (10) days thereafter.  No interest shall accrue or be paid with respect to any Distribution as a consequence of such Distribution not having been made on any date specified herein.

(e)    <u>Manner of Payments Under the Plan</u>.  Unless the Person or Entity receiving a Distribution agrees otherwise, any Distribution to be made in Cash under the Plan shall be made, at the election of the Debtors or Reorganized Debtors, as applicable, by check drawn on a domestic bank or by wire transfer from a domestic bank.

(f)    <u>Setoffs</u>.  The Debtors or Reorganized Debtors, as applicable, are authorized, pursuant to and to the extent permitted
by applicable law, to set off against any Allowed Claim and the Distributions to be made on account of such Allowed Claim, the Claims, rights, and Causes of Action of any nature that the Estates may hold against the holder of such Allowed Claim; *provided*, that the Debtors or Reorganized Debtors, as applicable, give the holder of such Allowed Claim no fewer than five (5) days' notice in writing (including email) of the proposed setoff and the holder of such Allowed Claim does not object to the proposed setoff within thirty (30) days of receiving such notice.  If an objection is timely raised to a proposed setoff, the Debtors or Reorganized Debtors, as applicable, may seek relief from the

Bankruptcy Court to effectuate the setoff.  Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Estates or the Debtors or Reorganized Debtors, as applicable, of any such Claims, rights, and Causes of Action the Estates may have against such holder.

(g)    Exemption from Transfer Taxes.  Pursuant to section 1146(a) of the Bankruptcy Code, the assignment or transfer of any lease or sublease, the delivery, making, filing, or recording of any deed or other instrument of transfer, or the issuance, transfer, or exchange of any security, under the Plan, including any deeds, bills of sale, or assignments executed in connection with the Sale or any other disposition of Assets contemplated by the Plan, shall not be subject to any stamp, real estate transfer, mortgage, recording, or other similar tax to the maximum extent covered by section 1146 of the Bankruptcy Code.

(h)    Preservation and Application of Insurance.  The provisions of the Plan shall not diminish or impair in any manner the enforceability of coverage of any insurance policies (and any agreements, documents, or instruments relating thereto) that may cover Claims against the Debtors or Reorganized Debtors, as applicable,, any directors, trustees, or officers of the Debtors or Reorganized Debtors, as applicable,, or any other Person, including, without limitation, insurance for the Debtors' or Reorganized Debtors', as applicable, directors and officers.

(i)    Address for Delivery of Distributions.  Subject to Bankruptcy Rule 9010, any Distribution or delivery to a holder of an Allowed Claim shall be made at the address of such holder as set forth on the registers maintained by the Debtors or Reorganized Debtors, as applicable, as provided for in the Plan.  If any Distribution is returned to the Debtors or Reorganized Debtors, as applicable, as undeliverable, no Distributions shall be made to such holder unless the Debtors or Reorganized Debtors, as applicable, are notified of such holder's then current address within sixty (60) days after such Distribution was returned.  After such date, if such notice was not provided, a holder shall have forfeited its right to such Distribution, and the undeliverable Distribution shall be reallocated and distributed to holders of Allowed Claims in accordance with the Plan.

(j)    Federal Income Tax Consequences to the Debtors.  The Debtors do not anticipate that confirmation of the Plan will result in the Debtors or Reorganized Debtors, as applicable, being assessed or owing any Federal Income Tax.  Confirmation will not trigger a taxable event.  Moreover, the elimination of intercompany payables/receivables will not give rise to any cancellation of indebtedness income.

(k)    Time Bar to Cash Payments.

Checks issued by the Debtors or Reorganized Debtors, as applicable, in respect of Allowed Claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof.  Requests for reissuance of any check shall be in writing to the Debtors or Reorganized Debtors, as applicable, by the holder of the Allowed Claim to whom such check originally was issued.  Any such written claim in respect of such a voided check must be received by the Debtors or Reorganized Debtors, as applicable, on or before 60 days after the expiration of the 60-day period following the date of issuance of such check. Thereafter, the amount represented by such

voided check shall irrevocably revert to the Estates and be treated as Available Cash.  Any Claim in respect of such voided check shall be discharged and forever barred from assertion against the Debtors or Reorganized Debtors, or the Estates.

          (l)     <u>Record Date for Distributions to Holders of Claims</u>.  As of the close of business on the Confirmation Date, there shall be no further changes in the record holders of the Claims for purposes of the Distribution of Available Cash.  The Debtors or Reorganized Debtors, as applicable, shall have no obligation to recognize any transfer of Claims occurring after the Confirmation Date.

          (m)     <u>Disputed Payments</u>.  If any dispute arises as to the identity of a holder of an Allowed Claim who is to receive any Distribution, the Debtors or Reorganized Debtors, as applicable, may, in lieu of making such Distribution to such Person, make such Distribution into an escrow account to be held in trust for the benefit of such holder and such Distribution shall not constitute property of the Estates.  Such Distribution shall be held in escrow until the disposition thereof shall be determined by order of the Bankruptcy Court or other court of competent jurisdiction or by written agreement signed by all of the interested parties to such dispute.

          (n)     <u>Directors and Officers</u>. The directors and officers of the Debtors, Cort Javarone (Managing Member/CEO of 4D LLC and President of 4D Inc.) and Emer Timmons (Director, 4D LLC) shall remain in place after Confirmation of the Plan.   To the extent funds are available and provided the Reorganized Debtors are current with Plan payments hereunder, the directors and officers shall be entitled to their reasonable and customary compensation.

          (o)     <u>Discharge of the Trustee</u>.  that the services of the Trustee in this case shall be terminated upon the Effective Date and the Trustee shall be discharged from any further obligations in this case and/or under the Plan.

# ARTICLE VIII.

## EFFECT OF THE PLAN ON CLAIMS INTERESTS AND CAUSES OF ACTION

### Section 8.1    <u>Binding Effect</u>.

On and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against the Debtors who held such Claim at any time during the Chapter 11 Cases and their respective successors and assigns, whether or not the Claim of such holder is Impaired under the Plan and whether or not such holder has been deemed to accept the Plan.

### Section 8.2    <u>Term of Injunctions or Stays</u>.

Unless otherwise provided in the Plan, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Cases are closed.

**Section 8.3** **Causes of Action.**

All preference or avoidance claims or actions of the Debtors, including, but not limited to any actions or claims arising under section 544, 547, 548 549 and 550 of the Bankruptcy Code and any other similar or corresponding claims or actions arising under state or any other law (collectively, the "Avoidance Actions"), in each case to the extent not included in the Acquired Assets, are hereby irrevocably and unconditionally waived and released.

**Section 8.4** **Injunctions.**

(a)    Satisfaction of Claims.  The treatment to be provided for Allowed Claims shall be in full satisfaction, settlement, and release of each such Claim.

(b)    Scope of Injunction.  Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that hold a Claim are permanently enjoined from taking any of the following actions against the Debtors, Reorganized Debtors, their affiliates, the Trustee or any present and former directors, officers, trustees, agents, attorneys, advisors, members, or employees of the Debtors or Reorganized Debtors, their affiliates, the Trustee or any of their respective successors or assigns, or any of their respective assets or properties, on account of any Claim: (i) commencing or continuing in any manner any action or other proceeding with respect to a Claim or based upon a theory which arises out of such holder's Claim; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order with respect to a Claim; (iii) creating, perfecting or enforcing any Lien or Encumbrance with respect to a Claim; (iv) asserting a setoff, right of subrogation or recoupment of any kind with respect to a Claim, the Assets or other property of the Estates; and (v) commencing or continuing any action that does not comply with or is inconsistent with the Plan.  Nothing shall preclude the holder of a Claim from pursuing any applicable insurance after the Chapter 11 Cases are closed, from seeking discovery in actions against third parties or from pursuing third party insurance that does not cover Claims against the Debtors.  For the avoidance of doubt, nothing in this Injunction shall limit the rights of a holder of a Claim to enforce the terms of the Plan.

(c)    Release of Collateral.  Except as expressly provided herein: (i) each holder of (a) an Allowed Secured Claim;  and/or (b) an Allowed Claim that is purportedly secured, on the Effective Date shall (x) turn over and release to the Debtors or Reorganized Debtors, as applicable, any and all property that secures or purportedly secures such Claim;  and (y) execute such documents and instruments as the Debtors or Reorganized Debtors, as applicable, require to evidence such claimant's release of such property;  and (ii) on the Effective Date, all Claims, rights, title, and interest in such property shall revert to the Debtors or Reorganized Debtors, as applicable, free and clear of all Claims, including (without limitation) Liens, charges, pledges, Encumbrances, and/or security interests of any kind.  No Distribution shall be made to or on behalf of any holder of such Claim unless and until such holder executes and delivers to the Debtors or Reorganized Debtors, as applicable, such release of Liens.  Any such holder that fails to execute and deliver such release of Liens within sixty (60) days of any demand thereof shall be deemed to have no further Claim and shall not participate in any Distribution hereunder.  Notwithstanding the immediately preceding sentence, a holder of a Disputed Claim shall not be required to execute and deliver such release of Liens until the time such Claim is Allowed or disallowed.

(d)    Cause of Action Injunction.  On and after the Effective Date, all Persons other than the Debtors or Reorganized Debtors, as applicable, will be permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively, or otherwise) on account of, or respecting any Claim, debt, right, or Cause of Action that the Debtors or Reorganized Debtors, as applicable, retain authority to pursue in accordance with the Plan.

## Section 8.5    Exculpation.

**Except as otherwise set forth in the Plan, neither the Debtors, Reorganized Debtors, nor the Exculpated Parties shall have or incur any liability to any Person or entity for any action taken or omitted to be taken between the Petition Date and the Effective Date in connection with or related to the formulation, preparation, dissemination, implementation, confirmation, or consummation of the Plan, the Confirmation Order, the Asset Purchase Agreement or any contract, release, or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan, the administration of the Plan or property to be distributed pursuant to the Plan, a Plan Implementation Transaction, and actions taken or omitted to be taken in connection with the Chapter 11 Cases or the operations, monitoring, or administration of the Debtors or Reorganized Debtors during the Chapter 11 Cases; *provided, however*, that such action taken or not taken by such Person or Entity was specifically on behalf of the Debtors or Reorganized Debtors and in conjunction with the Chapter 11 Cases, *provided further, however* that the Exculpated Parties did not engage in fraud, gross negligence, willful misconduct, or acts performed outside the scope of section 1184 of the Bankruptcy Code not authorized by the Bankruptcy Court.  The Debtors and Reorganized Debtors shall have no liability for any action taken or omitted to be taken in connection with or related to the post-confirmation administration of the Estates, except for (i) fraud, gross negligence, or willful misconduct, and (ii) solely in the case of attorneys, to the extent that such exculpation would violate any applicable professional disciplinary rules, including Rule 1.8(h) of the New York State Rules of Professional Conduct.**

## Section 8.6    Compromise of Controversies.

Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution, and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of, relating to, or in connection with the business or affairs of or transactions with the Debtors.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, Creditors, and other parties in interest, and are fair, equitable, and within the range of reasonableness.

**Section 8.7**     <u>**Releases by the Debtors**</u>.

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, each Released Party and their respective advisors, attorneys, and Representatives of any professional employed by any of them is deemed released, solely in their capacity in acting on behalf of the Debtors or their Estates, by the Debtors and their Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the subject matter of, any Claim or Interest that is treated in the Plan, the negotiation, formulation, or preparation of the Plan, the Confirmation Order, any Sale process or transaction contemplated by the Plan, any Asset Sale Agreement or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence relating to the Debtors, in connection with the Chapter 11 Cases, *provided, however*, that the Released Parties did not engage in fraud, willful misconduct, or gross negligence, taking place on or before the Effective Date.**

**Section 8.8**     <u>**Post-Confirmation Activity**</u>.

As of the Effective Date, the Reorganized Debtors may administer estate assets, without supervision of the Bankruptcy Court, other than those restrictions expressly imposed by the Bankruptcy Code, the Plan, and the Confirmation Order, as applicable.  Without limiting the foregoing, the Reorganized Debtors may pay any charges it incurs for taxes, professional fees, disbursements, expenses, or related support services, in connection with their respective duties, after the Effective Date without application to and approval of the Bankruptcy Court.

## ARTICLE IX. EXECUTORY CONTRACTS

**Section 9.1**     <u>**Executory Contracts and Unexpired Leases**</u>.

(a)     <u>Assumption Procedures.</u>  The Debtors will file the Assumption Schedule, if any, with the Court no later than five (5) business days prior to the Confirmation Hearing and concurrently serve notice of such filing, by email or overnight mail, upon all counter-parties to the Assigned Contracts.  The Assumption Schedule shall identify the proposed Assigned Contracts and the corresponding Cure Amounts required by section 365 of the Bankruptcy Code, if any. All non-debtor parties to the Assigned Contracts shall have ten (10) business days following service of the Assumption Schedule (or any amendment to such schedule), to file an objection (an "Assumption Objection") to the proposed assumption and assignment of any Assigned Contract or any Cure Amount listed for an Assigned Contract.  Any party filing an Assumption Objection shall state with

specificity the basis of the objection and what Cure Amount it asserts and shall include appropriate documentation in support thereof.

       If an Assumption Objection is timely filed and not consensually resolved, this Court shall hold a hearing with respect to such Assumption Objection at such date as this Court shall designate. No Assigned Contract that is the subject of any such Assumption Objection shall be assumed by the Debtors and assigned to Buyer (if applicable) until such Assumption Objection is resolved.

       (b)    <u>Rejection Procedures.</u> To the extent not previously rejected, on the Effective Date, but subject to the occurrence of the Effective Date, all executory contracts and unexpired leases of the Debtors entered into prior to the Petition Date that have not previously been assumed or rejected, or are not set forth on the Assumption Schedule to be assumed and, if applicable, assigned to Buyer in conjunction with a Sale and Confirmation Order, shall be deemed rejected by the Debtors pursuant to the provisions of section 365 of the Bankruptcy Code.  Following the Effective Date, any Assigned Contract a Buyer elects to exclude from a Sale pursuant to the terms of an Asset Purchase Agreement shall be deemed rejected as of the date of such election.

       (c)    <u>Effect of Confirmation Order.</u> Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving, subject to and upon the occurrence of the Effective Date, the assumptions, assumptions and assignments, or rejections of any executory contracts and unexpired leases assumed, assumed and assigned, or rejected pursuant to the Plan. Any motions to assume, assume and assign, or reject any executory contracts or unexpired leases that is pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order but may be withdrawn, settled, or otherwise prosecuted by the Debtors or Reorganized Debtors, as applicable, with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date.

       To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto.

## Section 9.2    <u>Rejection Damages Bar Date.</u>

       If rejection by the Debtors, pursuant to the Plan, of an executory contract or unexpired lease, results in a Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtors and their Estates unless a proof of claim is filed with the Clerk of the Bankruptcy Court and served upon the Debtors not later than thirty (30) days after the date of service of notice of entry of the Confirmation Order, or such other period set by the Bankruptcy Court.

**Section 9.3      Effect of Post-Confirmation Rejection.**

The entry by the Bankruptcy Court on or after the Confirmation Date of an order authorizing the rejection of an executory contract or unexpired lease of the Debtors entered into prior to the Petition Date shall result in such rejection being a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code.

## ARTICLE X. CONDITIONS TO CONFIRMATION AND OCCURRENCE OF EFFECTIVE DATE

**Section 10.1 Conditions to Confirmation.**

The Plan may not be confirmed unless the Confirmation Order is entered in a form reasonably acceptable to the Debtors and, if applicable, any Buyer.

**Section 10.2 Conditions to Occurrence of Effective Date.**

The Effective Date for the Plan may not occur unless each of the conditions set forth below is satisfied.  Any one or more of the following conditions may be waived in whole or in part at any time by the Debtors with the consent, if applicable, of Buyer:

(a)      The Bankruptcy Court shall have entered the Confirmation Order and it shall have become a Final Order;

(b)      The Confirmation Order shall provide for the releases, injunctions and exculpation of the Persons provided for in the Plan.

**Section 10.3 Effect of Nonoccurrence of the Conditions to Occurrence of Effective Date.**

If each of the conditions to the occurrence of the Effective Date has not been satisfied or duly waived by the Debtors on or before the date which is no later than the first Business Day after fourteen (14) days after the Confirmation Date, or by such later date as is approved, after notice and a hearing, by the Bankruptcy Court, then upon motion by any party in interest made before the time that each of the conditions has been satisfied or duly waived, the Confirmation Order may be vacated by the Bankruptcy Court; *provided, however,* that, notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions to occurrence of the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant the Plan, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against the Debtors, or (b) prejudice in any manner the rights of the Debtors or of any other party in interest.

## ARTICLE XI.

## CONFIRMABILITY AND SEVERABILITY OF A PLAN

**Section 11.1 Confirmability and Severability of Plan.**

Subject to the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, revoke, or withdraw the Plan.  If the Debtors revoke or withdraw the Plan, then nothing contained herein or in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtors, or to prejudice in any manner the rights of the Debtors or any Persons in any further proceedings involving the Debtors. A determination by the Bankruptcy Court that the Plan is not confirmable pursuant to section 1129 of the Bankruptcy Code shall not limit or affect the Debtors' ability to modify the Plan to satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code.  Each provision of the Plan shall be considered severable and, if for any reason any provision or provisions therein are determined to be invalid and contrary to any existing or future law, the balance of the Plan shall be given effect without relation to the invalid provision, to the extent it can be done without causing a material change in the Plan.

## ARTICLE XII. ADMINISTRATIVE PROVISIONS

**Section 12.1 <u>Retention of Jurisdiction.</u>**

Notwithstanding confirmation of the Plan or occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction and authority for all purposes permitted under applicable law, including, without limitation, the following purposes:

(a)    To determine any motion, adversary proceeding, Avoidance Action, application, contested matter, Causes of Action, or other litigated matter pending on or commenced after the Confirmation Date;

(b)    To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

(c)    To ensure that Distributions to holders of Allowed Claims are accomplished as provided herein;

(d)    To hear and determine objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including, without limitation, to hear and determine objections to the classification of Claims and the allowance or disallowance of Disputed Claims, in whole or in part;

(e)    To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(f)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)    To issue injunctions, enter and implement other orders, and take such

other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(h)     To hear and determine any application to modify the Plan, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)      To hear and determine all matters relating to the distribution of Plan Implementation Proceeds;

(j)      To hear and determine all Professional Fee Claims;

(k)     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order or any transactions or payments contemplated hereby or thereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(l)      To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release, exculpation or injunction provisions set forth herein, or to maintain the integrity of the Plan following consummation;

(m)    To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)     To enter a final decree closing the Chapter 11 Cases;

(p)     To recover all Assets of the Debtors and property of the Estates, wherever located;

(q)     To hear and determine any matters for which jurisdiction was retained by the Bankruptcy Court pursuant to prior orders; and

(r)      To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code, title 28 of the United States Code, and other applicable law.

## Section 12.2    <u>Governing Law.</u>

Except to the extent the Bankruptcy Code, Bankruptcy Rules, or other federal laws apply, the rights and obligations arising under the Plan shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of law of New York.

**Section 12.3     Effectuating Documents, Further Transactions.**

The Debtors or Reorganized Debtors, as applicable, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**Section 12.4     Waiver of Bankruptcy Rules 3020(e) and 7062.**

The Debtors may request that the Confirmation Order include (i) a finding that Bankruptcy Rule 7062 shall not apply to the Confirmation Order, and (ii) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

**Section 12.5     Discharge.**

In the event this Plan is confirmed under section 1191(a) of the Bankruptcy Code, as of the Effective Date, the Debtors will be discharged from any debt that arose before Confirmation, to the extent specified in section 1141(d)(1)(A) of the Bankruptcy Code, except that the Debtors will not be discharged of any debt imposed under the Plan.

In the event this Plan is confirmed under section 1191(b) of the Bankruptcy Code, Confirmation does not discharge any debt provided for in this Plan until the Bankruptcy Court grants a discharge on completion of all payments due under the Plan or as otherwise provided in section 1192 of the Bankruptcy Code.

**Section 12.6     Headings.**

The headings used in the Plan are inserted for convenience only, and neither constitute a portion of the Plan nor in any manner affect the construction of provisions of the Plan.

**Section 12.7     Governmental Carve-Out.**

Nothing in the Plan or the Confirmation Order shall (i) effect a release of any Claim of, (ii) enjoin from bringing any Claim, suit, action or other proceedings by, or (iii) exculpate any party from any liability to, the United States Government or any of its agencies or any state or local government within the United States, arising under (v) the federal securities laws, (w) the Employment Retirement Income Security Act of 1974, as amended, (x) the Internal Revenue Code, (y) the environmental laws or (z) any criminal laws of the United States.

**Section 12.8     Amendments.**

The Debtors may alter, amend, or modify the Plan under section 1193(a) of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date and prior to substantial consummation of this Plan as defined in section 1101(2) of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, may under section 1193(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile

any inconsistencies in this Plan or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan.

**Section 12.9 Successors and Assigns.**

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the heir, executor, administrator, successor, or assign of such Person.

**Section 12.10 Confirmation Order and Plan Control.**

To the extent the Confirmation Order and/or the Plan is inconsistent with any agreement entered into between the Debtors and any third party, the Plan controls any such agreements, and the Confirmation Order controls the Plan.

**Section 12.11 Further Action.**

Nothing contained in the Plan will prevent the Debtors or Reorganized Debtors, as applicable, from taking such actions as may be necessary to consummate the Plan even though such actions may not be specifically provided for within the Plan.

**Section 12.12 Exhibits.**

All Exhibits to the Plan are incorporated by reference and are intended to be an integral part of this document as though fully set forth in the Plan.

**Section 12.13 Notices.**

Any notice required or permitted to be provided under the Plan, unless otherwise provided herein, shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) overnight delivery service, postage prepaid, and addressed as follows:

**For the Debtors and Reorganized Debtors**:

4D Factory, Inc. *et al.*,
Attn: Cort Javarone, Managing Member/CEO

300 Southard Street, Suite 207

Key West, FL  33040


**Counsel to the Debtors**:

SPENCE LAW OFFICE, P.C.
Attn: Robert J. Spence, Esq.

55 Lumber Road, Ste 5
Roslyn, New York 11576

**For the Trustee**:

Charles N. Persing
Subchapter V Trustee
100 Passaic Avenue, Suite 310
Fairfield, NJ 07004

**For the United States Trustee**:

William K. Harrington
United States Trustee
United States Department of Justice
201 Varick Street, Room 1006
New York, New York 10014
Attn:  Paul Schwartzberg, Esq.

**Section 12.14 Substantial Consummation.**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101(2) and 1127(b) of the Bankruptcy Code.

**Section 12.15 Deemed Acts.**

Whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

DATED:       New York, New York
             January 8, 2024

                              4D Factory, Inc.


                              By: _____
                                   Cort Javarone, President


                              The 4D Factory, LLC


                              By: _____
                                   Cort Javarone, Managing
                                   Member/CEO

41

EXHIBIT A

**EXHIBIT A -- THE 4D FACTORY LLC/4D FACTORY INC. - Plan Projections & Payments** [NOTE 1]

The Plan provides for two primary paths to repayment through Disposable Income from sale of tokens and/or from Centili Ltd., as shown below, that can work together or independently, supplemented by additional upfront investment from 4D LLC stakeholders.

Sale of 4D LLC's SHRAP Token - Projections [NOTE 2]

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales as % of Low Case Monthly Volume [NOTE 2] | 1.3% | Total Income | 667,590 | 667,590 | 667,590 | 667,590 | 667,590 | 667,590 | 667,590 | 667,590 | 667,590 | 667,590 | 667,590 | 667,590 |
| Income Applied to Plan Payments | 75% | | 500,693 | 500,693 | 500,693 | 500,693 | 500,693 | 500,693 | 500,693 | 500,693 | 500,693 | 500,693 | 500,693 | 500,693 |
| Income Applied to Operations [NOTE 3] | 25% | | 166,898 | 166,898 | 166,898 | 166,898 | 166,898 | 166,898 | 166,898 | 166,898 | 166,898 | 166,898 | 166,898 | 166,898 |

| PLAN PAYMENTS [TOKEN SALES] | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Monthly Income | 500,693 | 500,693 | 500,693 | 500,693 | 500,693 | 500,693 | 500,693 | 500,693 | 500,693 | 500,693 | 500,693 | 500,693 |
| | | | | | | | | | | | | |
| Plan Payments - Recurring (Admin / MEP / GUC) | | (500,693) | (500,693) | (500,693) | (500,693) | (500,693) | (500,693) | (500,693) | (500,693) | (500,693) | (500,693) | (500,693) |
| Plan Payments - Effective Date of Plan  ($250,693 Admin / $250,000 MEP/GUC) | (500,693) | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Starting Debt/Admin Expense Balance (est.) | 5,500,000 | 4,999,308 | 4,498,615 | 3,997,923 | 3,497,230 | 2,996,538 | 2,495,845 | 1,995,153 | 1,494,460 | 993,768 | 493,075 | - |
| Ending Debt/Admin Expense Balance | 4,999,308 | 4,498,615 | 3,997,923 | 3,497,230 | 2,996,538 | 2,495,845 | 1,995,153 | 1,494,460 | 993,768 | 493,075 | - | - |

| DEBTOR CORPORATE OPERATIONS [TOKEN SALES] | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Monthly Income | 166,898 | 166,898 | 166,898 | 166,898 | 166,898 | 166,898 | 166,898 | 166,898 | 166,898 | 166,898 | 166,898 | 166,898 |
| | | | | | | | | | | | | |
| Expenses | | | | | | | | | | | | |
| Compensation | 50,000 | 50,000 | 50,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 |
| Insurance | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 |
| Rent | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Accounting | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Legal | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Total Expenses | 70,000 | 70,000 | 70,000 | 90,000 | 90,000 | 90,000 | 92,000 | 92,000 | 92,000 | 92,000 | 92,000 | 92,000 |
| | | | | | | | | | | | | |
| Cash Flow Reserve Available for Centili Investment [NOTE 3] | 96,898 | 96,898 | 96,898 | 76,898 | 76,898 | 76,898 | 74,898 | 74,898 | 74,898 | 74,898 | 74,898 | 74,898 |

Centili - Plan Payments (see EXHIBIT B – CASH FLOW PROJECTIONS FOR CENTILI) [NOTE 4]

| PLAN PAYMENTS (FROM CENTILI CASH PROJECTIONS) | | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Month 13 | Month 14 | Month 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Capital Investment (minimum) | [NOTE 5] | 500,000 | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| Plan Payments - Recurring (Centili Funded) | | | | | (40,000) | (40,000) | (40,000) | (40,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (100,000) | (100,000) | (100,000) |
| Plan Payments - Effective Date of Plan (Cap. Contrib.) | | (100,000) | | | | | | | | | | | | | | |
| Plan Payments - One Time Payment(s) (Centili Funded) | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| Starting Debt/Admin Expense Balance (est.) | | 5,500,000 | 5,400,000 | 5,400,000 | 5,400,000 | 5,360,000 | 5,320,000 | 5,280,000 | 5,240,000 | 5,190,000 | 5,140,000 | 5,090,000 | 5,040,000 | 4,990,000 | 4,890,000 | 4,790,000 |
| Ending Debt/Admin Expense Balance | | 5,400,000 | 5,400,000 | 5,400,000 | 5,360,000 | 5,320,000 | 5,280,000 | 5,240,000 | 5,190,000 | 5,140,000 | 5,090,000 | 5,040,000 | 4,990,000 | 4,890,000 | 4,790,000 | 4,690,000 |
| | | | | | | | | | | | | | | | | |
| Operating Cash | | 332,197 | 284,532 | 189,455 | 99,009 | 75,204 | 67,667 | 65,598 | 130,416 | 227,752 | 410,277 | 702,836 | 1,021,068 | 1,288,398 | 1,586,076 | 1,923,311 |
| Funded to Debtor (Parent) Expenses (see below) | | (35,500) | (35,500) | (35,500) | (35,500) | (35,500) | (35,500) | (42,000) | (92,000) | (92,000) | (92,000) | (92,000) | (92,000) | (130,000) | (130,000) | (130,000) |
| | | | | | | | | | | | | | | | | |
| Centili Net Cash | | 296,697 | 249,032 | 153,955 | 63,509 | 39,704 | 32,167 | 23,598 | 38,416 | 135,752 | 318,277 | 610,836 | 929,068 | 1,158,398 | 1,456,076 | 1,793,311 |

| DEBTOR CORPORATE OPERATIONS [CENTILI FUNDED ONLY] | | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Month 13 | Month 14 | Month 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Expenses | | | | | | | | | | | | | | | | |
| Compensation | | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 100,000 | 100,000 | 100,000 |
| Insurance | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 10,000 | 10,000 | 10,000 |
| Rent | | 500 | 500 | 500 | 500 | 500 | 500 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Accounting | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Legal | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 10,000 | 10,000 | 10,000 |
| Total Expenses | | 35,500 | 35,500 | 35,500 | 35,500 | 35,500 | 35,500 | 42,000 | 92,000 | 92,000 | 92,000 | 92,000 | 92,000 | 130,000 | 130,000 | 130,000 |

NOTES / ASSUMPTIONS TO 4D LLC PROJECTIONS:
NOTE 1 - Plan provides for two primary paths to repayment through Disposable Income (from sale of tokens and/or from Centili Ltd.) that can work together or independently, supplemented by additional upfront investment from 4D LLC stakeholders.
NOTE 2 - Modest monthly sales of SHRAP token holdings, that belong to 4D LLC, can settle all Plan payments fastest - in one year rather than three years out of cash flow from operating company.
Projected sales of SHRAP tokens are 1.3% of lowest reported market volume per day/month, an imperceptible amount that would not affect the market price.

| 4D HOLDINGS: | Token Amount Held | Current Market Price | Current Market Value |
|---|---|---|---|
| | 480,900,000 | $  0.27 | $  129,843,000 |

| TRADING VOLUME: | DAILY | MONTHLY |
|---|---|---|
| SHRAP Daily Trading Volume Range Low | 1,700,000 | 51,000,000 (US$) |
| SHRAP Daily Trading Volume Range High | 15,000,000 | 450,000,000 (US$) |

NOTE 3 - Token sales fund plan payments and remainder funds company expenses and investment in Centili operating company (as needed). Note that 4D LLC may also propose to help fund Neon Machine Inc. operations, available cash permitting after payment of plan payments and any cash needs of Centili.  Contributions to/funding of affiliates constitute expenditures necessary for the continuation, preservation, or operation of the business of the debtor. 11 USC 1191(d)(2).
NOTE 4 - Centili long term contracts signed with Large Telco & Enterprise Partners will generate growing cash flow that can settle Plan payments within three years, per projections on Ex B.
NOTE 5 - 4D LLC Stakeholders have committed $500,000 in new capital at closing as supplemental funding (following $200,000 invested since filing for Ch 11 protection), which will be made available to support growth at Centili.
NOTE 6 - This payment is illustrative of a one-time payment to supplement Plan payments to Creditors.

| | Month 16 | Month 17 | Month 18 | Month 19 | Month 20 | Month 21 | Month 22 | Month 23 | Month 24 | Month 25 | Month 26 | Month 27 | Month 28 | Month 29 | Month 30 | Month 31 | Month 32 | Month 33 | Month 34 | Month 35 | Month 36 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | |
| | | | | | | | | | | | | | | | | | | | | | (1,990,000) | [NOTE 6] |
| | 4,690,000 | 4,590,000 | 4,490,000 | 4,390,000 | 4,290,000 | 4,190,000 | 4,090,000 | 3,990,000 | 3,890,000 | 3,790,000 | 3,640,000 | 3,490,000 | 3,340,000 | 3,190,000 | 3,040,000 | 2,890,000 | 2,740,000 | 2,590,000 | 2,440,000 | 2,290,000 | 2,140,000 | |
| | **4,590,000** | **4,490,000** | **4,390,000** | **4,290,000** | **4,190,000** | **4,090,000** | **3,990,000** | **3,890,000** | **3,790,000** | **3,640,000** | **3,490,000** | **3,340,000** | **3,190,000** | **3,040,000** | **2,890,000** | **2,740,000** | **2,590,000** | **2,440,000** | **2,290,000** | **2,140,000** | **-** | |
| | 2,350,445 | 2,807,933 | 3,350,652 | 3,868,801 | 4,408,280 | 4,976,160 | 5,561,145 | 6,151,760 | 6,753,930 | 7,263,465 | 7,771,182 | 8,285,393 | 8,803,414 | 9,317,134 | 9,835,614 | 10,356,694 | 10,873,274 | 11,394,014 | 11,916,924 | 12,434,366 | 12,955,749 | |
| | (130,000) | (130,000) | (130,000) | (153,000) | (153,000) | (153,000) | (153,000) | (153,000) | (153,000) | (153,000) | (153,000) | (153,000) | (153,000) | (153,000) | (153,000) | (153,000) | (153,000) | (153,000) | (153,000) | (153,000) | (153,000) | |
| | 2,220,445 | 2,677,933 | 3,220,652 | 3,715,801 | 4,255,280 | 4,823,160 | 5,408,145 | 5,998,760 | 6,600,930 | 7,110,465 | 7,618,182 | 8,132,393 | 8,650,414 | 9,164,134 | 9,682,614 | 10,203,694 | 10,720,274 | 11,241,014 | 11,763,924 | 12,281,366 | 12,802,749 | |
| | Month 16 | Month 17 | Month 18 | Month 19 | Month 20 | Month 21 | Month 22 | Month 23 | Month 24 | Month 25 | Month 26 | Month 27 | Month 28 | Month 29 | Month 30 | Month 31 | Month 32 | Month 33 | Month 34 | Month 35 | Month 36 | |
| | 100,000 | 100,000 | 100,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | |
| | 10,000 | 10,000 | 10,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | |
| | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | |
| | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | |
| | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | |
| | 130,000 | 130,000 | 130,000 | 153,000 | 153,000 | 153,000 | 153,000 | 153,000 | 153,000 | 153,000 | 153,000 | 153,000 | 153,000 | 153,000 | 153,000 | 153,000 | 153,000 | 153,000 | 153,000 | 153,000 | 153,000 | |

EXHIBIT B

## EXHIBIT B - Centili Ltd. Projections

### Centili (Storefront Model Only)

| | YEAR 1 | | | | | | | | | | | | YEAR 2 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Month 1 (March) | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 |
| **REVENUE** | 200,709 | 223,601 | 148,172 | 321,349 | 328,739 | 490,301 | 618,137 | 859,313 | 1,134,221 | 1,485,559 | 2,093,132 | 2,414,783 | 2,747,474 | 3,032,714 | 3,294,325 | 3,571,239 | 3,868,558 | 4,109,485 | 4,220,167 |
| PaaS | 74,327 | 95,452 | 15,452 | 99,905 | 26,384 | 106,384 | 41,758 | 93,537 | 53,239 | 134,488 | 117,428 | 108,261 | 83,344 | 85,867 | 91,319 | 133,134 | 100,508 | 142,023 | 106,677 |
| Integration (Professional Services) | 60,000 | 60,000 | 80,000 | | 80,000 | | 50,000 | | 80,000 | 50,000 | 40,000 | | | 40,000 | | 40,000 | | 40,000 | |
| Monthly Recurring Fee (MRR) | 14,000 | 14,000 | 14,000 | 17,000 | 22,000 | 22,000 | 34,000 | 34,000 | 34,000 | 41,000 | 41,000 | 51,000 | 51,000 | 63,000 | 63,000 | 67,000 | 67,000 | 72,000 | 76,000 |
| Volume-based Variable Monthly Fees | 327 | 1,452 | 1,452 | 2,905 | 4,384 | 4,384 | 7,758 | 9,537 | 12,239 | 13,488 | 16,428 | 17,261 | 20,344 | 22,867 | 24,319 | 26,134 | 28,508 | 30,023 | 30,677 |
| *Storefront - visitors* | | 1,125 | 1,125 | 2,250 | 3,729 | 3,729 | 7,104 | 8,228 | 10,603 | 11,852 | 13,810 | 14,643 | 17,726 | 19,267 | 20,392 | 21,225 | 23,600 | 24,787 | 24,787 |
| *Transaction-based* | 327 | 327 | 327 | 655 | 655 | 655 | 655 | 1,309 | 1,636 | 1,636 | 2,618 | 2,618 | 2,618 | 3,600 | 3,927 | 4,909 | 4,909 | 5,236 | 5,891 |
| Payment | 126,382 | 128,149 | 132,720 | 221,445 | 302,356 | 383,918 | 576,379 | 765,776 | 1,080,982 | 1,351,071 | 1,975,704 | 2,306,522 | 2,664,130 | 2,946,847 | 3,203,006 | 3,438,105 | 3,768,050 | 3,961,462 | 4,113,490 |
| Transaction-based | 11,375 | 11,674 | 11,983 | 61,760 | 109,394 | 137,633 | 152,627 | 172,767 | 195,478 | 215,478 | 288,800 | 302,715 | 333,748 | 352,664 | 370,149 | 406,041 | 460,278 | 492,819 | 520,331 |
| Prepaid Vouchers | 84,167 | 80,759 | 78,361 | 93,179 | 104,251 | 111,376 | 162,460 | 235,079 | 349,746 | 418,952 | 481,009 | 539,011 | 615,268 | 681,508 | 732,432 | 777,658 | 816,909 | 849,998 | 877,031 |
| Postpaid Vouchers | 26,250 | 35,716 | 42,376 | 57,325 | 88,710 | 134,909 | 247,522 | 357,930 | 526,578 | 702,870 | 1,205,895 | 1,455,615 | 1,701,343 | 1,912,674 | 2,091,246 | 2,240,636 | 2,490,862 | 2,609,464 | 2,702,359 |
| New Merchant Integration | 4,590 | | | 9,180 | | | 13,770 | | | 9,180 | 13,770 | | | 9,180 | 13,770 | | | 9,180 | 13,770 |
| **COST OF REVENUE** | (138,512) | (141,267) | (113,249) | (241,796) | (182,544) | (327,838) | (430,205) | (594,495) | (836,885) | (1,103,033) | (1,600,573) | (1,896,551) | (2,205,144) | (2,460,036) | (2,682,090) | (2,869,105) | (3,106,509) | (3,255,776) | (3,402,018) |
| PaaS | (36,333) | (36,335) | (4,480) | (100,743) | (7,790) | (103,376) | (44,853) | (45,704) | (19,058) | (52,362) | (23,565) | (24,199) | (26,331) | (27,469) | (27,613) | (28,232) | (29,141) | (29,991) | (30,091) |
| Integration Costs | (31,856) | (31,856) | | (94,712) | | (95,568) | (31,856) | (31,856) | | (31,000) | | | | | | | | | |
| Platform Maintenance | (2,499) | (2,499) | (2,499) | (3,332) | (4,165) | (4,165) | (6,664) | (6,664) | (9,163) | (9,996) | (10,829) | (10,829) | (11,662) | (11,662) | (11,662) | (11,662) | (11,662) | (11,662) | (11,662) |
| Storefront monthly instance costs | (1,875) | (1,875) | (1,875) | (2,500) | (3,370) | (3,370) | (5,980) | (6,715) | (9,325) | (10,685) | (11,800) | (12,290) | (13,405) | (14,385) | (14,385) | (14,875) | (15,610) | (16,345) | (16,345) |
| Transaction costs | (103) | (105) | (106) | (199) | (255) | (273) | (353) | (469) | (570) | (681) | (936) | (1,080) | (1,264) | (1,422) | (1,566) | (1,695) | (1,869) | (1,984) | (2,084) |
| Payment | (102,178) | (104,932) | (108,769) | (141,053) | (174,754) | (224,463) | (385,353) | (548,791) | (817,827) | (1,050,671) | (1,577,008) | (1,872,352) | (2,178,813) | (2,432,566) | (2,654,477) | (2,840,873) | (3,106,929) | (3,255,776) | (3,371,927) |
| Transaction cost-to-serve | (103) | (105) | (106) | (199) | (255) | (273) | (353) | (469) | (570) | (681) | (936) | (1,080) | (1,264) | (1,422) | (1,566) | (1,695) | (1,869) | (1,984) | (2,084) |
| Prepaid Vouchers | (75,750) | (72,683) | (70,525) | (83,861) | (93,826) | (100,239) | (147,464) | (215,056) | (319,966) | (384,676) | (442,645) | (496,888) | (568,620) | (630,985) | (678,931) | (721,572) | (758,621) | (789,880) | (815,432) |
| Postpaid Vouchers | (23,625) | (32,144) | (38,138) | (51,593) | (80,673) | (123,951) | (229,437) | (333,265) | (491,891) | (657,214) | (1,133,427) | (1,368,984) | (1,600,829) | (1,800,159) | (1,968,580) | (2,109,506) | (2,346,439) | (2,458,512) | (2,546,312) |
| Customer Support (Ops Costs) | | | | | | | | | | | | | | | | | | | |
| New Merchant Integration (Professional Services) | (2,700) | | | (5,400) | | | (8,100) | | | (5,400) | (8,100) | | | (5,400) | (8,100) | | | (5,400) | (8,100) |
| **Gross Profit** | | | | | | | | | | | | | | | | | | | |
| PaaS | 37,994 | 59,118 | 10,972 | (838) | 18,593 | 3,008 | (3,095) | 47,833 | 34,181 | 82,126 | 93,863 | 84,062 | 57,013 | 58,397 | 63,706 | 104,902 | 71,367 | 112,032 | 76,586 |
| Integration (Professional Services) | 28,144 | 48,144 | | (14,712) | | (15,568) | (31,856) | 18,144 | | 49,000 | 50,000 | 40,000 | | | 40,000 | | 40,000 | | 40,000 |
| Monthly Recurring Fee (MRR) | 11,501 | 11,501 | 11,501 | 13,668 | 17,835 | 17,835 | 27,336 | 27,336 | 31,837 | 31,004 | 40,171 | 40,171 | 51,338 | 51,338 | 55,338 | 55,338 | 60,338 | 60,338 | 64,338 |
| Volume-based Variable Monthly Fees | (1,651) | (528) | (529) | 206 | 758 | 740 | 1,425 | 2,353 | 2,344 | 2,122 | 3,692 | 3,891 | 5,675 | 7,059 | 8,368 | 9,564 | 11,029 | 11,694 | 12,248 |
| *Storefront - visitors* | (1,875) | (750) | (750) | (250) | 359 | 359 | 1,124 | 1,513 | 1,278 | 1,167 | 2,010 | 2,353 | 4,822 | 4,882 | 6,007 | 6,350 | 7,990 | 8,442 | 8,442 |
| *Transaction-based* | 224 | 222 | 221 | 456 | 399 | 381 | 302 | 840 | 1,066 | 955 | 1,682 | 1,538 | 1,354 | 2,177 | 2,361 | 3,214 | 3,040 | 3,252 | 3,807 |
| Payment | 26,903 | 23,217 | 23,951 | 45,792 | 52,602 | 59,455 | 99,126 | 116,985 | 168,555 | 208,500 | 298,696 | 364,570 | 443,417 | 489,280 | 553,929 | 605,332 | 661,121 | 711,087 | 749,663 |
| Transaction-based | 11,272 | 11,570 | 11,877 | 21,561 | 34,139 | 37,360 | 52,274 | 72,297 | 94,908 | 114,797 | 187,864 | 226,635 | 282,484 | 326,242 | 368,583 | 404,346 | 458,410 | 490,836 | 518,247 |
| Prepaid Vouchers | 8,417 | 8,076 | 7,836 | 9,318 | 10,425 | 11,138 | 14,996 | 20,023 | 29,781 | 34,277 | 38,364 | 42,123 | 46,648 | 50,523 | 53,501 | 56,086 | 58,288 | 60,119 | 61,599 |
| Postpaid Vouchers | 2,625 | 3,572 | 4,238 | 5,733 | 8,038 | 10,958 | 18,086 | 24,665 | 34,687 | 45,656 | 72,468 | 86,631 | 100,515 | 112,516 | 122,666 | 131,130 | 144,423 | 150,952 | 156,048 |
| New Merchant Integration | 4,590 | | | 9,180 | | | 13,770 | | | 9,180 | 13,770 | | | 9,180 | 13,770 | | | 9,180 | 13,770 |
| **Total Gross Profit** | 62,197 | 82,335 | 34,923 | 79,554 | 146,195 | 162,463 | 187,931 | 264,818 | 297,336 | 382,526 | 492,559 | 518,232 | 542,130 | 572,678 | 612,235 | 702,134 | 732,488 | 817,718 | 818,149 |
| **Fixed Costs (Payroll, G&A)** | (130,000) | (130,000) | (130,000) | (130,000) | (130,000) | (130,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (175,000) | (175,000) | (175,000) | (175,000) | (175,000) | (175,000) | (200,000) |
| **EBITDA** | (67,803) | (47,665) | (95,077) | (50,446) | 16,195 | 32,463 | 37,931 | 114,818 | 147,336 | 232,526 | 342,559 | 368,232 | 367,330 | 397,678 | 437,235 | 527,134 | 557,488 | 642,718 | 618,149 |
| | | | | | | | | | | | | | | | | | | | |
| **Capital Investment (minimum)** | 500,000 | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| **Plan Payments - Recurring (Centili Funded)** | | | | (40,000) | (40,000) | (40,000) | (40,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) |
| **Plan Payments - Effective Date of Plan (Cap. Contrib.)** | (100,000) | | | | | | | | | | | | | | | | | | |
| **Plan Payments - One Time Payment(s) (Centili Funded)** | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| **Cash** | 332,197 | 284,532 | 189,455 | 99,009 | 75,204 | 67,667 | 65,598 | 130,416 | 227,752 | 410,277 | 702,836 | 1,021,068 | 1,288,398 | 1,586,076 | 1,923,311 | 2,350,445 | 2,807,933 | 3,350,652 | 3,868,801 |
| | | | | | | | | | | | | | | | | | | | |
| **Starting Debt/Admin Expense Balance (est.)** | 5,500,000 | 5,400,000 | 5,400,000 | 5,400,000 | 5,360,000 | 5,320,000 | 5,280,000 | 5,240,000 | 5,190,000 | 5,140,000 | 5,090,000 | 5,040,000 | 4,990,000 | 4,890,000 | 4,790,000 | 4,690,000 | 4,590,000 | 4,490,000 | 4,390,000 |
| **Ending Debt/Admin Expense Balance** | 5,400,000 | 5,400,000 | 5,400,000 | 5,360,000 | 5,320,000 | 5,280,000 | 5,240,000 | 5,190,000 | 5,140,000 | 5,090,000 | 5,040,000 | 4,990,000 | 4,890,000 | 4,790,000 | 4,690,000 | 4,590,000 | 4,490,000 | 4,390,000 | 4,290,000 |

NOTE 1 - Centili projections based exclusively on long term contracts signed and being drafted with Large Telco & Enterprise Partners. Excludes Direct to Consumer product business that can increase cash flow, which will be funded from reinvestment of profit or new capital invested.

| | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | | 1Q | 2Q | 3Q | 4Q | | YEAR 1 | YEAR 2 | YEAR 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | YEAR 3 | | | | | | | | | | YEAR 1 | | | | | | |
| | 4,320,045 | 4,417,926 | 4,483,982 | 4,514,826 | 4,554,834 | 4,581,008 | 4,582,325 | 4,603,061 | 4,614,057 | 4,605,505 | 4,618,377 | 4,625,592 | 4,614,354 | 4,624,883 | 4,630,447 | 4,617,281 | 4,627,010 | | 572,483 | 1,140,389 | 2,611,675 | 5,993,474 | | 10,318,016 | 47,129,576 | 55,342,901 |
| | 106,677 | 110,677 | 110,677 | 111,510 | 111,510 | 111,510 | 111,510 | 111,510 | 111,510 | 111,510 | 111,510 | 111,510 | 112,165 | 112,165 | 112,165 | 112,165 | 112,165 | | 185,232 | 232,672 | 188,534 | 360,177 | | 966,614 | 1,293,922 | 1,341,393 |
| | | | | | | | | | | | | | | | | | | | 140,000 | 160,000 | 50,000 | 170,000 | | 520,000 | 80,000 | |
| | 76,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | | 42,000 | 61,000 | 109,000 | 143,000 | | 355,000 | 876,000 | 960,000 |
| | 30,677 | 30,677 | 31,510 | 31,510 | 31,510 | 31,510 | 31,510 | 31,510 | 31,510 | 31,510 | 31,510 | 31,510 | 32,165 | 32,165 | 32,165 | 32,165 | 32,165 | | 3,232 | 11,672 | 29,534 | 47,177 | | 91,614 | 337,922 | 381,393 |
| | 24,787 | 24,787 | 24,787 | 25,620 | 25,620 | 25,620 | 25,620 | 25,620 | 25,620 | 25,620 | 25,620 | 25,620 | 25,620 | 25,620 | 25,620 | 25,620 | 25,620 | | 2,250 | 9,708 | 25,934 | 40,305 | | 78,197 | 277,381 | 307,434 |
| | 5,891 | 5,891 | 5,891 | 5,891 | 5,891 | 5,891 | 5,891 | 5,891 | 5,891 | 5,891 | 5,891 | 5,891 | 6,545 | 6,545 | 6,545 | 6,545 | 6,545 | | 982 | 1,964 | 3,600 | 6,872 | | 13,417 | 60,541 | 73,959 |
| | 4,213,368 | 4,307,249 | 4,373,305 | 4,403,316 | 4,443,324 | 4,469,498 | 4,470,815 | 4,490,551 | 4,502,547 | 4,493,995 | 4,506,867 | 4,514,082 | 4,502,189 | 4,512,718 | 4,518,283 | 4,505,117 | 4,514,846 | | 387,251 | 907,718 | 2,423,137 | 5,633,297 | | 9,351,402 | 45,835,653 | 54,001,508 |
| | 542,498 | 559,563 | 572,221 | 581,369 | 587,877 | 592,471 | 595,709 | 597,996 | 599,620 | 600,780 | 601,616 | 602,223 | 602,667 | 602,996 | 603,240 | 603,422 | 603,562 | | 35,033 | 308,787 | 520,872 | 806,994 | | 1,671,686 | 5,779,559 | 7,206,301 |
| | 898,468 | 915,048 | 927,628 | 937,043 | 944,025 | 949,174 | 952,961 | 955,743 | 957,787 | 959,291 | 960,398 | 961,215 | 961,819 | 962,266 | 962,598 | 962,843 | 963,028 | | 243,286 | 308,806 | 747,285 | 1,438,973 | | 2,738,350 | 9,973,016 | 11,509,123 |
| | 2,772,403 | 2,823,458 | 2,859,686 | 2,884,903 | 2,902,242 | 2,914,083 | 2,922,145 | 2,927,631 | 2,931,370 | 2,933,924 | 2,935,673 | 2,936,875 | 2,937,704 | 2,938,277 | 2,938,675 | 2,938,852 | 2,939,076 | | 104,342 | 280,944 | 1,132,030 | 3,364,380 | | 4,883,697 | 29,991,278 | 35,194,284 |
| | – | 9,180 | 13,770 | – | 9,180 | 13,770 | – | 9,180 | 13,770 | – | 9,180 | 13,770 | – | 9,180 | 13,770 | – | 9,180 | | 4,590 | 9,180 | 22,950 | 22,950 | | 59,670 | 91,800 | 91,800 |
| | (3,480,566) | (3,550,047) | (3,598,997) | (3,624,210) | (3,652,665) | (3,671,473) | (3,674,608) | (3,687,850) | (3,696,036) | (3,691,785) | (3,699,896) | (3,704,513) | (3,697,773) | (3,704,143) | (3,707,537) | (3,699,839) | (3,705,628) | | (393,028) | (752,178) | ######## | ######## | | (7,606,948) | (37,946,714) | (44,341,082) |
| | (30,176) | (30,247) | (30,305) | (30,841) | (30,879) | (30,908) | (30,931) | (30,950) | (30,964) | (30,975) | (30,984) | (30,991) | (30,996) | (31,000) | (31,004) | (31,006) | (31,008) | | (77,148) | (211,909) | (109,615) | (100,126) | | (498,798) | (351,316) | (371,716) |
| | | | | | | | | | | | | | | | | | | | (63,712) | (190,279) | (63,712) | (31,000) | | (348,703) | | |
| | (11,662) | (11,662) | (11,662) | (11,662) | (11,662) | (11,662) | (11,662) | (11,662) | (11,662) | (11,662) | (11,662) | (11,662) | (11,662) | (11,662) | (11,662) | (11,662) | (11,662) | | (7,497) | (11,662) | (22,491) | (31,654) | | (73,304) | (139,944) | (139,944) |
| | (16,345) | (16,345) | (16,345) | (16,835) | (16,835) | (16,835) | (16,835) | (16,835) | (16,835) | (16,835) | (16,835) | (16,835) | (16,835) | (16,835) | (16,835) | (16,835) | (16,835) | | (5,625) | (9,340) | (22,020) | (34,775) | | (71,660) | (188,055) | (202,020) |
| | (2,169) | (2,240) | (2,298) | (2,344) | (2,382) | (2,411) | (2,434) | (2,453) | (2,467) | (2,478) | (2,487) | (2,494) | (2,499) | (2,503) | (2,507) | (2,509) | (2,511) | | (314) | (727) | (1,392) | (2,697) | | (5,131) | (23,317) | (29,752) |
| | (3,450,390) | (3,519,799) | (3,568,692) | (3,593,369) | (3,621,786) | (3,640,565) | (3,643,677) | (3,656,901) | (3,665,072) | (3,660,810) | (3,668,912) | (3,673,522) | (3,666,777) | (3,673,143) | (3,676,533) | (3,668,833) | (3,674,620) | | (315,880) | (540,269) | ######## | ######## | | (7,108,151) | (37,595,398) | (43,969,365) |
| | (2,169) | (2,240) | (2,298) | (2,344) | (2,382) | (2,411) | (2,434) | (2,453) | (2,467) | (2,478) | (2,487) | (2,494) | (2,499) | (2,503) | (2,507) | (2,509) | (2,511) | | (314) | (727) | (1,392) | (2,697) | | (5,131) | (23,317) | (29,752) |
| | (835,703) | (851,385) | (863,286) | (872,193) | (878,798) | (883,670) | (887,253) | (889,885) | (891,819) | (893,241) | (894,289) | (895,061) | (895,632) | (896,050) | (896,369) | (896,601) | (896,777) | | (218,958) | (277,926) | (682,486) | (1,324,208) | | (2,503,577) | (9,265,406) | (10,716,653) |
| | (2,612,518) | (2,660,774) | (2,695,008) | (2,718,832) | (2,735,206) | (2,746,383) | (2,753,989) | (2,759,163) | (2,762,686) | (2,765,091) | (2,766,737) | (2,767,867) | (2,768,646) | (2,769,184) | (2,769,558) | (2,769,722) | (2,769,932) | | (93,908) | (256,216) | (1,054,593) | (3,159,626) | | (4,564,343) | (28,252,675) | (33,168,959) |
| | – | (5,400) | (8,100) | – | (5,400) | (8,100) | – | (5,400) | (8,100) | – | (5,400) | (8,100) | – | (5,400) | (8,100) | – | (5,400) | | (2,700) | (5,400) | (13,500) | (13,500) | | (35,100) | (54,000) | (54,000) |
| | 76,501 | 80,430 | 80,372 | 80,669 | 80,631 | 80,602 | 80,579 | 80,560 | 80,546 | 80,535 | 80,526 | 80,519 | 81,168 | 81,164 | 81,161 | 81,158 | 81,156 | | 108,084 | 20,763 | 78,919 | 260,051 | | 467,817 | 942,606 | 969,676 |
| | | | | | | | | | | | | | | | | | | | 76,288 | (30,279) | (13,712) | 139,000 | | 171,297 | 80,000 | |
| | 64,338 | 68,338 | 68,338 | 68,338 | 68,338 | 68,338 | 68,338 | 68,338 | 68,338 | 68,338 | 68,338 | 68,338 | 68,338 | 68,338 | 68,338 | 68,338 | 68,338 | | 34,503 | 49,338 | 86,509 | 111,346 | | 281,696 | 736,056 | 820,056 |
| | 12,163 | 12,092 | 12,034 | 12,331 | 12,293 | 12,264 | 12,241 | 12,222 | 12,208 | 12,197 | 12,188 | 12,181 | 12,830 | 12,826 | 12,823 | 12,820 | 12,818 | | (2,708) | 1,704 | 6,122 | 9,705 | | 14,824 | 126,550 | 149,620 |
| | 8,442 | 8,442 | 8,442 | 8,785 | 8,785 | 8,785 | 8,785 | 8,785 | 8,785 | 8,785 | 8,785 | 8,785 | 8,785 | 8,785 | 8,785 | 8,785 | 8,785 | | (3,375) | 468 | 3,914 | 5,510 | | 6,537 | 89,326 | 105,414 |
| | 3,721 | 3,650 | 3,593 | 3,546 | 3,509 | 3,479 | 3,456 | 3,438 | 3,424 | 3,412 | 3,404 | 3,397 | 4,046 | 4,042 | 4,038 | 4,036 | 4,034 | | 667 | 1,236 | 2,208 | 4,175 | | 8,287 | 37,224 | 44,206 |
| | 762,978 | 792,850 | 812,713 | 809,947 | 826,938 | 837,034 | 827,138 | 839,050 | 845,575 | 833,184 | 843,354 | 848,660 | 835,412 | 844,975 | 849,850 | 836,284 | 845,626 | | 74,071 | 157,849 | 384,666 | 871,766 | | 1,488,352 | 8,219,255 | 10,086,143 |
| | 540,329 | 557,322 | 569,923 | 579,025 | 585,496 | 590,060 | 593,275 | 595,544 | 597,153 | 598,302 | 599,129 | 599,729 | 600,168 | 600,492 | 600,734 | 600,912 | 601,051 | | 34,718 | 93,060 | 219,480 | 529,297 | | 876,555 | 5,681,242 | 7,176,549 |
| | 62,765 | 63,663 | 64,342 | 64,850 | 65,226 | 65,504 | 65,708 | 65,858 | 65,968 | 66,050 | 66,109 | 66,154 | 66,186 | 66,210 | 66,228 | 66,242 | 66,252 | | 24,329 | 30,881 | 64,799 | 114,764 | | 234,773 | 707,610 | 792,470 |
| | 159,885 | 162,685 | 164,678 | 166,072 | 167,036 | 167,700 | 168,155 | 168,469 | 168,684 | 168,833 | 168,936 | 169,008 | 169,058 | 169,093 | 169,117 | 169,130 | 169,143 | | 10,434 | 24,728 | 77,437 | 204,755 | | 317,354 | 1,738,603 | 2,025,324 |
| | – | 9,180 | 13,770 | – | 9,180 | 13,770 | – | 9,180 | 13,770 | – | 9,180 | 13,770 | – | 9,180 | 13,770 | – | 9,180 | | 4,590 | 9,180 | 22,950 | 22,950 | | 59,670 | 91,800 | 91,800 |
| | 839,479 | 867,880 | 884,985 | 890,615 | 902,169 | 909,536 | 907,717 | 914,211 | 918,022 | 913,719 | 918,480 | 921,079 | 916,580 | 920,740 | 922,911 | 917,442 | 921,382 | | 179,455 | 388,212 | 750,085 | 1,393,317 | | 2,711,068 | 9,182,861 | 11,001,819 |
| | (200,000) | (200,000) | (200,000) | (200,000) | (200,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | | (390,000) | (390,000) | (450,000) | (450,000) | | (1,680,000) | (2,250,000) | (3,000,000) |
| | 639,479 | 667,880 | 684,985 | 690,615 | 702,169 | 659,536 | 657,717 | 664,211 | 668,022 | 663,719 | 668,480 | 671,079 | 666,580 | 670,740 | 672,911 | 667,442 | 671,382 | | (210,545) | (1,788) | 300,085 | 943,317 | | 1,031,068 | 6,932,861 | 8,001,819 |
| | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) (1,990,000) | | | | | | | | | |
| | 4,408,280 | 4,976,160 | 5,561,145 | 6,151,760 | 6,753,930 | 7,263,465 | 7,771,182 | 8,285,393 | 8,803,414 | 9,317,134 | 9,835,614 | 10,356,694 | 10,873,274 | 11,394,014 | 11,916,924 | 12,434,366 | 12,955,749 | | | | | | | | | |
| | 4,290,000 | 4,190,000 | 4,090,000 | 3,990,000 | 3,890,000 | 3,790,000 | 3,640,000 | 3,490,000 | 3,340,000 | 3,190,000 | 3,040,000 | 2,890,000 | 2,740,000 | 2,590,000 | 2,440,000 | 2,290,000 | 2,140,000 | | | | | | | | | |
| | 4,190,000 | 4,090,000 | 3,990,000 | 3,890,000 | 3,790,000 | 3,640,000 | 3,490,000 | 3,340,000 | 3,190,000 | 3,040,000 | 2,890,000 | 2,740,000 | 2,590,000 | 2,440,000 | 2,290,000 | 2,140,000 | – | | | | | | | | | |

EXHIBIT C

Liquidation Analysis for 4D Factory, Inc., et al (23-11618 MEW)

| Assets | Scheduled/Appraised Value | Liquidation Value |
|---|---|---|
| Cash on hand | $3,000.00 | $3,000.00 |
| Equity In Centili Ltd. (Scheduled value) | $20,000,000[1] | unknown |
| Equity in Neon Machine, Inc. (Scheduled value) | $18,000,000 | unknown |
| Equity in Neon Media LLC (Scheduled value) | $ 6,000,000 | unknown |
| Shrap Tokens (Neon Machine Inc.) (based on US$/token) | $130,000,000[2] | unknown |
| Causes of Action (Scheduled value) | $100,000,000 | unknown |
| | | |
| | | |
| **ESTIMATED RECOVERY BY CH 7 TRUSTEE** | | **$4,500,000[3]** |
| Payments to secured creditors, administrative expenses and priority claims | | |
| Secured Creditor (MEP) | | ($4,200,000) |
| Chapter 7 Trustee commission | | ($158,250) |
| Chapter 7 Trustee administrative expenses (attorney's fees only) | | ($100,000) |
| Chapter 11 Administrative Claims | | ($500,000) |

[1] This is the Scheduled value but the Debtors believe the value has increased significantly since the Petition Date based on, at a minimum, the valuation proposed for Centili in an offer to merge with a Public Company submitted in December 2023, a proposed private investment in Centili in negotiation in January 2024, and the value of the large, long-term contracts the Company has recently signed and is launching in 1Q 2024.

[2] 4D LLC listed its interest in Neon Machine LLC at $18,000,000 in its Schedules. At the time 4D LLC could only calculate a value for the equity interest in Neon Machine Inc.. Since the filing, the SHRAP token owned by the Debtor has been listed and begun trading on exchanges, thus its value can now be calculated based on the actual market price of $0.28 per token, which total value is shown separately. At present, 4D LLC is not in possession of its tokens and is seeking turnover in its Chapter 11 case based on approval by the Board, which the Debtor controls. The Debtors expect delivery of the tokens within 30 days.

[3] The Debtors estimate that any recovery for creditors by a Chapter 7 Trustee would be affected by, at a minimum, the lack of cash in the estate, the necessity to arrange and/or provide financing to grow and generate returns from the operations of non-debtor affiliates, which would cease without the Debtors in place, reluctance of a Chapter 7 Trustee to litigate claims without any certainty of payment of costs and attorneys fees, and the uncertainty of litigation recoveries. In addition, prior to the bankruptcy filing, MEP had scheduled an Article 9 UCC sale of all assets of 4D LLC (including but not limited to its stock in Centili Ltd., Neon Media LLC and Neon Machine LLC) and the assets of Neon Media, LLC. According to MEP, no other bidders had registered to participate in the sale and, practically speaking, had the auction proceeded to conclusion on October 12, 2023 with no competing bidders, MEP would have taken all assets in a credit bid leaving nothing for any other creditors. This same result is a foreshadowing of what could possibly occur in a Chapter 7 liquidation. In stark contrast to a liquidation, Allowed Claims will likely be paid in full within 1 to 3 years.

| | | |
|---|---|---|
| Priority claims | | ($7,108.42)[4] |
| Total Available for General Unsecured Claims | | (-465,358) |
| Payments to nonpriority unsecured claims | | |
| Balance for nonpriority unsecured claims | | $0 |
| Estimated Percentage of Claims Which Unsecured Creditors Would Have Received or Retained in a Chapter 7 Liquidation | | 0% |
| Projected Percentage of Claims Which Unsecured Creditors Would Receive in Chapter 11 Plan | | 100% |

Confirmation of the Plan is in the best interests of the creditors.  Under a liquidation, unsecured creditors are estimated to receive approximately 0% of their claims.  However, under the Plan, unsecured creditors will receive 100% of their Allowed Claims.

---

[4]  Priority claim of the Internal Revenue Service.