**Hearing Date: February 15, 2024 at 10:00 a.m. (ET)**
**Objection Deadline: February 8, 2024 at 4:00 p.m. (ET)**
**Reply Deadline: February 12, 2024 at 4:00 p.m. (ET)**

Jonathan D. Canfield
Avram E. Luft
**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone:    (212) 318-6000
Facsimile:    (212) 319-4090
Email: joncanfield@paulhastings.com
         aviluft@paulhastings.com

Justin Rawlins
Will Clark Farmer
**PAUL HASTINGS LLP**
1999 Avenue of the Stars, 27th Floor
Century City, California 90067
Telephone:    (310) 620-5700
Facsimile:    (310) 620-5899
Email: justinrawlins@paulhastings.com
         willfarmer@paulhastings.com

*Counsel to Mark Long, Colin Foran, Naomi Lackaff,
Aaron Nonis, Don Norbury, and Mark Yeend*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

|  |  |  |
|---|---|---|
| *In re*: | : | Chapter 11 |
|  | : |  |
|  | : | No. 23-11618 (MEW) |
| 4D FACTORY, INC., *et al.*, | : |  |
|  | : | (Subchapter V Cases) |
| Debtors.[1] | : |  |
|  | : | (Jointly Administered) |

---------------------------------------------------------x

# NOTICE OF MOTION OF NEON SHAREHOLDERS
## FOR ENTRY OF AN ORDER FOR RELIEF FROM PRIOR ORDER GRANTING
## RELIEF FROM STAY, OR, IN THE ALTERNATIVE,
## GRANTING RENEWED RELIEF FROM AUTOMATIC STAY

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are 4D Factory Inc. (6770), and The 4D Factory LLC (8935).

**PLEASE TAKE NOTICE** that Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend (collectively, the "Neon Shareholders" or "Movants") have requested and obtained a hearing date on the annexed *Motion for Entry of an Order for Relief from Prior Order Granting Relief from Stay, or, in the Alternative, Granting Renewed Relief from Automatic Stay* (the "Motion") before the Honorable Michael E. Wiles, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 617, One Bowling Green, New York, New York 10004-1408 on February 15, 2024 at 10:00 a.m. prevailing Eastern Time.

**PLEASE TAKE NOTICE** that the deadline for any responses to the Motion is February 8, 2024, at 4:00 p.m. prevailing Eastern Time.

**PLEASE TAKE NOTICE** that the deadline for the Neon Shareholders to reply to any timely filed responses to the Motion is February 12, 2024, at 4:00 p.m. prevailing Eastern Time.

*[Remainder of Page Intentionally Left Blank.]*

Dated: February 1, 2024
      New York, New York

By: *Jonathan D. Canfield*
Jonathan D. Canfield
Avram E. Luft
**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone:    (212) 318-6000
Facsimile:    (212) 319-4090
Email:  joncanfield@paulhastings.com
       aviluft@paulhastings.com

Justin Rawlins
Will Clark Farmer
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, California 90067
Telephone:    (310) 620-5700
Facsimile:    (310) 620-5899
Email:  justinrawlins@paulhastings.com
       willfarmer@paulhastings.com

*Counsel to Mark Long, Colin Foran, Naomi Lackaff,*
*Aaron Nonis, Don Norbury, and Mark Yeend*

Hearing Date: **February 15, 2024 at 10:00 a.m. (ET)**
Objection Deadline: **February 8, 2024 at 4:00 p.m. (ET)**
Reply Deadline: **February 12, 2024 at 4:00 p.m. (ET)**

Jonathan D. Canfield
Avram E. Luft
**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone:    (212) 318-6000
Facsimile:    (212) 319-4090
Email:  joncanfield@paulhastings.com
           aviluft@paulhastings.com

Justin Rawlins
Will Clark Farmer
**PAUL HASTINGS LLP**
1999 Avenue of the Stars, 27th Floor
Century City, California 90067
Telephone:    (310) 620-5700
Facsimile:    (310) 620-5899
Email:  justinrawlins@paulhastings.com
           willfarmer@paulhastings.com

*Counsel to Mark Long, Colin Foran, Naomi Lackaff,
Aaron Nonis, Don Norbury, and Mark Yeend*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

| | | |
|---|---|---|
| | : | Chapter 11 |
| *In re*: | : | |
| | : | No. 23-11618 (MEW) |
| 4D FACTORY, INC., *et al.*, | : | |
| | : | (Subchapter V Cases) |
| Debtors.[1] | : | |
| | : | (Jointly Administered) |

---------------------------------------------------------x

### MOTION OF NEON SHAREHOLDERS FOR ENTRY OF AN ORDER FOR RELIEF FROM PRIOR ORDER GRANTING RELIEF FROM STAY, OR, IN THE ALTERNATIVE, GRANTING RENEWED RELIEF FROM AUTOMATIC STAY

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are 4D Factory Inc. (6770), and The 4D Factory LLC (8935).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

JURISDICTION AND VENUE ......................................................................................... 10

BACKGROUND ................................................................................................................ 11

I.      PREPETITION EVENTS ......................................................................................... 11

II.     DEBTORS' BANKRUPTCY FILINGS AND NON-DEBTOR DEFENDANT
DIRECTORS ........................................................................................................... 11

III.    NEON SHAREHOLDERS' DELAWARE ACTION AND MOTION FOR STAY
RELIEF .................................................................................................................... 12

IV.    EVENTS FOLLOWING ENTRY OF STAY ORDER EVIDENCE DEBTOR'S
EFFORTS TO RAID NEON, THROUGH NON-DEBTOR DEFENDANT
DIRECTORS, FOR THE BENEFIT OF DEBTORS' STAKEHOLDERS ................... 14

V.     JANUARY 16 DELAWARE CHANCERY COURT HEARING ................................. 18

ARGUMENT ..................................................................................................................... 18

I.      CHANGED CIRCUMSTANCES AND THE INTERVENING ACTIONS OF
THE DEBTORS AND NON-DEBTOR DEFENDANT DIRECTORS
WARRANT RELIEF FROM THE STAY ORDER ....................................................... 18

II.     THIS COURT SHOULD OTHERWISE PERMIT THE DELAWARE ACTION
TO PROCEED EXPEDIENTLY ............................................................................... 23

        A.     Automatic Stay Does Not Apply to Governance Dispute In Delaware
Involving a Non-Debtor Delaware Corporation .................................................. 23

        B.     Alternatively, Cause Exists to Grant Relief From Automatic Stay to
Resolve Critical Governance Issues of Non-Debtor Corporation ........................ 28

MEMORANDUM OF LAW .............................................................................................. 32

NOTICE ............................................................................................................................ 32

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re American Media Distributors, LLC*,
216 B.R. 486 (Bankr. E.D.N.Y. 1998)......................................................................24

*In re Anvil Holdings LP*,
595 B.R. 622 (Bankr. W.D.N.Y. 2019) .................................................................21

*Buck v. Davis*,
137 S. Ct. 759 (2017)...........................................................................................19

*In re Calvert*,
135 B.R. 398 (Bankr. S.D. Cal. 1991) ............................................................25, 27

*In re Capitale Ventures I, LLC*,
No. 14-11984, 2014 WL 3586543 (Bankr. S.D.N.Y. July 21, 2014) ......................25

*In re CII Parent, Inc.*,
No. 22-11345, 2023 WL 2926571 (Bankr. D. Del. April 12, 2023).................25, 27

*In re Cinole, Inc.*,
339 B.R. 40 (Bankr. W.D.N.Y 2006) ...............................................................20, 21

*Grayson v. Imagination Station, Inc.*,
No. 5051-CC, 2010 WL 3221951 (Del. Ch. Aug. 16, 2010).................................22

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
328 F. Supp. 2d 439 (S.D.N.Y. 2004).................................................................25

*Invictus Glob. Mgmt., LLC v. Monomoy Cap. Partners LLC (In re Grupo
Aeromexico)*,
Adv. Proc. No. 22-01122, 2023 WL 6206093, (Bankr. S.D.N.Y. Sep. 22,
2023) ...................................................................................................................19

*In re Johns-Manville Corp.*,
801 F.2d 60 (2d Cir. 1986).................................................................................24

*In re Marvel Entertainment Group*,
209 B.R. 832 (D. Del. 1997)...............................................................................24

*In re Mazzeo*,
167 F.3d 139 (2d Cir. 1999)...............................................................................29

*In re Peoples Bankshares, Ltd.*,
68 B.R. 536 (Bankr. N.D. Iowa 1986) .................................................................24

# TABLE OF AUTHORITIES

### (continued)

Page(s)

*Picard v.Fairfield Greenwich Ltd.*,
   762 F.3d 199 (2d Cir. 2014)................................................................24

*Queenie, Ltd. v. Nygard Int'l*,
   321 F.3d 282 (2d Cir. 2003)............................................................24, 25

*Solomon v. Armstrong*,
   747 A.2d 1098 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000) .........................22

*In re Sonnax Indus., Inc.*,
   907 F.2d 1280 (2d Cir. 1990)......................................................29, 30, 31

*In re SS Body Armor I, Inc.*,
   527 B.R. 597 (Bankr. D. Del. 2015) ......................................................24

*In re Stream TV Networks, Inc.*,
   No. 23-10763, 2024 WL 87639 (Bankr. E.D. Pa. Jan. 5, 2024)............................31

*SVB Fin. Grp. v. UBS Sec., LLC*,
   No. 23-10367, 2023 WL 2962212 (Bankr. S.D.N.Y. April 14, 2023) ....................25

*Teachers Ins. & Annuity Assoc. v. Butler*,
   803 F.2d 61 (2d Cir. 1986)................................................................24

*In re Tower Automotive, Inc.*,
   356 B.R. 598 (Bankr. S.D.N.Y. 2006) ....................................................27

*In re Winer*,
   158 B.R. 736 (N.D. Ill. 1993) ........................................................26, 27

**Statutes**

8 Delaware Code §
   204(h)(1) ............................................................................22, 23

11 U.S.C. §
   105(a) .............................................................................1, 10, 24
   362.................................................................................. *passim*
   542.................................................................................5, 15

28 U.S.C. §
   157..................................................................................10
   1334.................................................................................10
   1408.................................................................................10
   1409.................................................................................10

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Other Authorities**

Federal Rules of Bankruptcy Procedure
    4001.................................................................................................................10
    9024..........................................................................................................1, 10, 18

Federal Rules of Civil Procedure
    60(b) ............................................................................................... *passim*

Local Bankruptcy Rules
    4001-1 .............................................................................................................10
    9013-1 ......................................................................................................1, 10, 32

Pursuant to Rule 60(b) of the Federal Rules of Civil Procedure (the "Civil Rules"), made applicable to the above-captioned chapter 11 cases (the "Chapter 11 Cases") by Rule 9024 of the Federal Rules of Bankruptcy Procedure (each a "Bankruptcy Rule"), 11 U.S.C. § 105(a), and rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (each an "LBR"), movants Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend (collectively, the "Neon Shareholders" or "Movants") respectfully submit this motion (the "Motion") for entry of an order, substantially in the form of the proposed order annexed hereto as **Exhibit A**, for relief from the Court's prior *Order Granting Limited Relief from Stay* [ECF No. 50] (the "Stay Order") due to materially changed circumstances, or, in the alternative, granting renewed relief from the automatic stay and related relief.  In further support of the Motion, the Movants rely upon the *Declaration of Will Clark Farmer in Support of Motion for Relief from Stay Order* (the "Farmer Declaration"), filed concurrently herewith.

## PRELIMINARY STATEMENT

1.      This Motion seeks urgent relief from the automatic stay to prevent the Debtor's[2] weaponization of the automatic stay to improperly entrench its illegitimate board of directors at Neon Machine, Inc. ("Neon"), a non-debtor entity, and insulate from judicial scrutiny actions taken by those illegitimate non-debtor directors to raid Neon for the Debtors' benefit.

2.      As this Court correctly recognized during the December 13 hearing related to the Stay Order (the "Stay Hearing"),

> Your -- the asset that you're talking about, which is control, came with a contingency, in effect.  It was subject to the possibility that somebody else would have control under these safe agreements.  You don't want me to protect the asset.  You want me to enhance the

---

[2] References to the "Debtor" are to The 4D Factory LLC, the only debtor holding an interest in Neon.  References to the "Debtors" are to both of the jointly administered debtors, collectively.

asset by eliminating that contingency. How is that what the automatic stay calls for?

Farmer Decl., Ex. 1, Dec. 13, 2023 Hearing Tr. at 10:6-12 (the "Stay Hr'g Tr."). Yet, since leaving this Court, the Debtor and the Non-Debtor Defendant Directors (as defined *infra*) have taken deliberate steps to use the Stay Order for exactly that purpose.

3.     The Court clearly understood that the Debtor, in opposing relief from stay, sought a "pocket veto"[3] that would flip the automatic stay's protections on its head, turning it into a sword rather than a shield. The Court previously granted relief from stay to resolve the dispute in Delaware but preserved its ability, based on discussion with the parties, to revisit the automatic stay before the actual conversion of any Neon preferred shares into Neon common stock or the use of such stock to elect new directors or re-appoint Neon's former CEO. The Court clearly appreciated and acknowledged, however, that

> I don't think I have jurisdiction over any of it. It's all happening at a non-debtor company. **There are claims against individual directors**. I don't have jurisdiction over the individual directors. Somebody might make a case that it's somehow related to the bankruptcy case, but it would be extremely thin.

*Id.* at 28:6-19 (emphasis added).

4.     Based upon recent events, relief to permit complete and prompt resolution of the "Delaware Action" (captioned *Long, et al. v. Javarone, et al.*, Del. Ch. Ct. Case No. 2023-1186) and any related proceedings to determine the proper directors who constitute the board of Neon is now urgently warranted. In the interim weeks since entry of the Stay Order, (1) the Delaware Chancery Court (the "Delaware Court") interpreted the Stay Order as putting the Delaware Action "on ice," and (2) the Debtor, and its appointees, have taken actions to manipulate the Stay Order and use it as a sword to benefit the Debtor, through the Non-Debtor Defendant Directors'

---

[3] Stay Hr'g Tr. at 12:2-4.

affirmative resolution to raid and drain Neon (a non-debtor) of assets it holds in reserve. The Non-Debtor Defendant Directors' conduct goes much farther than simply preserving a chapter 11 estate's equity stake in a corporate entity. Rather, they have used the stay to attempt to achieve the very result—enhancing the Debtor's asset by illegitimately maintaining control of Neon's corporate governance—that this Court admonished was plainly not what the "automatic stay calls for."[4]

5.      Following this Court's issuance of the Stay Order, the Neon Shareholders sought prompt expedition of the Delaware Action so as to quickly present and decide the corporate governance issues facing Neon. As this Court correctly recognized during the Stay Hearing, using the analogy of possession of a car,[5] the Delaware Action should proceed and issues related to that matter, including discovery, should be presented to the Delaware Court. *Id.* at 28:20-29:15 (commenting that "I don't have the jurisdiction to do it, and probably even if I had the jurisdiction, I don't have the power to enter a final judgment. It would all have to be redone in the district court. So I'm going to let it happen in Delaware"). The defendants in the Delaware Action (all non-debtor directors who were appointed by the Debtor, and collectively referred to as the "Non-Debtor Defendant Directors") opposed expedition of the Delaware Action by citing and relying on the Stay Order, arguing that the Stay Order, among other things, militated against expediting the Delaware Action. The Non-Debtor Defendant Directors took this position notwithstanding the Court's admonition that "if, as [Debtors] say, this launch was made up and that the trigger didn't really happen, well, you should be able to ***dispense with it quickly*** in a Delaware court then."[6]

---

[4] Stay Hr'g Tr. at 10:6-12.

[5] *Id.* at 9:1-21.

[6] *Id.* at 14:5-12 (emphasis added).

6.      The Non-Debtor Defendant Directors' plan worked, and, at the January 16 hearing on expedition,[7] the Delaware Court interpreted the Stay Order as having "effectively imposed a status quo order on changes to the board and to management"[8] that "put on ice" the issue of "who's in charge[,]"[9] and thus—subject to further interpretation and/or direction from this Court— intended to deny the motion to expedite because it believed there was no exigent issue to resolve while the Stay Order was effective.  The Delaware Court stated it would reach out to this Court to discuss the Stay Order and what could or could not move forward in Delaware.[10]  If the Delaware Court issues a final order denying the request for expedition, then the Delaware Action will proceed in normal course which could take years to resolve.

7.      Meanwhile, the Non-Debtor Defendant Directors immediately took affirmative steps to use the Stay Order and the Delaware Court's interpretation of it to disrupt Neon's business so as to solely advance the Debtor's managing member's personal interests (as well as their own). Notably, despite submitting an affidavit claiming Network Launch had not occurred in opposing the Neon Shareholders' earlier motion for relief from stay, the ***day after entry*** of the Stay Order counsel to Cort Javarone (the Managing Member of the Debtor) sent a letter to the Argon Protocol Foundation, copying a Neon Shareholder, demanding 16,000,000 SHRAP tokens be delivered to Mr. Javarone, in his individual capacity, based on the occurrence of "Token Launch" (*i.e.*, Network Launch).[11]

---

[7] All references to dates in January are to January 2024.

[8] Farmer Decl., Ex. 2, Jan. 16, 2024 Hr'g Tr. at 36:22-23 (the "Jan. 16 Hr'g Tr.").

[9] *Id.* at 37:8-14.

[10] *Id.* at 35:4-19.

[11] The irony here is not lost on the Neon Shareholders, as Network Launch—the *sine qua non* of SHRAP token creation and transferability—establishes the illegitimacy of the Non-Debtor Defendant Directors' continued control of Neon's board of directors.

8.      Approximately a week later, on January 4, Debtors' counsel (who had previously disputed whether Network Launch occurred) wrote to a Neon employee, alleging that Neon or its Board of Directors is in possession of estate property, in the form of 480,927,488 SHRAP Treasury tokens (even though those tokens do not belong to the Debtor but instead belong to Neon, a non-debtor company), demanding that Neon's non-debtor board of directors use its authority to distribute such tokens to the Debtor, and threatening to bring an adversary proceeding under section 542 of the Bankruptcy Code to recover such tokens.

9.      On January 8, the Debtors filed their proposed plan of reorganization (the "Plan"),[12] which speculates that SHRAP Treasury tokens (which the Debtors do not own, did not disclose on their schedules, and are not entitled to) will not only fund the Plan but allow all Plan payments to be completed within one year rather than three years, because of the SHRAP token's "liquid trading market where the value can be monetized on any given day."[13]  The Debtors can only attempt to obtain the SHRAP tokens by having the illegitimate Non-Debtor Defendant Directors take affirmative steps and breach their fiduciary duties to improperly authorize the tokens' release and distribution.  These steps by the Non-Debtor Defendant Directors are actions that the Neon Shareholders should be free to challenge in Delaware.

10.     On January 9, the Non-Debtor Defendant Directors—not the Debtor—sent a board meeting agenda to Neon's non-defendant directors, scheduling a board meeting for January 12 to discuss, among other things, "SHRAP Token release authorization," and on January 12, the Non-Debtor Defendant Directors voted to remove restrictions and authorize distribution of *the entirety* of Neon's Treasury tokens on a pro rata basis to Neon's equity holders (a pro rata calculation that

---

[12] [ECF No. 51].

[13] Plan at 8.

also ignores the equity held by the SAFE investors, and is premised on the Stay Order halting issuance of shares required upon Network Launch).

11.     On January 31, Mr. Honour, a Non-Debtor Defendant Director, the purported executive chairman of Neon's board, and an indirect stockholder of the Debtor, wrote to Neon employees and the Debtors' representatives, among others, directing Neon to execute the illegitimate board resolution's directive to distribute Neon's SHRAP Treasury tokens based on: (a) an attached capitalization table of Neon's purported equity holders (dated nearly two years ago), and (b) a certificate executed by Mr. Honour dated January 23 purporting to certify the void January 12 board resolution.[14]  Mr. Honour's correspondence also attached a letter from counsel to the Debtor, also dated January 31, providing a cryptocurrency wallet address "for receipt of 4D Factory's token allocation." *Id.*

12.     The contradictions inherent in the Non-Debtor Defendant Directors' conduct and the positions taken before this Court and the Delaware Court are glaring.  <u>First</u>, the raiding of Neon's assets through the self-serving dictates of Neon's illegitimate board members is being demanded based on the Debtor implicitly admitting the occurrence of Network Launch.  The mere ability for tokens to be delivered at all concedes a *bona fide* Network Launch because without a Network Launch there could be no SHRAP tokens to deliver.  The Non-Debtor Defendant Directors have no answer to this other than gamesmanship, referring to "Token Launch"[15] rather than Network Launch and asserting that the *bona fide* Network Launch question is "going to be heavily litigated" and "going to require . . . considerable discovery and expert witness analysis."[16]

---

[14] *See* Farmer Decl., Ex. 7, Jan. 31, 2024 e-mail and attachments from S. Honour to Neon employees and Non-Debtor Defendant Directors, among others.

[15] *See* Farmer Decl., Ex. 4, Dec. 27, 2023 Letter from ArentFox Schiff LLP to Argon Protocol Foundation.

[16] Jan. 16 Hr'g Tr. at 27:5-14.

Neither position alters the conclusion that "Network Launch" necessarily occurred, and the Non-Debtor Defendant Directors should not be allowed to demand tokens (that would not exist but for a Network Launch having occurred) while simultaneously ignoring the contractually obligated issuance of Neon preferred shares under the SAFEs. <u>Second</u>, the Debtor and its appointed Non-Debtor Defendant Directors seek to take advantage of the automatic stay pending resolution of the Network Launch issue. Far from maintaining the status quo as to Neon's assets, the Debtors' Plan proposes to treat Neon as part of the estate and use its assets to fund distributions to (both) Debtors' creditors. Not only does the Non-Debtor Defendant Directors' attempted token distribution (it is void) risk improperly allocating non-debtor assets to the wrong shareholders of Neon and stripping Neon's investors of their rights, any attempt to confirm such a Plan would place the very Delaware governance issues this Court stated should be decided by the Delaware Court squarely back before this Court, an inefficient and expensive result.

13.     This attempted non-debtor corporate maneuver benefits illegitimate insiders (all three Non-Debtor Defendant Directors are direct or indirect stakeholders in the Debtor), allowing them to profit off of resale of SHRAP tokens while harming the interests of all other stakeholders of Neon, including more than thirty investor-shareholders of Neon, all while using the cover of the Stay Order. *See Declaration of Cort Javarone Pursuant to Rule 1007-2 of the Local Bankruptcy Rules of the SDNY,* [ECF No. 9], ¶ 4 (noting "$28 million [invested] by venture capital and other investors" in Neon). The Non-Debtor Defendant Directors' acts are all for the benefit of the Debtors' stakeholders and to the detriment of all other Neon stakeholders.

14.     Put simply, the Debtor has an equity interest in a non-debtor entity, and a Delaware Court should resolve whether that interest is a majority or minority stake in Neon. The Debtor, however, prior to resolution of that issue, continues to leverage the Non-Debtor Defendant

Directors to create an unscheduled asset (Neon's SHRAP Treasury tokens), effectively and improperly elevating its equity interest, by having them sign an affirmative, void, board resolution to distribute **Neon's** assets to the Debtor, all while hiding behind the automatic stay.  Not only does the Non-Debtor Defendant Directors' resolution harm every other stakeholder of Neon, the resolution of this illegitimate board is either (a) void as a matter of Delaware law, or (b) should be enjoined.

15.     As this Court previously observed, the "automatic stay, Section 362(a)(3) is designed to protect your legitimate assets.  It's not meant to allow you to keep everything over which you have possession, but to which you might not be legally entitled."  Stay Hr'g Tr. at 14:18-21.  The Debtor's improper use of the Bankruptcy Code's protections should not stand.[17] The Delaware Action must proceed expeditiously with the direction that the resolution of the Delaware Action will end the uncertainty presently stifling Neon and provide the parameters of the Debtor's interests in Neon.

16.     This Court already saw through the Debtors' antics, and now should grant further relief due to the intervening actions of the Debtor and Non-Debtor Defendant Directors.  Such further relief will prevent undue harm and delay, especially as the Debtors are using the Stay Order as a sword against a non-debtor entity and its non-debtor stakeholders.

---

[17] Indeed, Neon is particularly vulnerable. On December 18, 2023, a Neon employee sent a letter "on behalf of the employees of Neon Machine Inc." to Neon's five-member board of directors, threatening a mass resignation if suspended-CEO Mark Long was not reinstated, because employees lack all confidence in Mr. Javarone as a result of his refusal "to acknowledge the launch of our token and network, let alone the thousands of players using them since May 2023."  Farmer Decl., Ex. 3, Dec. 18, 2023 e-mail and attached letter to Neon Machine board of directors.  The letter was signed *by all fifty-three Neon employees*.  This all occurring at an increasingly critical juncture for Neon, a non-debtor enterprise that is on the precipice of launching its flagship product.  To maximize its value, Neon requires the full attention of its most experienced and trusted managers; it needs to continue fundraising to reach its full potential before product launch; its employees deserve certainty and should not be distracted by the Debtor's corporate brinksmanship; and Neon's corporate governance rights should no longer be in limbo and harming the company's operations.

17.     The Neon Shareholders' request for relief is simple and consistent with the previous Stay Order:  a debtor cannot use the stay to protect non-debtor directors who are harming a non-debtor, Neon.  Further, Neon's corporate governance and proper ownership of its equity interests should be resolved as soon as possible by a court in Delaware.

18.     The law in the Second Circuit supports such a result.  Courts in the Second Circuit are clear that the automatic stay does not disrupt the paramount importance of corporate governance rights, and, thus, the stay should not apply to any of the relief the Neon Shareholders seek.[18]  Again, this Court has already observed that "I don't think I have jurisdiction over any of it."[19]  The Neon Shareholders agree with the Court, and it is well settled that Bankruptcy Court jurisdiction should not extend to a state court action involving only non-debtor entities, even if the result of the litigation may reduce the value of a debtor's stock holdings in the entity.

19.     Moreover, the Debtor's brazen use of the automatic stay to allow non-debtor directors to use it as a sword to thwart Neon's corporate governance, while simultaneously attempting to use the Bankruptcy Code to loot a non-debtor entity (to fund the Debtors' Plan), is manifestly unjust.  It is black letter law that Neon's directors owe fiduciary duties to Neon's stakeholders—not the Debtor's creditors.  Equally plain is that, while a debtor's equity interests in a non-debtor entity are property of the estate, that non-debtor entity's assets are not.

20.     Accordingly, resolution of the Network Launch issue, performance under the SAFEs,[20] and Neon's corporate governance dispute are ripe because the present "status quo" is

---

[18] At the hearing in the Delaware Action to expedite the case, the Non-Debtor Defendant Directors represented to the Delaware Court that they would soon file a cross-claim against the two other counterparties to the investment agreements at issue (Griffin and Polychain) so those parties will be before the Delaware Court in the immediate term.

[19] Stay Hr'g Tr. at 28:6-19.

[20] Capitalized terms not defined in this Motion have the meanings given to such terms in the first stay motion filed by the Neon Shareholders, or the Stay Order, as applicable.  *See* [ECF No. 28].

both (a) significantly harming Neon, and, (b) as the Debtor contends, preventing the Debtors from reorganizing. *See* Jan. 16 Hr'g Tr. at 24:17-19 (Counsel to Non-Debtor Defendant Directors: "what it looks like is that the [Neon Shareholders] in this case are preventing the funding of a plan in the bankruptcy court . . . Because they are not issuing the tokens that they were directed by the board of directors . . . since they began this plan to do what they're doing with the [Delaware] Court.")  The Debtors should no longer be permitted to wield the automatic stay to prevent the Delaware Court from expeditiously answering the Network Launch inquiry and Neon from electing its authorized board of directors, and these issues should be resolved quickly so as to aid in the efficient administration of the Debtors' estates without delay and increased costs, the very goal of subchapter V.  Given the intervening events since the Stay Hearing, the automatic stay should not prevent or otherwise impede the Delaware Action, or any other legal action necessary to bring claims against the Non-Debtor Defendant Directors, to: (a) quickly move forward to resolve Network Launch, and (b) otherwise resolve the Delaware Action, including a determination of the proper corporate governance of Neon.

## <u>JURISDICTION AND VENUE</u>

21.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

22.    The statutory predicates for the relief requested herein are Civil Rule 60(b), made applicable by Bankruptcy Rule 9024, 11 U.S.C. § 362(d)(1), Bankruptcy Rule 4001,  LBR 4001-1 and 9013-1, and section 105(a) of title 11 of the United States Code, 11 U.S.C. § 101, *et seq* (the "<u>Bankruptcy Code</u>").

## **BACKGROUND**

### I.      **Prepetition Events**

23.      In the interests of efficiency, and the Neon Shareholders having previously submitted their *Motion for an Order Declaring Automatic Stay Inapplicable, or in the Alternative, Granting Related Relief from Automatic Stay* [ECF No. 28] (the "Stay Motion"), the Neon Shareholders do not repeat the factual background provided therein and incorporate by reference such information and the documentary support attached to the *Declaration of Jacob D. Alderdice* annexed thereto [ECF No. 28-1].

### II.      **Debtors' Bankruptcy Filings and Non-Debtor Defendant Directors**

24.      In or around August 2023, in retaliation for then-CEO Mark Long's refusal to assist the Debtor with a proposed repurchase of its equity interests in Neon such that the Debtor could supposedly satisfy its creditors, Mr. Javarone removed Mr. Long from Neon's Board of Directors and replaced him with Non-Debtor Defendant Director Scott Honour, an indirect equity holder in the Debtor (not Neon).

25.      On October 10, 2023, the Debtors commenced the Chapter 11 Cases.

26.      On or around October 16, 2023, the Debtor caused Steve Horowitz to be appointed to Neon's Board of Directors.  Messrs. Javarone, Honour, and Horowitz, collectively, are the Non-Debtor Defendant Directors in the Delaware Action.

27.      On November 13, 2023, the Debtor filed its Schedules and Statements of Financial Affairs.  *See* No. 23-11619 [ECF No. 19] (the "Schedules").  The Debtor's Schedule A/B, summarizing its assets, included "Neon Machine Inc. (Debtor owns 80% of common stock ***subject to possible dilution***),"[21] among other assets.  *Id.* at 9-13 (emphasis added).  The Debtor ***did not***

---

[21] As of the Petition Date, the Debtor purported to own 60% of the common stock of Neon, and it has never owned more than that amount of Neon common stock.

*schedule any cryptocurrency assets or tokens* on its Schedules under Part 4: Investments, Part 10: Intangibles and intellectual property, or Part 11: All other assets. *See id.* Other than its common stock holdings in Neon, and its purported interests in certain intellectual property allegedly held through such common stock, the Debtor did not schedule any other assets related to Neon or Neon's assets.

### III.    Neon Shareholders' Delaware Action and Motion for Stay Relief

28.    On November 27, 2023, the Neon Shareholders brought a derivative action on behalf of Neon in the Delaware Court, asserting claims for breach of fiduciary duties against the Non-Debtor Defendant Directors. Following an exchange of correspondence between counsel to the Debtors and prior counsel to the Neon Shareholders, on December 4, 2023, the Neon Shareholders filed the Stay Motion, seeking authority to proceed with the Delaware Action, and requested that the Stay Motion be adjudicated on an expedited basis.

29.    On December 13, 2023, the Court held a hearing on the Stay Motion.[22] During the Stay Hearing, the Court questioned the Debtors' overbroad view of the automatic stay: "You don't want me to protect the asset. You want me to enhance the asset by eliminating that contingency. How is that what the automatic stay calls for?"[23] The Court also noted that Neon's corporate governance dispute would need to be litigated in Delaware, observing: "I don't have the jurisdiction to do it, and probably even if I had the jurisdiction, I don't have the power to enter a final judgment. It would all have to be redone in the district court. So I'm going to let it happen in Delaware."[24]

---

[22] *See generally* Farmer Decl., Ex. 1.

[23] Stay Hr'g Tr. at 10:6-12.

[24] *Id.* at 28:20-29:1.

30.     The Court indicated it was inclined to grant limited relief from the automatic stay to authorize the Neon Shareholders to proceed in Delaware as to the question of whether Network Launch occurred, but that the Court wanted the parties to come back to the Court as to the issuance of Neon preferred or common stock, the conversion of Neon preferred stock to common stock, or the use of Neon preferred or common stock to elect new directors and/or to cause the appointment of a new CEO.[25]  The Court expressed its "hope" that if any parties in interest and/or stakeholders disagreed with the Court's tentative ruling, they would "com[e] to [the Court]" before engaging in self-help.[26]

31.     Less than a week later, on December 18, 2023, David Johnson, an employee at Neon and Executive Producer of Shrapnel, Neon's flagship product, sent a letter "on behalf of the employees of Neon Machine Inc." to Neon's five-member board of directors (the "Employee Letter").[27]  The Employee Letter implored the board members to reinstate suspended-CEO Mark Long, and "convey[ed] that, should Mark [Long] not be reinstated, we may find it untenable to continue under the leadership of someone who refuses to acknowledge the launch of our token and network, let alone the thousands of players using them since May 2023."[28]  The Employee Letter was **signed by 53 of Neon Machine's then-current employees**, effectively all of Neon's full-time staff other than certain founders and managers at the company.

32.     On December 26, 2023, the Court entered its Stay Order, noting that it "did not need to reach the issue of whether the automatic stay was inapplicable because stay relief was warranted to allow the Delaware Action to proceed as to whether any preferred stock should be

---

[25] Stay Hr'g Tr. at 31:19-32:10.

[26] *Id.* at 32:6-10.

[27] Farmer Decl., Ex. 3, Dec. 18, 2023 e-mail and attached letter to Neon board of directors.

[28] *Id.*

issued." Stay Order at 1. The Court retained jurisdiction to "hear and determine all matters arising from or related to the implementation, interpretation, or enforcement" of the Stay Order. *Id.,* ¶ 5.

## IV.    Events Following Entry of Stay Order Evidence Debtor's Efforts to Raid Neon, Through Non-Debtor Defendant Directors, for the Benefit of Debtors' Stakeholders

33.    Only a day after the Stay Order was issued, and ignoring the Debtors' arguments made at the Stay Hearing that Network Launch had supposedly not occurred, on December 27, 2023, ArentFox Schiff LLP, on behalf of its client, Cort Javarone "in connection with Mr. Javarone's [purported] ownership of SHRAP tokens," pursuant to certain assignment agreements, sent a letter to the Argon Protocol Foundation, copying a Neon Shareholder, demanding 16,000,000 SHRAP tokens be delivered to Mr. Javarone under the terms of such agreements.[29] The letter provided that:

> Section 1.2 of the Assignment Agreements provide that the Foundation shall "distribute, or cause to be distributed, the Tokens to [Mr. Javarone] as soon as practicable *after the date of the Token Launch*." As of this writing, the *SHRAP token is trading on multiple exchanges (e.g. KuCoin)*; therefore, the Foundation is obligated to immediately distribute the Tokens to Mr. Javarone *because the Foundation has issued SHRAP tokens* to others under similar contracts. The Foundation is obligated to "take such further actions as may be reasonably requested to give effect to the transactions contemplated" by the Assignment Agreements. (See Section 8.5 of the Assignment Agreements.)
>
> As assignee to the Token Subscription Agreements, dated November 8, 2021, by and between the Foundation and Neon Machine, Inc., Mr. Javarone is owner of all rights, title, and interests in the Tokens.
>
> We therefore request you immediately acknowledge that you *will distribute to Mr. Javarone the Tokens, whereupon our firm will provide a wallet address*.[30]

---

[29] Farmer Decl., Ex. 4, Dec. 27, 2023 Letter from ArentFox Schiff LLP to Argon Protocol Foundation.

[30] *Id.* at 1 (emphasis added).

Mr. Javarone's express acknowledgment of Token Launch (*i.e.*, Network Launch), the trading of the SHRAP token, and the ability for such tokens to be delivered to him through receipt in a "wallet address," are all acts derivative of a *bona fide* Network Launch, since without a Network Launch there could be no SHRAP tokens to deliver.  Moreover, this demand for SHRAP tokens was clearly timed to take advantage of the Stay Order which allowed the Non-Debtor Defendant Directors to continue their efforts to delay and entrench their positions as illegitimate directors at Neon, while the Debtor simultaneously attempts to rob Neon's coffers such that the Debtors' stakeholders may receive recoveries from non-debtor assets.

34.    On January 4, 2024, Mr. Javarone then had the Debtor's counsel send a letter to fellow Non-Debtor Defendant Director, Scott Honour, as purported Executive Chairman of the Board of Neon, alleging that "Neon Machine, Inc. and/or its Board of Directors is in possession and/or control of assets belonging to 4D LLC, to wit:  480,927,488 [SHRAP] tokens[,]"[31] and "demand[ing] the immediate release of the tokens . . . turnover of, and access to in transferable form, and all such property, in accordance with . . . section 542 of the Bankruptcy Code."[32]  No support or evidence was provided that reflects the Debtor's proper ownership or rights to Neon's Treasury tokens (or any other Neon assets).  The Debtor's demand was notable not only in its unsupported assertion that an (unscheduled) asset of a non-debtor entity was estate property, but also its contradictory position—demanding the transfer of SHRAP tokens that would not exist ***but for*** Network Launch.  *Compare* Jan. 4 Letter at 1 ("Neon . . . should instruct its crypto vendor . . . to turn over the [tokens] at a wallet address"), *with,* Hong Decl., [ECF No. 42-1], ¶¶ 9-11 (concluding incorrectly that as "of October 3, 2023, I believe there were only eight (8) total holders

---

[31] Farmer Decl., Ex. 5, Jan. 4, 2024 Letter from Debtors' Counsel to Neon and Neon board of directors.

[32] *Id.*

of SHRAP blockchain tokens," and the "generation of the tokens on April 29, 2023 appears to have been a *de minimis* test of the Shrapnel subnet system and not a 'bona fide transaction' intended to function as a 'Network Launch.'").

35.     On January 8, the Debtors filed their proposed *Chapter 11 Plan of Reorganization* [ECF No. 51] (the "Plan"), which is to be funded not by a monetization of the Debtors' only assets—*i.e.*, their equity interests in certain non-debtor entities, such as Neon—or a financing event, or a recapitalization, but rather the liquidation of non-debtor assets.  The Plan provides that it "is currently focused first on the Projections from its core operating company, Centili Ltd. and from the 4D LLC Projections illustrating the anticipated sales of 4D LLC's *SHRAP* Tokens."  Plan at 8.  The Debtors went on to mischaracterize Neon's corporate structure (and black letter law), asserting that "the shares *and crypto-currency* [the Debtor] owns in Neon Machine" would fund the proposed Plan through "sale[s] of a portion of 4D LLC's *assets in Neon Machine Inc.*"  *Id.* Curiously, the Debtors also admit that just as Network Launch occurred in April 2023, "Secured Creditor MEP . . . propose[d] . . . that the Debtor utilize *its value* in Neon Machine to repay debt; however, in the last four months . . . the *market to monetize those assets* has become far more visible and accessible and it is now possible to do so*."  Id.* (emphasis added).

36.     Realizing that the Debtors have no contractual or other rights to the SHRAP tokens in Neon's Treasury, but determined to press forward with their smash and grab, on January 9, the Non-Debtor Defendant Directors, presumably at the direction of the Debtor, sent a board meeting agenda to Neon's remaining directors, scheduling a board meeting for January 12 to discuss, among other things, "SHRAP Token release authorization."[33]  At the subsequent illegitimate board

---

[33] Farmer Decl., Ex. 6, Jan. 9, 2024 Neon board of directors meeting agenda regarding Jan. 12, 2024 proposed board meeting.

meeting on January 12, the Non-Debtor Defendant Directors voted to remove restrictions and authorize distribution of the entirety of Neon's Treasury tokens on a pro rata basis to equity holders, an attempted (non-debtor) corporate maneuver that is not only void, or should be enjoined, but would plainly risk misallocating assets among Neon's proper stockholders and undermining those stockholders' rights, including those pursuant to the SAFEs.[34]

37.     On January 31, Mr. Honour, a Non-Debtor Defendant Director, wrote to Neon employees and the Debtors' representatives, among others, directing Neon to execute the illegitimate January 12 board resolution's directive to distribute Neon's SHRAP Treasury tokens on a purported pro rata basis to Neon's then-stockholders *as of February 14, 2022.*[35] Mr. Honour's correspondence also attached a letter from counsel to the Debtor providing a cryptocurrency wallet address such that the Debtor could receive its purported allocation of Neon's assets. *Id.*

38.     Setting aside the breaches of fiduciary duties by the Non-Debtor Defendant Directors, the Debtor has no basis to demand that Neon, a non-debtor entity (and simply an investment held by one of the Debtors), liquidate its assets for the benefit of the Debtors' stakeholders (*i.e.,* (a) the Non-Debtor Defendant Directors, all three of whom are significant direct or indirect stockholders in the Debtor, (b) the Debtor's creditors, and (c) the stakeholders of 4D Factory Inc.—a debtor-entity with no interest in Neon).  No agreement exists providing such expansive and value-destructive rights to the Debtor.  Rather, the SHRAP tokens held in Neon's Treasury are similar to treasury stock held by a Delaware corporation.  Such Treasury tokens are established for various reasons and have been held on Neon's balance sheet for general corporate

---

[34] The Neon Shareholders reserve all rights with respect to any remedies at law or equity against the Non-Debtor Defendant Directors.

[35] *See* Farmer Decl., Ex. 7 at 3, Jan. 31, 2024 e-mail and attachments from S. Honour to Neon employees and Non-Debtor Defendant Directors, among others.

purposes to (1) make it more efficient to transfer tokens, pursuant to any properly authorized agreements, (2) to provide tokens issued under Neon's token incentive plan to employees, and (3) to use if allowed and as permitted under applicable laws for corporate activities.

39.    At bottom, Neon's Treasury tokens were never meant or intended to be used as a rainy-day fund for the Debtor (much less the Debtors), such that it could fund a proposed Plan to the detriment of Neon and Neon's stakeholders, including its own creditors.  The automatic stay does not protect the Non-Debtor Defendant Directors' actions, even if their ultimate goal is to enrich the Debtors (and themselves) with non-debtor assets, at the expense of Neon.

**V.    January 16 Delaware Chancery Court Hearing**

40.    On January 16, the Delaware Court held a hearing on the Neon Shareholders' motion to expedite.  The Delaware Court interpreted the Stay Order as a *status quo* order that prevents the Delaware Court from taking any action beyond resolving the Network Launch issue. This caused the Delaware Court to deny expedition and state that whether Network Launch occurred can be heard and decided in normal litigation course on a standard briefing schedule.

## <u>ARGUMENT</u>

**I.    CHANGED CIRCUMSTANCES AND THE INTERVENING ACTIONS OF THE DEBTORS AND NON-DEBTOR DEFENDANT DIRECTORS WARRANT RELIEF FROM THE STAY ORDER[36]**

41.    This Motion seeks entry of an order for relief from the Stay Order, or, in the alternative, granting renewed relief from the automatic stay due to the intervening actions of the Debtor and Non-Debtor Defendant Directors.  In addition to the inherent powers of this Court to

---

[36] Whether framed as a request for relief of the Stay Order under Rule 60(b)(6) and Bankruptcy Rule 9024, or a renewed request for relief from the automatic stay, the Motion should be granted.

decide this matter,[37] Rule 60(b)(6) authorizes this Court to grant relief to a moving party for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). Here, "extraordinary circumstances" warrant relief, including "the risk of injustice to parties" and "the risk of undermining the public's confidence in the judicial process." *Buck v. Davis*, 137 S. Ct. 759, 778 (2017) (quoting *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 863-864 (1998)).

42. <u>First</u>, the circumstances here represent a manifest injustice if the Debtors are permitted to use the automatic stay to stall resolution of a non-debtor corporate governance dispute, as they have since September 2023, such that they can cause the Non-Debtor Defendant Directors to entrench themselves and ignore the obligations of Neon to honor its agreement under the SAFEs, all while the Non-Debtor Defendant Directors attempt to fund the Debtors' restructuring with Neon's assets. To wit, since entry of the Stay Order, Debtor, and/or its affiliates or appointed Non-Debtor Defendant Directors have: (1) on December 27, demanded SHRAP tokens that would not exist but for the existence of the Network Launch, (2) on January 4, demanded SHRAP Treasury tokens to which Debtor has no rights to obtain, (3) on January 8, submitted a proposed Plan funded by such tokens, (4) on January 9, called for a meeting of Neon's board with an agenda item to approve distribution of Treasury tokens to the Debtor, among others, (5) on January 12, purported to approve the distribution of the Treasury Tokens to the Debtor, (6) on January 31, directed Neon employees to implement the distribution of the Treasury Tokens to the Debtor, and (7) yet, opposed expedition of the Delaware Action in reliance on the Stay Order, among other reasons, attempting to entrench the Non-Debtor Defendant Directors and claiming to the Delaware Court

---

[37] *Invictus Glob. Mgmt., LLC v. Monomoy Cap. Partners LLC (In re Grupo Aeromexico),* Adv. Proc. No. 22-01122, 2023 WL 6206093, at *4 (Bankr. S.D.N.Y. Sep. 22, 2023) (citing *In re Chateaugay Corp.*, 201 B.R. 48, 62 (Bankr. S.D.N.Y. 1996) and *Langston Law Firm v. Mississippi*, 410 B.R. 150, 155 (S.D.N.Y. 2008)).

that the Neon Shareholders brought the Delaware Action to stop the Debtors from funding their

Plan (which was filed exactly six weeks *after* the Delaware Action was commenced).[38]

43.      Put simply, the Debtor, through its appointed Non-Debtor Defendant Directors, is

utilizing the automatic stay as a sword to raid a non-debtor corporate entity while it is in wrongful

"possession" of control over Neon's board of directors, as its legal right to control the board has

long-since lapsed (and did so pre-petition).[39]  This Court was clear that the automatic stay cannot

be leveraged to enhance an asset, but that is precisely what the Debtor's efforts to date seek to

accomplish.

44.      The Motion should be granted for the additional reason that courts in the Second

Circuit recognize that a debtor may not improperly use the protections of the automatic stay as a

sword, instead of a shield that offers the honest debtor the chance to rehabilitate.  In *In re Cinole,

Inc.,* 339 B.R. 40 (Bankr. W.D.N.Y March 16, 2006), the debtor filed its petition on the eve of a

foreclosure sale with hardly any cash or working capital and no financing commitments.  339 B.R.

at 45.  The Court commented that given the circumstances, any "business plan" of the debtor's

was "pure speculation," and did not warrant the filing of a chapter 11 case to stop the foreclosure.

*Id.*  The only way a rehabilitated business would be able to exit chapter 11 was "if [the debtor] was

somehow able to use the Bankruptcy Code as a sword rather than as a shield" to stop legitimate

collection efforts "in the hopes that he could at some point in the future raise capital or obtain

---

[38] *See* Jan. 16 Hr'g Tr. at 24:17-19 (Counsel to Non-Debtor Defendant Directors: "what it looks like is that the [Neon Shareholders] in this case are preventing the funding of a plan in the bankruptcy court . . . Because they are not issuing the tokens that they were directed by the board of directors . . . since they began this plan to do what they're doing with the [Delaware] Court.")

[39] *See* Stay Hr'g Tr. at 14:5-12 ("It seems to me quite clear that there are legitimate disputes here.").  The Debtors admit Neon has been funded with "$28 million by venture capital and other investors," yet the Non-Debtor Defendant Directors ignore their fiduciary obligations to Neon's shareholders and attempt to prevent such investors from obtaining the benefit of their bargain with Neon.  *Declaration of Cort Javarone Pursuant to Rule 1007-2 of the Local Bankruptcy Rules of the SDNY,* [ECF No. 9], ¶ 4.

financing . . .; a pipedream in this Court's view[.]"  *Id.* at 46; *see also In re Anvil Holdings LP,*

595 B.R. 622, 625 (Bankr. W.D.N.Y. Jan. 24, 2019) (describing the automatic stay as being

"wielded by the debtor as a battle axe, not a shield" where there was "no business to be saved, no

jobs at risk, no laudable social purpose to be served, no legitimate bankruptcy purpose to be

advanced").

45.     Here, like in *Cinole, Inc.,* there are two holding-company Debtors with a pipedream

Plan, funded by unscheduled assets belonging to a non-debtor entity (Neon) and/or the speculative

"prospects" of a wholly-owned non-debtor subsidiary (Centili Ltd.) who is allegedly insolvent and

owes at least one of its creditors (also seeking stay relief) approximately $750,000.  *See* [ECF No.

53].  While a proposed Plan is on file, parties in interest have no visibility into the true financial

affairs of either of the Debtors' wholly-owned entities, Centili Ltd. and Neon Media LLC.[40]

Instead of seeking a pragmatic resolution to the Debtors' financial distress under the mandates of

the Bankruptcy Code, and in order to deflect and put forth more red herrings, the Neon

Shareholders expect that the Debtors will continue the ruse—delay; object to stay relief; and avoid

any ruling on Network Launch, while simultaneously using the veneer of the honest debtor seeking

reorganization to try and raid Neon before the SAFEs are enforced.  Such gamesmanship should

not be countenanced by the Court.[41]

46.     Second, exigent circumstances warrant relief.  Given all of the efforts of the

Debtors, through the Non-Debtor Defendant Directors and otherwise, to destroy Neon's value for

their gain, urgent resolution of the Delaware Action is necessary.  The Delaware Court interpreted

---

[40] This while Neon, with assistance from the Neon Shareholders, has responded to informal Rule 2004 discovery requests and produced 454 pages of documents related to Neon, including bank statements, Rule 2015.3 financial statements, and sensitive documents related to Neon's development and improvement of the Shrapnel game.

[41] This is especially true given the Debtors' previous attempt to put the Network Launch issue squarely before the Court.  *See generally* Obj. to Stay Motion, [ECF No. 42] and Hong Decl., [ECF 42-1], ¶¶ 9-11.

the Stay Order to be a *status quo* order that effectively put the Delaware Court's resolution of the matter "on ice."[42]  Meanwhile, the Debtor continues to leverage its improper "possession" of control of a non-debtor to extract benefits for the Debtors' stakeholders, to the detriment of all other *non-debtor* stakeholders, including shareholders, investors, creditors, and employees of Neon.  Indeed, Neon is in crisis.  Its employees have indicated that they all may promptly resign if no resolution is reached. *See* Farmer Decl., Ex. 3, Dec. 18, 2023 e-mail and attached letter to Neon Machine board of directors.

47.     The Non-Debtor Defendant Directors would have Neon liquidate all SHRAP Treasury tokens, because they believe it in their interests as direct or indirect shareholders *of the Debtor*.  Their self-interested (and *ultra vires*) board resolution, purportedly passed on January 12, is void for numerous reasons, including, among other reasons, because the Non-Debtor Defendant Directors, including Mr. Javarone, are purporting to take actions they lack authority to take, as an illegitimate board of directors, and which are not performed in Neon's interests.  *See Solomon v. Armstrong*, 747 A.2d 1098, 1114 and n.45 (Del. Ch. 1999), *aff'd,* 746 A.2d 277 (Del. 2000) ("void acts are those acts that the board . . . has no . . . authority to undertake . . . are fundamentally contrary to public policy" and, among others, those that "are not performed in the interest of the corporation . . . [and those] contrary to basic principles of fiduciary law."); *Grayson v. Imagination Station, Inc.,* No. 5051-CC, 2010 WL 3221951, at *18 (Del. Ch. Aug. 16, 2010) (the "appropriate remedy would be to void the actions taken by the illegitimate board" where defendants "allow[ed] illegitimate directors on the board to take certain actions, and . . . prevent[ed] legitimate directors from participating"); *cf.* 8 Del. C. § 204(h)(1) ("'Defective corporate act' means . . . any act or

---

[42] Jan. 16 Hr'g Tr. at 37:8-14.

transaction purportedly taken by or on behalf of the corporation . . . that is . . . void or voidable due to a failure of authorization").

48.    <u>Third</u>, no parties in interest will be prejudiced by the Court's granting relief from the Stay Order.  To the contrary, the Court invited parties that might seek relief beyond the parameters of the Stay Order to raise such issues before the Court and not act hastily.[43]  In addition, granting the additional relief requested herein is critical for all stakeholders, including the Debtors.  *See* Jan. 16 Hr'g Tr. at 24:17-19 (Counsel to Non-Debtor Defendant Directors: "what it looks like is that the [Neon Shareholders] in this case are preventing the funding of a plan in the bankruptcy court . . . Because they are not issuing the tokens that they were directed by the board of directors . . . since they began this plan to do what they're doing with the [Delaware] Court.").

49.    Because the Debtors have, since entry of the Stay Order, so brazenly departed from the *status quo*, the Neon Shareholders submit that the Motion should be granted under Civil Rule 60(b)(6).[44]

## II.    THIS COURT SHOULD OTHERWISE PERMIT THE DELAWARE ACTION TO PROCEED EXPEDIENTLY

### A.    <u>Automatic Stay Does Not Apply to Governance Dispute In Delaware Involving a Non-Debtor Delaware Corporation</u>

50.    For the same reasons as set forth in the Stay Motion, sections 362(a)(1) and (6) of the Bankruptcy Code are not at issue here.  The Neon Shareholders address in particular whether the automatic stay may apply pursuant to section 362(a)(3) to curtail the relief they seek in the Delaware Action.  The authorities resoundingly answer that inquiry in the negative, and the Motion should be granted.

---

[43] Stay Hr'g Tr. at 32:6-10.

[44] The Motion is timely under the facts and circumstances of this case.  Not only is the Motion filed within less than a year, *see* Civil Rule 60(b)(1)-(3), but the events occurring since entry of the Stay Order have developed apace and are dynamic, as in all restructurings.

51.     Courts in the Second Circuit recognize that the automatic stay does not preclude the paramount interest of corporate governance rights from being acted upon unless "clear abuse" is afoot.  *In re Johns-Manville Corp.,* 801 F.2d 60, 63 (2d Cir. 1986).  It is well settled that even a debtor's board of directors may be replaced during a reorganization.  *See, e.g, In re Johns-Manville Corp.,* 801 F.2d at 63 (right to call a shareholder meeting to elect a new board of directors impaired only if the shareholder is guilty of "clear abuse"); *In re Marvel Entertainment Group,* 209 B.R. 832, 838 (D. Del. 1997) ("right of shareholders to be represented by directors of their choice and thus to control corporate policy is paramount"); *In re SS Body Armor I, Inc.,* 527 B.R. 597 (Bankr. D. Del. 2015) (adopting "the holdings of *Johns-Manville* and *Marvel Entertainment*); *In re American Media Distributors, LLC,* 216 B.R. 486, 489 (Bankr. E.D.N.Y. 1998) (same).

52.     Where corporate governance disputes involving non-debtors are at issue, as is the case here, the likelihood that the stay might apply **is even more remote**.  *See e.g.,* *In re American Media Distributors, LLC,* 216 B.R. at 489-90 (stay did not apply to non-debtor co-owners whose operating agreement provided that governance dispute should be arbitrated because "such claims between non-debtors . . . have no effect on the debtor's property"); *In re Peoples Bankshares, Ltd.,* 68 B.R. 536 (Bankr. N.D. Iowa 1986) (declining to reach section 362(b)(4) police power exception to automatic stay because stay was inapplicable to regulator's acts with respect to non-debtor subsidiaries of bank holding company).

53.     By its terms, the automatic stay applies to protect debtors, not others.  *See Queenie, Ltd. .v Nygard Int'l,* 321 F.3d 282, 287 (2d Cir. 2003); *Teachers Ins. & Annuity Assoc. v. Butler,* 803 F.2d 61, 65 (2d Cir. 1986).  The stay is only extended to non-debtors in extraordinarily unique circumstances that are not present here.  *See Picard v.Fairfield Greenwich Ltd.,* 762 F.3d 199, 213 (2d Cir. 2014) ("But it is an extraordinary exercise of discretion to use [section 105] to stay a third

24

party action not involving the debtor, and the mere possibility that a third-party action will have some effect on a debtor's estate is not enough to satisfy either the *Queenie* or *Winter* standards."). Consistent with the statute's purpose and plain meaning, in the ordinary case, "courts in this Circuit have regularly refused to extend a debtor corporation's § 362(a) stay to its non-debtor officers and principals." *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 328 F. Supp. 2d 439, 441 (S.D.N.Y. 2004); *see also In re Capitale Ventures I, LLC,* No. 14-11984, 2014 WL 3586543, at *1 (Bankr. S.D.N.Y. July 21, 2014) ("There is no question that a bankruptcy petition ordinarily stays litigation against the filing entity and not against principals or affiliates.").  The same goes for a non-debtor entity that the debtor has an equity interest in, even one that is wholly-owned by the debtor, unless unusual circumstances exist.  *See e.g.*, *SVB Fin. Grp. v. UBS Sec., LLC,* No. 23-10367, 2023 WL 2962212, at *7 (Bankr. S.D.N.Y. April 14, 2023) ("It is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass related non-debtor entities who are defendants in lawsuits.") (citation omitted).

54.    That is so even when a debtor that owns stock in an entity may lose, or loses, majority control of a non-debtor entity through stock dilution—just the concern the Debtor espouses in this case.  *See In re Calvert,* 135 B.R. 398, 400 (Bankr. S.D. Cal. 1991) (holding that stay did not apply to post-petition actions of non-debtor entity's board to exchange debt for equity with non-debtor shareholder, thereby diluting debtor shareholder and giving non-debtor a majority interest and control); *see also In re CII Parent, Inc.,* No. 22-11345, 2023 WL 2926571, at *17 (Bankr. D. Del. April 12, 2023) (denying motion to enforce stay concerning "corporate governance dispute over proper boards" of non-debtor entities because debtor had bargained away certain equity rights pre-petition, and pre-petition agreements governed the dispute).

55.     *In re Winer,* 158 B.R. 736 (N.D. Ill. 1993) is particularly instructive.  In *Winer,* a non-debtor entity entered into an agreement with  investors; in return for their payment of $50,000, the investors would receive an equity interest in the non-debtor (25%), as well as the right to purchase additional equity in the future for a sum certain (up to 40%).[45]  *Id.* at 737.  The debtor however, didn't perform and deliver the shares pursuant to the parties' pre-petition (simple) agreement for equity (the "Agreement").  *Id.* The debtor-stockholder eventually filed bankruptcy and during his case, "purporting to wear his hat as [non-debtor's] president," he transferred certain intellectual property of the non-debtor entity to a third-party.  *Id.* at 738.  Eventually, the counter-parties to the Agreement sought specific performance of the Agreement and to enjoin the non-debtor entity from transferring its assets.  *Id.* at 739.[46]

56.     Distinguishing the Second Circuit's decision in *48th St. Steakhouse,* 835 F.2d 427, 430 (2d Cir. 1987), the Court not only held that the automatic stay did not bar the issuance of the shares by the non-debtor entity (pursuant to the Agreement), but "any claimed shareholder power to effect the distribution" of the non-debtor's assets was "non-existent." *Id.* at 746.  Moreover, the court held that the "personal power" of directorship did not pass to the trustee as property of the estate, but rather, stayed with the individual debtor and was not estate property subject to the stay. *Id.* at 748.

57.     In other words, the debtor in *Winer*, like the Non-Debtor Defendant Directors here, **are non-debtor directors subject to suit concerning pre-petition equity agreements and post-petition conduct that jeopardizes the assets of a non-debtor**.   The Non-Debtor Defendant Directors' actions should not be protected by the automatic stay.

---

[45] The debtor held the remainder of equity interests in the non-debtor entity.

[46] The debtor was not a party to the lawsuit.

58.     Not only is the automatic stay inapplicable, the Non-Debtor Defendant Directors'
attempt to distribute Neon's assets for the benefit of the Debtor is outside of this Court's
jurisdiction.  None of the Delaware Action, Neon's corporate governance dispute, Neon's assets,
and the Non-Debtor Defendant Directors' conduct provide this Court jurisdiction, as it has already
recognized.  Stay Hr'g Tr. at 28:6-19 ("I don't think I have jurisdiction over any of it.").  That the
outcome of the Delaware Action may impact the value of the Debtor's stock in Neon does not alter
that result.  *See, e.g., In re Tower Automotive, Inc.,* 356 B.R. 598, 601 (Bankr. S.D.N.Y. 2006)
(absent evidence that non-debtor subsidiary was a sham or alter ego, bankruptcy court jurisdiction
did not extend to state court proceeding, "even though the value of the debtor's stock holdings in
the subsidiary ***would be directly impacted by the results of the litigation***") (emphasis added)
(citing *Feldman v. Beck Industries, Inc., (In re Beck Industries, Inc.),* 479 F.2d 410 (2d Cir. 1973));
*In re Winer,* 158 B.R. at 738 (enforceability and effect of pre-petition agreement for future equity
"can be sorted out before [the state court] in the course of his adjudicating the merits" of investors'
claims against non-debtor entity "just as they need not have sidetracked the Bankruptcy Court's
decision of the issues before it").

59.     Here, not only does the Court lack jurisdiction regarding the Delaware Action, the
automatic stay simply doesn't extend to such an action where only non-debtor parties are involved,
even if the corporate governance dispute may dilute the Debtor's interests such that it will lose its
majority stake.  *See Calvert,* 135 B.R. at 400.  The critical time is when the agreement—here the
SAFEs—is executed and approved.  *Compare In re Winer,* 158 B.R. at 741, and *In re CII Parent,
Inc.,* 2023 WL 2926571, at *17 (debtor "gave away its right to vote" pledged equity under pre-
petition loan and security agreements), *with* Objection to Stay Motion, [ECF No. 42] ¶ 34 ("At
[the] precise moment [of preferred share conversion to Griffin and Polychain], the Debtors'

controlling equity in Neon becomes jeopardized[.]").  On the Petition Date, the Debtor's rights, interests, and obligations were contingent—Neon, a non-debtor, had entered into a bargain whereby the Debtor's shares may be diluted—a fact the Debtor readily admitted in its Schedules. *See* Schedules at 10 (Item 15.2) (admitting stake was subject to dilution).

60.    The Debtor's controlling equity in Neon was jeopardized long before the Petition Date, when the SAFEs were agreed to and approved by Neon's board.  Stay Hr'g Tr. at 10:6-12 ("the asset that you're talking about, which is control, came with a contingency"); *id.* at 8:6-11 ("Well, the theory of the complaint here . . . is that you currently possess control, but that you're not legally entitled to it, that these shares should have been issued sometime before you filed your bankruptcy case."); *id.* at 8:20-9:8 ("If you lose [in Delaware], wouldn't that just mean in effect that the asset you are claiming to own and that you possessed at the time of bankruptcy didn't' rightfully belong to you?").  Because it is well-settled in the Second Circuit that corporate governance rights are paramount, and, generally, not subject to the automatic stay, especially so when involving a non-debtor, and given this Court's lack of jurisdiction, the Court should grant the Motion and determine that the stay is inapplicable to all the relief requested in the Delaware Action.

**B.    Alternatively, Cause Exists to Grant Relief From Automatic Stay to Resolve Critical Governance Issues of Non-Debtor Corporation**

61.    Even if the Court decides that the automatic stay applies to the Delaware Action and the shareholder rights flowing from it, the specific relief from the automatic stay requested by the Neon Shareholders here is warranted.

62.    The Second Circuit has identified twelve factors that may be relevant in deciding whether cause exists to lift the automatic stay to allow litigation to proceed in another forum:

> (1) whether relief would result in a partial or complete resolution of
> the issues; (2) lack of any connection with or interference with the

bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether the movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interest of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of the harms.

*In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990). Not all *Sonnax* elements are relevant in every case, *In re Mazzeo*, 167 F.3d 139, 143 (2d Cir. 1999). Here, all applicable *Sonnax* elements either weigh in favor of lifting the stay, or are inapplicable to the circumstances.

63.    Pursuant to the Stay Order, the Court has already determined that cause exists to lift the stay with respect to determining whether Network Launch occurred.  Granting renewed relief to permit resolution of the Delaware Action[47] in its entirety—including resolution of the core governance issues, issuance and conversion of preferred to common stock, and the appointment of directors and officers—is now critically important.  The Delaware Court interpreted the Stay Order as having "put on ice" the issue of "who's in charge"[48] at Neon and is unlikely to take any action to resolve these disputes without this Court's imprimatur.  The Debtor's abuse of the automatic stay, through the Non-Debtor Defendant Directors, to disrupt Neon's corporate governance is causing significant harm to Neon, its employees, and the more than thirty outside investors whose

---

[47] For the same reasons outlined below, cause exists to lift the automatic stay to the extent the Neon Shareholders may bring any other legal action necessary to assert claims against the Non-Debtor Defendant Directors, to: (a) quickly move forward to resolve Network Launch, and (b) otherwise resolve the Delaware Action, including the issuance of Neon preferred stock and its conversion to common stock, the exercise of corporate governance rights attendant thereto, including the election of directors and officers

[48] *Id.* at 37:8-14.

corporate governance rights the Non-Debtor Defendant Directors seek to "pocket veto" until they can completely raid the till of a non-debtor entity, leaving themselves and the Debtor enriched and Neon's other stakeholders holding the bag.[49]  Accordingly, to the extent the Court determines that the automatic stay applies to the Delaware Action (it does not), the Court's previous finding of cause to lift the stay should be extended with respect to issuance and conversion of Neon stock, exercising corporate governance rights attendant thereto, and the Neon Shareholders taking any other legal action necessary to bring claims against the Non-Debtor Defendant Directors to resolve the corporate governance dispute.  The specific *Sonnax* elements also support lifting the stay as to the foregoing relief.

64.    Here, the third, fifth, eighth, and ninth *Sonnax* elements all are either inapplicable or weigh in favor of lifting the stay.  The Delaware Action does not involve the Debtor as a fiduciary; the Debtor is a non-party and, thus, its insurer need not defend; and there will be no judgment claim or lien against the Debtor such that it could be avoided or subordinated (for the same reason).  The remaining *Sonnax* elements all militate in favor of granting relief such that, assuming Network Launch has occurred, the Neon preferred stockholders should be authorized to exercise their paramount corporate governance rights over a non-debtor, based on their enforceable agreements with a non-debtor.

65.    The Neon Shareholders would receive complete relief for their claims if the stay were lifted so they could pursue a judgment with respect to Neon's rightful board of directors. The Delaware Action will not interfere with the Debtor's bankruptcy case at all—in fact it would provide direction and clarity to the Debtor's proposed reorganization in a cost-effective manner

---

[49] *See Declaration of Cort Javarone Pursuant to Rule 1007-2 of the Local Bankruptcy Rules of the SDNY,* [ECF No. 9], ¶ 4 (noting "$28 million [invested] by venture capital and other investors" in Neon).

by finally and quickly determining if the Debtor had any "control" interests in Neon as of the Petition Date, given the contingent common equity it held, and its blatant refusal to cause Neon to honor its obligations under the SAFEs.  The Delaware Action would proceed in the Delaware Chancery Court, an institution with "unique and established expertise" to resolve such corporate governance disputes.  *See In re Stream TV Networks, Inc.,* No. 23-10763, 2024 WL 87639, at *35 (Bankr. E.D. Pa. Jan. 5, 2024) (finding cause to lift stay to allow creditor to resolve director-appointment dispute at wholly-owned debtor subsidiary because issue was "critical to these bankruptcy cases . . . but governed by Delaware law").

66.    The Delaware Action, or any action seeking substantially similar relief against the Non-Debtor Defendant Directors, would involve only third parties—namely, non-debtor Neon, the Non-Debtor Defendant Directors, Griffin and Polychain,[50] and the non-debtor Neon Shareholders. Nor would litigating the Delaware Action prejudice the interests of the Debtor's creditors.  The Debtor's creditors have no legal interest in Neon's contractual obligations and assets.  This is even more clear with respect to the stakeholders of 4D Factory Inc., which has no interest in Neon at all.  As to efficiency, this Court has already commented that to the extent the parties do not reach a resolution out of court, "I don't have the jurisdiction to do it, and probably even if I had the jurisdiction, I don't have the power to enter a final judgment. It would all have to be redone in the District Court."[51]  Accordingly, the Delaware Action is far more efficient for all parties.  Given the Delaware Court's expertise, and because the circumstances involve a "relatively straight

---

[50] There is no doubt that both Griffin and Polychain will be involved in the Delaware Action.  Both intend to assert their rights under the SAFEs and seek immediate resolution of the governance issues that presently plague Neon.  And, Non-Debtor Defendant Directors' counsel stated at the hearing in Delaware that he would be filing claims against both investors shortly.  Jan. 16 Hr'g Tr. at 20:13-18 (Counsel to Non-Debtor Defendant Directors: "it is our intention to bring Polychain and Griffin into this lawsuit.  I expect to get that on file within the next one week to ten days, max"); 33:12-16 ("We think  the parties should be allowed to be in, such as Griffin and Polychain that I will file next week").

[51] Stay Hr'g Tr. at 28:20-25.

forward" application of the SAFEs' plain meaning, the eleventh element also weighs in favor of lifting the stay.  Here, the Debtor will not be a party to the Delaware Action, but Neon will be irreparably harmed should it be unable to enforce the bargain agreed to in the SAFEs, and instead the Non-Debtor Defendant Directors loot Neon for the Debtor's benefit.  The Neon Shareholders are experiencing operational, reputational, and legal harm due to the Non-Debtor Defendant Directors' failures to abide by their fiduciary duties and instead pursue the Debtor's interests.

67.      To make matters worse, Neon and its shareholders are suffering at a critical time for the enterprise—the launch and promotion of its flagship product. The balance of harms tips heavily in favor of granting relief from the stay, and the Motion should be granted.

## MEMORANDUM OF LAW

68.      Pursuant to LBR 9013-1(a), no separate memorandum of law is required.

## NOTICE

69.      Notice has been provided to: (a) attorneys for the Debtors; (b) the Office of the U.S. Trustee; (c) the subchapter V trustee; and (d) all parties who have formally appeared and requested notice in these Chapter 11 Cases.  In light of the nature of the relief requested herein, the Neon Shareholders submit that no other or further notice is required.


*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Movants respectfully request that the Motion be granted and the Court (a) determine that the automatic stay does not apply to the Delaware Action, and any related proceeding, such that the stay does not prevent non-debtor Neon Machine, Inc., its shareholders, or any other non-debtor from taking corporate acts consistent with any ruling in the Delaware Action or any other legal action necessary to bring claims against the Non-Debtor Defendant Directors and resolve the corporate governance dispute as to Neon Machine, Inc., or, in the alternative, (b) amend the Stay Order to the extent that cause exists to lift the stay with respect to the foregoing relief.

Dated: February 1, 2024
      New York, New York

By: *Jonathan D. Canfield*
Jonathan D. Canfield
Avram E. Luft
**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone:    (212) 318-6000
Facsimile:    (212) 319-4090
Email: joncanfield@paulhastings.com
      aviluft@paulhastings.com

Justin Rawlins
Will Clark Farmer
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, California 90067
Telephone:    (310) 620-5700
Facsimile:    (310) 620-5899
Email: justinrawlins@paulhastings.com
      willfarmer@paulhastings.com

*Counsel to Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend*