**<u>EXHIBIT 2</u>**

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MARK LONG, COLIN FORAN, NAOMI LACKAFF,:
AARON NONIS, DON NORBURY, and MARK      :
YEEND, on behalf of Neon Machine,       :
Inc.,                                   :
                                        :
              Plaintiffs,               :
                                        :
        v                               : C. A. No.
                                        : 2023-1186-MTZ
CORT JAVARONE, SCOTT HONOUR,             :
and STEVE HOROWITZ,                      :
                                        :
              Defendants,                :
                                        :
        and                             :
                                        :
NEON MACHINE, INC.,                      :
                                        :
              Nominal Defendant.         :


                        - - -


                 Chancery Court Chambers
                 Leonard L. Williams Justice Center
                 500 North King Street
                 Wilmington, Delaware
                 Tuesday, January 16, 2024
                 11:01 a.m.

                        - - -

BEFORE: HON. MORGAN T. ZURN, Vice Chancellor

                        - - -

TELEPHONIC ORAL ARGUMENT and GUIDANCE OF THE COURT ON
         PLAINTIFFS' MOTION TO EXPEDITE
------------------------------------------------------------
              CHANCERY COURT REPORTERS
         Leonard L. Williams Justice Center
         500 North King Street - Suite 11400
             Wilmington, Delaware 19801
                   (302) 255-0524

2

1    APPEARANCES:

2        KEVIN M. COEN, ESQ.
         BENJAMIN D. SMITH, ESQ.
3        Morris, Nichols, Arsht & Tunnell LLP
              -and-
4        EDWARD HAN, ESQ.
         TIMOTHY D. REYNOLDS, ESQ.
5        of the California Bar
         Paul Hastings LLP
6          for Plaintiffs

7

         MARC CASARINO, ESQ.
8        Kennedys CMK LLP
              -and-
9        ALLAN E. ANDERSON, ESQ.
         of the California Bar
10       ArentFox Schiff
              -and-
11       PATRICK FEENEY, ESQ.
         of the New York Bar
12       ArentFox Schiff
           for Defendants Cort Javarone, Scott Honour,
13         and Steve Horowitz

14

15                          - - -

16

17

18

19

20

21

22

23

24

3

1          THE COURT:  Good morning, Counsel.

2  This is Morgan Zurn.

3          May I have appearances, please,

4  beginning with counsel for the plaintiff.

5          ATTORNEY COEN:  Good morning,

6  Your Honor.  This is Kevin Coen from Morris Nichols.

7  With me today on the line, I have Ben Smith from my

8  office.  And then from Paul Hastings, we have

9  Edward Han and Timothy Reynolds.  With Your Honor's

10 permission, Mr. Han will be speaking today on behalf

11 of the plaintiffs.

12         THE COURT:  Thank you.  Good morning.

13         And counsel for the defendants.

14         ATTORNEY CASARINO:  Good morning,

15 Your Honor.  Marc Casarino of Kennedys on behalf of

16 the defendants.  Also on the phone is my co-counsel

17 from the ArentFox law firm, Allan Anderson.  And I

18 believe Patrick Feeney from his firm is also going to

19 join, but I did not hear him yet.

20         In any event, both have been admitted

21 *pro hac vice*.  And, Your Honor, while I will present

22 most of our arguments today, with the Court's

23 indulgence, I request that Mr. Anderson be permitted

24 to speak on a final issue at the conclusion of my

4

1   remarks.

2                    THE COURT:  Thank you.

3                    Just as a heads-up, if I could ask

4   you-all for the grace we gave each other during the

5   pandemic.  It's a snow day here, and there are a lot

6   of small, wet kids having hot chocolate in my house.

7   If something goes wrong, that's why.  But I am

8   prepared, I did read all your papers, and we'll do our

9   best.

10                   Mr. Han.

11                   ATTORNEY HAN:  Thank you.  And good

12  morning, Your Honor.  And good luck dealing with all

13  the children in your house and the hot chocolate being

14  served.

15                   As the Court knows, expedited

16  proceedings should be ordered where the moving party,

17  one, presents a colorable claim and, two, demonstrates

18  a possibility of threatened irreparable injury.  As

19  Delaware precedent has held, the showing necessary for

20  this Court to grant our motion to expedite is not

21  high.  We believe we've exceeded that threshold here.

22                   In fact, if you look at the papers,

23  defendants do not challenge the first prong of this

24  expedition analysis, and the opposition really only

5

1  focuses on the irreparable injury prong.

2              Now, as to that first prong, the

3  colorable claim prong, again, even though defendants

4  do not challenge that, they do raise a factual dispute

5  as to whether, quote/unquote, network launch has

6  occurred.

7              Now, initially, Your Honor, that's

8  irrelevant to the analysis for this motion since it's

9  simply a defense and not a bar defining that

10 plaintiffs have presented a colorable claim.  But even

11 setting that aside, whether network launch has

12 occurred is really not even a genuine dispute here, in

13 our opinion, Your Honor.

14             As we've presented in our papers,

15 network launch is defined in the SAFEs as a:

16 "bona fide transaction or series of transactions

17 pursuant to which the Token Issuer issues [a] native

18 Token associated with access to and use of the

19 Network."

20             So network launch occurred here,

21 Your Honor, when the SHRAP token, which is the native

22 token associated with access to and use of any

23 network, was issued.

24             THE COURT REPORTER:  Counsel, this is

6

1   Doug, the court reporter.  If you would slow down,

2   please.  Thank you.

3              ATTORNEY HAN:  So network launch

4   occurred here where the SHRAP token, which is a native

5   token associated with access to and use of the Neon

6   network, was issued.  And that occurred at the latest

7   in April 2023.

8              I wish to further point out that

9   network launch is an easily verifiable event,

10  Your Honor, because of the very public and transparent

11  nature of the blockchain.

12             Now, defendants' argument that network

13  launch has not occurred -- and they've made that

14  argument both in their opposition brief, as well as in

15  denials and their answer -- is completely

16  disingenuous, Your Honor, and really just shows that

17  the defendants are speaking out of both sides of their

18  mouths.

19             On the one side, defendants are

20  claiming network launch has not occurred.  But then on

21  the other, as we demonstrated in our reply papers,

22  Mr. Javarone has explicitly demanded tokens that would

23  not exist but for the network launch having occurred.

24             And he's demanding those tokens under

7

1  agreement that contains virtually -- a virtually

2  identical definition of "network launch" as the SAFEs

3  do.

4              So, again, not only do we believe a

5  colorable claim exists here, but that any dispute as

6  to whether network launch occurred is really

7  disingenuous.

8              Now, as to the second prong, the

9  threatened irreparable injury prong, defendants focus

10  their arguments two ways, basically.  One, they claim

11  that there was -- plaintiffs delayed in seeking

12  relief; and two, they claim that any suffered harm --

13  any harm suffered by the plaintiffs is speculative and

14  that certainly relief is supposedly prohibited by a

15  stay entered in the bankruptcy proceedings at

16  Mr. Javarone's affiliated entity, The 4D Factory.

17  Now, we disagree.

18              First, as we detailed in our reply

19  papers, Your Honor, there was no delay in bringing

20  this action or filing the motion to expedite.  The

21  June 29, 2023, day that the defendants point to is

22  simply the sixty-first day after the network launch

23  occurred, which occurred at the latest on April 29,

24  2023.  And that's the date when the SAFEs

8

1   automatically converted to preferred stock.

2            Now, there was no reason for the

3   plaintiffs to file a claim then because defendants did

4   not first dispute whether network launch occurred

5   until much later, at an October 5, 2023, board

6   meeting.

7            Now, after the defendants made their

8   first dispute as to whether network launch occurred,

9   Mr. Long, one of the plaintiffs here, attempted to

10  resolve this matter.  And he had discussions and

11  communications with the defendants and provided them

12  information.

13           However, when it was clear that they

14  were going to continue to entrench themselves as

15  directors and those attempts to try to informally

16  resolve this matter failed, plaintiffs then

17  immediately filed a complaint and the motion to

18  expedite.  So we just don't believe there was any

19  undue delay here, Your Honor.

20           We also don't believe that the

21  threatened harm is speculative.  In fact, Neon is

22  currently suffering, as there is uncertainty regarding

23  who controls Neon and directs the factions.  I'm not

24  sure if a better analogy right now is that Neon is a

9

1  rudder on the ship or has two rudders facing opposing

2  directions.

3          But, frankly, the way defendants have

4  set this up has made it very difficult for Neon to

5  either continue its fundraising opportunities and/or

6  to, frankly, conduct its normal operations in the

7  normal course.

8          In fact, all of the employees of Neon

9  who are not the plaintiffs here sent a letter to the

10  board of directors in late December, I believe, asking

11  for clarity as to who's running the company and,

12  frankly, demanding that Mr. Long be reinstated as CEO

13  and stating that they will resign if this isn't -- if

14  this issue isn't resolved quickly.

15          So, again, these actions by defendants

16  are absolutely harming the company right now and

17  they're absolutely continuing to harm the company

18  while the defendants continue these actions.

19          Now, defendants do make an argument

20  that the complaint assumes certain actions on behalf

21  of nonparties Polychain and Griffin.  That argument,

22  frankly, Your Honor, is inaccurate.

23          In the complaint and in our reply

24  papers, we detail that both investors have a

10

1  ready-to-manage conversion of their SAFEs and that

2  both Polychain and Griffin believe that the SAFEs have

3  converted and they intend to exercise their rights

4  afforded to stockholders, including their ability to

5  elect members to the company's board.  So that

6  argument, frankly, Your Honor, is frank -- is

7  incorrect.

8           Finally, Your Honor, as to the

9  bankruptcy court's order, we do not believe that

10  prohibits adjudication by this Court of the relief

11  that we seek.  If the stay were as broad as the

12  defendants are trying to claim, then the bankruptcy

13  court could have simply stayed this entire action.

14           Instead, the bankruptcy court order

15  only states that "any use of the stock to elect new

16  directors and/or to cause the appointment of a new

17  CEO" are subject to the stay and would require further

18  application back to the bankruptcy court.

19           The bankruptcy court even stated at

20  the hearing on that motion to stay, Your Honor, that

21  he found it hard to believe that if the plaintiffs won

22  the case in Delaware that the bankruptcy court would

23  nevertheless still say that they're not supposed to

24  issue the securities.  And that makes practical sense,

1    Your Honor, because the bankruptcy court rightfully

2    defers to this court to resolve the corporate issues

3    under Delaware law involving Neon, which is not in

4    bankruptcy.

5              And lastly, Your Honor, I would like

6    to flag that defendants should also want proper

7    resolution of the issues raised in this action.  If

8    they're right in their position -- which, again, I

9    don't think they are -- then they should want finality

10   right away as to who is or is not a stockholder and

11   who is or is not legitimately on the board so that

12   Neon can then move forward and operate.

13             Frankly, Your Honor, defendants are

14   afraid of that because they understand what'll happen

15   once the SAFEs do convert and Polychain and Griffin

16   then are exercising the rights as stockholders.  So

17   they're trying to prolong this matter as long as

18   possible to stay entrenched for as long as possible to

19   take advantage of the company for as long as possible.

20             So plaintiffs request an expedited

21   proceeding with a trial set for hopefully March,

22   Your Honor.  And we don't believe the issues in this

23   matter are complicated or complex at all.  We believe

24   they're very straightforward.  And this trial should

12

1  not take more than two days.

2              Thank you, Your Honor.  Unless the

3  Court has any questions ...

4              THE COURT:  Thank you.

5              I just wanted to explore a little bit

6  and make sure that I understood -- I just wanted to

7  float my understanding of the bankruptcy court's order

8  by you and also ask for your thoughts.  I think I want

9  to reach out to the bankruptcy judge and make sure

10 that I don't run sideways of what he's trying to

11 accomplish before I do anything.  I think that's the

12 fair and right thing to do, so I wanted to get your

13 thoughts on that.

14             But my understanding of what he

15 accomplished on the stay motion, I read it to say that

16 he declined to actually stay any adjudication in this

17 action.  But what he did accomplish was essentially a

18 stipulation by the parties in front of him that they

19 would not exercise their stock to effectuate any

20 change in control, which makes sense to me through the

21 lens of thinking through the estate in front of him as

22 he kind of probed that the estate in front of him is

23 4D, and some of the value there is control over Neon.

24             Do I have that roughly right by your

13

1  perspective?

2              ATTORNEY HAN:  I believe so,

3  Your Honor.  I believe that's entirely correct.  I

4  think the Court did not stay this action.  And the

5  bankruptcy court stated that because the parties who

6  were present at the hearing agreed that that part of

7  the action, that the shareholder and stockholder vote

8  would go back to him for analysis before moving

9  forward.

10              THE COURT:  And who exactly are the

11 parties to that agreement?

12             ATTORNEY HAN:  Your Honor, I believe

13 the plaintiffs and 4D's counsel were present at that

14 hearing.  I'm not sure if ArentFox was also there as

15 counsel for the defendants.

16             THE COURT:  So when you say

17 "plaintiffs," you mean you-all?

18             ATTORNEY HAN:  Yes, ma'am.

19             THE COURT:  So you-all have agreed

20 with 4D not to take any action towards any change in

21 control based on however the SAFEs and conversion to

22 preferred and any subsequent conversion to common

23 might shake out.

24             Do I have that right?

1          ATTORNEY HAN:  I believe we've agreed,

2     the plaintiffs have agreed with 4D that they would go

3     back to the bankruptcy court before any stock is

4     exercised to elect new directors or cause the

5     appointment of a new CEO.

6          THE COURT:  How is that consistent

7     with asking me to reinstate an ousted CEO?

8          ATTORNEY HAN:  Well, Your Honor, I was

9     thinking that because of the bankruptcy court order

10    and stipulation, what we could do is do this in

11    phases, if the Court's so inclined.  We could,

12    frankly, streamline this action tremendously by doing

13    that as well.

14          The main issue, the threshold issue

15    here, as the defendants, frankly, acknowledge and

16    concede is whether network launch occurred, and that

17    is front and center in front of the bankruptcy court

18    as well, and the bankruptcy court acknowledged that

19    that's the main issue and that should go forward.  And

20    we could do that very quickly, frankly, Your Honor,

21    probably in cross-briefs filed within a week or two,

22    because we believe it's all publicly available

23    information.

24          Now, once that's decided, then we

15

1   could go back to the bankruptcy court and let the

2   bankruptcy court know what's going on, and then this

3   court can continue with the expedited proceedings for

4   the remainder of the issues.

5           THE COURT:  Okay.  That was the order

6   of operations that I had come up with that might not

7   offend what the bankruptcy court was trying to

8   accomplish or be inconsistent with what I think

9   you-all agreed to there.

10          And it did seem to me that perhaps the

11  idea of whether a network launch occurred and what the

12  effect of issuing the tokens is under the SAFE

13  agreement is something that could be dealt with on the

14  pleading since the complaint has been answered.  And

15  obviously I'll hear from the defendants on this.

16          But I am comforted to hear that it

17  sounds like you think the best way to go forward is to

18  table any subsequent effects on leadership of the

19  company or management of the company based on that

20  conclusion until we check in with the bankruptcy

21  court.

22          Do I have that right?

23          ATTORNEY HAN:  Absolutely, Your Honor.

24          THE COURT:  Okay.  To me, that also

16

1   then colors the expedition argument, because what I

2   understand to be the driving force of your expedition

3   argument is this idea that the leadership of the

4   company is up in the air.

5          But if you-all have essentially agreed

6   with the 4D folks and in front of the bankruptcy court

7   that I'm not going to make any decisions on the

8   leadership of the company until we check in with the

9   bankruptcy court, doesn't that take the air out of

10  your balloon on imminent irreparable harm?

11         ATTORNEY HAN:  Not at all, Your Honor.

12  I think going back to the bankruptcy court would be,

13  frankly, a very quick and easy thing to do.  We would

14  simply request that a hearing and/or, frankly, submit

15  some information to the bankruptcy court of this

16  Court's adjudication of the network launch issue and

17  state that we wish to move forward in Delaware to

18  conclude the action as to the other allegations that

19  were raised in the complaint, and based on the order

20  of this court that those proceedings would be

21  concluded by X date because they've been expedited.

22  We believe the bankruptcy court would be receptive to

23  that.

24         THE COURT:  It also seems strange to

1  me that -- and this is zooming out to a different

2  topic -- it seems very strange to me to be

3  adjudicating SAFE rights of minority investors who

4  aren't here.

5            ATTORNEY HAN:  So, Your Honor, I think

6  it's not so much adjudicating rights of minority

7  investors who aren't here as opposed to adjudicating

8  the harms being caused to Neon, which is the

9  counterparty to the SAFEs.

10            This is a derivative action brought to

11  address the harms to Neon, and it's brought by the

12  only current stockholders who are not affiliated with

13  the defendants.  So, again, it goes back to the

14  irreparable harm, to the argument that I made earlier,

15  and that Polychain and Griffin arguably have no

16  standing to bring these types of derivative claims

17  since they're SAFE holders and not stockholders to the

18  action, the defendants.

19            So we don't think you're adjudicating

20  the rights of Polychain and Griffin at all.  You're

21  adjudicating whether the language in the SAFEs say

22  what it does and that the defendants are -- frankly,

23  are improperly entrenching themselves, should be the

24  second part of the analysis on the expedition.

1            THE COURT:  But that first part, and

2  the only part where it sounds like we are more

3  comfortable proceeding, is in what I understand to be

4  a reading of the SAFE agreement and concluding whether

5  those rights converted.  And Griffin and Polychain

6  aren't here.

7            Seems to me under *Germaninvestments*,

8  Vice Chancellor Slights, when you're talking about

9  interpreting the terms of the contract, you've got to

10 have the parties to that contract before the Court.

11           ATTORNEY HAN:  Your Honor, I believe

12 Polychain and Griffin, as we've alleged and set forth

13 in our papers, are both supportive of this position

14 and, frankly, in their own rights during the board

15 meeting in October, as well as the recent board

16 meetings, have demanded that the board and the company

17 recognize the SAFEs have converted.

18           I imagine Polychain and Griffin will

19 do what they do once this Court has made a decision on

20 the network launch issue and whether the SAFEs have

21 converted because that's an agreement by Neon.

22           But, again, based on what our clients

23 know and what occurred at board meetings, both

24 Polychain and Griffin are eager to and believe the

19

1   SAFEs have converted and wanted to help right the Neon

2   ship in terms of corporate governance.

3                 So I'm not sure it's the same type of

4   issues that the Court is concerned about in terms of

5   adjudicating rights of nonparties.

6                 THE COURT:  It's --

7                 ATTORNEY ANDERSON:  Your Honor, this

8   is Allan Anderson.  If I could make a point when it's

9   a good time.

10                THE COURT:  Yes, it's not quite a good

11  time yet.  But thank you.  I'll turn to you in a

12  moment.

13                ATTORNEY ANDERSON:  Thank you,

14  Your Honor.

15                THE COURT:  Thank you.

16                Mr. Han, I'm thinking about this

17  almost more from a Court of Chancery rule joinder

18  issue, joinder of a necessary party.  Would we offend

19  Griffin or Polychain or do something that they don't

20  want, thinking more of a Rule 19 joinder issue.

21                ATTORNEY HAN:  I have not thought

22  about it that way, Your Honor.  But if that is

23  something that the Court requires -- and I do not

24  think there would be an issue with the plaintiffs

20

1   enjoining Polychain and Griffin in any expedited

2   action so that then the Court has comfort that there

3   are -- any rights of theirs are then adjudicated while

4   they are present.

5                    THE COURT:  Thank you.

6                    Mr. Anderson.

7                    ATTORNEY ANDERSON:  Thank you,

8   Your Honor.

9                    This last Friday, there was a board

10  meeting; and at the board meeting, the shareholders

11  were involved, and I also understand that Polychain

12  and Griffin were involved with that board meeting.

13                   I wanted to tell the Court that it is

14  our intention to bring Polychain and Griffin into this

15  lawsuit.  I expect to get that on file within the next

16  one week to ten days, max; and that I think we should

17  not do this expedited motion until we have all the

18  necessary parties in this case.

19                   So my argument is, Your Honor, at this

20  particular point in time, the necessary parties are

21  not in this action and therefore, a motion to expedite

22  is premature and it should not be considered until

23  Griffin and Polychain are properly in this case.

24                   THE COURT:  Thank you for that.

1          Mr. Han, was there anything else

2   before I give the floor to Mr. Anderson?  Is there

3   anything else that you wanted to address?

4          ATTORNEY HAN:  I don't think so,

5   although I would like to address Mr. Anderson's point

6   really quickly.  If they intend to bring Polychain and

7   Griffin into the lawsuit, I don't think that should

8   have any --

9          THE COURT REPORTER:  Counsel, you're

10   doing it again.  If you would slow down, I would

11   really, really appreciate it.

12          (The court reporter read back from the

13   record as follows:

14          "Attorney Han:  I don't think so,

15   although I would like to address Mr. Anderson's point

16   really quickly.  If they intend to bring Polychain and

17   Griffin into the lawsuit ...," and then after that,

18   please.

19          ATTORNEY ANDERSON:  This is Allan

20   Anderson.  Who's speaking?

21          THE COURT:  That is the court

22   reporter.  Mr. Anderson, I need you to wait your turn.

23   Thank you.

24          And, Mr. Han, please slow down for the

22

1  court reporter.

2              ATTORNEY HAN:  Absolutely.  Thank you,

3  Your Honor.  I apologize.

4              If the defendants intend to bring

5  Polychain and Griffin into the lawsuit, that should

6  not impact in any way this motion to expedite.  And,

7  frankly, if the defendants believed they had any

8  claims against Polychain and Griffin, they could have

9  and should have raised those when they filed their

10 answer to the complaint.  They did not file any

11 counterclaims.  They did not file any type of

12 cross-claim.  And, again, that matter should have been

13 raised earlier, and I don't think that should impact

14 this motion to expedite.

15             Thank you, Your Honor.

16             THE COURT:  Thank you.

17             Is there, Mr. Han, any further

18 development in 4D's bankruptcy that I need to be aware

19 of?

20             ATTORNEY HAN:  I believe 4D has filed

21 a bankruptcy plan.  I think that happened, I want to

22 say, a couple weeks ago.  I do not know of any other

23 developments in the bankruptcy court.  I imagine

24 Mr. Anderson could speak to that.

23

1                    THE COURT:  All right.  We'll do that

2        in a moment.

3                    4D having filed for bankruptcy, what

4        is the effect of that on your argument that

5        Mr. Javarone is taking actions to essentially pay off

6        his debt and he's resorted to reorganization, it

7        seems?

8                    ATTORNEY HAN:  Well, I think there's a

9        difference between 4D and Mr. Javarone, although

10       Mr. Javarone seems to blur the two whenever it suits

11       him.  Mr. Javarone is the defendant in this action,

12       not 4D.

13                    Mr. Javarone is the one that's

14       claiming tokens, even though he's claiming that

15       network ones didn't occur.

16                    Now, as to 4D and its stockholdings, I

17       don't think, frankly, that impacts this case.  4D's

18       holdings are what they are, and that will be

19       determined in bankruptcy court.  And any value to

20       those holdings will be determined in bankruptcy court.

21                    This action is about Mr. Javarone's

22       and the other defendants' breaches of their fiduciary

23       duties.

24                    THE COURT:  Thank you.

24

1                    Mr. Anderson, thank you for your

2       patience.  It's your turn.

3                    ATTORNEY ANDERSON:  Sure.  I can talk

4       a bit about the bankruptcy situation.

5                    4D is the holding company for

6       Mr. Javarone's shares in the company.  He is the

7       majority shareholder through 4D.

8                    He asked for the 16 million in tokens

9       because the event that occurred in April or June was

10      not a *bona fide* event.  If it was a *bona fide* event,

11      the largest shareholder would have been issued tokens

12      and would be selling tokens like the plaintiffs in

13      this case.

14                   So what we're looking at in the

15      bankruptcy court is he does have a plan that has been

16      submitted.  The bankruptcy court has a right to be

17      able to fund the plan.  And what it looks like is that

18      the plaintiffs in this case are preventing the funding

19      of a plan in the bankruptcy court.

20                   THE COURT:  How so?

21                   ATTORNEY ANDERSON:  Because they are

22      not issuing the tokens that were directed by the board

23      of directors and have refused to comply with board

24      directives since they began this plan to do what

25

1   they're doing with the Court.

2           THE COURT:  To the extent that your

3   position is that the plaintiffs are preventing the

4   funding of a bankruptcy plan, isn't that more properly

5   an issue for the bankruptcy court than this court?

6           ATTORNEY ANDERSON:  Oh, it certain --

7   it certainly is.  I was just explaining --

8           THE COURT:  Thank you.  I appreciate

9   that.

10          Could you address the extent to which

11   you disagree with how I've interpreted what happened

12   in the bankruptcy court and the stipulation and the

13   judge's ruling.

14          ATTORNEY ANDERSON:  I think I would

15   defer to my co-counsel, Marc Casarino, who's been

16   dealing with this.  But my understanding is that is

17   consistent with -- your understanding is consistent

18   with my understanding of the agreement.

19          And based on your understanding, and

20   given the fact that we do not have necessary parties

21   in this case, I believe, it is my argument that this

22   motion to expedite is premature and inappropriate.

23          And also I would say it is

24   inconsistent for the moving parties to be claiming

26

1    that they acted expeditiously in this case because it

2    only took them two weeks to file after Mr. Long was

3    put on suspension when, in fact, their complaint,

4    verified complaint, claims that the events took place

5    months earlier, and therefore, as we argued in our

6    opposition, they delayed.  And laches is applicable.

7                    THE COURT:  Thank you.

8                    Mr. Casarino.

9                    ATTORNEY CASARINO:  Yes.  Thank you,

10   Your Honor.

11                   So I will take them -- some arguments

12   in reverse order since Your Honor picked up on a

13   couple of the points that I think are really

14   dispositive here.

15                   One is this bankruptcy and the impact

16   on the plaintiffs' motion to expedite.  We -- and to

17   confirm, your understanding, as you stated it today,

18   is also our understanding.  I think you have it

19   correct in terms of what the bankruptcy court did and

20   what the current state of play is with respect to

21   that.

22                   And so the only issue that we believe

23   that is live right now in this matter is whether there

24   was a network launch.  And while I appreciate that the

27

1  plaintiffs feel very strong about their case, as

2  Your Honor may guess, there is another side to the

3  story that we intend to present.  And we believe that

4  there was not a *bona fide* issuance of tokens.

5          Now, plaintiffs' argument is it's

6  plain as day that the tokens were issued, so therefore

7  there was a network launch.  They keep just glossing

8  over the qualifier that it had to be a *bona fide*

9  issuance of tokens, and that is a very hotly contested

10 issue that is going to be heavily litigated.  It's

11 going to require, we believe, considerable discovery

12 and expert witness analysis.  And all those things

13 are -- you know, run contrary to expediting relief

14 here.

15          But, in any event, as Your Honor has

16 identified and I was -- I believe it, I was going to

17 say it myself, that because all the plaintiffs can do

18 here is argue whether there was a network launch.

19 They can't use the -- you know, the shares to vote for

20 new directors or appoint a new CEO without bankruptcy

21 court approval.

22          So this whole theory that they have to

23 hurry up to do this in order to effect change of

24 management is simply incorrect and would, in fact, run

CHANCERY COURT REPORTERS

1    afoul of the bankruptcy court automatic stay.

2              And to the extent they argue that

3    there's some question about management and who was in

4    control of Neon, a couple of points on that.

5              One, the DGCL at 141 tells us that a

6    board of directors is in control.  And Mr. Anderson

7    may have more flavor on this, but from my perspective,

8    Your Honor, what we're seeing here is a founder and

9    his confederates who just don't want to recognize that

10   a board of directors is in control of Neon and

11   controls its destiny and how it operates, and instead

12   issued a bunch of tokens themselves for pennies and

13   are now self-dealing and selling those on an open

14   market without board approval, is my understanding.

15   And the *bona fides* of that are going to be hotly in

16   dispute here.

17             So we believe that the bankruptcy just

18   completely undermines the request for expedited relief

19   here.

20             But to walk through the other

21   elements, if I may, just to complete my argument on

22   those for the record.  This is, we believe, a

23   garden-variety corporate dispute this court routinely

24   handles on a normal litigation schedule.

29

1            And the plaintiffs are making this

2    request to expedite by creating the appearance of

3    timeliness and exigency where none exist.  As set

4    forth in our papers, we think the request to expedite

5    should be denied, and I've already stated one reason

6    why.  And there are a couple of others.

7            First, we don't believe the request

8    was made as timely as plaintiffs suggest.  Plaintiffs

9    misdirect that they filed a complaint within two weeks

10   of Mr. Long being suspended as CEO.

11           But the grounds to this lawsuit, the

12   issue here is not Mr. Long's suspension as CEO, as

13   we've all agreed.  The grounds for this lawsuit, the

14   heart of it is this purported network launch the

15   plaintiffs allege to have occurred in April 2023.

16           And while plaintiffs were plainly on

17   notice that there was no conversion of the SAFE

18   interest as of June 29, 2023, 61 days later, they

19   certainly could have pursued a claim at that time.

20           But they absolutely concede in their

21   papers that they were aware there was not a conversion

22   and that the board was investigating the *bona fides* of

23   the token issuance as of October 5, 2023.  Plaintiffs

24   did not file suit until November 27, 2023.  That is

30

1  almost two months, not merely two weeks, after they

2  had absolute knowledge that there is a dispute over

3  the issuance of those tokens.

4              We've cited a number of decisions in

5  our paper, in our brief, that -- motions to expedite

6  in this court have been denied where plaintiffs have

7  waited as long and even not as long to pursue

8  litigation as the plaintiffs have here.  For that

9  reason alone, we think the plaintiffs are just too

10 dilatory in seeking relief.

11             Second, the plaintiffs fail to show

12 that there was imminent and irreparable harm

13 warranting the extraordinary relief of expediting this

14 litigation.

15             Initially, plaintiffs said that they

16 needed to expedite this because they wanted to launch

17 the game in December.  My understanding is the game

18 did not launch in December, and, in fact, I think it's

19 unclear when the game is going to launch.  But I've

20 heard representations that it might be early second

21 quarter 2024.

22             So to the extent plaintiffs suggest

23 that there was this imminent game launch, that's

24 simply not the case.

31

1          To the extent plaintiffs suggest

2   exigency is required because there is a potential

3   disruption to funding, they've identified no facts to

4   support this speculative risk.

5          On this point, plaintiffs are simply

6   wrong that they can merely recite some speculative,

7   nonfactual predicate to justify expediting this

8   litigation.  Again, in footnote 6 of our paper, we

9   cite a number of authorities that provide that the

10  basis for seeking expedited relief must be

11  nonspeculative.

12         And conceptually, this makes sense

13  because expediting litigation is an extraordinary

14  remedy, and it poses a lot of undue burden and harm on

15  the parties and the Court and its staff.  And so it's

16  warranted only when there is actual imminent and

17  irreparable harm, not speculative.

18         To the extent, as I've already

19  mentioned, plaintiffs are questioning who was in

20  control, again, no question Section 141 puts the board

21  in control.

22         And, nevertheless, we believe that

23  that dispute is a prototypical corporate dispute

24  routinely addressed by this Court on a normal

32

1   litigation schedule.  It does not justify imposing the

2   burden of expedited litigation.

3                    And lastly on this imminent

4   irreparable harm element, as Your Honor pointed out,

5   we think the elephant in the room here is the absence

6   of the SAFE investors.  That is very conspicuous.

7   These plaintiffs, who are the ones that issued

8   themselves the tokens that are in dispute, are the

9   ones pushing this to get a fast decision to get rid of

10  the board that's investigating that transaction to

11  themselves -- that's self-dealing, by the way,

12  Your Honor -- in order to bless it so they are in

13  control, they bless what they've done, and then they

14  move on in life.

15                   That's curious, but the SAFE investors

16  themselves have made no showing in this court.

17  They've not raised any issue with this court --

18  although those are the ones that are allegedly

19  violated here.

20                   And to the extent there was suggestion

21  that it's questionable whether the SAFE investors

22  could pursue a claim, it's their contract, as

23  Your Honor points out.  If they believe their

24  contractual rights have been violated, they most

33

1  certainly could bring a claim for violation of their

2  contract.  We don't think so in terms of the

3  *bona fides* of the dispute.  But it certainly is a

4  right that they would have to pursue.

5            And for all of those reasons,

6  Your Honor, we believe that the motion to expedite

7  should be denied in this instance.

8            And I will cede to Mr. Anderson if he

9  has any further flavor on some of those points.

10            ATTORNEY ANDERSON:  Thank you,

11  Counsel.

12            I definitely -- just to follow up on

13  that, we don't think it's appropriate to do a motion

14  to expedite.  We think the parties should be allowed

15  to be in, such as Griffin and Polychain that I will

16  file next week.

17            Also, Your Honor, if you do feel

18  compelled that this is a motion to expedite, we would

19  request that the hearing or the trial for that be

20  moved to June or at the very earliest late May.  But

21  we don't think it's appropriate.

22            THE COURT:  Thank you.

23            Mr. Han.

24            ATTORNEY HAN:  Your Honor, I believe

34

1   all of the points that both counsel made are points

2   that were addressed in the papers already.  I will

3   note that the majority of those points are, frankly,

4   just defenses to the allegations and they're not

5   reasons to deny expedition.

6              To the extent any of their arguments

7   were about expedition solely, they make conflicting

8   claims.  They're arguing that the motion was premature

9   and too late, and it just doesn't make sense here,

10  Your Honor.

11             To the extent Polychain and Griffin

12  need to be in this action, they can be brought into

13  this action, and that doesn't need to slow this down

14  at all.

15             And Mr. Anderson can file that

16  complaint, again, this week if he wants.  We believe

17  this motion to expedite should be granted, we believe

18  we should proceed as the Court previously indicated

19  and in terms of first deciding the network launch

20  issue, which can be decided very quickly.  We don't

21  think it's nearly as difficult of a question as

22  Mr. Casarino presented.  We believe it's a very

23  straightforward question.  We think that could be

24  decided, go to the bankruptcy court, get the

1   bankruptcy court's approval to move forward, and then

2   come back and decide the rest of the issues.

3                    Thank you, Your Honor.

4                    THE COURT:  Thank you.  I wanted to

5   just check in.  Do any of you have any opposition to

6   me reaching out to the bankruptcy judge?

7                    VARIOUS COUNSEL:  No, Your Honor.

8                    ATTORNEY HAN:  Not from plaintiffs,

9   Your Honor.

10                    ATTORNEY ANDERSON:  Nor from the

11   defendants, Your Honor.  Thank you.

12                    THE COURT:  Thank you.  I do intend to

13   do that before making a final ruling.  What I

14   anticipate is that I'll share with you my current

15   thoughts, and you can do with them what you will.  But

16   I do want to reach out to the bankruptcy judge; and

17   once I do that, then I will enter an order with

18   modifications really setting in stone what it is that

19   we're going to do.

20                    But I'll share with you my thoughts,

21   as I sit here today, without the benefit of having

22   checked in with the bankruptcy court.

23                    I don't think that the timing of the

24   underlying events and the plaintiffs' approach to the

1    Court precludes expedition on its own.  I understand

2    the real issue to be the board's response to the

3    dispute over whether there was a network launch, and

4    that happened in September.  And this action was filed

5    in November, after what looks like some fairly intense

6    back-and-forth between the parties and the board and

7    the changes to the board that have inspired this

8    action and the changes to management.  So I don't

9    think there is an argument as to laches precluding

10   expedition.

11               There's no real dispute as to

12   colorable claim.  I think the argument for imminent

13   irreparable harm has really been gutted by the

14   stipulation before the bankruptcy court.  It seems to

15   me that the real argument, the best argument for

16   imminent irreparable harm, was this sort of classic

17   idea of electoral rights in the balance and management

18   in the balance.  But the stipulation between

19   plaintiffs and 4D before the bankruptcy court, as I

20   currently understand it -- and it sounds like the

21   parties think I've come to the correct

22   understanding -- has effectively imposed a *status quo*

23   order on changes to the board and to management.

24               Now, obviously that doesn't extend to

1   Griffin or Polychain.  They're not here and they

2   weren't parties to the stipulation.  But I understood

3   the bankruptcy court to essentially be putting out

4   there that that judge would be displeased if Griffin

5   or Polychain chose to convert their stock to common

6   and use those common shares to make changes to

7   corporate leadership.

8               So I think the issue of who's in

9   charge and for how long they'll be in charge has

10  effectively been put on ice by the stipulation before

11  the bankruptcy court, which resolves imminent

12  irreparable harm in much the same way that a

13  *status quo* order would in a more classically presented

14  control fight.

15              The other arguments as to imminent

16  irreparable harm that were offered include impediments

17  to fundraising.  I haven't seen anything

18  particularized or particularly imminent.  And the

19  other argument was an operational one about the launch

20  of the game.  I didn't hear any response to that from

21  counsel this morning as to the fact that it didn't

22  happen, and I don't have any other allegations before

23  me as to imminent harm to business operations.

24              I appreciate that counsel have come to

38

1   their own realization that the only issue that's

2   really fairly litigable in this action at this time is

3   whether there was a network launch.  Seems to me

4   that's something that, if the plaintiffs think that

5   can be decided on the papers, they can file a motion.

6               A 30/30/15 briefing schedule will lead

7   us almost to the exact same decision point as a motion

8   to expedite.  So I'm not even sure expedition is truly

9   necessary to accomplish what the plaintiffs want to

10  accomplish.

11              What I would ask is that you-all

12  confer and talk about bringing Griffin and Polychain

13  in.  I'm very uncomfortable adjudicating their

14  contractual rights without them here, and I might just

15  outright refuse to do it.  But you-all can talk about

16  that.

17              In the meantime, I'm going to check in

18  with the bankruptcy court and make sure that I'm not

19  stepping on any toes or running afoul of the stay in

20  that action, even though 4D is not a party here.  And

21  you can send me a letter and let me know what you

22  think, and I will share with you my final thoughts

23  once I get in touch with the bankruptcy court and hear

24  what you have to say about bringing in Griffin and

39

1   Polychain.

2               Is that helpful?  Does that make

3   sense?

4               ATTORNEY COEN:  Yes, Your Honor.

5               ATTORNEY HAN:  Yes.

6               ATTORNEY CASARINO:  Yes from the

7   defendants, Your Honor.  Thank you.

8               THE COURT:  I suppose the motion to

9   expedite is denied, but I will enter an order giving

10  more concrete direction once I touch base with the

11  bankruptcy court and hear from you on the status of

12  bringing in Griffin and Polychain before we adjudicate

13  their contractual rights.

14              Is there anything else I can do for

15  you today?

16              ATTORNEY HAN:  No, Your Honor.

17              ATTORNEY CASARINO:  No, Your Honor.

18  But I do have a sudden hankering for hot chocolate.

19              THE COURT:  It's probably spilled all

20  over my kitchen counter.

21              Take care, everybody, and we'll be in

22  touch.

23              (Proceedings concluded at 11:41 a.m.)

24                    - - -

40

1                              CERTIFICATE

2

3                 I, DOUGLAS J. ZWEIZIG, Official Court

4    Reporter for the Court of Chancery of the State of

5    Delaware, Registered Diplomate Reporter, Certified

6    Realtime Reporter, do hereby certify that the

7    foregoing pages numbered 3 through 39 contain a true

8    and correct transcription of the proceedings as

9    stenographically reported by me at the hearing in the

10   above cause before the Vice Chancellor of the State of

11   Delaware, on the date therein indicated, except for

12   the rulings, which were revised by the Vice

13   Chancellor.

14                 IN WITNESS WHEREOF I have hereunto set

15   my hand at Wilmington, this 17th day of January, 2024.

16

17                 /s/ Douglas J. Zweizig
                   ---------------------------
18                    Douglas J. Zweizig
                     Official Court Reporter
19                 Registered Diplomate Reporter
                   Certified Realtime Reporter
20

21

22

23

24