**EXHIBIT 4**



**ArentFox Schiff LLP**

555 West Fifth Street
48th Floor
Los Angeles, CA  90013

213.629.7400    **MAIN**
213.629.7401    **FAX**

afslaw.com

December 27, 2023

**VIA ELECTRONIC CORRESPONDENCE**

**David C. Meyer**
Partner, Los Angeles
213.443.7647    **DIRECT**

david.meyer@afslaw.com

Argon Protocol Foundation
Oceania Business Plaza, 21st Floor, Tower 1000
Issac Hanono Missri Street, Punta Pacifica
Panama City, Republic of Panama
Attention: Diana Aidee Muñoz Maclao de Camargo (diana.amorlove@hotmail.com)

Re:    Demand for Distribution of SHRAP Tokens

Dear Ms. Muñoz:

Our firm represents Cort Javarone in connection with Mr. Javarone's ownership of SHRAP tokens pursuant to (i) the Assignment and Assumption Agreement, dated November 8, 2021, by and among Argon Protocol Foundation, Neon Machine, Inc., and Cort Javarone for 1,000,000 tokens attached hereto as Exhibit A and (ii) the Assignment and Assumption Agreement, dated November 8, 2021, by and among Argon Protocol Foundation, Neon Machine, Inc., and Cort Javarone for 15,000,000 tokens attached hereto as Exhibit B (collectively, the "**Assignment Agreements**"). We demand that Argon Protocol Foundation (the "**Foundation**") immediately distribute to Mr. Javarone 16,000,000 SHRAP tokens (the "**Tokens**") as required by the Assignment Agreements.

Section 1.2 of the Assignment Agreements provide that the Foundation shall "distribute, or cause to be distributed, the Tokens to [Mr. Javarone] as soon as practicable after the date of the Token Launch." As of this writing, the SHRAP token is trading on multiple exchanges (e.g. KuCoin); therefore, the Foundation is obligated to immediately distribute the Tokens to Mr. Javarone because the Foundation has issued SHRAP tokens to others under similar contracts. The Foundation is obligated to "take such further actions as may be reasonably requested to give effect to the transactions contemplated" by the Assignment Agreements. (See Section 8.5 of the Assignment Agreements.)

As assignee to the Token Subscription Agreements, dated November 8, 2021, by and between the Foundation and Neon Machine, Inc., Mr. Javarone is owner of all rights, title, and interests in the Tokens.

We therefore request you immediately acknowledge that you will distribute to Mr. Javarone the Tokens, whereupon our firm will provide a wallet address. Time is of the essence so please let us know by close of business (Pacific Time) Friday, December 29, 2023 when the Foundation will distribute the Tokens to Mr. Javarone. We look forward to hearing from you.



December 27, 2023
Page 2

Very truly yours,

David C. Meyer

Enclosures
DCM:sv

cc:    Omar Camargo (camargoomar85@gmail.com)
       Aaron Nonis (aaron.nonis@shrapnel.com)

Exhibit A

## ASSIGNMENT AND ASSUMPTION OF TOKEN SUBSCRIPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF TOKEN SUBSCRIPTION AGREEMENT (this "*Agreement*"), is made this 8th day of November, 2021 (the "*Effective Date*"), by and among Argon Protocol Foundation, a Republic of Panama foundation (the "*Foundation*"), Neon Machine, Inc., a Delaware corporation ("*Assignor*"), and the undersigned (the "*Assignee*"). Unless otherwise defined herein, all capitalized terms shall have the meanings assigned to such terms in that certain Token Subscription Agreement (the "*TSA*") dated on or about the date hereof between the Assignor and the Foundation.

WHEREAS, the Assignor and the Foundation previously entered into the TSA whereby Assignor purchased the right to receive 1,000,000 SHRAP Tokens (the "*Tokens*") from the Foundation.

WHEREAS, the Assignee is providing certain services to the Assignor in connection with the Foundation's mission to support the growth and development of the Protocol, the Tokens and the Network.

WHEREAS, in consideration of Assignee's services and payment of the aggregate purchase price set forth on the signature page hereto (the "*Aggregate Purchase Price*"), Assignor desires to transfer and assign to Assignee, and Assignee desires to purchase and assume, Assignor's rights, title and interests in and to the TSA in respect to the Tokens, all as further set forth in this Agreement.

NOW, THEREFORE, incorporating the foregoing recitals as a material part hereof, and in consideration of the covenants contained in this Agreement and in the TSA, Assignor and Assignee, each intending to be legally bound hereby, agree as follows:

1.  **ASSIGNMENT**.

    1.1    On the Effective Date and subject to the terms and conditions of this Agreement, Assignor does hereby unconditionally and irrevocably assign, transfer, convey and deliver unto Assignee, and Assignee hereby purchases and accepts, all of Assignor's rights, title and interest in and to the TSA, including the right to receive, automatically and without any future payment, that number of SHRAP Tokens (the "*Tokens*") set forth on the signature page hereto from the Foundation. Assignee by this Agreement becomes entitled to the rights, title and interest of Assignor in and to the TSA in respect to the Tokens as if Assignee were an original party to the TSA.

    1.2    In consideration for Assignor's assignment of Assignor's rights, title and interest in and to the TSA in respect to the Tokens under the terms of this Agreement, Assignee hereby delivers, or has delivered, a duly executed copy of this Agreement to the Assignor and the Foundation, and payment of the Aggregate Purchase Price in USDC, USDT or any other U.S. Dollar-denominated stablecoin, ETH or BTC on as-converted to U.S. Dollar basis, or U.S. Dollars. In consideration for receipt of the Aggregate Purchase Price, the Assignor hereby delivers, or has delivered, to the Assignee and the Company a duly executed copy of this Agreement, and agrees to distribute, or cause to be distributed, the Tokens to the Assignee as soon as practicable after the date of the Token Launch.

**2.    REPRESENTATIONS AND WARRANTIES OF ASSIGNEE.** Assignee hereby represents and warrants to Assignor and the Foundation as follows:

**2.1    Entirely for Own Account.** Assignee is acquiring the right to receive the Token Interests entirely for Assignee's own account to hold for the long term, not as a nominee or agent, and not with a view to, or for sale in connection with, a distribution of the Token Interests within the meaning of the Securities Act of 1933, as amended (the "***1933 Act***"). Assignee has no present intention of selling or otherwise disposing of all or any portion of the Token Interests and no one other than Assignee has any beneficial ownership of any of the Token Interests. By executing this Agreement, Assignee further represents that Assignee does not presently have any contract, undertaking, agreement or arrangement with any individual, corporation, partnership, trust, limited liability company, association or other entity ("***Person***") to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Token Interests.

**2.2    Access to Information.** Assignee has had access to all information that Assignee reasonably considers important in making the decision to obtain the Token Interests, and Assignee has had ample opportunity to ask questions of the Foundation's representative concerning such matters and this transaction.

**2.3    Understanding of Risks.** Assignee is a founder, officer, director, employee, consultant, advisor, independent contractor, or other service provider of Assignor and fully aware of:  (a) the highly speculative nature of the Token Interests; (b) the financial hazards involved; (c) the lack of liquidity of the Token Interests and the restrictions on transferability of the Token Interests (e.g., that Assignee may not be able to sell or dispose of the Token Interests or use them as collateral for loans); and (d) the tax consequences of purchasing the Token Interests, including the tax consequences of receiving the Tokens in accordance with the terms of this Agreement and the TSA. Further, the Assignee understands that the Token Interests involve risks, all of which the Assignee fully and completely assumes, including, but not limited to, the risk that (i) the technology associated with the Protocol, the SHRAP Tokens and the Network will not function as intended; (ii) the Protocol and/or the Network will not be completed and the SHRAP Tokens will not be distributed; (iii) the Network will fail to attract sufficient interest from key stakeholders; (iv) the Network will not gain adoption and acceptance; and (v) the Foundation, Assignor and/or the Network may be subject to investigation and punitive actions from governmental authorities. The Assignee understands and expressly accepts that the Tokens will be delivered to the Assignee at the sole risk of the Assignee on an "AS IS" and "UNDER DEVELOPMENT" basis. The Assignee understands and expressly accepts that the Assignee has not relied on any oral or written statements, representations or warranties made by the Foundation, Assignor or any of their officers, directors, employees, consultants, advisors, equity holders, or other agents outside of this instrument, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE ASSIGNEE ASSUMES ALL RISK AND LIABILITY FOR THE RESULTS OBTAINED BY THE USE OF ANY SHRAP TOKENS AND REGARDLESS OF ANY ORAL OR WRITTEN STATEMENTS MADE BY ASSIGNOR OR THE FOUNDATION, BY WAY OF TECHNICAL ADVICE OR OTHERWISE, RELATED TO THE USE OF THE SHRAP TOKENS.

**2.4** **Understanding and Experience**. Assignee has sufficient understanding of the functionality, usage, storage, transmission mechanisms and other material characteristics of cryptographic tokens, token wallets and other token storage mechanisms, public and private key management, blockchain technology, and blockchain-based software systems to understand the terms of this instrument. Assignee understands, acknowledges and agrees that such knowledge allows the Assignee to appreciate the implications and risks of acquiring the Tokens Interests herein.

**2.5** **Accredited Investor**. Assignee is either an accredited investor (as defined in Rule 501(a) of Regulation D promulgated under the 1933 Act); or Assignee is a sophisticated purchaser and has appointed a purchaser representative (as defined in Rule 501(i) of Regulation D promulgated under the 1933 Act).

**2.6** **Assignee's Qualifications.** Assignee has a preexisting personal or business relationship with Assignor and the Foundation and/or certain of their officers and/or directors of a nature and duration sufficient to make Assignee aware of the character, business acumen and general business and financial circumstances of Assignor and the Foundation and/or certain of their officers and/or directors. If Assignee is not an accredited investor, then the Assignee, alone or with its purchaser representative, has made its own independent investigation, review and analysis regarding the Assignor and the Foundation and the transactions contemplated hereby, which investigation, review and analysis were conducted by the Assignee, alone or with its purchaser representative, and together with other expert advisors that it has engaged for such purpose. By reason of their business or financial experience, Assignee and its purchaser representative, if applicable, is capable of evaluating the merits and risks of this transaction, has the ability to protect Assignee's own interests in this transaction and is financially capable of bearing a total loss of the value of this transaction.

**2.7** **Information Statement**.[1] Assignee has received a confidential information statement from Assignor or the Foundation setting forth such information required to be provided under Rule 502(b) of Regulation D promulgated under the 1933 Act, and has had ample opportunity to review such documents with Assignee's purchaser representative (as defined in Rule 501(i) of Regulation D promulgated under the 1933 Act) and ask questions concerning such matters and this transaction.

**2.8** **No General Solicitation.** At no time was Assignee presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television or other form of general advertising or solicitation in connection with the offer, sale, purchase and assignment of the Token Interests.

**2.9** **Compliance with Securities Laws.** Assignee understands and acknowledges that, to the extent the Token Interests are considered securities, the Token Interests have not been, and are not expected to be, registered with the Securities and Exchange Commission ("*SEC*") under the 1933 Act or any applicable state securities law, but instead are being issued under an exemption or exemptions from the registration and qualification requirements of the 1933

---

[1] Note to draft: this paragraph is not required for 506(c) compliant offerings.

Act and other applicable state securities laws which impose certain restrictions on Assignee's ability to transfer the Token Interests.

**2.10**    **No Public Market**. The Assignee understands that no public market now exists for the Token Interests, and that neither Assignor nor the Foundation has made any assurances that a public market will ever exist for the Token Interests.

**2.11**    **Restrictions on Transfer.** The Token Interests may constitute securities in various jurisdictions, although Assignor and the Foundation do not concede this point in any jurisdiction. Accordingly, Assignee understands and agrees as follows:

> **Assignee may not transfer any Token Interests unless (1) such Token Interests are registered under the 1933 Act and qualified under other applicable state securities laws, (2) exemptions from such registration and qualification requirements are available, or (3) such Token Interests do not constitute securities under applicable law or SEC rules.**

Assignee understands that only the Foundation may file a registration statement with the SEC or other applicable state securities commissioners and that the Foundation is under no obligation to do so with respect to the Token Interests. Assignee has also been advised that exemptions from registration and qualification may not be available or may not permit Assignee to transfer all or any of the Token Interests in the amounts or at the times proposed by Assignee. Assignee further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Token Interests, and on requirements relating to the Foundation which are outside of the Assignee's control, and which the Foundation is under no obligation and may not be able to satisfy.

**2.12**    **Legends**. The Assignee understands that the Token Interests may bear any legend required by the securities laws of any state to the extent such laws are applicable to the Token Interests, to the extent they may contain a legend, and the following legend (and even without such legend the following restrictions apply):

> *"THE TOKEN INTERESTS GRANTED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED."*

**3.**    **LOCKUP.** The Token Interests and the Tokens issued to the Assignee in fulfillment of the Token Interests (as applicable as of the applicable date of determination, the "***Restricted Tokens***") shall be subject to the following restrictions (collectively, the "***Lockup Provisions***"):

**3.1** **Lockup Period**. Prior to the twelve-month anniversary of the Effective Date, Assignee agrees that it will not, without the prior written consent of the Assignor, offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale of, or place any liens or security interests in, hypothecate, encumber or otherwise transfer or dispose of ("*Transfer*") any Restricted Tokens or any interest therein, any options to purchase any Restricted Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Restricted Tokens, including the Token Interests assigned to the Assignee herein, whether now or hereinafter acquired by the Assignee; *provided that*, subject to Section 2.9, on the twelve-month anniversary of the Effective Date, 1/3 of the Restricted Tokens shall be released from these Lockup Provisions, and 1/36th of the Restricted Tokens shall be released on each monthly anniversary thereafter, such that all Restricted Tokens will be released from these Lockup Provisions on the three-year anniversary of the Effective Date.

**3.2** **Unvested Tokens**. Notwithstanding anything to the contrary herein, Assignee agrees that it will not, at any time, Transfer any Unvested Tokens (as defined below), any options to purchase any Unvested Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Unvested Tokens.

**3.3** **Restrictions**. To ensure compliance with these Lockup Provisions, the Company and/or the Foundation may impose technological lockups or restrictions on the Restricted Tokens or withhold delivery of the Restricted Tokens until such restrictions expire or termination.

**4.** **FOUNDATION'S REPURCHASE OPTION.** The Foundation and/or its assignees shall have the option to repurchase all or a portion of the Unvested Tokens on the terms and conditions set forth in this Section (the "*Repurchase Option*") if Assignee ceases to be employed by Assignor for any reason, or no reason, including without limitation Assignee's death, disability, voluntary resignation or termination by Assignor with or without cause.

**4.1** **Definition of "Employed by Assignor"; "Termination Date".** For purposes of this Agreement, Assignee will be considered to be "*employed by Assignor*" if the Board of Directors of the Assignor (the "*Board*") determines that Assignee is rendering substantial services as a director, officer, employee, consultant, advisor or independent contractor to the Assignor or to any Affiliate thereof. In case of any dispute as to whether Assignee is employed by Assignor, the Board shall have sole discretion to determine whether Assignee has ceased to be employed by Assignor or its Affiliate and the effective date on which Assignee's employment or service relationship terminated (the "*Termination Date*"). An "*Affiliate*" means any entity that owns, directly or indirectly, stock representing more than 50% of the total combined voting power of all classes of stock of Assignor or any entity in which Assignor owns, directly or indirectly, equity interests representing more than 50% of the voting power of such entity.

**4.2** **Unvested and Vested Restricted Tokens**.

**(a)** Vesting Schedule. Restricted Tokens that are vested pursuant to the schedule set forth herein are "*Vested Tokens*". Restricted Tokens that are not vested pursuant to the schedule set forth herein are "*Unvested Tokens*". The "*Vesting Commencement Date*" is the date set forth on the signature page hereto. If Assignee has continuously been employed by

Assignor, at all times from the Vesting Commencement Date, and thereafter, for so long (and only for so long) as Assignee remains continuously employed by Assignor at all times from the Vesting Commencement Date, on the last business day of each month after the Vesting Commencement Date 1/36th of the Restricted Tokens will become Vested Tokens, such that if Assignee has been continuously employed by the Assignor during such period, all Restricted Tokens will be fully vested on the three-year anniversary of the Vesting Commencement Date. No Unvested Tokens will become Vested Tokens after the Termination Date.

        **(b)**        Acceleration of Vesting Following Termination without Cause. Notwithstanding anything to the contrary set forth in Section 3, if Assignee's employment by the Assignor is terminated by the Assignor (or successor thereof) following the twelve (12) month anniversary of the Vesting Commencement Date but prior to the First Vesting Date, other than for Cause, and provided that the Assignee delivers to the Assignor and the Company a general release and non-disparagement agreement of claims in favor of the Assignor, the Company and certain related parties in a form satisfactory to the Assignor and the Company (the "*Release*") within sixty (60) days following such separation from service, and satisfy all conditions to make the Release effective, then, effective as of immediately prior to such termination, a number of Restricted Tokens equal to the product of (a) the number of Restricted Tokens, and (b) a fraction, the numerator of which is the number of whole calendar months that has elapsed between the Vesting Commencement Date and the Termination Date, and the denominator of which is thirty-six (36), will become Vested Tokens at the time of such termination.

As used in this Section 4.2(b): "*Cause*" means any of the following: (a) the Assignee's unauthorized misuse of the Company's trade secrets or proprietary information, (b) the Assignee's conviction of or plea of nolo contendere to a felony or a crime involving moral turpitude, (c) the Assignee's commission of an act of fraud against the Assignor, the Company or any Affiliate, (d) the Assignee's willful engagement in conduct that is in bad faith and materially injurious to the Assignor, the Company or any Affiliate, including but not limited to, misappropriation of trade secrets, fraud or embezzlement, (e) Assignee commits a material breach of any written agreement between Assignee and the Assignor that causes harm to the Assignor, which breach is not cured within thirty (30) days after receipt of written notice describing in detail such breach to Assignee from the Assignor, or (f) Assignee engages in material misfeasance or malfeasance demonstrated by a continued pattern of material failure to perform the essential job duties associated with Assignee's position, which breach is not cured within thirty (30) days after receipt of written notice describing in detail such breach to Assignee from the Assignor.

        **(c)**        Acceleration of Vesting Following Insolvency of Assignor. In addition to any Restricted Tokens that have become Vested Tokens pursuant to Section 4.2(a) hereof, in the event of a voluntary or involuntary dissolution, liquidation or winding-up of the Assignor, the filing of a petition by or against the Assignor under Title 11 of the United States Code (as now and hereafter in effect, or any successor statute), the appointment of a receiver, trustee, custodian or liquidator of or for all or substantially all of the assets or property of the Assignor, or the execution by the Assignor of a general assignment for the benefit of creditors (in each case, an "*Insolvency Event*"), then, if Assignee has been continuously employed by the Assignor from the Effective Date until the date of such Insolvency Event, effective as of such Insolvency Event, 100% of the Restricted Tokens will become Vested Tokens at the time of such event.

**4.3     Exercise of Repurchase Option at Original Price.** At any time within ninety (90) days after the Termination Date, the Foundation and/or its assignee(s) may elect to repurchase any or all of the Unvested Tokens by giving Assignee written notice of exercise of the Repurchase Option; provided, however, that without requirement of further action on the part of either party hereto, the Repurchase Option shall be deemed to have been automatically exercised as to all Unvested Tokens as of 11:59 PM PT on the date that is ninety (90) days after the Termination Date, unless the Foundation declines in writing to exercise its Repurchase Option. Foundation and/or its assignee(s) will then repurchase (or be deemed to have repurchased) from Assignee (or from Assignee's personal representative as the case may be) any or all of the Unvested Tokens at a price of per Token equal to that set forth on the signature page hereto (the "*Repurchase Price*").

**4.4     Payment of Repurchase Price.** The Repurchase Price may be payable in Bitcoin, Ether or other forms of digital assets on an as-converted to U.S. dollars basis or in U.S. dollars, at the option of the Foundation and/or its assignee(s), as the case may be, by cash, wire transfer or check, or by cancellation of all or a portion of any outstanding indebtedness owed by Assignee to the Foundation (or to such assignee) or by any combination thereof, or any other forms of payment on an as-converted to U.S. dollars basis as determined by the Foundation in its sole discretion. The Repurchase Price will be paid without interest.

**4.5     Right of Termination Unaffected.** Nothing in this Agreement will be construed to limit or otherwise affect in any manner whatsoever the right or power of Assignor (or any Affiliate) to terminate Assignee's employment or service relationship with Assignor (or any Affiliate) at any time for any reason or no reason, with or without cause.

**5.     RIGHTS AS OWNER OF TOKEN INTERESTS AND TOKENS.** The Token Interests do not, and the Tokens will not following the Token Launch, entitle Assignee to vote or receive dividends or be deemed the holder of equity of Assignor or the Foundation for any purpose, nor will anything contained herein be construed to confer on the Assignee, as such, any of the rights of a stockholder of Assignor or the Foundation or any right to vote for the election of Assignor's Board or the Foundation's Board or upon any matter submitted to the stockholders of Assignor, Assignor's Board, Foundation's Board, or the council members of the Foundation, or at any meeting thereof, or to give or withhold consent to any corporate or foundation action or to receive notice of meetings, or to receive subscription rights or otherwise.

**6.     DISCLAIMER AND LIMITATION OF LIABILITY.** Neither the Assignor nor the Foundation shall be liable or responsible to the Assignee, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, including without limitation, launching, developing and maintaining the Protocol and/or the Network, launching the Tokens, selling the Token Interests, sending the Tokens to the smart contract address compatible with receiving Tokens, or distributing the Tokens, when and to the extent such failure or delay is caused by or results from acts beyond the affected party's commercially reasonable control, including, without limitation: (a) acts of God; (b) flood, fire, earthquake, pandemic or explosion; (c) war, invasion, hostilities (whether war is declared or not); terrorist threats or acts, or other civil unrest; (d) applicable law or regulations; or (e) action by any governmental authority. NEITHER THE ASSIGNOR NOR THE FOUNDATION MAKE ANY

WARRANTY WHATSOEVER WITH RESPECT TO THE TOKENS, INCLUDING ANY (A) WARRANTY OF MERCHANTABILITY; (B) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (C) WARRANTY OF TITLE; OR (D) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE. EXCEPT AS EXPRESSLY SET FORTH HEREIN, ASSIGNEE ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE ASSIGNOR OR THE FOUNDATION, OR ANY OTHER PERSON ON THE ASSIGNOR OR THE FOUNDATION'S BEHALF.

The Assignee understands that Assignee has no right against the Assignor or the Foundation or any other individual or legal entity except in the event of the Assignor's or the Foundation's material breach of this instrument or intentional fraud. THE ASSIGNOR'S AND THE FOUNDATION'S (OR ANY OTHER INDIVIDUAL'S OR LEGAL ENTITY'S) AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT OR OTHERWISE, SHALL NOT EXCEED US$1,000.00. NEITHER THE ASSIGNOR, THE FOUNDATION NOR THEIR REPRESENTATIVES SHALL BE LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS INSTRUMENT.

7.    **TAX CONSEQUENCES**. ASSIGNEE UNDERSTANDS THAT ASSIGNEE MAY SUFFER ADVERSE TAX CONSEQUENCES AS A RESULT OF ASSIGNEE'S RECEIPT, VESTING OR DISPOSITION OF ASSIGNOR'S RIGHTS UNDER THE TSA. ASSIGNEE REPRESENTS (a) THAT ASSIGNEE HAS CONSULTED WITH A TAX ADVISER THAT ASSIGNEE DEEMS ADVISABLE IN CONNECTION WITH THE RECEIPT, VESTING, AND DISPOSITION OF ASSIGNOR'S RIGHTS UNDER THE TSA, AND (b) THAT ASSIGNEE IS NOT RELYING ON ASSIGNOR, THE FOUNDATION, OR ANY AGENTS, REPRESENTATIVES, OR ADVISORS OF EITHER ASSIGNOR OR FOUNDATION FOR ANY TAX ADVICE. Assignee has been informed that unless Assignee files with the Internal Revenue Service (and, if necessary, the proper state taxing authorities) within 30 days after the Effective Date, electing pursuant to Section 83(b) of the Internal Revenue Code (and similar state tax provisions, if applicable) to be taxed currently on any difference between the fair market value of the Token Interests on the date of grant and the amount paid by the Assignee, there may be a recognition of taxable income to Assignee at each time the Repurchase Option lapses with respect to a portion of the Restricted Tokens, measured by the excess, if any, of the fair market value of such portion of the Restricted Tokens over the amount paid by the Assignor allocable to such portion of the Restricted Tokens. Assignee represents that Assignee has consulted any tax advisors Assignee deems advisable in connection with Assignee's receipt of Assignor's rights under the TSA and the filing of the election under Section 83(b) and similar tax provisions. A form of Election under Section 83(b) is attached hereto as Exhibit A for reference. ASSIGNEE HEREBY ASSUMES ALL RESPONSIBILITY FOR FILING SUCH ELECTION AND PAYING ANY TAXES RESULTING FROM SUCH ELECTION OR FROM FAILURE TO FILE THE ELECTION AND PAYING TAXES RESULTING FROM THE LAPSE OF THE REPURCHASE RESTRICTIONS ON THE UNVESTED TOKENS.

THE FAIR MARKET VALUE OF ASSIGNOR'S RIGHTS UNDER THE TSA HAS BEEN DETERMINED IN GOOD FAITH IN ACCORDANCE WITH A VALUATION REPORT RECEIVED BY THE FOUNDATION AND SHARED WITH ASSIGNOR, A COPY OF WHICH IS AVAILABLE TO ASSIGNEE UPON REQUEST. THERE IS NO GUARANTEE THAT SUCH DETERMINATION OF FAIR MARKET VALUE WILL NECESSARILY REFLECT OR EQUAL ANY DETERMINATION OF FAIR MARKET VALUE BY A TAXING AUTHORITY (SUCH AS THE INTERNAL REVENUE SERVICE). ASSIGNEE AGREES TO BE FULLY RESPONSIBLE FOR ANY TAXES RESULTING FROM THE RECEIPT, VESTING AND DISPOSITION OF ASSIGNOR'S RIGHTS UNDER THE TSA, INCLUDING ANY ADDITIONAL TAXES RESULTING FROM A DIFFERENT DETERMINATION OF FAIR MARKET VALUE.

## 8. **MISCELLANEOUS**.

**8.1** **Notices**. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, or (b) when sent, if sent by electronic mail or facsimile during normal business hours of the Assignor, and if not sent during normal business hours, then on the Assignor's next Business day, or (c) three (3) Business Days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries. All notices for delivery outside the United States will be sent by express courier. All notices for delivery will be sent by express courier. All notices not delivered personally will be sent with postage and/or other charges prepaid and properly addressed to the party to be notified at the address set forth below the signature lines of this Agreement or at such other address as such other party may designate by one of the indicated means of notice herein to the other party hereto. A "*Business day*" shall be a day, other than Saturday or Sunday, when the banks in the Republic of Panama are open for business.

**8.2** **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the jurisdiction set forth in the TSA, without giving effect to that body of laws pertaining to conflict of laws.

**8.3** **Binding Effect**. This Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties hereto and their respective successors and assigns.

**8.4** **Entire Agreement**. This Agreement and the TSA constitute the entire agreement and understanding of the parties with respect to the subject matter hereof and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

**8.5** **Further Assurances**. Assignee agrees to execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably requested to give effect to the transactions contemplated hereby, including without limitation to enable the Foundation and the Assignor to comply with applicable laws and any other documents that (1) other unaffiliated purchasers of Tokens shall be required to execute and deliver, or (2) are requested by any digital asset exchanges or markets (including any specific or additional lock-up agreements or terms in connection with a listing or sale of Tokens).

**8.6      Counterparts; Facsimile Signatures.** This Agreement may be executed in any number of counterparts, each of which will be deemed an original, and all of which together shall constitute one and the same agreement. This Agreement may be executed and delivered by facsimile or other means of electronic delivery and upon such delivery the facsimile signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties hereto, being authorized to do so and intending to be legally bound hereby, have duly executed and entered into this Agreement on the date first set forth above.

**ASSIGNOR:**

NEON MACHINE, INC.

By: _____

Name: _Mark Long_____

Title: _CEO_____

**IN WITNESS WHEREOF**, the parties hereto, being authorized to do so and intending to be legally bound hereby, have duly executed and entered into this Agreement on the date first set forth above.

**ASSIGNEE:**

DocuSigned by:

*Cort Javarone*

066C102172D3417

Name: Cort Javarone

| Number of SHRAP Tokens | Price per Token | Vesting Commencement Date |
|---|---|---|
| 1,000,000 | $0.00002616 | November 08, 2021 |

**IN WITNESS WHEREOF**, the parties hereto, being authorized to do so and intending to be legally bound hereby, have duly executed and entered into this Agreement on the date first set forth above.

FOUNDATION:

ARGON PROTOCOL FOUNDATION

By: _Diana Muñoz_ _____
      1F2ADEB61CF54CD...
Name: _Diana Muñoz_ _____
Title: _Director_ _____

## EXHIBIT A

## ELECTION UNDER SECTION 83(b) OF THE
## INTERNAL REVENUE CODE

The undersigned Taxpayer hereby elects, pursuant to Section 83(b) of the Internal Revenue Code, as amended, to include in gross income for the Taxpayer's current taxable year the excess, if any, of the fair market value of the property described below at the time of transfer over the amount paid for such property, as compensation for services.

1.      TAXPAYER'S NAME: _____

        TAXPAYER'S ADDRESS: _____

        SOCIAL SECURITY NUMBER: _____

2.      The property with respect to which the election is made is described as follows: the right to receive from Argon Protocol Foundation, a Republic of Panama foundation (the "**Foundation**") [_____] SHRAP Tokens of the Foundation (the "**Tokens**").

3.      The date on which the right to receive the Tokens was transferred was [_____], 2021 and this election is made for calendar year 2021.

4.      The Tokens are subject to the following restrictions: The Foundation may repurchase all or a portion of the Tokens at $[_____] per Token under certain conditions at the time of Taxpayer's termination of employment or services.

5.      The fair market value of the right to receive the Tokens (without regard to restrictions other than restrictions which by their terms will never lapse) was $[_____] per Token at the time of transfer.

6.      The amount paid for the right to receive the Tokens was $[_____] per Token.

7.      The Taxpayer has submitted a copy of this statement to the Foundation.

*THIS ELECTION MUST BE FILED WITH THE INTERNAL REVENUE SERVICE ("**IRS**"), AT THE OFFICE WHERE THE TAXPAYER FILES ANNUAL INCOME TAX RETURNS, <u>WITHIN 30 DAYS</u> AFTER THE DATE OF TRANSFER OF THE PROPERTY. THE ELECTION CANNOT BE REVOKED WITHOUT THE CONSENT OF THE IRS.*

Dated: _____    _____
                                            Taxpayer's Signature

Exhibit B

**Smart In
Your World®**
AFDOCS:199245616.3

## ASSIGNMENT AND ASSUMPTION OF TOKEN SUBSCRIPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF TOKEN SUBSCRIPTION AGREEMENT (this "***Agreement***"), is made this 8th day of November, 2021 (the "***Effective Date***"), by and among Argon Protocol Foundation, a Republic of Panama foundation (the "***Foundation***"), Neon Machine, Inc., a Delaware corporation ("***Assignor***"), and the undersigned (the "***Assignee***"). Unless otherwise defined herein, all capitalized terms shall have the meanings assigned to such terms in that certain Token Subscription Agreement (the "***TSA***") dated on or about the date hereof between the Assignor and the Foundation.

**WHEREAS**, the Assignor and the Foundation previously entered into the TSA whereby Assignor purchased the right to receive 15,000,000 SHRAP Tokens (the "***Tokens***") from the Foundation.

**WHEREAS**, the Assignee is providing certain services to the Assignor in connection with the Foundation's mission to support the growth and development of the Protocol, the Tokens and the Network.

**WHEREAS**, in consideration of Assignee's services and payment of the aggregate purchase price set forth on the signature page hereto (the "***Aggregate Purchase Price***"), Assignor desires to transfer and assign to Assignee, and Assignee desires to purchase and assume, all of Assignor's rights, title and interests in and to the TSA, all as further set forth in this Agreement.

**NOW, THEREFORE**, incorporating the foregoing recitals as a material part hereof, and in consideration of the covenants contained in this Agreement and in the TSA, Assignor and Assignee, each intending to be legally bound hereby, agree as follows:

1.    **ASSIGNMENT**.

1.1    On the Effective Date and subject to the terms and conditions of this Agreement, Assignor does hereby unconditionally and irrevocably assign, transfer, convey and deliver unto Assignee, and Assignee hereby purchases and accepts, all of Assignor's rights, title and interest in and to the TSA, including the right to receive, automatically and without any future payment, that number of SHRAP Tokens (the "***Tokens***") set forth on the signature page hereto from the Foundation. Assignee by this Agreement becomes entitled to all rights, title and interest of Assignor in and to the TSA as if Assignee were an original party to the TSA.

1.2    In consideration for Assignor's assignment of Assignor's rights, title and interest in and to the TSA under the terms of this Agreement, Assignee hereby delivers, or has delivered, a duly executed copy of this Agreement to the Assignor and the Foundation, and payment of the Aggregate Purchase Price in USDC, USDT or any other U.S. Dollar-denominated stablecoin, ETH or BTC on as-converted to U.S. Dollar basis, or U.S. Dollars. In consideration for receipt of the Aggregate Purchase Price, the Assignor hereby delivers, or has delivered, to the Assignee and the Company a duly executed copy of this Agreement, and agrees to distribute, or cause to be distributed, the Tokens to the Assignee as soon as practicable after the date of the Token Launch.

     **2.**    <u>**REPRESENTATIONS AND WARRANTIES OF ASSIGNEE**</u>. Assignee hereby represents and warrants to Assignor and the Foundation as follows:

     **2.1**    <u>**Entirely for Own Account**</u>. Assignee is acquiring the right to receive the Token Interests entirely for Assignee's own account to hold for the long term, not as a nominee or agent, and not with a view to, or for sale in connection with, a distribution of the Token Interests within the meaning of the Securities Act of 1933, as amended (the "***1933 Act***"). Assignee has no present intention of selling or otherwise disposing of all or any portion of the Token Interests and no one other than Assignee has any beneficial ownership of any of the Token Interests. By executing this Agreement, Assignee further represents that Assignee does not presently have any contract, undertaking, agreement or arrangement with any individual, corporation, partnership, trust, limited liability company, association or other entity ("***Person***") to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Token Interests.

     **2.2**    <u>**Access to Information**</u>. Assignee has had access to all information that Assignee reasonably considers important in making the decision to obtain the Token Interests, and Assignee has had ample opportunity to ask questions of the Foundation's representative concerning such matters and this transaction.

     **2.3**    <u>**Understanding of Risks**</u>. Assignee is a founder, officer, director, employee, consultant, advisor, independent contractor, or other service provider of Assignor and fully aware of: (a) the highly speculative nature of the Token Interests; (b) the financial hazards involved; (c) the lack of liquidity of the Token Interests and the restrictions on transferability of the Token Interests (<u>e.g.</u>, that Assignee may not be able to sell or dispose of the Token Interests or use them as collateral for loans); and (d) the tax consequences of purchasing the Token Interests, including the tax consequences of receiving the Tokens in accordance with the terms of this Agreement and the TSA. Further, the Assignee understands that the Token Interests involve risks, all of which the Assignee fully and completely assumes, including, but not limited to, the risk that (i) the technology associated with the Protocol, the SHRAP Tokens and the Network will not function as intended; (ii) the Protocol and/or the Network will not be completed and the SHRAP Tokens will not be distributed; (iii) the Network will fail to attract sufficient interest from key stakeholders; (iv) the Network will not gain adoption and acceptance; and (v) the Foundation, Assignor and/or the Network may be subject to investigation and punitive actions from governmental authorities. The Assignee understands and expressly accepts that the Tokens will be delivered to the Assignee at the sole risk of the Assignee on an "AS IS" and "UNDER DEVELOPMENT" basis. The Assignee understands and expressly accepts that the Assignee has not relied on any oral or written statements, representations or warranties made by the Foundation, Assignor or any of their officers, directors, employees, consultants, advisors, equity holders, or other agents outside of this instrument, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE ASSIGNEE ASSUMES ALL RISK AND LIABILITY FOR THE RESULTS OBTAINED BY THE USE OF ANY SHRAP TOKENS AND REGARDLESS OF ANY ORAL OR WRITTEN STATEMENTS MADE BY ASSIGNOR OR THE FOUNDATION, BY WAY OF TECHNICAL ADVICE OR OTHERWISE, RELATED TO THE USE OF THE SHRAP TOKENS.

**2.4    Understanding and Experience**. Assignee has sufficient understanding of the functionality, usage, storage, transmission mechanisms and other material characteristics of cryptographic tokens, token wallets and other token storage mechanisms, public and private key management, blockchain technology, and blockchain-based software systems to understand the terms of this instrument. Assignee understands, acknowledges and agrees that such knowledge allows the Assignee to appreciate the implications and risks of acquiring the Tokens Interests herein.

**2.5    Accredited Investor**. Assignee is either an accredited investor (as defined in Rule 501(a) of Regulation D promulgated under the 1933 Act); or Assignee is a sophisticated purchaser and has appointed a purchaser representative (as defined in Rule 501(i) of Regulation D promulgated under the 1933 Act).

**2.6    Assignee's Qualifications.** Assignee has a preexisting personal or business relationship with Assignor and the Foundation and/or certain of their officers and/or directors of a nature and duration sufficient to make Assignee aware of the character, business acumen and general business and financial circumstances of Assignor and the Foundation and/or certain of their officers and/or directors. If Assignee is not an accredited investor, then the Assignee, alone or with its purchaser representative, has made its own independent investigation, review and analysis regarding the Assignor and the Foundation and the transactions contemplated hereby, which investigation, review and analysis were conducted by the Assignee, alone or with its purchaser representative, and together with other expert advisors that it has engaged for such purpose. By reason of their business or financial experience, Assignee and its purchaser representative, if applicable, is capable of evaluating the merits and risks of this transaction, has the ability to protect Assignee's own interests in this transaction and is financially capable of bearing a total loss of the value of this transaction.

**2.7    Information Statement**.  Assignee has received a confidential information statement from Assignor or the Foundation setting forth such information required to be provided under Rule 502(b) of Regulation D promulgated under the 1933 Act, and has had ample opportunity to review such documents with Assignee's purchaser representative (as defined in Rule 501(i) of Regulation D promulgated under the 1933 Act) and ask questions concerning such matters and this transaction.

**2.8    No General Solicitation.** At no time was Assignee presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television or other form of general advertising or solicitation in connection with the offer, sale, purchase and assignment of the Token Interests.

**2.9    Compliance with Securities Laws.** Assignee understands and acknowledges that, to the extent the Token Interests are considered securities, the Token Interests have not been, and are not expected to be, registered with the Securities and Exchange Commission ("**SEC**") under the 1933 Act or any applicable state securities law, but instead are being issued under an exemption or exemptions from the registration and qualification requirements of the 1933 Act and other applicable state securities laws which impose certain restrictions on Assignee's ability to transfer the Token Interests.

**2.10    No Public Market**. The Assignee understands that no public market now exists for the Token Interests, and that neither Assignor nor the Foundation has made any assurances that a public market will ever exist for the Token Interests.

**2.11    Restrictions on Transfer.** The Token Interests may constitute securities in various jurisdictions, although Assignor and the Foundation do not concede this point in any jurisdiction. Accordingly, Assignee understands and agrees as follows:

> **Assignee may not transfer any Token Interests unless (1) such Token Interests are registered under the 1933 Act and qualified under other applicable state securities laws, (2) exemptions from such registration and qualification requirements are available, or (3) such Token Interests do not constitute securities under applicable law or SEC rules.**

Assignee understands that only the Foundation may file a registration statement with the SEC or other applicable state securities commissioners and that the Foundation is under no obligation to do so with respect to the Token Interests. Assignee has also been advised that exemptions from registration and qualification may not be available or may not permit Assignee to transfer all or any of the Token Interests in the amounts or at the times proposed by Assignee. Assignee further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Token Interests, and on requirements relating to the Foundation which are outside of the Assignee's control, and which the Foundation is under no obligation and may not be able to satisfy.

**2.12    Legends.** The Assignee understands that the Token Interests may bear any legend required by the securities laws of any state to the extent such laws are applicable to the Token Interests, to the extent they may contain a legend, and the following legend (and even without such legend the following restrictions apply):

> *"THE TOKEN INTERESTS GRANTED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED."*

**3.    LOCKUP.** The Token Interests and the Tokens issued to the Assignee in fulfillment of the Token Interests (as applicable as of the applicable date of determination, the "***Restricted Tokens***") shall be subject to the following restrictions (collectively, the "***Lockup Provisions***"):

**3.1    Lockup Period**. Prior to the twelve-month anniversary of the Effective Date, Purchaser agrees that it will not, without the prior written consent of the Assignor, offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale of, or place any liens or

security interests in, hypothecate, encumber or otherwise transfer or dispose of ("*Transfer*") any Restricted Tokens or any interest therein, any options to purchase any Restricted Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Restricted Tokens, including the Token Interests acquired herein, whether now or hereinafter acquired by the Purchaser.

    **3.2  Unlock Schedule.** Subject to Section 3.1, on the six-month anniversary of the Network Launch (as defined below), 1/24 of the Restricted Tokens shall be released from these Lockup Provisions, and 1/24th of the Restricted Tokens shall be released on each monthly anniversary thereafter, such that all Restricted Tokens will be released from these Lockup Provisions on the thirty (30) month anniversary of the Network Launch.

    **3.3  Network Launch.** "Network Launch" means the bona fide public release and transaction or series of transactions pursuant to which the SHRAP token is issued and provided with access to and use of the associated blockchain-based network, platform, or service operated or managed by (or by a service provider on behalf of), or based upon, intellectual property developed, owned, or exclusively licensed by, the Foundation or an Affiliate of the Foundation.

    **3.4  Unvested Tokens**. Notwithstanding anything to the contrary herein, Assignee agrees that it will not, at any time, Transfer any Unvested Tokens (as defined below), any options to purchase any Unvested Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Unvested Tokens.

    **3.5  Restrictions**. To ensure compliance with these Lockup Provisions, the Company and/or the Foundation may impose technological lockups or restrictions on the Restricted Tokens or withhold delivery of the applicable Restricted Tokens until such restrictions expire or termination.

   **4.  FOUNDATION'S REPURCHASE OPTION**. The Foundation and/or its assignees shall have the option to repurchase all or a portion of the Unvested Tokens on the terms and conditions set forth in this Section (the "*Repurchase Option*") if Assignee ceases to be employed by Assignor for any reason, or no reason, including without limitation Assignee's death, disability, voluntary resignation or termination by Assignor with or without cause.

    **4.1  Definition of "Employed by Assignor"; "Termination Date".** For purposes of this Agreement, Assignee will be considered to be "*employed by Assignor*" if the Board of Directors of the Assignor (the "*Board*") determines that Assignee is rendering substantial services as a director, officer, employee, consultant, advisor or independent contractor to the Assignor or to any Affiliate thereof. In case of any dispute as to whether Assignee is employed by Assignor, the Board shall have sole discretion to determine whether Assignee has ceased to be employed by Assignor or its Affiliate and the effective date on which Assignee's employment or service relationship terminated (the "*Termination Date*"). An "*Affiliate*" means any entity that owns, directly or indirectly, stock representing more than 50% of the total combined voting power of all classes of stock of Assignor or any entity in which Assignor owns, directly or indirectly, equity interests representing more than 50% of the voting power of such entity.

    **4.2  Unvested and Vested Restricted Tokens**.

**(a)**    Vesting Schedule. Restricted Tokens that are vested pursuant to the schedule set forth herein are "***Vested Tokens***". Restricted Tokens that are not vested pursuant to the schedule set forth herein are "***Unvested Tokens***". The "***Vesting Commencement Date***" is the date set forth on the signature page hereto. All tokens granted here under are hereby fully vested as of the Effective Date and shall be considered Vested Tokens.

**(b)**    Acceleration of Vesting Following Termination without Cause. Notwithstanding anything to the contrary set forth in Section 3, if Assignee's employment by the Assignor is terminated by the Assignor (or successor thereof) following the twelve (12) month anniversary of the Vesting Commencement Date but prior to the First Vesting Date, other than for Cause, and provided that the Assignee delivers to the Assignor and the Company a general release and non-disparagement agreement of claims in favor of the Assignor, the Company and certain related parties in a form satisfactory to the Assignor and the Company (the "***Release***") within sixty (60) days following such separation from service, and satisfy all conditions to make the Release effective, then, effective as of immediately prior to such termination, a number of Restricted Tokens equal to the product of (a) the number of Restricted Tokens, and (b) a fraction, the numerator of which is the number of whole calendar months that has elapsed between the Vesting Commencement Date and the Termination Date, and the denominator of which is thirty-six (36), will become Vested Tokens at the time of such termination.

As used in this Section 4.2(b): "***Cause***" means any of the following: (a) the Assignee's unauthorized misuse of the Company's trade secrets or proprietary information, (b) the Assignee's conviction of or plea of nolo contendere to a felony or a crime involving moral turpitude, (c) the Assignee's commission of an act of fraud against the Assignor, the Company or any Affiliate, (d) the Assignee's willful engagement in conduct that is in bad faith and materially injurious to the Assignor, the Company or any Affiliate, including but not limited to, misappropriation of trade secrets, fraud or embezzlement, (e) Assignee commits a material breach of any written agreement between Assignee and the Assignor that causes harm to the Assignor, which breach is not cured within thirty (30) days after receipt of written notice describing in detail such breach to Assignee from the Assignor, or (f) Assignee engages in material misfeasance or malfeasance demonstrated by a continued pattern of material failure to perform the essential job duties associated with Assignee's position, which breach is not cured within thirty (30) days after receipt of written notice describing in detail such breach to Assignee from the Assignor.

**(c)**    Acceleration of Vesting Following Insolvency of Assignor. In addition to any Restricted Tokens that have become Vested Tokens pursuant to Section 4.2(a) hereof, in the event of a voluntary or involuntary dissolution, liquidation or winding-up of the Assignor, the filing of a petition by or against the Assignor under Title 11 of the United States Code (as now and hereafter in effect, or any successor statute), the appointment of a receiver, trustee, custodian or liquidator of or for all or substantially all of the assets or property of the Assignor, or the execution by the Assignor of a general assignment for the benefit of creditors (in each case, an "***Insolvency Event***"), then, if Assignee has been continuously employed by the Assignor from the Effective Date until the date of such Insolvency Event, effective as of such Insolvency Event, 100% of the Restricted Tokens will become Vested Tokens at the time of such event.

**4.3**    **Exercise of Repurchase Option at Original Price.** At any time within ninety (90) days after the Termination Date, the Foundation and/or its assignee(s) may elect to repurchase any or all of the Unvested Tokens by giving Assignee written notice of exercise of the Repurchase Option; provided, however, that without requirement of further action on the part of either party hereto, the Repurchase Option shall be deemed to have been automatically exercised as to all Unvested Tokens as of 11:59 PM PT on the date that is ninety (90) days after the Termination Date, unless the Foundation declines in writing to exercise its Repurchase Option. Foundation and/or its assignee(s) will then repurchase (or be deemed to have repurchased) from Assignee (or from Assignee's personal representative as the case may be) any or all of the Unvested Tokens at a price of per Token equal to that set forth on the signature page hereto (the "***Repurchase Price***").

**4.4**    **Payment of Repurchase Price.** The Repurchase Price may be payable in Bitcoin, Ether or other forms of digital assets on an as-converted to U.S. dollars basis or in U.S. dollars, at the option of the Foundation and/or its assignee(s), as the case may be, by cash, wire transfer or check, or by cancellation of all or a portion of any outstanding indebtedness owed by Assignee to the Foundation (or to such assignee) or by any combination thereof, or any other forms of payment on an as-converted to U.S. dollars basis as determined by the Foundation in its sole discretion. The Repurchase Price will be paid without interest.

**4.5**    **Right of Termination Unaffected.** Nothing in this Agreement will be construed to limit or otherwise affect in any manner whatsoever the right or power of Assignor (or any Affiliate) to terminate Assignee's employment or service relationship with Assignor (or any Affiliate) at any time for any reason or no reason, with or without cause.

**5.**    **RIGHTS AS OWNER OF TOKEN INTERESTS AND TOKENS.** The Token Interests do not, and the Tokens will not following the Token Launch, entitle Assignee to vote or receive dividends or be deemed the holder of equity of Assignor or the Foundation for any purpose, nor will anything contained herein be construed to confer on the Assignee, as such, any of the rights of a stockholder of Assignor or the Foundation or any right to vote for the election of Assignor's Board or the Foundation's Board or upon any matter submitted to the stockholders of Assignor, Assignor's Board, Foundation's Board, or the council members of the Foundation, or at any meeting thereof, or to give or withhold consent to any corporate or foundation action or to receive notice of meetings, or to receive subscription rights or otherwise.

**6.**    **DISCLAIMER AND LIMITATION OF LIABILITY**. Neither the Assignor nor the Foundation shall be liable or responsible to the Assignee, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, including without limitation, launching, developing and maintaining the Protocol and/or the Network, launching the Tokens, selling the Token Interests, sending the Tokens to the smart contract address compatible with receiving Tokens, or distributing the Tokens, when and to the extent such failure or delay is caused by or results from acts beyond the affected party's commercially reasonable control, including, without limitation: (a) acts of God; (b) flood, fire, earthquake, pandemic or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, or other civil unrest; (d) applicable law or regulations; or (e) action by any governmental authority. NEITHER THE ASSIGNOR NOR THE FOUNDATION MAKE ANY WARRANTY WHATSOEVER WITH RESPECT TO THE TOKENS, INCLUDING ANY (A)

DocuSign Envelope ID: 51FC4930-815A-496E-AA15-12907E944BA0

WARRANTY OF MERCHANTABILITY; (B) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (C) WARRANTY OF TITLE; OR (D) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE. EXCEPT AS EXPRESSLY SET FORTH HEREIN, ASSIGNEE ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE ASSIGNOR OR THE FOUNDATION, OR ANY OTHER PERSON ON THE ASSIGNOR OR THE FOUNDATION'S BEHALF.

The Assignee understands that Assignee has no right against the Assignor or the Foundation or any other individual or legal entity except in the event of the Assignor's or the Foundation's material breach of this instrument or intentional fraud. THE ASSIGNOR'S AND THE FOUNDATION'S (OR ANY OTHER INDIVIDUAL'S OR LEGAL ENTITY'S) AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT OR OTHERWISE, SHALL NOT EXCEED US$1,000.00. NEITHER THE ASSIGNOR, THE FOUNDATION NOR THEIR REPRESENTATIVES SHALL BE LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS INSTRUMENT.

7. **TAX CONSEQUENCES**. ASSIGNEE UNDERSTANDS THAT ASSIGNEE MAY SUFFER ADVERSE TAX CONSEQUENCES AS A RESULT OF ASSIGNEE'S RECEIPT, VESTING OR DISPOSITION OF ASSIGNOR'S RIGHTS UNDER THE TSA. ASSIGNEE REPRESENTS (a) THAT ASSIGNEE HAS CONSULTED WITH A TAX ADVISER THAT ASSIGNEE DEEMS ADVISABLE IN CONNECTION WITH THE RECEIPT, VESTING, AND DISPOSITION OF ASSIGNOR'S RIGHTS UNDER THE TSA, AND (b) THAT ASSIGNEE IS NOT RELYING ON ASSIGNOR, THE FOUNDATION, OR ANY AGENTS, REPRESENTATIVES, OR ADVISORS OF EITHER ASSIGNOR OR FOUNDATION FOR ANY TAX ADVICE. Assignee has been informed that unless Assignee files with the Internal Revenue Service (and, if necessary, the proper state taxing authorities) within 30 days after the Effective Date, electing pursuant to Section 83(b) of the Internal Revenue Code (and similar state tax provisions, if applicable) to be taxed currently on any difference between the fair market value of the Token Interests on the date of grant and the amount paid by the Assignee, there may be a recognition of taxable income to Assignee at each time the Repurchase Option lapses with respect to a portion of the Restricted Tokens, measured by the excess, if any, of the fair market value of such portion of the Restricted Tokens over the amount paid by the Assignor allocable to such portion of the Restricted Tokens. Assignee represents that Assignee has consulted any tax advisors Assignee deems advisable in connection with Assignee's receipt of Assignor's rights under the TSA and the filing of the election under Section 83(b) and similar tax provisions. A form of Election under Section 83(b) is attached hereto as Exhibit A for reference. ASSIGNEE HEREBY ASSUMES ALL RESPONSIBILITY FOR FILING SUCH ELECTION AND PAYING ANY TAXES RESULTING FROM SUCH ELECTION OR FROM FAILURE TO FILE THE ELECTION AND PAYING TAXES RESULTING FROM THE LAPSE OF THE REPURCHASE RESTRICTIONS ON THE UNVESTED TOKENS.

THE FAIR MARKET VALUE OF ASSIGNOR'S RIGHTS UNDER THE TSA HAS BEEN DETERMINED IN GOOD FAITH IN ACCORDANCE WITH A VALUATION REPORT RECEIVED BY THE FOUNDATION AND SHARED WITH ASSIGNOR, A COPY OF WHICH IS AVAILABLE TO ASSIGNEE UPON REQUEST. THERE IS NO GUARANTEE THAT SUCH DETERMINATION OF FAIR MARKET VALUE WILL NECESSARILY REFLECT OR EQUAL ANY DETERMINATION OF FAIR MARKET VALUE BY A TAXING AUTHORITY (SUCH AS THE INTERNAL REVENUE SERVICE). ASSIGNEE AGREES TO BE FULLY RESPONSIBLE FOR ANY TAXES RESULTING FROM THE RECEIPT, VESTING AND DISPOSITION OF ASSIGNOR'S RIGHTS UNDER THE TSA, INCLUDING ANY ADDITIONAL TAXES RESULTING FROM A DIFFERENT DETERMINATION OF FAIR MARKET VALUE.

8.    **MISCELLANEOUS**.

8.1    **Notices**. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, or (b) when sent, if sent by electronic mail or facsimile during normal business hours of the Assignor, and if not sent during normal business hours, then on the Assignor's next Business day, or (c) three (3) Business Days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries. All notices for delivery outside the United States will be sent by express courier. All notices for delivery will be sent by express courier. All notices not delivered personally will be sent with postage and/or other charges prepaid and properly addressed to the party to be notified at the address set forth below the signature lines of this Agreement or at such other address as such other party may designate by one of the indicated means of notice herein to the other party hereto. A "***Business day***" shall be a day, other than Saturday or Sunday, when the banks in the Republic of Panama are open for business.

8.2    **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the jurisdiction set forth in the TSA, without giving effect to that body of laws pertaining to conflict of laws.

8.3    **Binding Effect**. This Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties hereto and their respective successors and assigns.

8.4    **Entire Agreement**. This Agreement and the TSA constitute the entire agreement and understanding of the parties with respect to the subject matter hereof and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

8.5    **Further Assurances**. Assignee agrees to execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably requested to give effect to the transactions contemplated hereby, including without limitation to enable the Foundation and the Assignor to comply with applicable laws and any other documents that (1) other unaffiliated purchasers of Tokens shall be required to execute and deliver, or (2) are requested by any digital asset exchanges or markets (including any specific or additional lock-up agreements or terms in connection with a listing or sale of Tokens).

**8.6**    **Counterparts; Facsimile Signatures.** This Agreement may be executed in any number of counterparts, each of which will be deemed an original, and all of which together shall constitute one and the same agreement. This Agreement may be executed and delivered by facsimile or other means of electronic delivery and upon such delivery the facsimile signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

[SIGNATURE PAGE FOLLOWS]

10

　　　**IN WITNESS WHEREOF**, the parties hereto, being authorized to do so and intending to be legally bound hereby, have duly executed and entered into this Agreement on the date first set forth above.

**ASSIGNOR:**

NEON MACHINE, INC.

By: _____

Name: Mark Long _____

Title: CEO _____

    **IN WITNESS WHEREOF**, the parties hereto, being authorized to do so and intending to be legally bound hereby, have duly executed and entered into this Agreement on the date first set forth above.

                    **ASSIGNEE:**

                    Name: Cort Javarone

| Number of SHRAP Tokens | Price per Token | Vesting Commencement Date |
| --- | --- | --- |
| 15,000,000 | $0.00002616 | 11/08/2021 – Fully Vested Tokens |

**IN WITNESS WHEREOF**, the parties hereto, being authorized to do so and intending to be legally bound hereby, have duly executed and entered into this Agreement on the date first set forth above.

**FOUNDATION:**

ARGON PROTOCOL FOUNDATION

By: _Diana Muñoz_____
1F2ADEB64CF54CD...

Name: Diana Muñoz_____

Title: Director_____

13

## **EXHIBIT A**

## **ELECTION UNDER SECTION 83(b) OF THE**
## **INTERNAL REVENUE CODE**

The undersigned Taxpayer hereby elects, pursuant to Section 83(b) of the Internal Revenue Code, as amended, to include in gross income for the Taxpayer's current taxable year the excess, if any, of the fair market value of the property described below at the time of transfer over the amount paid for such property, as compensation for services.

1.      TAXPAYER'S NAME:          _____

        TAXPAYER'S ADDRESS:      _____

        SOCIAL SECURITY NUMBER: _____

2.      The property with respect to which the election is made is described as follows:  the right to receive from Argon Protocol Foundation, a Republic of Panama foundation (the "***Foundation***") [_____] SHRAP Tokens of the Foundation (the "***Tokens***").

3.      The date on which the right to receive the Tokens was transferred was [_____], 2021 and this election is made for calendar year 2021.

4.      The Tokens are subject to the following restrictions:  The Foundation may repurchase all or a portion of the Tokens at $[_____] per Token under certain conditions at the time of Taxpayer's termination of employment or services.

5.      The fair market value of the right to receive the Tokens (without regard to restrictions other than restrictions which by their terms will never lapse) was $[_____] per Token at the time of transfer.

6.      The amount paid for the right to receive the Tokens was $[_____] per Token.

7.      The Taxpayer has submitted a copy of this statement to the Foundation.

*THIS ELECTION MUST BE FILED WITH THE INTERNAL REVENUE SERVICE ("**IRS**"), AT THE OFFICE WHERE THE TAXPAYER FILES ANNUAL INCOME TAX RETURNS, <u>WITHIN 30 DAYS</u> AFTER THE DATE OF TRANSFER OF THE PROPERTY. THE ELECTION CANNOT BE REVOKED WITHOUT THE CONSENT OF THE IRS.*

Dated:  _____      _____
                                                Taxpayer's Signature