**Spence Law Office, P.C.**
Robert J. Spence, Esq. (RS3506)
Attorneys for Plaintiff
55 Lumber Road, Suite 5
Roslyn, New York 11576
Tel.:(516) 336-2060

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X

In re:

4D FACTORY, INC., et al.,

                            Debtors. [1]

                         Chapter 11
                         (Subchapter V)
              Case No.: 23-11618 (MEW)
              (Jointly Administered)

-------------------------------------------------------------------X

THE 4D FACTORY LLC,

               Plaintiff,

     -against-

MARK LONG, COLIN FORAN, NAOMI LACKAFF,
AARON NONIS, DON NORBURY, MARK YEEND,
CALVIN ZHOU,

                 Defendants,

and

NEON MACHINE, INC.

                 Nominal Defendant.

              Adv. Pro. No. 24-_____(MEW)

              **COMPLAINT**

-------------------------------------------------------------------X

    1.    Plaintiff, The 4D Factory LLC (the "Plaintiff"), as co-debtor and debtor-in-

possession with 4D Factory, Inc. (each a "Debtor" and together the "Debtors") in the jointly-

administered chapter 11 cases captioned *In re 4D Factory, Inc., et al.*, Case No. 23-11618 (MEW)

(the "Chapter 11 Cases"), by and through its counsel, Spence Law Office, P.C., brings this

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number, are 4D Factory Inc. (6770), and The 4D Factory LLC (8935).

complaint against Defendants Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, Mark Yeend, Calvin Zhou (collectively, the "Manager Defendants"), and nominal defendant Neon Machine, Inc., for recovery of Plaintiff's assets that have been unlawfully withheld and/or unlawfully converted by Defendants.

**Nature of the Complaint**

2.      Plaintiff has filed this complaint in order to recover the fair end of its bargain with Mr. Long and to recover property of the Plaintiff for the benefit of Plaintiff's estate. Plaintiff believed it was engaging with a good-faith business partner in Mr. Long when he sought Plaintiff's financing to get his video game development business, Neon Media, LLC ("Neon Media"), off the ground.  Plaintiff was the first to back Mr. Long and his team with millions of dollars with the expectation that they would be collaborative and dependable business partners, and with Plaintiff would develop a successful company that would be profitable for all involved. Despite Plaintiff being the founding and majority shareholder of Neon Machine, and the first to back Defendants with millions in capital, expertise, and critical resources in the midst of a global pandemic and taking the greatest risk to bring Manager Defendants' ideas to life, the Manager Defendants took everything committed by Plaintiff and then some, and in return misled and defrauded Plaintiff by breaking every commitment they made before and after formation of Neon Machine, wrote Plaintiff out of the history, ignored the board of directors of Neon Machine (the "Board") for two years to evade oversight, leaving Plaintiff no option but to take this adversarial action to recover its property lest the Manager Defendants succeed in ensuring every stakeholder enjoys the value they are due from Neon Machine—except Plaintiff, The 4D Factory LLC.

3.      Plaintiff was willing to continue supporting Mr. Long's artistic vision when he turned his team's primary attention away from finishing their first project, despite the millions

of dollars Plaintiff put into its development. And Mr. Long's next pitch sounded promising: a first-person shooter video game called *Shrapnel* that would utilize cryptocurrency as a means of generating added revenue from the game. Mr. Long and his team sold this idea on the promise that Plaintiff, as 60% shareholder of Neon Media, would receive an equivalent share of the *Shrapnel* cryptocurrency (the "SHRAP Token").

4.      Shrapnel's development began at Neon Media, and its early development was funded by Plaintiff. Plaintiff ultimately agreed to Mr. Long's plans for the game, including the establishment of a new company, Neon Machine, Inc. ("Neon Machine"), the assignment of the valuable *Shrapnel* intellectual property (the "*Shrapnel* IP")—IP that was created and held at Neon Media and funded by Plaintiff, and which would not exist but for Plaintiff's funds—from Neon Media to Neon Machine, and outside financing from two venture capital firms, Griffin Gaming Partners II, L.P. ("Griffin") and Polychain Ventures II LP ("Polychain"). Plaintiff was willing to agree to the integrated transaction only based upon the Defendants' promises, not to mention the implicit agreement of good faith and fair dealing, and at a minimum, to (a) maintain Plaintiff's 60% controlling interest and control via a majority on the Neon Machine's Board; (b) maintain Plaintiff's right to its *pro rata* share of SHRAP Token; and (c) distribute dividends payable to Manager Defendants, each among Mr. Long's top officers, by Neon Machine to Plaintiff first, until the cash it contributed to Neon Media —at the time more than $2.3 million—had been paid back.

5.      Plaintiff did not expect that Defendants would so quickly and thoroughly abuse its trust and abandon their promises. Immediately after, and in some instances *concurrently* with making their vital promises and representations to Plaintiff to induce its acceptance of these transactions, Defendants operated in concert to ensure Plaintiff would never receive a dime from Neon Machine.

6.    Manager Defendants secretly coordinated a massive giveaway of *more than one-third of 3 billion total SHRAP Tokens*, including *more than 550 million tokens* to themselves... but none to Plaintiff.  This self-dealing giveaway significantly diluted the amount of SHRAP Tokens available for equity.  Months later, Manager Defendants claimed suddenly that Plaintiff was only entitled to benefit as a shareholder from Neon Machine's use of SHRAP Tokens and would have none of its own.  Then Defendants, Mr. Long in particular, engaged Neon Machine in a series of unauthorized financings with third parties that will ultimately dilute Plaintiff's 60% equity interest (39% only if Griffin and Polychain's SAFEs converted to preferred equity) to *no more than 26%*.

7.    Defendants managed to force these value-destroying transactions past Plaintiff through a campaign of total concealment at Neon Machine.  Mr. Long held only two formal Board meetings at Neon Machine over the course of his tenure as a Director and CEO of the company, at which none of the highly material activities reported herein were noticed or discussed. Upon information and belief, Plaintiff's two Board members at Neon Machine other than Mr. Long himself, who had been entrusted by Plaintiff to sit in one of its Board seats, were excluded from a series of frequent meetings Mr. Long secretly held with the Board's other two directors from Griffin and Polychain, at which certain or all of the material activities detailed herein were agreed to.  None of Mr. Long's secret meetings were valid Board meetings pursuant to Neon Machine's Bylaws (as defined below).  Manager Defendants' concerted efforts ensured that Plaintiff received virtually no information about the finances and operations of Neon Machine for more than a year and a half.

8.    Today, Plaintiff is in bankruptcy managing significant debt it incurred investing in Mr. Long's startup and in both projects he proposed, including the critical resources needed to help Mr. Long get *Shrapnel* off the ground.  Meanwhile, after all the support, Defendants

have written Plaintiff out of the history of Neon Machine, ignored Plaintiff's status as a founding stakeholder and insider, and now say that Plaintiff is entitled to virtually nothing. Plaintiff has filed this complaint to recover what it is rightfully owed. As described herein, Plaintiff seeks against Defendants, each individually and collectively: (a) turnover of 480,927,488 SHRAP Tokens owed to it (or in the alternative, 331,561,208 SHRAP Tokens); (b) actual, general, compensatory and consequential damages of no less than $5 million; (c) punitive and exemplary damages of no less than $5 million; (d) declaratory relief establishing Plaintiff's rights; (e) reasonable litigation expenses and attorneys' fees; and (f) such other and further relief as this Court deems just and proper.

### The Parties

9.      Plaintiff The 4D Factory LLC is, and was at all times, a limited liability company formed under the laws of the State of Wyoming. Plaintiff, along with 4D Factory, Inc., are debtors and debtors-in-possession in the jointly-administered cases captioned *In re 4D Factory, Inc., et al.*, Case No. 23-11618 (MEW) brought in the United States Bankruptcy Court for the Southern District of New York.

10.     On information and belief, Defendant Mark Long resides in Seattle, WA. He is a former director and currently suspended CEO of Neon Machine. He is also a minority shareholder in Neon Machine.

11.     On information and belief, Defendant Colin Foran resides in Seattle, WA. He is Chief Creative Officer of Neon Machine. He is also a minority shareholder in Neon Machine.

12.     On information and belief, Defendant Naomi Lackaff resides in Seattle, WA. Ms. Lackaff is the Head of Partnerships of Neon Machine. She is also a minority shareholder in Neon Machine.

13.     On information and belief, Defendant Aaron Nonis resides in Seattle, WA. Mr. Nonis is the Chief Operating Officer of Neon Machine.  He is also a minority shareholder in Neon Machine.

14.     On information and belief, Defendant Don Norbury resides in Seattle, WA. Mr. Norbury is the Chief Technical Officer of Neon Machine.  He is also a minority shareholder in Neon Machine.

15.     On information and belief, Defendant Mark Yeend resides in Seattle, WA. Mr. Yeend is the Chief Marketing Officer of Neon Machine.  He is also a minority shareholder in Neon Machine.

16.     On information and belief, Defendant Calvin Zhou resides in Glendale, CA. Mr. Zhou is the Head of Business Development at Neon Machine.  He is also a minority shareholder in Neon Machine.

17.     Neon Machine is a Delaware corporation with its principal place of business in Seattle, WA.  Neon Machine is named in this action because it may hold or control property of the estate which Plaintiff seeks to recover, and therefore its rights are potentially impacted.

18.     On information and belief, non-party Argon Protocol Foundation ("Argon Foundation") is a Panamanian foundation created by and operated at the direction of Neon Machine.

19.     On information and belief, non-party Argon Asset Ventures Corp. ("Argon Corp.") is a Panamanian foundation created by, and operated at the direction of,  Neon Machine.

20.     Andrew Grossman, Esq., a non-party mentioned in this Complaint, resides in Pacific Palisades, CA.  Mr. Grossman is the former general counsel of Plaintiff and the current general counsel of Neon Machine.

21.     All references to the "Defendants" herein shall refer to Defendants collectively and individually, unless otherwise noted.

## Jurisdiction and Venue

22.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Plaintiff consents to entry of final orders and judgment by the Court.

23.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 541, 542 and 1107(a) of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 7001.

24.     This adversary proceeding is commenced pursuant to Rules 7001(1), 7001(9), and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and sections 541 and 542 of the Bankruptcy Code.

## Case Background

25.     On October 10, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Subchapter V of chapter 11 of the Bankruptcy Code.

26.     Plaintiff continues in existence as a debtor-in-possession pursuant to Bankruptcy Code 11 U.S.C. §1184.

## Factual Allegations

**A.     Creation of Neon Machine and the Relationship and Conduct of the Parties.**

27.     In or around March 2020, Mr. Long reached out to Plaintiff seeking funding to launch the business at his new company Neon Media.  Neon Media was formed by Mr. Long around that time after he and his team of employees, including the other Manager Defendants, were laid off from HBO, a subsidiary of Warner Brothers Entertainment ("Warner Bros.").  Upon

information and belief, at all relevant times each Manager Defendant reported directly to Mr. Long on a daily basis. Mr. Long represented to Plaintiff that Neon Media would be able to use brands from Warner Bros. to develop video games, and that Neon Media already secured funding and marketing resources to move forward on such a project.

28.     On July 20, 2020, Plaintiff and Neon Media entered into an Amended and Restated Limited Liability Company Operating Agreement (the "Operating Agreement"), under which Plaintiff would serve as Neon Media's sole Manager and committed to invest $2,300,000 in total capital contributions as needed, in exchange for 60% equity in the company. Each of Manager Defendants and Plaintiff would constitute "Members" of Neon Media, and entered into "Membership Agreements," which provided them ownership units in the company. The Membership Agreements specifically laid out that any developed intellectual property, including game designs, game concepts, inventions, and business plans, were property of Neon Media.

29.     Six months after closing on the Operating Agreement, Mr. Long requested that Neon Media immediately begin developing a video game based on *Foundation*, the science fiction book series written by Isaac Asimov, rather than any Warner Bros. brand. Mr. Long informed Plaintiff that Neon Media would need more than $10 million more to develop this game, yet no such funding had been secured. In February 12, 2021, Plaintiff began funding the budget to produce Foundation, into which it invested over $4 million to date.

30.     In March 2021, Plaintiff approved the development of another of Mr. Long's projects at Neon Media, *Shrapnel*, a first-person shooter video game with a cryptocurrency (or "crypto") component. Mr. Long pitched the project to Plaintiff, the sole Manager of Neon Media, on the basis that it would be funded through the issuance of a crypto token, the SHRAP Token, bringing tens of millions in non-dilutive capital into Neon Media. Upon information and belief, Mr. Long represented that Plaintiff and Manager Defendants would receive a certain

amount of SHRAP Tokens, based on and *pro rata* with their respective ownership of Neon Media, of which Plaintiff would receive the largest share due to its 60% ownership.

31.     An email on May 13, 2021 from Mr. Zhou confirmed to Plaintiff that, due to Plaintiff's equity in Neon Media, it would be entitled to at least 342,222,222 SHRAP Tokens, with a potential cash value of up to approximately $598 million, and indicates the tokens were to be Plaintiff's property, labeling them "4D Token" (not "Treasury token" or any other categorization.)  In addition to showing the amount and projected values at different prices of Plaintiff's total holdings, the table shows the "Per Month (24 Month Vesting in $m)" value that will become available to Plaintiff every month.  This indicates the amount releasing from lockup monthly, which would only be possible with accessible SHRAP tokens delivered to Plaintiff's wallet, just like the millions that have been distributed to other token rights holders, which the Plaintiff has demanded be turned over.  On May 22, 2021, Mr. Zhou emailed Plaintiff with a capitalization table repeating the 342,222,222 SHRAP Tokens number.  Mr. Zhou's communications and attachments to same are attached hereto as **Exhibit A**.

32.     Upon information and belief, around May or June 2021, Plaintiff was advised that additional SHRAP Tokens would be made available for purchase by investors.  Plaintiff indicated its interest in purchasing additional tokens.  However, Mr. Zhou questioned why Plaintiff would want to purchase additional SHRAP Tokens when it was being granted so many already.  When a massive token give-away to Defendants was executed later, and a separate "private sale" was conducted, Defendants never informed Plaintiff nor offered SHRAP Tokens to Plaintiff.

33.     In or about June 2021, Manager Defendants drafted a marketing presentation (the "June 2021 Deck") that proposed a high-level breakdown of the SHRAP "tokenomics."  The June 2021 Deck specifically described a "Shrapnel Treasury," which would

consist of tokens allocated to development costs and a rewards program.  Manager Defendants did

not represent to Plaintiff at this time or at any other time prior to February 2022 that any of its

rights to SHRAP Tokens would fall into this category.

34.    In an email on August 4, 2021, Mr. Long predicted in a chart tracking

comparable tokens in other blockchain games that the SHRAP Token could have a $200 million

fully-diluted market capitalization at listing, based on a price of $0.06667 per token.

35.    While the original intent was for *Shrapnel* to be developed at Neon Media,

in August 2021, Mr. Long sought to create a separate entity to develop the *Shrapnel* project.  Upon

information and belief, in mid-August 2021, Mr. Long approached Plaintiff's then-Chairman,

Jonathan Miller, to make this proposal.  Mr. Long pitched to Mr. Miller that the equity and control

of this new entity, Neon Machine, would mirror Neon Media's control and economics (in which

Plaintiff held 60% equity and served as sole Manager of the company).  Mr. Long represented that

the sale of SHRAP Tokens would fund Neon Machine, and if any additional financing were

needed, he would refer any interested parties to Plaintiff to negotiate deal terms.

36.    Upon information and belief, Mr. Miller told Mr. Long that Plaintiff could

approve the structure provided that Neon Machine was a "controlled subsidiary" of Plaintiff.

Plaintiff agreed to the creation of Neon Machine contingent on this control arrangement.

37.    However, without notifying Plaintiff, Mr. Long had already filed a

Certificate of Incorporation forming Neon Machine in Delaware on August 3, 2021.  On the same

day, Mr. Long issued Promissory Notes on behalf of Neon Machine to each of Manager

Defendants, including himself, on account of purported loans they had made to Neon Machine.

These loans were never noticed to Plaintiff.  Upon information and belief, there is no record that

any cash was paid to Neon Machine on account of the purported "loans."

38.     On August 20, 2021, Mr. Long adopted Neon Machine's bylaws without notice to or consent of Plaintiff or Neon Media (the "Bylaws").  Those Bylaws and their correlating Board resolution, all executed by Mr. Long alone, established Mr. Long as the only director of the Board of Neon Machine and as the "President, Chief Executive Officer, Chief Financial Officer, Treasurer, Secretary," despite his promise that Neon Machine's control structure would "mirror" Neon Media.  The Bylaws and the Board resolution are attached hereto as **Exhibits B** and **C**, respectively.

39.     Additionally, upon information and belief, around Fall 2021, Mr. Long began to engage with Plaintiff's in-house counsel, Mr. Grossman, and ultimately retained him as general counsel for Neon Machine, without notice to or a waiver of conflicts from Plaintiff.  Mr. Grossman then acted on the direction of Mr. Long, despite his continuing employment by Plaintiff, effectively duping Plaintiff into believing he was acting to look out for Plaintiff's interests when he was in fact then conflicted.

**B.     Long Presents New Financing from Griffin and Polychain as a *Fait Accompli*.**

40.     Despite Mr. Long's representations that SHRAP Token issuance would fund Neon Machine, and that he would refer any interested parties to Plaintiff as manager of Neon Media to negotiate the terms of any financing, Mr. Long negotiated funding terms with Griffin and Polychain without informing Plaintiff.  On September 2, 2021, Mr. Long presented to Plaintiff for the first time via email a funding deal with Griffin and Polychain, by which both entities would fund a combined $8 million to Neon Machine.  Mr. Norbury, Mr. Zhou and Mr. Grossman were copied on this email.  Mr. Long presented the deal between Neon Machine, Griffin and Polychain as substantially finalized, without Plaintiff's involvement.

41.     The deal Mr. Long negotiated with Griffin and Polychain required that Plaintiff agree to a transfer of the *Shrapnel* IP from Neon Media to Neon Machine.  In the September 2, 2021 email, Mr. Long represented to Plaintiff that as 60% shareholder of Neon Machine, it would retain control of three seats (the "4D Directors"): "3 for Neon/4D (both of which Plaintiff controlled), 2 for Griffin/Polychain, plus 1 observer from Griffin."  Mr. Long also represented in the email that he intended to schedule "day long monthly board meetings" including Griffin and Polychain.  Mr. Long then said: "**So, I believe we have an agreement in principle.**" (emphasis in original).  Mr. Long's September 2, 2021 email is attached hereto **Exhibit D**.

42.     This "agreement in principle" had not been previously run by or approved by Plaintiff.  However, after negotiations with Mr. Long, Plaintiff as majority shareholder of Neon Media agreed to transfer of the *Shrapnel* IP so long as Plaintiff received certain rights in exchange: (a) preservation of Plaintiff's 60% equity stake in Neon Machine with all rights thereto, including 3 of 5 Board seats; (b) confirmation that Plaintiff would receive its equity share of SHRAP Tokens; and (c) an assignment to Plaintiff of any dividends that Manager Defendants would receive from Neon Machine, including receipt of tokens, until such time as Plaintiff recovered its capital investment in Neon Media, which at the time exceeded the $2.3 million originally agreed to.  Mr. Long also promised to Mr. Javarone personally future interests in about 16 million SHRAP Tokens, as compensation for services as an advisor to and director of Neon Machine.  To assuage Plaintiff's concerns and secure its approval of the structure, Mr. Long unequivocally confirmed that he would commit to vote with the other 4D Directors on Board decisions.

**C.     The Parties Enter into an Agreement Contingent on Plaintiff Receiving SHRAP Tokens and Dividends to Pay Back Plaintiff's Substantial Investment.**

43.     With this arrangement, the parties entered into a series of integrated transactions to memorialize the deal.  Mr. Grossman provided the forms of the IP Transfer

Agreement and the Recoupment Agreements (both as defined below) in the same email dated September 23, 2021, clearly evidencing the interrelation of the two contracts. Each of these agreements was signed or agreed to by consent of the Members of Neon Media (Manager Defendants) simultaneously on or around October 1, 2021.

44.    First, upon information and belief, on October 1 Plaintiff and Mr. Long executed a Stock Purchase Right Notice and Restricted Stock Purchase Agreement entitling Plaintiff to 6 million common shares of Neon Machine as of August 20, 2021.

45.    Second, Neon Media and Neon Machine entered into an Intellectual Property Sale Agreement under which all of Neon Media's intellectual property in Shrapnel was "sold" to Neon Machine for total listed, nominal consideration of $500.00 (the "IP Transfer Agreement").

46.    Third, Plaintiff, Neon Machine, and each Manager Defendant entered into Assignment of Rights to Dividends Agreements (the "Recoupment Agreements"). The form of Recoupment Agreements prepared by Mr. Grossman provided that each Manager Defendant would assign and transfer to Plaintiff all of their rights and interests in and to any dividends - "*including any class of cryptocurrency or similar assets*" - paid or to be paid by Neon Machine until Plaintiff's "Capital Account" under the Neon Media Operating Agreement was paid off. Neon Machine would agree to pay those dividends directly to Plaintiff. On October 1, 2021, Mr. Long, as Director, CEO and shareholder, confirmed Manager Defendants' **unanimous approval** of the Recoupment Agreements to Plaintiff via email to Plaintiff. The October 1, 2021 email is attached hereto as **Exhibit E**.

47.    Fourth, effective October 3, 2021, Neon Machine closed with each of Griffin and Polychain on the Simple Agreements for Future Equity, or "SAFEs," in the amount of

$5 million and $3 million, respectively.[2]  The SAFEs[3] provide that, upon occurrence of a "Network Launch," and the passing of sixty days without the termination of the SAFEs or the occurrence of a "Qualified Financing," Griffin and Polychain's SAFEs will automatically convert into a new series of Neon Machine preferred shares belonging to each of Griffin and Polychain.  The partial term sheet attached to the SAFEs provides that holders of Preferred stock may at their sole discretion vote as though their preferred equity was common stock, without converting to common stock, or could elect to convert their preferred shares to common stock at any time.  However, the Bylaws do not permit issuance of preferred stock pursuant to the SAFEs and must be amended along with negotiation of the terms of the preferred stock before any preferred stock can be issued.

48.    The SAFEs define a Network Launch as "a *bona fide* transaction or series of transactions" (emphasis added) pursuant to which Neon Machine issues, or "mints," the native token associated with access to and use of the Shrapnel network.  The SAFEs define "Network" as "any blockchain-based application, platform or service operated or managed by, or based upon, or incorporating material portions of any intellectual property developed, owned or exclusively licensed by, the Company…."  In other words, the "Network Launch" meant the actual launch of the *Shrapnel* game platform.  That has always been the sole reason for SHRAP Tokens to exist, to wit: for use when playing the game itself.

**D.    Simultaneously, Defendants Engage in Secret Insider Transactions to Maximize Their Own Profits and Minimize Recoveries for Plaintiff.**

---

[2] Plaintiff was aware of the entry into the SAFEs in principle.  However, Mr. Long as the sole director of Neon Machine as of the date the SAFEs were entered into, unilaterally executed them on Neon Machine's behalf, and did not provide the material terms of the SAFEs to Plaintiff until after the first meeting of the full Board in January 2022.  In other words, Plaintiff was not provided with the specific terms of the SAFEs until after the IP Transfer Agreement was effectuated.

[3] The SAFEs were previously provided to this Court as Exhibit 2 to the *Neon Shareholders' Motion for an Order Declaring Automatic Stay Inapplicable, or In the Alternative, Granting Relief From Automatic Stay* [ECF 28], and are not reattached here.

i.   Manager Defendants Conduct Token Giveaway to Themselves, and Mr. Long Enters into
Side Letters Granting Substantial SHRAP Tokens to Griffin and Polychain.

49.   At the same time that the parties entered into the above agreements,
Manager Defendants, upon information and belief, entered into a series of self-dealing and illicit
transactions (collectively, the "Token Giveaway") that functioned to give them each substantial
holdings of and/or rights to SHRAP Tokens.  Mr. Long, who secretly set up Neon Machine so he
would be its purported sole director and officer at this time, effectuated these transactions without
Plaintiff's knowledge and in spite of his representations that Plaintiff would have majority control
of the Board.  Indeed, he had acknowledged this fact in his September 2, 2021 email; it was, as
Mr. Long termed it, the "*agreement in principle*." (Exhibit D).

50.   First, on September 29, 2021, without knowledge or consent of Plaintiff,
Mr. Long entered into token side letter agreements with each of Griffin and Polychain (the "Side
Letters").  The Side Letters provided that Griffin would receive 10.875% of the 3 billion "Total
Network Tokens," more than 326 million SHRAP Tokens, and Polychain would receive 6.525%,
or more than 195 million SHRAP Tokens, for no additional consideration.  This amount was
granted *in addition to* the *pro rata* amount allocated to Griffin and Polychain, as touted in the
February 2022 Cap Table and the Internal Cap Table (defined below).  Mr. Long secretly ratified
the Side Letters as the purported sole member of the Board of Neon Machine, without the
knowledge or consent of Plaintiff.

51.   Second, on October 1, 2021, without knowledge or consent of Plaintiff, Mr.
Long delivered a series of Offers of Employment by Neon Machine (the "Offer Letters") to each
Manager Defendant.  Each of the Offer Letters promised, "subject to the Company's approval of
a "Token Incentive Plan," future token interests in amounts of SHRAP Tokens that far exceeded
what Plaintiff was told would be granted to each Manager Defendant.  Again, these amounts were

granted *in addition to* the *pro rata* amount allocated to Manager Defendants, as revealed in the February 2022 Cap Table and the Internal Cap Table (defined below)..

52.     For example, according to the May 22, 2021 Equity Cap Table, Mr. Long would be entitled to approximately 35.5 million SHRAP Tokens on account of his equity interests in Neon Media. *See* Exhibit A. However, Mr. Long's Offer Letter promised to grant him over 90 million SHRAP Tokens, including SHRAP Tokens purportedly issued to satisfy certain purported debts incurred by Neon Machine from Mr. Long. Upon information and belief, there is no record that the Promissory Notes (or the SHRAP Tokens granted to satisfy them) correspond to any actual funds paid by Manager Defendants. Mr. Long's Offer Letter, executed by Mr. Nonis, is attached hereto as **Exhibit F**.[4]

53.     The Token Giveaway was a unilateral action by Mr. Long and facilitated by Manager Defendants to give themselves 1/6 of the total SHRAP Tokens for free,[5] *in addition to* the allocation Defendants presented to Plaintiff as corresponding to their respective equity holdings. Incredibly, no SHRAP Tokens were given to Plaintiff, an insider and the majority stockholder of Neon Machine who was supposed to receive the largest portion of SHRAP Tokens. Messrs. Long, Norbury and Zhou were each granted 91,328,859 million SHRAP Tokens; Messrs. Foran and Nonis were each granted 76,328,859 million SHRAP Tokens, and Mr. Yeend and Ms. Lackaff were each granted over 61 million SHRAP Tokens. On or around November 8, 2021, Argon Foundation purportedly entered into Token Subscription Agreements with each Manager

---

[4] Upon information and belief, each of the Offer Letters are substantially similar in terms, except for specific grants of SHRAP Tokens.
[5] The Manager Defendants purportedly paid approximately $14,000 in the aggregate per the subscription agreements, but there is no evidence that even this *de minimis* amount was paid.

Defendant, and with Griffin and Polychain, to guarantee them the SHRAP Tokens. A copy of Mr. Long's Token Subscription Agreements are annexed hereto as **Exhibit G**.[6]

54.    On information and belief, Mr. Long purportedly granted the authority to distribute the rights to the SHRAP Tokens as the only director of the Board of Neon Machine and as the "President, Chief Executive Officer, Chief Financial Officer, Treasurer, Secretary" of Neon Machine in a *Unanimous Board Resolution of Neon Machine Inc.* dated November 5, 2021. Notwithstanding that the subject matter of the purported *Unanimous Board Resolution* should have been noticed and determined by the actual agreed upon Board of 5 directors, and all shareholders, and notwithstanding that the Board did not authorize, among other things, the issuance of 552 million SHRAP Tokens to the Manager Defendants, on this date, Plaintiff was the owner of 60% of the issued and outstanding shares of Neon Machine and was entitled to participate in any dividend of Neon Machine to the stockholders. Bylaws, Article 2, Sec. 7(c).

55.    The effect of the Offer Letters and the Side Letters, never disclosed to Plaintiff until August 2023, was to execute a massive dividend to Defendants, ensuring Manager Defendants would profit from future sale of SHRAP Tokens, and avoid any dilution of their rights to SHRAP Tokens, while Plaintiff's SHRAP Tokens were relegated to holdings it could not access, or so Defendant Long and his co-defendants have attempted to make the case.. As explained below, Manager Defendants knew or had reason to know that the Token Subscription Agreements were disingenuous because, upon information and belief, Argon Foundation was a shell entity, and Neon Machine was itself responsible for generating and distributing the SHRAP Tokens. At a minimum, they knew this was not an arms-length transaction, that they had voted unanimously to assign any such dividends to Plaintiff prior to taking or receiving a dividend from Neon Machine,

---

[6] This is an example of the Token Subscription Agreements. Each of the Manager Defendants has 2 such agreements and all are dated "as of" November 8, 2021.

and that any dividends must be made pro-rata after the recoupment of Plaintiff's investment in Neon Media was satisfied.

56.    Defendants then developed the fiction that the SHRAP Tokens promised to Plaintiff were not actually intended to be distributed.  Rather, these tokens would be owned by Neon Machine, to be reserved in the so-called Shrapnel Treasury.  Manager Defendants would represent that Plaintiff and the other equity holders (which were, exclusively, Manager Defendants) would not receive SHRAP Tokens but could only *benefit* from their use by the company, just as a company's equity holders would be entitled to the benefit of dividends.  Because Defendants executed the Token Giveaway, Defendants, along with Griffin and Polychain, could safely hold more than 1 billion SHRAP Tokens while claiming that the promised equity-based SHRAP Token entitlements were never intended for actual distribution.  Upon information and belief, *Plaintiff is the only entity that cannot access the SHRAP Tokens it was promised.*

57.    To reiterate:  by this time, Mr. Long and Manager Defendants had entered into Side Letters, Offer Letters and Token Subscription Agreements giving away more than 1/3 of the Total Network Tokens without knowledge or consent of Plaintiff, *after* Mr. Long represented to Plaintiff that it would control 3 of 5 Board seats and hold 60% equity in Neon Machine and after the unanimous vote to assign their dividends to Plaintiff until Plaintiff received back its capital investment.

ii.    Mr. Long Creates Argon Foundation and Argon Corp. and Uses Them to Project False Legitimacy to the Token Issuances.

58.    Around this time, Mr. Long arranged for the incorporation and establishment of Argon Foundation and Argon Corp. in Panama which, though purporting to be independent, are exclusively controlled by Manager Defendants.  He retained García de Paredes Law, a Panamanian law firm that markets itself as providing "Company and Private Foundation

Incorporation" services, to incorporate both entities.[7]  Upon information and belief, the registered

offices of both Argon Foundation and Argon Corp. are the offices of García de Paredes Law.  Upon

information and belief, all directors and officers of both Argon Foundation and Argon Corp. are

employees or agents of García de Paredes Law.  Mr. Long was personally invoiced by García de

Paredes Law for the incorporation of both Argon Foundation and Argon Corp. on September 23,

2021.  Defendants never informed Plaintiff of Argon Foundation and Argon Corp.'s true status.

**E.**     **Defendants Repeatedly Misrepresent the Truth Regarding the SHRAP Tokens and
        Plaintiff's Board Control to Plaintiff.**

        59.     Mr. Long and Manager Defendants sought from the moment the ink was

dry on the IP Transfer Agreement to evade Plaintiff's oversight of Neon Machine, break their

agreements to assign their dividends, and to dilute Plaintiff's interests and control.  Mr. Long has

continued to coordinate with Manager Defendants to undermine and, flat out avoid, the Board's

authority and undermine the administrative functions of Neon Machine and has continued to

present himself publicly as the CEO of Neon Machine on the Internet, despite his suspension on

November 13, 2023.[8]

        60.     In November 2021, only a month after Plaintiff agreed to the transfer of

*Shrapnel* IP out of Neon Machine, Mr. Long communicated to Plaintiff that Griffin and Polychain

would refuse to allow Mr. Javarone onto the Board.  Plaintiff intended for Mr. Javarone, Ned

Sherman, and Mr. Long to sit on Plaintiff's Board seats.  Plaintiff contacted the founders of Griffin

directly to confirm this information.  On this call, the Griffin founders did not voice any objection

to Mr. Javarone sitting on the Board.  However, Griffin's founders then revealed that Mr. Long

had represented to them that Plaintiff would control only one seat on the Board.  As Plaintiff later

---

[7] *See* "Services," GDPELAW.COM (last accessed Feb. 17, 2024), *available at* https://www.gdeplaw.com/services/.
[8] As recently as February 21, 2024, Mr. Long represented himself on Linkedin and Twitter as CEO of Shrapnel as he
has done on a "dba" basis for Neon Machine.

found out, the SAFEs with Griffin and Polychain, which Plaintiff was not provided copies of until after the full Board was appointed, stated that Griffin and Polychain would each hold one Board seat; two seats would be held by nominees of common stock (Plaintiff named Mr. Long and Mr. Miller), and a "4D seat" would be "nominated" by the Plaintiff and "acceptable" to both Griffin and Polychain.  It appears Mr. Long had not informed Griffin that Plaintiff was the controlling shareholder of Neon Machine.  Mr. Long has since with dogged determination tried to make those misrepresentations stand up, despite all of his promises and agreements with Plaintiff to the contrary.

61.     In order to maintain Neon Machine's stability so shortly after its launch and its closing of investments with Griffin and Polychain, Plaintiff was constrained to refrain a second time from terminating Mr. Long.   Had Plaintiff known the full breadth of Mr. Long's treachery, it would have taken different actions.

62.     As agreed upon from inception, yet delayed three (3) months while Mr. Long executed his self-dealing agenda, Mr. Javarone, Mr. Sherman, Mr. Planche and Mr. Perszyk were officially made directors of the Board pursuant to a Board resolution on January 26, 2022. Also on January 26, 2022, the full Board executed a second Board resolution approving entry into a form of Intellectual Property License and Assignment and Services Agreement (the "Argon Services Agreement") with Argon Corp.  The form of Argon Services Agreement attached to the Board resolution and reviewed by the Board did not name the officer executing on behalf of Argon Corp.  Plaintiff was not informed at this time that Argon Corp. was a shell entity created by Mr. Long.

63.     Following the Board's approval, on February 2, 2022, Mr. Long executed the Argon Services Agreement on behalf of Neon Machine.  A true and correct copy of the executed Argon Services Agreement is attached hereto as **Exhibit H**.  Upon information and belief, an

employee of García de Paredes Law, Mr. Long's retained attorneys, executed the agreement on behalf of Argon Corp. Pursuant to the Argon Services Agreement, Argon Corp. retained Neon Machine to provide the "necessary technology, expertise, staffing, infrastructure, and other resources needed… in order to support the token issuance and the research, development, maintenance, marketing, and support" of the SHRAP Token blockchain. *See* Argon Services Agreement at 1. In other words, *Neon Machine would perform all the work to create the SHRAP Token*. Upon information and belief, both Argon Foundation and Argon Corp. were created to conceal the fact that Defendants, Neon Machine and its management, have sole authority for the generation and distribution of the SHRAP Tokens. Therefore, pursuant to the Token Subscription Agreements, rather than each of the Manager Defendants contracting with an independent entity to grant them SHRAP Tokens, Manager Defendants granted more than 1/6 of the Total Network Tokens *from themselves to themselves*.

     i.   <u>Defendants Provide Misleading Capitalization Tables to Plaintiff While Maintaining Separate Books Containing the Actual Capitalization.</u>

64. Now that the 4D Directors were officially seated on the Board, Defendants began a series of misrepresentations to Plaintiff in order to obscure the Token Giveaway and the nature of Plaintiff's SHRAP Token holdings.

65. During the January 26, 2022 Board meeting Mr. Long was asked what the status and then-current capitalization of SHRAP Tokens was. On February 14, 2022, just over two weeks after the full Board of Neon Machine was seated, Mr. Long delivered to Plaintiff, a copy of Neon Machine's February 2022 capitalization tables (the "<u>February 2022 Cap Tables</u>"). The February 14, 2022 email and the February 2022 Cap Tables are attached hereto as **Exhibits I** and **J**, respectively. Mr. Grossman was copied on this email. The February 2022 Cap Tables were

created by Mr. Zhou on January 29, 2022.  In this email, for the first time, Mr. Long suggested that

Plaintiff did not own its SHRAP Tokens:

> The token treasury controlled by the board is ~41% of total supply, of which 4D's
> 39% equity interest could theorectically [sic] translate into ~$240M should the
> board elect to distribute on a pro rata basis.  **(Exhibit I)**

66.     The February 2022 Cap Tables listed a purported accounting of the total 3

billion Total Network Tokens.  The February 2022 Cap Tables listed the SHRAP Tokens sitting in

"Neon Machine Treasury," and the SHRAP Tokens sitting with "Insiders" (a category which

Plaintiff, as a founding and majority shareholder of Neon Machine, should not have been excluded

from)).

| Neon Machine Treasury * | # tokens |
|---|---|
| 4D Factory | 480,927,488 |
| Griffin | 267,181,938 |
| Polychain | 160,309,163 |
| Founders | 320,618,325 |
| **Subtotal** | **1,229,036,913** |

| Insiders | |
|---|---|
| Seed Round Investors | 612,000,000 |
| Team, Advisors, Future Hires | 793,963,087 |
| Board Directors | 5,000,000 |
| **Subtotal** | **1,410,963,087** |

67.     The tables provided to Plaintiff were deliberately misleading.  The "Neon

Machine Treasury" table represented Plaintiff's understanding that it would receive SHRAP

Tokens in proportion to its equity in Neon Machine, as promised by Manager Defendants.  Mr.

Long and Mr. Grossman did not explain who belonged to the "Insiders" category, nor that Griffin,

Polychain and Manager Defendants received more than 1 billion additional SHRAP Tokens that

were hidden in the "Team, Advisors, Future Hires" and "Seed Round Investors" subcategories.

68.     Around the same time, a significantly more detailed capitalization table dated February 10, 2022, excerpts of which are attached hereto as **Exhibit K** (the "Internal Cap Table"), was maintained by Defendants, not shared with Plaintiff, which reflected their true intentions.  Upon information and belief, Mr. Zhou created the Internal Cap Table on October 28, 2021.  The Internal Cap Table listed the exact amounts of SHRAP Token being given to Griffin, Polychain, and Defendants.

| | Name | Number of Tokens |
|---|---|---|
| 81 | *Launch Partner Equity Investors* | |
| 82 | Griffin Gaming Partners II, L.P. | 309,937,500 |
| 83 | Griffin Gaming Partners II Side Fund, L.P. | 16,312,500 |
| 84 | Polychain Venture Partners II LP | 195,750,000 |
| 85 | **EQUITY INVESTOR SUBTOTAL** | **522,000,000** |

| | Name | Number of Tokens |
|---|---|---|
| 3 | *Founders FTIs* | |
| 4 | Mark Long | 70,001,845 |
| 5 | Don Norbury | 70,001,845 |
| 6 | Colin Foran | 65,665,352 |
| 7 | Aaron Nonis | 65,665,352 |
| 8 | Mark Yeend | 61,415,589 |
| 9 | Naomi Lackaff | 62,196,158 |
| 10 | Calvin Zhou | 70,001,845 |
| 11 | Gianna Sulyma (In Founders Round) | 15,418,945 |
| 12 | **FOUNDERS SUBTOTAL** | **480,366,930** |

| | Name | Number of Tokens |
|---|---|---|
| 93 | **Friends and Family Round** | |
| 94 | Mark Long | 21,327,014 |
| 95 | Don Norbury | 21,327,014 |
| 96 | Colin Foran | 10,663,507 |
| 97 | Aaron Nonis | 10,663,507 |
| 98 | Mark Yeend | 213,270 |
| 99 | Naomi Lackaff | 2,132,701 |
| 100 | Calvin Zhou | 21,327,014 |
| 101 | Gianna Sulyma | 213,270 |
| 102 | David Vicini | 1,066,351 |
| 103 | Andrew Grossman | 1,066,351 |
| 104 | **TOTAL** | **90,000,000** |

69.     The Internal Cap Table does not list anywhere the breakdown of SHRAP Tokens according to equity holdings as listed in the February 2022 Cap Table.  In fact, the Internal Cap Table only lists 15 million SHRAP Tokens "Reserved for 4D Factory" under the "Early Advisory" category.  (Exhibit K).  Upon information and belief, these SHRAP Tokens were shown

improperly as Plaintiff's, since they had been promised to Mr. Javarone, as Mr. Long confirmed in his February 14, 2022 email. Notably, despite being a founding investor, majority stockholder, and shown among "Founders" on the first Resolutions (Exhibit C), when Long and the Manager Defendants executed their give-away to "Founders," Plaintiff was forgotten.

70.    In short, Mr. Long and his team were providing capitalization tables to Plaintiff showing that it, Griffin, Polychain and Defendants would receive SHRAP Tokens in proportion to their equity holdings, while internally Manager Defendants were recording that Griffin, Polychain and Manager Defendants would have over 1 billion SHRAP Tokens among themselves, and Plaintiff was entitled to ***no tokens whatsoever***.

ii.    Defendants Make Affirmative Misrepresentations and False Statements to Plaintiff to Further Obscure the Truth.

71.    The relegation of the large SHRAP Token holdings it had long been promised by Defendants to  "Treasury," which Plaintiff could not readily access and might not even own, was a surprising revelation to Plaintiff.  Plaintiff, through Mr. Javarone,  began seeking answers to explain what Mr. Long meant in his communication that Plaintiff's SHRAP Tokens were held in "Neon Machine Treasury."  On May 10, 2022, Plaintiff, through Mr. Javarone, emailed to Mr. Long a series of questions seeking clarification about his February 14, 2022 email. The May 10, 2022 email is attached hereto as **Exhibit L**.

72.    Among other questions, Plaintiff asked: (1) the identities and investments of the "Pre-Seed" and "Seed Round" investors; (2) how many of the "Team, Advisors, and Future Hires" SHRAP Tokens were already granted or reserved for future hires; (3) how and when the "Seed Round" fundings and the grants of SHRAP Tokens to "Team, Advisors and Future Hires" were approved by the Board; (4) clarification about Plaintiff's token allocation in the "Treasury" category; and (5) why Plaintiff, Mr. Javarone, Mr. Conroy and Mr. Miller were not offered SHRAP

Tokens to purchase in the pre-public rounds.   Plaintiff indicated it had never seen its tokens classified in the "Treasury" category before:

> This suggests that 4D is limited to a category that cannot access the token unless approved for distribution, while the rest who have been granted tokens for free or invited to purchase them for fractions of a cent are more liquid and accessible. What was planned for how the Treasury tokens would be available and liquid?  Are there rules or other conditions related to the above white paper description that impact whether they can be distributed, per your footnote? (Exhibit L)

73.    By email dated July 29, 2022, more than two months later, Mr. Long finally provided his response to Plaintiff.  A true and correct copy of the July 29, 2022 email is attached hereto as **Exhibit M**.  Mr. Long prefaced his email to say that Mr. Grossman worked with Neon Machine's corporate counsel at Fenwick & West LLP to prepare answers to Plaintiff's questions. Mr. Grossman was still Plaintiff's general counsel at this time and was expected to provide Plaintiff with full information from Neon Machine.  Mr. Long's responses, drafted with the aid of Mr. Grossman and Fenwick according to Mr. Long, only further withheld the facts and obscured Defendants' true intentions.   Each false and/or misleading statement in Mr. Long's email (A through F below), and Plaintiff's response herein, on information and belief in each instance, is addressed below:

> A.    "Argon is a Panamanian foundation (without any members or shareholders) that is developing the smart contract responsible for the SHRAP token and is expected to eventually deploy the smart contract that mints the tokens.  Argon is a contractual counterparty of Neon, but is not owned or controlled by Neon." (Exhibit M)

74.    Statement "A" above, upon information and belief, is and was a false and misleading statement intended to lead Plaintiff to believe that the SHRAP Tokens were being developed and distributed by an entity independent of Neon Machine.  Upon information and belief, both Argon Foundation and Argon Corp. are Panamanian shell entities of Neon Machine

created by Mr. Long, and all operations related to creation and distribution of SHRAP Tokens were

managed by Manager Defendants at Neon Machine.

> B.     "Of the ~799 million SHRAP Tokens that have been allocated for current
> and future employees, directors, consultants, advisors, etc. of Neon [Machine] in
> connection with their services, interests in ~714.5 million SHRAP Tokens have
> already been allocated and/or granted (including to The 4D Factory LLC), and
> interests in ~84.5 million SHRAP Tokens remain reserved and available (note that
> the difference between ~794 million and ~799 million token interests is the 5
> million token interests allocated for Neon board directors, including yourself)."
> (Exhibit M)

75.     Statement "B" above, upon information and belief, is and was a  false and

misleading statement designed to conceal the Token Giveaway and otherwise delay and hinder

Plaintiff.  Mr. Long deliberately misrepresented that Plaintiff's SHRAP Tokens were included in

the 714.5 million that "have already been allocated and/or granted," when only Mr. Javarone's

personal tokens for his services as an advisor and director on the Board were included in that total.

In addition, although Plaintiff requested a specific breakdown of how the SHRAP Tokens were

distributed to "Team, Advisors and Future Hires," Mr. Long did not provide this breakdown,

concealing that Manager Defendants had distributed 552 million SHRAP Tokens to themselves.

> C.     "Separately, a group of founders and early service providers received an
> aggregate of 90 million SHRAP Token interests in exchange for cancellation of
> debt in the aggregate amount of ~$422,000."  (Exhibit M)

76.     76.     Statement "C" above, upon information and belief, is and was false

and misleading.  As of July 2023, the approximately $422,000 *purported* debt was still listed as

"notes payable" liabilities in Neon Machine's balance sheets, *with accrued interest*.  In reality, 552

million SHRAP Tokens had been distributed and/or assigned to the Manager Defendants, not "an

aggregate of 90 million SHRAP Token interests" as provided in the July 29, 2022 response.

> D.     "4D has a direct allocation of 15 million SHRAP Token interests, and a
> purchase agreement covering such token allocation was sent to 4D in December
> 2021 for signature."  (Exhibit M)

77.    Statement "D" above, upon information and belief, is and was a false and misleading statement intended to obscure the nature of Plaintiff's token interests.  Mr. Javarone had been granted 15 million SHRAP Tokens, not Plaintiff.  Upon information and belief, Mr. Long knew this fact, and indeed correctly stated this fact in his February 14, 2022 email.  Mr. Long changed his story from February and misrepresented to Plaintiff in July that those SHRAP Tokens belonged to it to hide the fact that Mr. Long had actually reserved no SHRAP Tokens for Plaintiff.

E.    "In May 2021, Calvin Zhou offered you the opportunity invest [sic] in the project, and Calvin recalls that you did not want to participate at that time." (Exhibit M)

78.    Statement "E" above, upon information and belief, is and was a false and misleading statement that upon information and belief was intended to suggest that Plaintiff willingly turned down the opportunity to "invest" in actual SHRAP Token, as opposed to having a right to benefit from the "treasury token."  Plaintiff was never offered an opportunity to further invest in SHRAP Token.  Instead, in or about May 2021 when Plaintiff and Mr. Zhou discussed the SHRAP Token's capitalization and potential capital raises, Mr. Zhou took the opportunity to reinforce the large stake in SHRAP Tokens Plaintiff was already entitled to in connection with its equity stake in Neon Machine.

F.    "The specific way in which Neon uses the SHRAP token interests on its balance sheet will be determined over time, as dictated by business needs. So long as Neon complies with applicable law, there aren't restrictions on how Neon can use the SHRAP token interests. **If approved by the Board, one of those use cases could be distributing some or all of the SHRAP token interests to Neon stockholders**."  (Exhibit M) (emphasis added).

79.    Statement "F" above, upon information and belief, is and was a deliberately misleading statement intended to lead Plaintiff to believe that its SHRAP Tokens, now classified

as "treasury" tokens, could still be distributed to them upon approval by the Board.[9]  However, upon information and belief, Defendants intended that Plaintiff would never receive its distribution of SHRAP Tokens, even by a Board vote to distribute SHRAP Token interests to Neon Machine's stockholders.  Indeed, with Griffin and Polychain in 2 out of 5 Board seats, Mr. Long sitting in one of Plaintiff's seats, and with Neon Machine actually in control of generation and distribution of SHRAP Tokens (rather than shell entities Argon Foundation and Argon Corp.), Mr. Long knew it was highly unlikely or even impossible for Plaintiff's "treasury" token to ever be distributed by the Board.  Later, when Plaintiff sought in January 2024 to exercise the Board's authority to distribute SHRAP Tokens to stockholders, Defendants argued that the Board was illegitimate, that Plaintiff's Board seats were invalid, and that the Board could not vote to distribute the SHRAP Tokens—and represented that Plaintiff was entitled to no SHRAP Tokens whatsoever.

80.    The Defendants were aware of the prospect of dilution of their common stock position if and when the SAFEs eventually converted.  If and when the conversion occurred, Defendants would be entitled to fewer tokens based on the dilution of their stock interest. Notwithstanding the lack of authority for the distribution of 552 million SHRAP Tokens in 2021, by distributing the SHRAP Tokens to themselves at the first opportunity, Defendants have attempted to avoid any dilution of their share of the SHRAP Tokens if and when the SAFEs convert, while subjecting Plaintiff to *all* the dilution and now even arguing Plaintiff should never receive its entitlement.

---

[9] This was at least the second time Mr. Long had said this.   See, Exhibit M: "The token treasury controlled by the board is ~41% of total supply, of which *4D's 39% equity interest could theorectically [sic] translated into ~$240M should the board elect to distribute on a pro rata basis." (emphasis added).*

**F.    Defendants Improperly Exercised Complete Control Over Neon Machine and Prevented Any Oversight By the Company's Majority Shareholder.**

81.    Through the remainder of 2022 and until Mr. Long's removal from the Board in 2023, Manager Defendants ran Neon Machine in direct contravention of Neon Machine's Bylaws and their responsibilities to shareholders and did not provide any more information to Plaintiff about its SHRAP Token interests.

82.    Despite promising "monthly day long board meetings," for almost two years, Mr. Long held only two Board meetings including the 4D Directors, including the first meeting of the full five-member Board on January 26, 2022.  Instead, upon information and belief, he held frequent, unnoticed meetings with Griffin and Polychain and excluded the other two 4D Directors, Mr. Javarone and Mr. Sherman, from these meetings.  Plaintiff did not even discover that these meetings took place until just before Mr. Long was removed from the Board on August 22, 2023, and did not discover the Token Giveaway until even later.

83.    These Board meetings were conducted in violation of Neon Machine's Bylaws.  Article III, Section 10 of the Bylaws provides that regular Board meetings may be held without notice as determined from time to time by the Board, however, any absent directors must be given notice of such determination when it is made.  Article III, Sections 11 and 12 of the Bylaws provide that notice of any special meetings of the Board must be given to each director. *See* Exhibit B.  Mr. Long, Griffin and Polychain never noticed the 4D Directors of any meeting they held.  Therefore, any actions "approved" by Mr. Long, Griffin and Polychain were not properly approved before the Board of Neon Machine, and therefore were truly invalid.

84.    While excluding two of the three Plaintiff directors - Mr. Javarone and Mr. Sherman - from vital Board meetings, as Plaintiff later discovered, Manager Defendants engaged in significant and damaging actions to Neon Machine's business and Plaintiff's equity value

without notice to or approval by Neon Machine's Board or its majority stockholder.  Upon information and belief, Manager Defendants: ran up extremely high operating costs without sufficient capital, draining Neon Machine's cash as quickly as it was raised, listing SHRAP Tokens on public exchanges, raising the majority of Neon Machine's capital by selling agreements for future stock that would dilute Plaintiff's equity stake in Neon Machine without authorization or approval, and using the cash raised, including from future stock sales, at their whim.

85.     In particular, Mr. Long improperly and secretly caused Neon Machine to issues securities of at least $15 million as additional SAFEs to third parties in 2023, on terms that were substantially similar to the terms of the SAFEs entered into with Griffin and Polychain in October 2021.  In conjunction with the SAFEs issued to Griffin and Polychain, conversion of the SAFEs to common stock in Neon Machine will significantly dilute Plaintiff's equity interests[10] and Manager Defendants' equity.  Plaintiff would lose its controlling interest of Neon Machine, have its potential dividends reduced considerably, and be substantially setback from ever recouping its original investment.  Upon information and belief, Defendants engaged in these actions for the direct purpose of minimizing Plaintiff's recovery of its investment in Neon Machine while they had guaranteed that Defendants could achieve massive profits thanks to the Token Giveaway.

86.     To reiterate, as of now, Mr. Long and his Manager Defendants have entered into, all without knowledge or consent of Plaintiff,  Token Subscription Agreements, Offer Letters and Side Letters giving away more than 1 billion SHRAP Tokens to Manager Defendants, Griffin and Polychain, plus $15 million in additional, equity-diluting SAFEs.

---

[10] Pursuant to the *Complaint* filed in the Derivative Action, Manager Defendants assert Plaintiff would only have a 19% equity interest in Neon Machine after SAFE conversion.

87.    Defendants' gambit worked.  Manager Defendants now together, hold more than 1/6 of the 3 billion SHRAP Tokens.  At the trading price of approximately $0.26[11], *the Manager Defendants possess rights to SHRAP Tokens worth over $135 million*, which are presumably held in their wallets,[12] which they can freely access and trade subject only to normal lockup restrictions applying to all token holders, while having so far locked out both the Plaintiff and Mr. Javarone from receiving a single token.  By contrast, Plaintiff has not received a penny, let alone a single token from Neon Machine.  Defendants' coordinated stripping of value from Neon Media followed by the calculated pilfering of Neon Machine, combined with the millions of dollars in capital Plaintiff provided for Mr. Long's projects, were among the root causes of Plaintiff's bankruptcy filing on October 10, 2023.

**G.    Defendants Continue to Withhold Plaintiff's SHRAP Tokens Even After Plaintiff Exercised Control Over the Board**.

88.    On August 22, 2023, Plaintiff removed Mr. Long from his seat on the Board of Neon Machine due to his withholding of information from the 4D Directors and refusal to report to the full Board.  Plaintiff, through its three Board seats (Mr. Javarone, Mr. Sherman and Mr. Honour (who replaced Mr. Long), instructed Neon Machine's outside counsel to provide access to the company's data room (which outside counsel, not Neon Machine management, complied with).  Plaintiff also called a series of Board meetings in order to establish proper governance, investigate Mr. Long's series of *ultra vires* acts, and consider ways to deal with the damaging consequences of Mr. Long's actions.  While the 4D Directors performed the duties of the Board, the two directors from Griffin and Polychain, Mr. Planche and Mr. Perszyk, objected to or abstained from voting on all proposed measures, including measures to provide *all* directors with access to Neon Machine's

---

[11] This valuation was taken from www.coingecko.com at on February 21, 2024.

[12] Plaintiff requested this information by letter dated December 27, 2023, but the Manager Defendants have refused to provide information as to how the tokens are allocated amongst the token holders.

books and records, appoint special counsel to the Board to help navigate matters, and to retain investment bankers to support capital raising beyond Griffin and Polychain alone.

89.    On September 15, 2023, Mr. Long forwarded to the Board a letter from Griffin (the "Demand Letter") demanding the conversion of their SAFEs to preferred equity.  Mr. Long advised that he already asked outside counsel Fenwick to draft an amended corporate charter and financing documents to implement this conversion.  The Demand Letter asserted for the first time the occurrence of an alleged "Network Launch" purportedly on April 29, 2023 that 60 days thereafter, on June 29, 2023, supposedly triggered a conversion of the SAFEs to preferred equity. Prior to September 15, 2023, neither the Plaintiff nor the Board ever received any notification, formal or informal, that a Network Launch or SAFE conversion occurred at any time.  In fact, no conversion can be automatic as the Bylaws put in place for the Company do not permit issuance of preferred stock and would have to be amended, and preferred share documents would have to be negotiated, all requiring Board approval, along with evaluating the purported Network Launch trigger event, as well as the complication that 75% of the "Series A" SAFEs ($15 million of $20 million) were issued *after* that date without Board approval and with language referring to Network Launch as a future event.

90.    When the Board advised Mr. Long that the Board would need to ultimately determine whether the Network Launch occurred, and emphasized the past unauthorized actions that required the Board's review, Mr. Long refused to provide analysis or backup materials, instead providing a URL link that supposedly represented the SHRAP blockchain, and threatening to tell Griffin and "the other SAFE holders" that the Board would not comply with the automatic conversion of the SAFEs.

91.    On October 5, 2023, the next Board meeting, Mr. Long and the respective directors of Griffin and Polychain continued to assert the Board was not legitimate, that the SAFEs

must be recognized as converted, and that the Board should not further scrutinize the occurrence of a "Network Launch." During the meeting, the 4D Directors also confirmed that Mr. Long had entered Neon Machine into approximately $15 million in new SAFEs in 2023 (after the purported Network Launch, a trigger event under the new SAFEs) without Board authorization. *Neon Machine's counsel* at *Fenwick stated at the meeting that it had no record of these SAFEs that had been issued.* Issuance of SAFE agreements **after** the purported "Network Launch," would mean that Manager Defendants knowingly entered into SAFEs referring to Network Launch as a future event even though they were taking the position that Network Launch had already occurred.

92.     On November 13, 2023, a third Board meeting was called. Mr. Long and the Griffin and Polychain board members received notice of this Board meeting but chose not to attend. Mr. Long was suspended as CEO with pay due to his abdication of responsibilities and obstruction of all Board directives as CEO of Neon Machine. Mr. Javarone was appointed as interim CEO and Treasurer. The Board approved steps to retain counsel to investigate Mr. Long's actions at the company and issued directives to certain Manager Defendants. Specifically, the Board issued a directive imposing a two-signature requirement for expenses over $5,000, meant to control costs and give the Board visibility on spending.— a common sense corporate control. The Board also authorized the retention of investment bankers and game industry specialist advisors on an expedited basis to support raising new financing for Neon Machine from a broad market. The Board, through Mr. Javarone as interim CEO, issued these directives to Messrs. Norbury, Nonis and Grossman. None of them responded to Mr. Javarone or complied with the Board's directives.

93.     Plaintiff's attempts to exercise Board authority exposed, among other things, the Manager Defendants' desperate desire to prevent the Board from opening capital raising activities to a broader market, since it would lessen the grip on Neon Machine they held with

Griffin and Polychain, control which has eviscerated Plaintiff's position despite being Majority Shareholder. Indeed, in keeping with their plan, Defendants ignored the Board's attempts to secure financing from the broader market. Instead, in early December 2023, Manager Defendants attempted to push through a $2 million equity investment from Griffin and Polychain. While this financing would be woefully insufficient at barely two-thirds of one month of Neon Machine's expenses, it would constitute a "Qualified Financing" that would cause Griffin and Polychain's SAFEs to automatically convert into preferred shares. If this transaction were carried through, the market would not have spoken but the scheme to remove Plaintiff's Directors from the Board and thereby its control, evade the Board's investigation of Mr. Long's actions, and ensure Plaintiff could never access its token entitlement, would be complete. The Board did not approve the transaction.

94.     On December 27, 2023, counsel for Mr. Javarone delivered a letter to Argon Foundation requesting the immediate turnover of Mr. Javarone's 16 million SHRAP Tokens per the signed contract(s) with the company. Despite Manager Defendants never raising any disputes as to Mr. Javarone's right to receive those SHRAP Tokens, they remain undelivered.

95.     On January 4, 2024, counsel for Plaintiff delivered a letter to the Board requesting the immediate turnover of Plaintiff's negotiated-for SHRAP Tokens. This letter sought turnover of 480,927,488 SHRAP Tokens based on the representations made in the February 2022 Cap Tables—the most recent capitalization tables Defendants have provided Plaintiff to date.

96.     These letters precipitated a fourth Board meeting on January 12, 2024. Griffin and Polychain's Board members attended and expressed their opinion, for the first time, that none of the 4D Directors were properly appointed to the Board because, they claimed, the SAFEs had already converted, and so Griffin and Polychain as "stockholders" could vote for and elect different directors. These statements could only possibly be true if Polychain and Griffin had

their SAFEs converted to preferred stock and voted as common shareholders, thereby diluting 4D's common stock and Board control. Indeed, Mr. Planche suggested at the meeting that they voted for and elected different directors sometime after the November 13, 2023 Board meeting.

97.    On February 1, 2024, certain Manager Defendants filed in Plaintiff's chapter 11 cases the *Motion of Neon Shareholders for Entry of an Order for Relief from Prior Order Granting Relief from Stay, or, in the Alternative, Granting Renewed Relief from Automatic Stay* [ECF 63] (the "Reconsideration Motion"). Through the Reconsideration Motion, Manager Defendants represented for the first time in indisputable terms their conclusion that Plaintiff was not entitled to any SHRAP Tokens whatsoever. *See* Reconsideration Motion ¶¶ 8-9 (stating the Debtors "do not own, did not disclose on their schedules, and are not entitled to" the SHRAP Tokens promised to Plaintiff); ¶¶ 38-39 ("Rather, the SHRAP Tokens held in Neon's Treasury are similar to treasury stock held by a Delaware corporation. Such Treasury tokens are established for various reasons and have been held on Neon's balance sheet for general corporate purposes… at bottom, Neon's Treasury tokens were never meant or intended to be used as a rainy-day fund for the Debtor…") Indeed, upon information and belief, the active trading of SHRAP Tokens since November 2023 demonstrates that millions of tokens have been distributed to holders around the world. Meanwhile, everything promised to Plaintiff has been either withheld or converted, or both.

### COUNT I
**(Turnover and Accounting of Property)**
**(Against Neon Machine Inc., or in the Alternative, Against Manager Defendants)**

98.    Plaintiff repeats and realleges paragraphs 1 through 97 hereof, as if fully set forth herein.

99.    Section 541 of the Bankruptcy Code provides that a debtor's estate is comprised of, subject to certain exceptions, "all legal or equitable interests of the debtor as of the commencement of the case."  11 U.S.C. § 541(a)(1).

100.    Section 542 of the Bankruptcy Code provides that an entity in possession, custody, or control during the case of property that the trustee may use, see, or lease under section 363 of the Bankruptcy Code "shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a).

101.    Plaintiff was promised SHRAP Tokens in proportion to Plaintiff's equity interests in Neon Machine.  Plaintiff has good cause to believe that SHRAP Tokens have been and are being improperly held by Manager Defendants that should be turned over to Plaintiff's bankruptcy estate immediately as promised.

102.    Plaintiff has a legal and equitable interest in the SHRAP Tokens being so held.  Although Neon Machine, through its Board, authorized the *pro rata* release of SHRAP Tokens including Plaintiff's SHRAP Tokens by delivery to Plaintiff's wallet address, those SHRAP Tokens have not been released.  To the extent SHRAP Tokens constitute "treasury stock" of Neon Machine, the action by the Board was in keeping with Article V, Section 1 of the Bylaws, not to mention in accordance with the process previously provided by Manager Defendants and their counsel.

103.    Plaintiff has good cause to believe that Manager Defendants have continued to sell and/or give away SHRAP Tokens to reduce the total amount remaining to distribute to stockholders, including to Plaintiff.  Manager Defendants continue to withhold information regarding the current pool of SHRAP Tokens remaining to distribute.  Plaintiff has only been informed that Manager Defendants gifted 552,602,013 to themselves and distributed nothing to

36

Plaintiff. Plaintiff is entitled to receive the 480,927,488 SHRAP Tokens Manager Defendants represented it was entitled to. In the alternative, Plaintiff is entitled to receive, at minimum, 60% of the SHRAP Tokens Manager Defendants distributed to themselves, or 331,561,208 tokens.

104.     The SHRAP Tokens can be used, sold, or otherwise transferred for value by Plaintiff as a debtor in the Chapter 11 Cases. SHRAP Tokens are currently in circulation with a value of more than $0.26 per token. At this value, Plaintiff could potentially yield more than $86 million from sale of its SHRAP Token.

105.     Accordingly, pursuant to 11 U.S.C. § 541(a) and 542(a), Plaintiff demands (i) immediate compliance with the Board's directive to release the SHRAP Tokens to Plaintiff, i.e. the immediate turnover to Plaintiff from Defendant Neon Machine of 480,927,488 SHRAP Tokens (or, in the alternative, 331,561,208 SHRAP Tokens) that constitute property of the estate, and (ii) an accounting of the Total Network Tokens.

106.     In the alternative, and to the extent any SHRAP Tokens which Plaintiff was entitled to were distributed to any or all of Manager Defendants, as dividends or otherwise, Plaintiff demands the immediate turnover from Manager Defendants of 331,561,208 SHRAP Tokens that constitute property of the estate to Plaintiff's wallet address. To the extent Manager Defendants have sold any SHRAP Tokens that constitute property of the estate, Plaintiff also demands the immediate turnover from Manager Defendants of the proceeds received for those sales, as well as turnover of the unsold SHRAP Tokens.

## COUNT II
### (Fraud)
### (Against Manager Defendants)

107.     Plaintiff realleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 106 hereinabove inclusive.

108.    Manager Defendants knowingly made a series of material misrepresentations to Plaintiff in order to induce Plaintiff to agree to Neon Machine's transaction with Griffin and Polychain, and then to mislead Plaintiff about the true nature of Plaintiff's interest.

109.    Mr. Long represented to Plaintiff that (1) it would maintain 60% control of equity in Neon Machine, (2) it would hold three of five seats on the Board; and (3) it would receive SHRAP Tokens as holder of 60% equity in Neon Machine, in proportion to its equity.

110.    By approving the Recoupment Agreements, each Manager Defendant represented to Plaintiff that it would be paid back for its significant investments.

111.    But for these representations made by Neon Machine's then-CEO and manager/shareholders, Plaintiff would not have agreed to the transactions.  Plaintiff reasonably believed Manager Defendants' representations were true because Plaintiff had not been informed that Mr. Long secretly created Neon Machine and unilaterally gave himself substantial power over the company through the Bylaws and had no reason to believe Manager Defendants would intentionally sabotage Plaintiff's investment.

112.    These representations were false when they were made, and Manager Defendants knew they were false, or made them recklessly without knowledge of their truth.  Manager Defendants had no intention of paying back Plaintiff for its investments.  They intended to induce Plaintiff to agree to the transfer of the *Shrapnel* IP out of Neon Media, and to the financing from Griffin and Polychain.

113.    Once Manager Defendants got what they wanted, they each consciously or recklessly undertook efforts to sabotage Plaintiff's investment.  Mr. Long set up Plaintiff's equity for significant dilution upon launch of the *Shrapnel* game by closing on additional SAFEs without notice to or approval of the Board.  Mr. Long gave more than a billion tokens to his colleagues Manager Defendants, and Griffin and Polychain without notice.

114.    Each Manager Defendant entered into Offer Letters with Neon Machine and Token Subscription Agreements with the shell entity Argon Foundation to grant themselves significant volumes of SHRAP Tokens that were not offered to Plaintiff.  Upon information and belief, because all services related to the generation and distribution of SHRAP Tokens were performed by Neon Machine, each Manager Defendant knew or should have known that, through the Token Subscription Agreements, they were essentially contracting with themselves to give SHRAP Tokens to themselves.

115.    From the appointment of the full Board on January 26, 2022, upon information and belief, each Manager Defendant worked directly with Mr. Long to conceal the status of the SHRAP Tokens from Plaintiff and withhold all of Neon Machine's vital financial and operational information from the 4D Directors.  Each Manager Defendant continues to withhold this information from the 4D Directors.  Each Manager Defendant was and is an active participant in the scheme to defraud Plaintiff.

116.    As a direct, proximate and foreseeable result of Manager Defendants' continuing fraud against Plaintiff as herein alleged, Plaintiff suffered and sustained and is entitled to recover from Manager Defendants, jointly and severally, actual, general, compensatory and consequential damages in an amount to be proven at trial but no less than $10,000,000.

### <u>COUNT III</u>
**(Breach of Fiduciary Duties of Loyalty and Care)**
**(Against Manager Defendants)**

117.    Plaintiff realleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 116 herein above inclusive.

118.    Manager Defendants, as managers, officers and directors of Neon Machine and persons otherwise in control of Neon Machine, owed fiduciary duties of care and loyalty to the shareholders of Neon Machine, including the majority stockholder Plaintiff.

119.    Manager Defendants breached their fiduciary duty of loyalty to Neon Machine and its shareholders by—without notice to or consent of the full Board of Neon Machine—setting up the significant dilution of common stock through SAFEs, creating significant liabilities for the company to ensure that future dividends to shareholders would be nearly impossible, snatching up substantial amounts of SHRAP Tokens for themselves through the Token Giveaway, including by entering into the Token Subscription Agreements while knowing or having reason to know that Argon Foundation was a shell entity, and deliberately misrepresenting the nature of Plaintiff's own SHRAP Tokens.

120.    Manager Defendants breached their fiduciary duty of care by misrepresenting the SHRAP Token capitalization to Plaintiff and withholding vital financial and operational information about Neon Machine from Plaintiff's Board directors.  Mr. Long in particular entered into significant additional SAFE financing without notice to or consent of the Board; and conducted improper "Board meetings" without notice to Plaintiff's two directors.  Upon information and belief, each other Manager Defendant worked directly with Mr. Long to cause these breaches.

121.    As a result of Manager Defendants' breaches of their fiduciary duties, Plaintiff consented to the transfer of Neon Media's valuable IP to Neon Machine for virtually no consideration.  Manager Defendants' breaches have caused Plaintiff to receive no proceeds from Neon Machine, despite the millions of dollars Plaintiff provided to Manager Defendants.  Plaintiff has incurred substantial costs, including legal fees, to address Manager Defendants' breaches. Manager Defendants' refusal to recognize Plaintiff's rights in the face of the debts Plaintiff took on to fund their projects is a primary precipitator of the Plaintiff's bankruptcy.

122.    Plaintiff is entitled to recover from Manager Defendants, jointly and severally, actual, general, compensatory and consequential damages in an amount to be proven at trial but no less than $10,000,000.

### COUNT IV
### (Aiding & Abetting Breaches of Fiduciary Duty)
### (Against Foran, Lackaff, Nonis, Norbury, Yeend, Zhou)

123.    Plaintiff realleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 122 hereinabove inclusive.

124.    As established above, Mr. Long is the suspended CEO and former Board director of Neon Machine, at all relevant times owed fiduciary duties of care and loyalty to the shareholders of Neon Machine, including Plaintiff, and breached those fiduciary duties.

125.    Each of Manager Defendants Foran, Lackaff, Nonis, Norbury, Yeend and Zhou had actual and/or constructive knowledge that Mr. Long was breaching his fiduciary duties. Upon information and belief, Defendants Foran, Lackaff, Nonis, Norbury, Yeend and Zhou worked with Mr. Long on a daily basis in developing the Shrapnel game and operating Neon Machine while shutting Plaintiff out from all oversight of the company.  Upon information and belief, Defendants Foran, Lackaff, Nonis, Norbury, Yeend and Zhou knew or should have known that Argon Foundation and Argon Corp. were shell entities created by Mr. Long because Neon Machine was responsible for the generation and distribution of SHRAP Tokens.

126.    Therefore, Defendants Foran, Lackaff, Nonis, Norbury, Yeend and Zhou knowingly participated in Mr. Long's breaches by executing the Offer Letters and the Token Subscription Agreements, generating the contradictory February 2022 Cap Table and the Internal Cap Table, and withholding virtually all information about the financials and operations of Neon Machine while Mr. Long was seated on the Board.

127.    As a result of Mr. Long's breaches of his fiduciary duties, as aided and abetted by Defendants Foran, Lackaff, Nonis, Norbury, Yeend and Zhou, Plaintiff consented to the transfer of the *Shrapnel* IP to Neon Machine for virtually no consideration.   Defendants Foran, Lackaff, Nonis, Norbury, Yeend and Zhou aided and abetted Mr. Long's breaches to ensure Plaintiff to receive

no proceeds from Neon Machine, despite the millions of dollars Plaintiff provided to fund their work. Plaintiff has incurred substantial costs, including legal fees, to address Mr. Long's *ultra vires* actions and breaches of fiduciary duty.  Mr. Long's refusal to recognize Plaintiff's rights in the face of the debts Plaintiff took on to fund their project is a primary precipitator of the Plaintiff's bankruptcy.

128.    Plaintiff is entitled to recover from Defendants Foran, Lackaff, Nonis, Norbury, Yeend and Zhou, jointly and severally, actual, general, compensatory and consequential damages in an amount to be proven at trial but no less than $10,000,000.

### COUNT V
### (Promissory Estoppel)
### (Against Manager Defendants)

129.    Plaintiff realleges and incorporates herein by this reference each and every allegation set forth in Paragraphs 1 through 128 hereinabove inclusive.

130.    In order to induce Plaintiff to agree to the transfer of the *Shrapnel* IP and entry into the SAFEs with Griffin and Polychain, Mr. Long made clear and unambiguous promises to Plaintiff that (1) it would maintain 60% control of equity in Neon Machine, (2) it would hold three of five seats on the Board; and (3) it would receive SHRAP Tokens as holder of 60% equity in Neon Machine, in proportion to its equity.

131.    Pursuant to the Recoupment Agreements, Manager Defendants made clear and unambiguous promises to Plaintiff  that they would assign their dividends from Neon Machine to Plaintiff until Plaintiff was repaid for its Capital Contribution into Neon Media.

132.    Plaintiff reasonably and justifiably relied to its detriment on Manager Defendants' promises in approving entry into the IP Transfer Agreement and the SAFEs and incurring substantial legal fees and other costs.

133.    The Manager Defendants' promises were hollow.  By simultaneously arranging the Token Giveaway and setting up Plaintiff's equity interests in Neon Machine for

future dilution without notice or authorization, Manager Defendants worked concertedly to ensure that Plaintiff would never receive a recovery of its investment. Meanwhile, each Manager Defendant has received massive payouts in SHRAP Token which they granted to themselves.

134.    As a proximate and foreseeable result of Manager Defendants' promises as herein alleged, while Manager Defendants arranged a substantial giveaway to themselves, Plaintiff has not recovered any of its Capital Contributions to Neon Media and has incurred damages and lost opportunity costs proximately caused by Plaintiff's reasonable and justifiable reliance on Manager Defendants' promises. Justice requires that Manager Defendants' promises to Plaintiff be enforced. Plaintiff is therefore entitled to actual, general, compensatory and consequential damages in an amount to be proven at trial but no less than $10,000,000.

### COUNT VI
### (Declaratory Relief)
### (Against All Defendants)

135.    Plaintiff realleges and incorporates herein by this reference each and every allegation set forth in Paragraphs 1 through 134 hereinabove inclusive.

136.    An actual and substantial controversy has arisen and now exists between Plaintiff on the other hand and Defendants on the other hand. Plaintiff contends, as stated above, that the parties agreed in exchange for the transfer of the *Shrapnel* IP to Neon Machine and the execution of the SAFEs with Griffin and Polychain, Plaintiff would be entitled to (1) receipt of SHRAP Tokens in direct correlation to Plaintiff's equity in Neon Machine; (2) assignment of Manager Defendants' rights to dividends in Neon Machine; and (3) three seats on the five-seat Board of Neon Machine. Plaintiff also contends that it would be inequitable and unjust if the integrated agreements surrounding the transfer of the *Shrapnel* IP were not enforced in accordance with their terms.

137.    Defendants contest and dispute Plaintiff's contentions regarding the agreements and promises that induced Plaintiff to agree to the transfer of the *Shrapnel* IP and entry into the SAFEs with Griffin and Polychain.

138.    This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

139.    Plaintiff is entitled to a declaration that the agreements and promises set forth in this Complaint in connection with the transfer of the *Shrapnel* IP to Neon Machine are enforceable in accordance with their terms, that Plaintiff is entitled to receipt of the SHRAP Tokens in direct proportion to Plaintiff's equity interests, totaling 480,927,488 SHRAP Tokens (or, in the alternative, 331,561,208 SHRAP Tokens), and that Manager Defendants committed fraud and breached their fiduciary duties in violating the agreements and promises made to Plaintiff.

**COUNT VII**
**(Conversion)**
**(Against Manager Defendants)**

140.    Plaintiff realleges and incorporates herein by this reference each and every allegation set forth in Paragraphs 1 through 139 hereinabove inclusive.

141.    Plaintiff has a legal right to its negotiated-for SHRAP Tokens.  The SHRAP Tokens were promised to Plaintiff by Neon Machine, through Mr. Long, in proportion to Plaintiff's equity in Neon Machine.  The promise of the SHRAP Tokens was a necessary condition to Plaintiff's approval of entry into the SAFEs and the transfer of the *Shrapnel* IP.

142.    Manager Defendants wrongfully disposed of Plaintiff's promised SHRAP Tokens as if they were their own.  Despite Plaintiff's demands for distribution of its SHRAP Tokens, Manager Defendants refuse to distribute Plaintiff's SHRAP Tokens, and have made repeated misrepresentations to Plaintiff about the status of the tokens.  Manager Defendants ***now*** take the position that there are ***no SHRAP Tokens allocated to Plaintiff*** at all.  If there are in fact

no SHRAP Tokens remaining to be distributed to Plaintiff, then Manager Defendants distributed to themselves SHRAP Tokens that should have been reserved for distribution to Plaintiff. Manager Defendants seized and used Plaintiff's interests in the available SHRAP Tokens for corporate purposes at their whim.

143.    As a result of Manager Defendants' unlawful withholding of Plaintiff's SHRAP Tokens, Plaintiff has received none of the SHRAP Tokens promised to it, and in general has been denied any returns on its multimillion-dollar investment.

144.    Plaintiff is entitled to a judgment against Manager Defendants directing the return to Plaintiff of 480,927,488 SHRAP Tokens (or, in the alternative, 331,561,208 SHRAP Tokens).

<u>**COUNT VIII**</u>
**(Fraudulent Transfer)**
**(Against Nominal Defendant Neon Machine)**

145.    Plaintiff repeats and realleges paragraphs 1 through 144 hereof, as if fully set forth herein.

146.    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay or defraud any creditor of the debtor. 6 Del. C. § 1304(a)(1).

147.    Plaintiff is a "creditor" to Neon Machine, as the term is defined under 6 Del. C. § 1301(4). Neon Machine is a "debtor" to Plaintiff, as the term is defined under 6 Del. C. § 1301(6). Each Manager Defendant is an "insider" of Neon Machine, as the terms is defined under 6 Del. C. § 1301(7)(b).

148.    On information and belief, Neon Machine was insolvent based on, at a minimum, its balance sheet showing negative shareholder equity at the time of the November 2021 transfer of the 552 SHRAP Tokens to Manager Defendants.

149.    Mr. Long approved the transfer of more than 552,602,013 SHRAP Tokens to Manager Defendants with actual intent to hinder, delay, or defraud Plaintiff.  Manager Defendants intended to prevent Plaintiff from recovering its share of SHRAP Tokens.  Manager Defendants granted the SHRAP Tokens to themselves, and then began representing to Plaintiff that its promised SHRAP Tokens did not belong to it.

150.    As far as the Token Giveaway constituted dividends to Manager Defendants, Mr. Long willfully approved distributions of dividends in SHRAP Tokens to Manager Defendants in order to avoid paying Plaintiff amounts due to it under the Recoupment Agreements and otherwise as the majority stockholder of Neon Machine.

151.    Plaintiff is entitled to a judgment against Manager Defendants directing the return to Plaintiff of 331,561,208 SHRAP Tokens, representing 60% of SHRAP Tokens distributed on account of equity, collectively from Manager Defendants.

<u>**COUNT IX**</u>
**(Unjust Enrichment)**
**(Against Manager Defendants)**

152.    Plaintiff repeats and realleges paragraphs 1 through 151 hereof, as if fully set forth herein.

153.    Manager Defendants have received more than 552,602,013 SHRAP Tokens by virtue of their control of Neon Machine, Argon Foundation, and Argon Corp.

154.    If indeed the 552,602,013 SHRAP Tokens delivered to the Manager Defendants comprised the balance, or most, of all tokens available to the stockholders, Plaintiff, as 60% stockholder, was entitled to 60% of the Distribution, or 331,561,208 SHRAP Tokens.

155.    By distributing the full amount of 552,602,013 SHRAP Tokens to themselves, each Manager Defendant took for themselves SHRAP Tokens intended for Plaintiff,

and therefore were enriched at Plaintiff's expense. Plaintiff has a legal and equitable interest in the SHRAP Tokens being held by Manager Defendants.

156.    Neither Manager Defendants nor Neon Machine have made any payments to Plaintiff to compensate for receiving any of the unauthorized SHRAP Tokens belonging to Plaintiff.

157.    Equity requires Manager Defendants to return the 331,561,208 SHRAP Tokens to the Debtor.

## COUNT X
### (Equitable Accounting)
### (Against All Defendants)

158.    Plaintiff repeats and realleges paragraphs 1 through 157 hereof, as if fully set forth herein.

159.    Upon information and belief, Argon Foundation and Argon Corp. are Panamanian shell entities that were formed by Mr. Long to, among other things, conceal beneficial ownership of such entities and the fact that SHRAP Tokens were being generated and distributed by Neon Machine.

160.    Upon information and belief, Manager Defendants were responsible for the classification, allocation and any other characteristics of the SHRAP Tokens, *not* Argon Foundation and Argon Corp.

161.    At a hearing on December 13, 2023, the Bankruptcy Court directed Manager Defendants to comply with all information requests by the Debtors to enable them to comply with the Bankruptcy Code and Bankruptcy Rules. Specifically, with respect to Bankruptcy Code sections 521 and 1190, the Debtors requested (and Manager Defendants failed to provide) full information regarding Plaintiff's stock value in Neon Machine and the value of its SHRAP

Tokens, as well as documentation and an accounting of how these tokens were distributed amongst the stockholders of Neon Machine and the universe of holders of SHRAP Tokens.

162.    Manager Defendants replied by directing Plaintiff to publicly-available and incomplete information.

163.    Plaintiff therefore has good cause to believe that Manager Defendants have been using the Debtors' SHRAP Tokens to enrich themselves.  Plaintiff also needs to determine what if any SHRAP Token is left for the estate from Neon Machine or whether Plaintiff will need to recover its SHRAP Token from the unauthorized Token Giveaway.

164.    Manager Defendants have refused to recognize the authority of the Board of Neon Machine, or the authority of the Bankruptcy Court, and are actively obstructing Plaintiff from obtaining access to information regarding the SHRAP Tokens and equity in Neon Machine.

165.    Plaintiff has no adequate remedy at law because it is impossible to ascertain the damage that the Manager Defendants have caused through self-dealing and mismanagement without an accounting for their activity while managing Neon Machine and managing and/or controlling Argon Foundation and Argon Corp.

166.    Accordingly, Plaintiff is entitled to an equitable accounting of the 3 billion SHRAP Tokens.

## CONCLUSION

**WHEREFORE,** Plaintiff respectfully prays for judgment against Defendants as follows:

a. On Count 1: a judgment in favor of Plaintiff and against all Defendants pursuant to 11 U.S.C. § 541(a) and 542(a), (i) compelling immediate turnover of (a) 480,927,488 SHRAP Tokens to Plaintiff, or, in the alternative, (b) 331,561,208 SHRAP Tokens from Manager Defendants, that constitute property of the estate, and (ii) an accounting of the Total Network Tokens; and (iii) to the extent Manager Defendants have sold any SHRAP Tokens that constitute property of the estate, a judgment in the amount of the proceeds received for those sales, as well as turnover of the unsold SHRAP Tokens;

b.  On Count 2: a judgment in favor of Plaintiff and against the Manager Defendants, jointly and severally, in an amount to be proven at trial but no less than $10,000,000;

c.  On Count 3: a judgment in favor of Plaintiff and against the Manager Defendants, jointly and severally, in an amount to be proven at trial but no less than $10,000,000;

d.  On Count 4: a judgment in favor of Plaintiff and against Defendants Foran, Lackaff, Nonis, Norbury, Yeend and Zhou, jointly and severally, in an amount to be proven at trial but no less than $10,000,000;

e.  On Count 5: a judgment in favor of Plaintiff and against Defendants Foran, Lackaff, Nonis, Norbury, Yeend and Zhou, jointly and severally, in an amount to be proven at trial but no less than $10,000,000;

f.  On Count 6: a judgment in favor of Plaintiff and against Defendants declaring that the agreements and promises set forth in this Complaint in connection with the transfer of the *Shrapnel* IP to Neon Machine are enforceable in accordance with their terms, that Plaintiff is entitled to receipt of the SHRAP Tokens in direct proportion to Plaintiff's equity interests, totaling 480,927,488 SHRAP Tokens (or, in the alternative, 331,561,208 SHRAP Tokens), and that Manager Defendants committed fraud and breached their fiduciary duties in violating the agreements and promises made to Plaintiff;

g.  On Count 7: a judgment in favor of Plaintiff and against Manager Defendants directing the return to Plaintiff of 480,927,488 SHRAP Tokens (or, in the alternative, 331,561,208 SHRAP Tokens);

h.  On Count 8: a judgment in favor of Plaintiff and against Defendants avoiding the transfer of tokens to Manager Defendants directing the turnover to Plaintiff of 480,927,488 SHRAP Tokens (or, in the alternative, 331,561,208 SHRAP Tokens) and against Manager Defendants directing the return to Plaintiff of 331,561,208 SHRAP Tokens, representing 60% of SHRAP Tokens distributed on account of equity, collectively from Manager Defendants;

i.  On Count 9: a judgment in favor of Plaintiff and against Manager Defendants directing the turnover to Plaintiff of 480,927,488 SHRAP Tokens (or, in the alternative, 331,561,208 SHRAP Tokens);

j.  On Count 10: a judgment against all Defendants directing that they provide Plaintiff with an accounting of the 3 billion SHRAP Tokens;

k.  For reasonable litigation expenses and attorneys' fees; and

l.  Such other and further relief as this Court deems just and proper.

Dated: February 22, 2024
       Roslyn, New York

                          SPENCE LAW OFFICE, P.C.
                          Attorneys for Plaintiff

                By:        */s/ Robert J. Spence*
                          Robert J. Spence, Esq.
                          55 Lumber Road, Suite 5
                          Roslyn, New York 11576
                          Tel.: (516) 336-2060