**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------X

In re:

4D FACTORY, INC., et al.,

                  Chapter 11
               (Subchapter V)
       Case No.: 23-11618 (MEW)
       (Jointly Administered)

                Debtors. [1]
---------------------------------------------------------------------X

THE 4D FACTORY LLC,

             Plaintiff,

    -against-                      Adv. Pro. No. 24-01319 (MEW)

MARK LONG, COLIN FORAN,
NAOMI LACKAFF, AARON NONIS,
DON NORBURY, MARK YEEND,
CALVIN ZHOU, GRIFFIN GAMING
PARTNERS II, L.P., GRIFFIN GAMING
PARTNERS II SIDE FUND, L.P., POLYCHAIN
VENTURES II LP, POLYCHAIN VENTURES II
(PARALLEL) LP, PIERRE-EDUOARD
PLANCHE, BENJAMIN PERSZYK,
JOSH ROSENTHAL,

               Defendants,
        and

NEON MACHINE, INC., ARGON PROTOCOL
FOUNDATION, ARGON ASSET VENTURES
CORP.

            Nominal Defendants.
---------------------------------------------------------------------X
GRIFFIN GAMING PARTNERS II, L.P., GRIFFIN
GAMING PARTNERS II SIDE FUND, L.P.,
POLYCHAIN VENTURES II LP, POLYCHAIN
VENTURES II (PARALLEL) LP,

           Counterclaim-Plaintiffs, v.

THE 4D FACTORY LLC,

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number,
    are 4D Factory Inc. (6770), and The 4D Factory LLC (8935).

Counterclaim-Defendant.

------------------------------------------------------------------X

GRIFFIN GAMING PARTNERS II, L.P., GRIFFIN
GAMING PARTNERS II SIDE FUND, L.P.,
POLYCHAIN VENTURES II LP, POLYCHAIN
VENTURES II (PARALLEL) LP,

Third-Party Plaintiffs,

v.

CORT JAVARONE, SCOTT HONOUR, and STEVE
HOROWITZ,

Third-Party Defendants.

------------------------------------------------------------------X

**MOTION FOR AN ORDER AUTHORIZING THE DEBTORS TO ENTER INTO
AGREEMENT WITH MEP CAPITAL HOLDINGS III, LP and CORT JAVARONE**

TO THE HONORABLE MICHAEL E. WILES,
UNITED STATES BANKRUPTCY JUDGE:

The Debtors 4D Factory, Inc. and The 4D Factory LLC ("4D LLC" or the "Debtor") move

for an order under Federal Rule of Bankruptcy Procedure 9019 approving the Agreement attached as

**Exhibit A** ("MEP Agreement") between MEP Capital Holdings III, LP ("MEP"), the Debtors, and

Cort Javarone ("Javarone") (collectively, the "Parties").

### INTRODUCTION

1.      4D LLC has already filed a related settlement agreement partially settling

issues (the "Partial Settlement") in the Adversary Proceeding related to Neon Machine Inc. ("Neon

Machine").    In connection with the Partial Settlement, the Parties resolve the distribution of the

tokens to Javarone and reserve all rights.    This motion addresses MEP's claims regarding the

distribution of tokens in the context of its secured interests and its rights under a certain 2021

agreement signed in connection with a $4 million loan to 4D LLC's affiliate, Neon Media, LLC

("Neon Media"), which was guaranteed by 4D LLC, which  granted MEP 1% of 4D LLC's issued

tokens over and above the repayment of the loan.   For the following reasons, the Debtors ask that the Court grant this 9019 motion and approve the Parties' MEP Agreement.

## REQUEST FOR RELIEF ON AN EXPEDITED BASIS

2.     4D respectfully requests that this motion, as it is related to the Partial Settlement and adds to the benefit to 4D LLC and the estate under the Partial Settlement, and should be considered and granted on an expedited basis along with the Partial Settlement. As with the Partial Settlement, the MEP Agreement and the expedited consideration of this motion will prejudice no party in interest.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

**A.  The Chapter 11 Case**

4.     The Debtors filed voluntary petitions for relief under subchapter V of chapter 11 of the Bankruptcy Code on October 10, 2023.

5.     The Debtors are continuing to manage and operate their business as debtors in possession under section 1184 of the Bankruptcy Code.

6.     Charles Persing has been appointed as the Subchapter V Trustee in these cases.

7.     On November 2, 2023, the Bankruptcy Court entered an order [Docket No. 16] authorizing the joint administration of the Debtors' Bankruptcy Cases.

8.     On November 13, 2023, the Debtors filed their schedules and required statements with the Court.

9.     On January 8, 2024, the Debtors filed their Plan of Reorganization with the Court [Docket No. 51].

10.      On March 24, 2024, the Debtors filed amended schedules *__A/B__*.

**B.  The Adversary Proceeding**

11.      In connection with this bankruptcy, 4D LLC initiated an Adversary Proceeding against the Neon Parties.[2]

12.      The Debtor and the Neon Parties have entered into the Partial Settlement which calls for the release of 16 million tokens to Javarone based on the contracts (**__Exhibits B and C__** hereto) between Mr. Javarone and Neon Machine Inc. ("Neon Machine").

13.      In 2021, contemporaneous with the spin-off of the "Shrapnel" game and IP developed by 4D's affiliate, Neon Media, 4D LLC approached MEP regarding a loan to Neon Media to continue funding development of the video game project launched by Neon Media. Neon Media signed as the primary borrower, and 4D LLC guaranteed the MEP obligations.   In discussions with MEP, 4D shared what was happening with Shrapnel and the transition into Neon Machine.  MEP requested, as collateral, a pledge of all assets of Neon Media and 4D,  which comprised 4D's equity ownership in its subsidiaries at the time, Neon Media and Neon Machine. As additional consideration, MEP wanted to share in the upside of the tokens 4D was entitled to from Neon Machine.  A letter agreement to 1% of 4D's tokens ("Letter Agreement") is annexed to the MEP Agreement.   Unbeknownst to 4D, around that same time, hundreds of millions of tokens were being granted to all of Neon Machine's other shareholders, but not 4D.   4D agreed to the 1% of the token upside in Letter Agreement and Neon Media and MEP closed on a $4 million loan, with 4D LLC as the guarantor, on December 2, 2021.

14.      MEP asserts a claim to Mr. Javarone's tokens in the context of the 1% interest in the tokens and 4D's bankruptcy case.  MEP has been patiently awaiting a resolution of the 4D claims and believes that in good faith MEP should receive a 1% interest in the recovery by Mr. Javarone.   Mr.

---

[2] *See The 4D Factory, LLC v. Mark Long et al.*, Adv. Pro. No. 24-01319 (MEW), in the United States Bankruptcy Court for the Southern District of New York; *see also id.* at Doc. # 4 (the Debtors' live complaint).

Javarone was the principal negotiator of the MEP loan and he believes that supporting the Debtor – Creditor relationship is important, even if MEP is not contractually owed 1% of his tokens. Accordingly, he is willing to grant MEP 1% of the tokens he is receiving under the Partial Settlement. The Debtor has asked that the 1% grant of tokens be applied to reduce the principal of the MEP loan to Neon Media and not as "additional consideration" as contemplated in the Letter Agreement of December 2, 2021. MEP has agreed, provided that any future tokens received by 4D for Neon Machine remain subject to the terms of the Letter Agreement of December 2, 2021.

15.    Mr. Javarone and 4D are parties to the adversary proceeding, while MEP has a vested interest in the outcome of the proceeding. Accordingly, the Parties wish to resolve this matter while reserving all rights, claims, defenses and remedies.

### THE MEP AGREEMENT

16.    Following arm's-length negotiations, the Parties seek to avoid a dispute over the delivery of Cort Javarone's tokens by resolving that issue in the MEP Agreement. The following summarizes the MEP Agreement's material terms:

1. ***Payment of tokens to MEP.*** Mr. Javarone agrees that within 2 business days, or later if delayed through no fault or delay of Mr. Javarone, of his receipt of the 15 million tokens he receives from Neon Machine he will transfer 1% of those tokens, or 150,000 tokens to MEP.

2. ***Application of Proceeds to MEP debt.*** Upon receipt of 150,000 tokens from Mr. Javarone, MEP will liquidate the tokens and will apply the cash proceeds received from the sale to reduce the principal of the debt owed on account of the guarantee by 4D of the loan of MEP to Neon Media, LLC ("MEP Loan"), which has a principal balance of $4,000,000 according to the proof of claim filed by MEP.

3. **Stipulation regarding future proceeds**. 4D stipulates that the terms of the December 2, 2021 letter agreement entered into between 4D and MEP on the same day as, and in connection with the MEP Loan and 4D guarantee thereof, and as a material inducement for MEP to enter into the MEP Loan (attached as Exhibit A) ("Letter Agreement") are applicable, as between 4D and MEP, to any tokens received by 4D from Neon Machine, Inc. (by way of settlement, judgment, or otherwise). In other words, 4D agrees that, pursuant to the terms of the Letter Agreement, MEP is entitled to 1% of such tokens in addition to allowed claim of MEP for amounts due under the MEP Loan..

4.  ***Reservation of Rights.*** All Parties reserve all of their rights, claims and defenses except that the settlement terms in Nos. 1-3 above set forth herein are binding on the Parties and may not be unwound.  For the avoidance of doubt, except for the express terms of the stipulation in No. 3 above, (a) the Debtors retain any rights, claims and defenses as against MEP and MEP's claims against the Debtors and their estates, including the right to object to any secured or priority status of any of MEP's claims (including the secured or priority status of MEP's claims to the tokens under the Letter Agreement); and (b) the stipulation shall not prejudice the waterfall provisions for payment of claims under the Bankruptcy Code and the rights of other allowed claim holders in the Bankruptcy Case.

## BASIS FOR REQUESTED RELIEF

17.    Federal Rule of Bankruptcy Procedure 9019(a) empowers the bankruptcy court to approve compromises if they're in the estate's best interests.[3]  Approval of compromises is within the Court's sound discretion and may not be vacated "except upon a showing of plain error or abuse of discretion."[4] Settlements and compromises are favored in bankruptcy since they minimize costly litigation and further parties' interests in expediting the bankruptcy estate's administration.[5]  A bankruptcy court may approve a compromise under Federal Rule of Bankruptcy Procedure 9019 if it "is fair, reasonable and adequately based on the facts and circumstances before the court."[6]

18.    In considering whether to do so, the Court should not substitute its judgment for the debtor's or determine the legal and factual issues raised that the parties seek to compromise.[7] Instead it should determine whether the settlement is in the estate's best interests and whether it is

---

[3] *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 802 (Bankr.S.D.N.Y. 1998); *In re Charles Street*, 209 B.R. 618, 619 (S.D.N.Y. 1997).

[4] *In re Teletronics Services, Inc.*, 762 F.2d 185, 189 (2d Cir. 1985).

[5] *In re Dewey & Leboeuf LLP*, 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012).

[6] *In re Hibbard Brown & Co.*, 217 B.R. 41, 45 (Bankr. S.D.N.Y. 1998).

[7] *Wellis v. Shogrue*, 165 B.R. 115, 122 (S.D.N.Y. 1994).

"fair and equitable."[8] The court's responsibility is to "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'"[9]

19.    The Second Circuit outlined the factors for considering settlements and compromises under the Bankruptcy Rules in *In re Iridium Operating LLC*.[10] These factors are interrelated and require the court to weigh the following:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement;" (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors;" and (7) "the extent to which the settlement is the product of arm's length bargaining."[11]

20. Moreover, in assessing a settlement, the Court should give due consideration to the informed judgment of the debtor and the principle that the law favors compromise.[12]

21. In *In re Drexel Burnham Lambert Group, Inc.*, the bankruptcy court stressed that weight must be given to the discretion of debtors and their counsel:

> Further, the court need not conduct a wholly independent investigation in formulating its opinion as to the reasonableness of a settlement. We may give weight to the informed judgments of the trustee or debtor-in-possession and their counsel that a

---

[8] *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S. Ct. 1157, 1163 (1968).

[9] *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (alteration in original) (*quoting Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

[10] *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007).

[11] *Id.* (internal citations omitted).

[12] *In re Spielfogel*, 211 B.R. 133 (Bankr. E.D.N.Y. 1997) (Eisenberg, U.S.B.J.).

> compromise is fair and equitable...and consider the competency and experience of counsel who support the compromise.... And indeed, a court may approve a settlement even if it believes that the trustee or debtor-in-possession ultimately would be successful at trial.... Finally, we must consider the principle that "the law favors compromise."[13]

22. Here, in this pendant settlement to the Partial Settlement, MEP and 4D receive a benefit, acknowledge their agreement and Mr. Javarone is free to utilize the tokens for the benefit of the estate.   Accordingly, the MEP Agreement is beneficial to the estate and its creditors. Because the MEP Agreement is also fair and reasonable, it should be approved.

## NOTICE

23. Notice of this 9019 motion (and the Motion to Expedite) has been provided by email to the United States Trustee, the subchapter V trustee, counsel for the Debtors, counsel for the Neon Parties, persons who claim a membership interest in 4D LLC, all creditors (including those asserting disputed claims), and all parties requesting notice in these chapter 11 cases under Bankruptcy Rule 2002.

24.  The Debtors submit that notice of the Motion in this manner comports with the requirements of Bankruptcy Rules 2002, 9013, 9014 and 9019.

## NO PRIOR REQUEST

25. No previous request for the relief sought here has been made to this Court or any other court.

## [THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

---

[13] *In re Drexel Burnham Lambert Group, Inc.,* 134 B.R. 499, 505 (Bankr.S.D.N.Y. 1991) (cites omitted).

**CONCLUSION**

For these reasons, the Debtors respectfully request that the Court grant this motion and

enter the order attached as __**Exhibit D**__ granting the relief sought here.


Dated: April 28, 2024

                                      **SPENCE LAW OFFICE, P.C.**


                                      By: *  /s/ Robert J. Spence*
                                              55 Lumber Road, Suite 5
                                              Roslyn, New York 11576
                                              (516) 336-2060
                                              Robert Spence, Esq.


                                      ***Attorneys for the Debtors and Debtors-in-Possession***

**<u>EXHIBIT A</u>**
**(AGREEMENT)**

# AGREEMENT

This Agreement, dated as of April 24, 2024, is entered into by and among the Cort Javarone, the Debtors,[1] and the MEP Capital Holdings III, LP ("MEP"). Each of the foregoing are collectively referred to herein as the "Parties" and each individually as a "Party."

## RECITALS

A.  Concurrently with this Agreement, Cort Javarone and The 4D Factory LLC ("4D") have reached an Agreement with certain parties regarding the occurrence of "Network Launch," which will result in the delivery of two deliveries of SHRAP tokens to Mr. Javarone, one for 15 million and one for 1 million.

B.  MEP and 4D wish to preserve their rights regarding any potential claims that those tokens should properly be considered the property of 4D or the 4D estate.

C.  The Parties have reached an agreement whereby all rights may be maintained without delaying the events related to the separate agreement regarding Network Launch, all of which is to the benefit of 4D's claims currently pending in *The 4D Factory, LLC. v. Mark Long et al.*, Adv. Pro. No. 24-01319 (MEW) (the "Adversary Proceeding"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

NOW THEREFORE, in consideration of the foregoing, and the representations, warranties, covenants, and agreements contained herein, the Parties hereby agree as follows:

## AGREEMENT

1.  ***Payment of tokens to MEP.*** Mr. Javarone agrees that within 2 business days, or later if delayed through no fault or delay of Mr. Javarone, of his receipt of the 15 million tokens he receives from Neon Machine he will transfer 1% of those tokens, or 150,000 tokens to MEP.

2.  ***Application of Proceeds to MEP debt.*** Upon receipt of 150,000 tokens from Mr. Javarone, MEP will liquidate the tokens and will apply the cash proceeds received from the sale to reduce the principal of the debt owed on account of the guarantee by 4D of the loan of MEP to Neon Media, LLC ("MEP Loan"), which has a principal balance of $4,000,000 according to the proof of claim filed by MEP.

3.  **Stipulation regarding future proceeds**. 4D stipulates that the terms of the December 2, 2021 letter agreement entered into between 4D and MEP on the same day as, and in connection with the MEP Loan and 4D guarantee thereof, and as a material inducement for MEP to enter into the MEP Loan  (attached as Exhibit A) ("Letter Agreement") are applicable, as between 4D and MEP, to any tokens received by 4D from Neon Machine, Inc. (by way of settlement,

---

[1] The Debtors are 4D Factory, Inc. and The 4D Factory LLC whose chapter 11, subchapter V bankruptcy cases are pending under jointly administered case number 23-11618 in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy").

judgment, or otherwise). In other words, 4D agrees that, pursuant to the terms of the Letter Agreement, MEP is entitled to 1% of such tokens in addition to allowed claim of MEP for amounts due under the MEP Loan..

4.  **Reservation of Rights.** All Parties reserve all of their rights, claims and defenses except that the settlement terms in Nos. 1-3 above set forth herein are binding on the Parties and may not be unwound. For the avoidance of doubt, except for the express terms of the stipulation in No. 3 above, (a) the Debtors retain any rights, claims and defenses as against MEP and MEP's claims against the Debtors and their estates, including the right to object to any secured or priority status of any of MEP's claims (including the secured or priority status of MEP's claims to the tokens under the Letter Agreement); and (b) the stipulation shall not prejudice the waterfall provisions for payment of claims under the Bankruptcy Code and the rights of other allowed claim holders in the Bankruptcy Case.

5.  **Entire Agreement.** All the terms of the Parties' Agreement are memorialized in this written instrument. To the extent any other terms have not been included in this written instrument, such terms are not considered part of the Agreement.

6.  **Amendments in Writing.** This Agreement may only be amended in writing and that writing must be executed by the Parties.

7.  **Fees and Expenses.** The Parties hereto shall bear their own fees and costs in the preparation of this settlement and its approval.

8.  **Governing Law and Enforcement.** This Agreement will be construed and enforced in accordance with the laws of the State of Delaware. This Agreement shall not be construed in favor of any particular Party to this Agreement; instead it should be construed as if drafted by all Parties. This Agreement may be enforced by the Bankruptcy Court during the pendency of the Bankruptcy.

9.  **Remedies.** In the event that any Party fails to perform, comply with or observe any covenant or agreement to be observed or performed under this Agreement, any other Party may proceed to protect and enforce its rights by suit in equity or action at law, whether for specific performance of any term contained in this Agreement or for an injunction against the breach of any such term or in aid of the exercise of any power granted in this Agreement or to enforce any other legal or equitable right, or to take any one or more of such actions, in each case, without any requirement to post a bond. None of the rights, powers or remedies conferred under this Agreement shall be mutually exclusive, and each such right, power or remedy shall be cumulative and in addition to any other right, power or remedy whether conferred by this Agreement or now or hereafter available at law, in equity, by statute or otherwise.

10. **Representations by Counsel.** Each of the Parties through their signatories affirms that he, she, or it has read and fully understands this Agreement and has had the opportunity to consult with legal counsel regarding this Agreement and its terms and conditions. Each Party through their signatory stipulates that he, she, or it has been represented and has been fully advised as to the

nature of this Agreement and the rights and obligations released. Each Party through their signatory further acknowledges that he, she, or it has carefully read and fully understands all the provisions of this Agreement and is entering into this Agreement voluntarily.

11. This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties hereto. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

12. ***Execution and Effective Date.*** This Agreement may be executed in one or more counterparts. This Agreement only takes effect after it has been executed by all Parties.

**Agreed to by:**

_____
(signature)

**Cort Javarone**
(name)

April 24, 2024
(date)

MEP Capital Holdings III, LP

By: _____
(signature)

Andrew Kotliar
General Partner of MEP Capital III, GP, LLC
(name)

April 24, 2024
(date)

***On behalf of MEP***

3

nature of this Agreement and the rights and obligations released. Each Party through their signatory further acknowledges that he, she, or it has carefully read and fully understands all the provisions of this Agreement and is entering into this Agreement voluntarily.

11. This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties hereto. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

12. **Execution and Effective Date.** This Agreement may be executed in one or more counterparts. This Agreement only takes effect after it has been executed by all Parties.

**Agreed to by:**

_____
**(signature)**

 **Cort Javarone**
**(name)**

  April 24, 2024
**(date)**

MEP Capital Holdings III, LP

By: _____

_____
**(signature)**

_____
**(name)**

_____
**(date)**

*On behalf of MEP*

The 4D Factory LLC and 4D Factory Inc.

By: _____
**(signature)**
Steven A Horowitz

_____
**(name)**
  April 28, 2024

_____
**(date)**

*On behalf of the Debtors*

3

Exhibit A

December _2_, 2021

MEP Capital Holdings III, LP

[INSERT ADDRESS]

Attn: [INSERT]

### Re:    _4D Parent Guarantee / Neon Senior Secured Loan and Security Agreement_

Ladies and Gentlemen,

This letter agreement (this "**Agreement**") is entered into by and between The 4D Factory LLC a Wyoming limited liability company (the "**Company**") and MEP Capital Holdings III, LP, a Delaware limited partnership ("**MEPCap**") in connection with Company's Parent Guarantee dated December _2_, 2021 (the "Guarantee") of the Senior Secured Loan and Security Agreement dated as of December _2_, 2021 (the "Secured Loan and Security Agreement") by and between MEPCap and NEON Media LLC a limited liability company organized under the laws of the State of Washington ("NEON"). Except as otherwise specified herein, all capitalized terms used but not otherwise defined herein shall have the respective meanings assigned thereto in the Secured Loan and Security Agreement. As a material inducement to MEPCap to enter into the Secured Loan and Security Agreement and the Guarantee, the Company hereby agrees that, in addition to any and all other rights provided to MEPCap pursuant to the Secured Loan and Security Agreement and the Guarantee, MEPCap will be entitled to the following contractual rights:

Tokens. In the event the Company receives any class of cryptocurrency, decentralized application tokens, protocol tokens, blockchain-based assets or other cryptofinance coins, tokens or similar digital assets built on blockchain or cryptographic technology or other like instrument, created using intellectual property created, in whole or in part, by Neon Machine Inc., including the "SHRAP" tokens (collectively, "Tokens"), MEPCap shall be entitled to receive, for no additional consideration, a number of Tokens equal to one percent (1%) of such Tokens received by the Company. All Tokens required to be issued hereunder to the MEPCap shall be delivered to MEPCap (subject to the provision by MEPCap to the applicable Token issuer of a valid wallet address to which such Tokens are to be delivered) by the Token issuer (or its assignee) no later than 15 Business Days after receipt of such tokens or notice that such Tokens are to be issued to the Company by the applicable Token issuer.

 Governing Law. This Agreement shall be governed by and construed under the internal laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws.

Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, _e.g._,

www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

Amendments and Waiver. Any term of this Agreement may be amended, modified or terminated and the observance of any term of this Agreement may be waived (either generally or in a particular instance, and either retroactively or prospectively) only with the written consent of the Company and MEPCap. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such term, condition or provision.

Severability. If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (a) the validity, legality and enforceability of the remaining provisions of this Agreement (including without limitation, each portion of any Section of hereof containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and shall remain enforceable to the fullest extent permitted by law; (b) such provision or provisions shall be deemed reformed to the extent necessary to conform to applicable law and to give the maximum effect to the intent of the parties hereto; and (c) to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of any Section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested thereby.

Specific Enforcement. Each of the parties hereto hereby agrees and acknowledges that (a) it would be irreparably harmed in the event of a breach by any other party of such other party's obligations hereunder, (b) monetary damages may not be an adequate remedy for such breach and (c) it shall be entitled to specific performance or injunctive relief, without the need to post a bond or other security, in addition to any other remedy that it may have at law or in equity, in the event of such breach.

Entire Agreement. This Agreement, together with the Secured Loan and Security Agreement and the Guarantee, constitutes the full and entire understanding and agreement among the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled.

Delays or Omissions. No delay or omission to exercise any right, power, or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power, or remedy of such nonbreaching or nondefaulting party, nor shall it be construed to be a waiver of or acquiescence to any such breach or default, or to any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. All remedies, whether under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**MEP Capital Holdings III, LP**

By:

By:_____
[NAME, TITLE]

Address:

**THE 4D FACTORY LLC**

By:_____
Cort Javarone, CEO

Address:
1187 Coast Village Road
Suite 443
Montecito, CA 93108
Attn: Cort Javarone

**EXHIBIT B**
**(Javarone Token Subscription Agreement 1)**

## ASSIGNMENT AND ASSUMPTION OF TOKEN SUBSCRIPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF TOKEN SUBSCRIPTION AGREEMENT (this "***Agreement***"), is made this 8th day of November, 2021 (the "***Effective Date***"), by and among Argon Protocol Foundation, a Republic of Panama foundation (the "***Foundation***"), Neon Machine, Inc., a Delaware corporation ("***Assignor***"), and the undersigned (the "***Assignee***"). Unless otherwise defined herein, all capitalized terms shall have the meanings assigned to such terms in that certain Token Subscription Agreement (the "***TSA***") dated on or about the date hereof between the Assignor and the Foundation.

**WHEREAS**, the Assignor and the Foundation previously entered into the TSA whereby Assignor purchased the right to receive 15,000,000 SHRAP Tokens (the "***Tokens***") from the Foundation.

**WHEREAS**, the Assignee is providing certain services to the Assignor in connection with the Foundation's mission to support the growth and development of the Protocol, the Tokens and the Network.

**WHEREAS**, in consideration of Assignee's services and payment of the aggregate purchase price set forth on the signature page hereto (the "***Aggregate Purchase Price***"), Assignor desires to transfer and assign to Assignee, and Assignee desires to purchase and assume, all of Assignor's rights, title and interests in and to the TSA, all as further set forth in this Agreement.

**NOW, THEREFORE**, incorporating the foregoing recitals as a material part hereof, and in consideration of the covenants contained in this Agreement and in the TSA, Assignor and Assignee, each intending to be legally bound hereby, agree as follows:

1. **ASSIGNMENT**.

   1.1    On the Effective Date and subject to the terms and conditions of this Agreement, Assignor does hereby unconditionally and irrevocably assign, transfer, convey and deliver unto Assignee, and Assignee hereby purchases and accepts, all of Assignor's rights, title and interest in and to the TSA, including the right to receive, automatically and without any future payment, that number of SHRAP Tokens (the "***Tokens***") set forth on the signature page hereto from the Foundation. Assignee by this Agreement becomes entitled to all rights, title and interest of Assignor in and to the TSA as if Assignee were an original party to the TSA.

   1.2    In consideration for Assignor's assignment of Assignor's rights, title and interest in and to the TSA under the terms of this Agreement, Assignee hereby delivers, or has delivered, a duly executed copy of this Agreement to the Assignor and the Foundation, and payment of the Aggregate Purchase Price in USDC, USDT or any other U.S. Dollar-denominated stablecoin, ETH or BTC on as-converted to U.S. Dollar basis, or U.S. Dollars. In consideration for receipt of the Aggregate Purchase Price, the Assignor hereby delivers, or has delivered, to the Assignee and the Company a duly executed copy of this Agreement, and agrees to distribute, or cause to be distributed, the Tokens to the Assignee as soon as practicable after the date of the Token Launch.

2.    **REPRESENTATIONS AND WARRANTIES OF ASSIGNEE.** Assignee hereby represents and warrants to Assignor and the Foundation as follows:

2.1    **Entirely for Own Account.** Assignee is acquiring the right to receive the Token Interests entirely for Assignee's own account to hold for the long term, not as a nominee or agent, and not with a view to, or for sale in connection with, a distribution of the Token Interests within the meaning of the Securities Act of 1933, as amended (the "***1933 Act***"). Assignee has no present intention of selling or otherwise disposing of all or any portion of the Token Interests and no one other than Assignee has any beneficial ownership of any of the Token Interests. By executing this Agreement, Assignee further represents that Assignee does not presently have any contract, undertaking, agreement or arrangement with any individual, corporation, partnership, trust, limited liability company, association or other entity ("***Person***") to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Token Interests.

2.2    **Access to Information.** Assignee has had access to all information that Assignee reasonably considers important in making the decision to obtain the Token Interests, and Assignee has had ample opportunity to ask questions of the Foundation's representative concerning such matters and this transaction.

2.3    **Understanding of Risks.** Assignee is a founder, officer, director, employee, consultant, advisor, independent contractor, or other service provider of Assignor and fully aware of:  (a) the highly speculative nature of the Token Interests; (b) the financial hazards involved; (c) the lack of liquidity of the Token Interests and the restrictions on transferability of the Token Interests (e.g., that Assignee may not be able to sell or dispose of the Token Interests or use them as collateral for loans); and (d) the tax consequences of purchasing the Token Interests, including the tax consequences of receiving the Tokens in accordance with the terms of this Agreement and the TSA. Further, the Assignee understands that the Token Interests involve risks, all of which the Assignee fully and completely assumes, including, but not limited to, the risk that (i) the technology associated with the Protocol, the SHRAP Tokens and the Network will not function as intended; (ii) the Protocol and/or the Network will not be completed and the SHRAP Tokens will not be distributed; (iii) the Network will fail to attract sufficient interest from key stakeholders; (iv) the Network will not gain adoption and acceptance; and (v) the Foundation, Assignor and/or the Network may be subject to investigation and punitive actions from governmental authorities. The Assignee understands and expressly accepts that the Tokens will be delivered to the Assignee at the sole risk of the Assignee on an "AS IS" and "UNDER DEVELOPMENT" basis. The Assignee understands and expressly accepts that the Assignee has not relied on any oral or written statements, representations or warranties made by the Foundation, Assignor or any of their officers, directors, employees, consultants, advisors, equity holders, or other agents outside of this instrument, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE ASSIGNEE ASSUMES ALL RISK AND LIABILITY FOR THE RESULTS OBTAINED BY THE USE OF ANY SHRAP TOKENS AND REGARDLESS OF ANY ORAL OR WRITTEN STATEMENTS MADE BY ASSIGNOR OR THE FOUNDATION, BY WAY OF TECHNICAL ADVICE OR OTHERWISE, RELATED TO THE USE OF THE SHRAP TOKENS.

**2.4**    **Understanding and Experience**. Assignee has sufficient understanding of the functionality, usage, storage, transmission mechanisms and other material characteristics of cryptographic tokens, token wallets and other token storage mechanisms, public and private key management, blockchain technology, and blockchain-based software systems to understand the terms of this instrument. Assignee understands, acknowledges and agrees that such knowledge allows the Assignee to appreciate the implications and risks of acquiring the Tokens Interests herein.

**2.5**    **Accredited Investor**. Assignee is either an accredited investor (as defined in Rule 501(a) of Regulation D promulgated under the 1933 Act); or Assignee is a sophisticated purchaser and has appointed a purchaser representative (as defined in Rule 501(i) of Regulation D promulgated under the 1933 Act).

**2.6**    **Assignee's Qualifications.** Assignee has a preexisting personal or business relationship with Assignor and the Foundation and/or certain of their officers and/or directors of a nature and duration sufficient to make Assignee aware of the character, business acumen and general business and financial circumstances of Assignor and the Foundation and/or certain of their officers and/or directors. If Assignee is not an accredited investor, then the Assignee, alone or with its purchaser representative, has made its own independent investigation, review and analysis regarding the Assignor and the Foundation and the transactions contemplated hereby, which investigation, review and analysis were conducted by the Assignee, alone or with its purchaser representative, and together with other expert advisors that it has engaged for such purpose. By reason of their business or financial experience, Assignee and its purchaser representative, if applicable, is capable of evaluating the merits and risks of this transaction, has the ability to protect Assignee's own interests in this transaction and is financially capable of bearing a total loss of the value of this transaction.

**2.7**    **Information Statement**. Assignee has received a confidential information statement from Assignor or the Foundation setting forth such information required to be provided under Rule 502(b) of Regulation D promulgated under the 1933 Act, and has had ample opportunity to review such documents with Assignee's purchaser representative (as defined in Rule 501(i) of Regulation D promulgated under the 1933 Act) and ask questions concerning such matters and this transaction.

**2.8**    **No General Solicitation.** At no time was Assignee presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television or other form of general advertising or solicitation in connection with the offer, sale, purchase and assignment of the Token Interests.

**2.9**    **Compliance with Securities Laws.** Assignee understands and acknowledges that, to the extent the Token Interests are considered securities, the Token Interests have not been, and are not expected to be, registered with the Securities and Exchange Commission ("*SEC*") under the 1933 Act or any applicable state securities law, but instead are being issued under an exemption or exemptions from the registration and qualification requirements of the 1933 Act and other applicable state securities laws which impose certain restrictions on Assignee's ability to transfer the Token Interests.

DocuSign Envelope ID: 61FC4930-815A-4965-AA45-13907E944BA9

**2.10    No Public Market**. The Assignee understands that no public market now exists for the Token Interests, and that neither Assignor nor the Foundation has made any assurances that a public market will ever exist for the Token Interests.

**2.11    Restrictions on Transfer.** The Token Interests may constitute securities in various jurisdictions, although Assignor and the Foundation do not concede this point in any jurisdiction. Accordingly, Assignee understands and agrees as follows:

> **Assignee may not transfer any Token Interests unless (1) such Token Interests are registered under the 1933 Act and qualified under other applicable state securities laws, (2) exemptions from such registration and qualification requirements are available, or (3) such Token Interests do not constitute securities under applicable law or SEC rules.**

Assignee understands that only the Foundation may file a registration statement with the SEC or other applicable state securities commissioners and that the Foundation is under no obligation to do so with respect to the Token Interests. Assignee has also been advised that exemptions from registration and qualification may not be available or may not permit Assignee to transfer all or any of the Token Interests in the amounts or at the times proposed by Assignee. Assignee further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Token Interests, and on requirements relating to the Foundation which are outside of the Assignee's control, and which the Foundation is under no obligation and may not be able to satisfy.

**2.12    Legends.** The Assignee understands that the Token Interests may bear any legend required by the securities laws of any state to the extent such laws are applicable to the Token Interests, to the extent they may contain a legend, and the following legend (and even without such legend the following restrictions apply):

> *"THE TOKEN INTERESTS GRANTED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED."*

**3.    LOCKUP.** The Token Interests and the Tokens issued to the Assignee in fulfillment of the Token Interests (as applicable as of the applicable date of determination, the "***Restricted Tokens***") shall be subject to the following restrictions (collectively, the "***Lockup Provisions***"):

**3.1    Lockup Period**. Prior to the twelve-month anniversary of the Effective Date, Purchaser agrees that it will not, without the prior written consent of the Assignor, offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale of, or place any liens or

security interests in, hypothecate, encumber or otherwise transfer or dispose of ("***Transfer***") any Restricted Tokens or any interest therein, any options to purchase any Restricted Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Restricted Tokens, including the Token Interests acquired herein, whether now or hereinafter acquired by the Purchaser.

      **3.2**    **Unlock Schedule.** Subject to Section 3.1, on the six-month anniversary of the Network Launch (as defined below), 1/24 of the Restricted Tokens shall be released from these Lockup Provisions, and 1/24th of the Restricted Tokens shall be released on each monthly anniversary thereafter, such that all Restricted Tokens will be released from these Lockup Provisions on the thirty (30) month anniversary of the Network Launch.

      **3.3**    **Network Launch.** "Network Launch" means the bona fide public release and transaction or series of transactions pursuant to which the SHRAP token is issued and provided with access to and use of the associated blockchain-based network, platform, or service operated or managed by (or by a service provider on behalf of), or based upon, intellectual property developed, owned, or exclusively licensed by, the Foundation or an Affiliate of the Foundation.

      **3.4**    **Unvested Tokens**. Notwithstanding anything to the contrary herein, Assignee agrees that it will not, at any time, Transfer any Unvested Tokens (as defined below), any options to purchase any Unvested Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Unvested Tokens.

      **3.5**    **Restrictions**. To ensure compliance with these Lockup Provisions, the Company and/or the Foundation may impose technological lockups or restrictions on the Restricted Tokens or withhold delivery of the applicable Restricted Tokens until such restrictions expire or termination.

    **4.**    **FOUNDATION'S REPURCHASE OPTION.** The Foundation and/or its assignees shall have the option to repurchase all or a portion of the Unvested Tokens on the terms and conditions set forth in this Section (the "***Repurchase Option***") if Assignee ceases to be employed by Assignor for any reason, or no reason, including without limitation Assignee's death, disability, voluntary resignation or termination by Assignor with or without cause.

      **4.1**    **Definition of "Employed by Assignor"; "Termination Date".** For purposes of this Agreement, Assignee will be considered to be "***employed by Assignor***" if the Board of Directors of the Assignor (the "***Board***") determines that Assignee is rendering substantial services as a director, officer, employee, consultant, advisor or independent contractor to the Assignor or to any Affiliate thereof. In case of any dispute as to whether Assignee is employed by Assignor, the Board shall have sole discretion to determine whether Assignee has ceased to be employed by Assignor or its Affiliate and the effective date on which Assignee's employment or service relationship terminated (the "***Termination Date***"). An "***Affiliate***" means any entity that owns, directly or indirectly, stock representing more than 50% of the total combined voting power of all classes of stock of Assignor or any entity in which Assignor owns, directly or indirectly, equity interests representing more than 50% of the voting power of such entity.

      **4.2**    **Unvested and Vested Restricted Tokens**.

**(a)** <u>Vesting Schedule</u>. Restricted Tokens that are vested pursuant to the schedule set forth herein are "***Vested Tokens***". Restricted Tokens that are not vested pursuant to the schedule set forth herein are "***Unvested Tokens***". The "***Vesting Commencement Date***" is the date set forth on the signature page hereto. All tokens granted here under are hereby fully vested as of the Effective Date and shall be considered Vested Tokens.

**(b)** <u>Acceleration of Vesting Following Termination without Cause</u>. Notwithstanding anything to the contrary set forth in Section 3, if Assignee's employment by the Assignor is terminated by the Assignor (or successor thereof) following the twelve (12) month anniversary of the Vesting Commencement Date but prior to the First Vesting Date, other than for Cause, and provided that the Assignee delivers to the Assignor and the Company a general release and non-disparagement agreement of claims in favor of the Assignor, the Company and certain related parties in a form satisfactory to the Assignor and the Company (the "***Release***") within sixty (60) days following such separation from service, and satisfy all conditions to make the Release effective, then, effective as of immediately prior to such termination, a number of Restricted Tokens equal to the product of (a) the number of Restricted Tokens, and (b) a fraction, the numerator of which is the number of whole calendar months that has elapsed between the Vesting Commencement Date and the Termination Date, and the denominator of which is thirty-six (36), will become Vested Tokens at the time of such termination.

As used in this Section 4.2(b): "***Cause***" means any of the following: (a) the Assignee's unauthorized misuse of the Company's trade secrets or proprietary information, (b) the Assignee's conviction of or plea of nolo contendere to a felony or a crime involving moral turpitude, (c) the Assignee's commission of an act of fraud against the Assignor, the Company or any Affiliate, (d) the Assignee's willful engagement in conduct that is in bad faith and materially injurious to the Assignor, the Company or any Affiliate, including but not limited to, misappropriation of trade secrets, fraud or embezzlement, (e) Assignee commits a material breach of any written agreement between Assignee and the Assignor that causes harm to the Assignor, which breach is not cured within thirty (30) days after receipt of written notice describing in detail such breach to Assignee from the Assignor, or (f) Assignee engages in material misfeasance or malfeasance demonstrated by a continued pattern of material failure to perform the essential job duties associated with Assignee's position, which breach is not cured within thirty (30) days after receipt of written notice describing in detail such breach to Assignee from the Assignor.

**(c)** <u>Acceleration of Vesting Following Insolvency of Assignor</u>. In addition to any Restricted Tokens that have become Vested Tokens pursuant to Section 4.2(a) hereof, in the event of a voluntary or involuntary dissolution, liquidation or winding-up of the Assignor, the filing of a petition by or against the Assignor under Title 11 of the United States Code (as now and hereafter in effect, or any successor statute), the appointment of a receiver, trustee, custodian or liquidator of or for all or substantially all of the assets or property of the Assignor, or the execution by the Assignor of a general assignment for the benefit of creditors (in each case, an "***Insolvency Event***"), then, if Assignee has been continuously employed by the Assignor from the Effective Date until the date of such Insolvency Event, effective as of such Insolvency Event, 100% of the Restricted Tokens will become Vested Tokens at the time of such event.

**4.3    Exercise of Repurchase Option at Original Price.** At any time within ninety (90) days after the Termination Date, the Foundation and/or its assignee(s) may elect to repurchase any or all of the Unvested Tokens by giving Assignee written notice of exercise of the Repurchase Option; provided, however, that without requirement of further action on the part of either party hereto, the Repurchase Option shall be deemed to have been automatically exercised as to all Unvested Tokens as of 11:59 PM PT on the date that is ninety (90) days after the Termination Date, unless the Foundation declines in writing to exercise its Repurchase Option. Foundation and/or its assignee(s) will then repurchase (or be deemed to have repurchased) from Assignee (or from Assignee's personal representative as the case may be) any or all of the Unvested Tokens at a price of per Token equal to that set forth on the signature page hereto (the "*Repurchase Price*").

**4.4    Payment of Repurchase Price.** The Repurchase Price may be payable in Bitcoin, Ether or other forms of digital assets on an as-converted to U.S. dollars basis or in U.S. dollars, at the option of the Foundation and/or its assignee(s), as the case may be, by cash, wire transfer or check, or by cancellation of all or a portion of any outstanding indebtedness owed by Assignee to the Foundation (or to such assignee) or by any combination thereof, or any other forms of payment on an as-converted to U.S. dollars basis as determined by the Foundation in its sole discretion. The Repurchase Price will be paid without interest.

**4.5    Right of Termination Unaffected.** Nothing in this Agreement will be construed to limit or otherwise affect in any manner whatsoever the right or power of Assignor (or any Affiliate) to terminate Assignee's employment or service relationship with Assignor (or any Affiliate) at any time for any reason or no reason, with or without cause.

**5.    RIGHTS AS OWNER OF TOKEN INTERESTS AND TOKENS.** The Token Interests do not, and the Tokens will not following the Token Launch, entitle Assignee to vote or receive dividends or be deemed the holder of equity of Assignor or the Foundation for any purpose, nor will anything contained herein be construed to confer on the Assignee, as such, any of the rights of a stockholder of Assignor or the Foundation or any right to vote for the election of Assignor's Board or the Foundation's Board or upon any matter submitted to the stockholders of Assignor, Assignor's Board, Foundation's Board, or the council members of the Foundation, or at any meeting thereof, or to give or withhold consent to any corporate or foundation action or to receive notice of meetings, or to receive subscription rights or otherwise.

**6.    DISCLAIMER AND LIMITATION OF LIABILITY**. Neither the Assignor nor the Foundation shall be liable or responsible to the Assignee, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, including without limitation, launching, developing and maintaining the Protocol and/or the Network, launching the Tokens, selling the Token Interests, sending the Tokens to the smart contract address compatible with receiving Tokens, or distributing the Tokens, when and to the extent such failure or delay is caused by or results from acts beyond the affected party's commercially reasonable control, including, without limitation: (a) acts of God; (b) flood, fire, earthquake, pandemic or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, or other civil unrest; (d) applicable law or regulations; or (e) action by any governmental authority. NEITHER THE ASSIGNOR NOR THE FOUNDATION MAKE ANY WARRANTY WHATSOEVER WITH RESPECT TO THE TOKENS, INCLUDING ANY (A)

WARRANTY OF MERCHANTABILITY; (B) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (C) WARRANTY OF TITLE; OR (D) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE. EXCEPT AS EXPRESSLY SET FORTH HEREIN, ASSIGNEE ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE ASSIGNOR OR THE FOUNDATION, OR ANY OTHER PERSON ON THE ASSIGNOR OR THE FOUNDATION'S BEHALF.

The Assignee understands that Assignee has no right against the Assignor or the Foundation or any other individual or legal entity except in the event of the Assignor's or the Foundation's material breach of this instrument or intentional fraud. THE ASSIGNOR'S AND THE FOUNDATION'S (OR ANY OTHER INDIVIDUAL'S OR LEGAL ENTITY'S) AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT OR OTHERWISE, SHALL NOT EXCEED US$1,000.00. NEITHER THE ASSIGNOR, THE FOUNDATION NOR THEIR REPRESENTATIVES SHALL BE LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS INSTRUMENT.

     7.    **TAX CONSEQUENCES**. ASSIGNEE UNDERSTANDS THAT ASSIGNEE MAY SUFFER ADVERSE TAX CONSEQUENCES AS A RESULT OF ASSIGNEE'S RECEIPT, VESTING OR DISPOSITION OF ASSIGNOR'S RIGHTS UNDER THE TSA. ASSIGNEE REPRESENTS (a) THAT ASSIGNEE HAS CONSULTED WITH A TAX ADVISER THAT ASSIGNEE DEEMS ADVISABLE IN CONNECTION WITH THE RECEIPT, VESTING, AND DISPOSITION OF ASSIGNOR'S RIGHTS UNDER THE TSA, AND (b) THAT ASSIGNEE IS NOT RELYING ON ASSIGNOR, THE FOUNDATION, OR ANY AGENTS, REPRESENTATIVES, OR ADVISORS OF EITHER ASSIGNOR OR FOUNDATION FOR ANY TAX ADVICE. Assignee has been informed that unless Assignee files with the Internal Revenue Service (and, if necessary, the proper state taxing authorities) <u>within 30 days</u> after the Effective Date, electing pursuant to Section 83(b) of the Internal Revenue Code (and similar state tax provisions, if applicable) to be taxed currently on any difference between the fair market value of the Token Interests on the date of grant and the amount paid by the Assignee, there may be a recognition of taxable income to Assignee at each time the Repurchase Option lapses with respect to a portion of the Restricted Tokens, measured by the excess, if any, of the fair market value of such portion of the Restricted Tokens over the amount paid by the Assignor allocable to such portion of the Restricted Tokens. Assignee represents that Assignee has consulted any tax advisors Assignee deems advisable in connection with Assignee's receipt of Assignor's rights under the TSA and the filing of the election under Section 83(b) and similar tax provisions. A form of Election under Section 83(b) is attached hereto as <u>Exhibit A</u> for reference. ASSIGNEE HEREBY ASSUMES ALL RESPONSIBILITY FOR FILING SUCH ELECTION AND PAYING ANY TAXES RESULTING FROM SUCH ELECTION OR FROM FAILURE TO FILE THE ELECTION AND PAYING TAXES RESULTING FROM THE LAPSE OF THE REPURCHASE RESTRICTIONS ON THE UNVESTED TOKENS.

DocuSign Envelope ID: 61FC4930-815A-4965-AA45-13807E944BA9

THE FAIR MARKET VALUE OF ASSIGNOR'S RIGHTS UNDER THE TSA HAS BEEN DETERMINED IN GOOD FAITH IN ACCORDANCE WITH A VALUATION REPORT RECEIVED BY THE FOUNDATION AND SHARED WITH ASSIGNOR, A COPY OF WHICH IS AVAILABLE TO ASSIGNEE UPON REQUEST. THERE IS NO GUARANTEE THAT SUCH DETERMINATION OF FAIR MARKET VALUE WILL NECESSARILY REFLECT OR EQUAL ANY DETERMINATION OF FAIR MARKET VALUE BY A TAXING AUTHORITY (SUCH AS THE INTERNAL REVENUE SERVICE). ASSIGNEE AGREES TO BE FULLY RESPONSIBLE FOR ANY TAXES RESULTING FROM THE RECEIPT, VESTING AND DISPOSITION OF ASSIGNOR'S RIGHTS UNDER THE TSA, INCLUDING ANY ADDITIONAL TAXES RESULTING FROM A DIFFERENT DETERMINATION OF FAIR MARKET VALUE.

## 8. **MISCELLANEOUS**.

**8.1**    **Notices**. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, or (b) when sent, if sent by electronic mail or facsimile during normal business hours of the Assignor, and if not sent during normal business hours, then on the Assignor's next Business day, or (c) three (3) Business Days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries. All notices for delivery outside the United States will be sent by express courier. All notices for delivery will be sent by express courier. All notices not delivered personally will be sent with postage and/or other charges prepaid and properly addressed to the party to be notified at the address set forth below the signature lines of this Agreement or at such other address as such other party may designate by one of the indicated means of notice herein to the other party hereto. A "**Business day**" shall be a day, other than Saturday or Sunday, when the banks in the Republic of Panama are open for business.

**8.2**    **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the jurisdiction set forth in the TSA, without giving effect to that body of laws pertaining to conflict of laws.

**8.3**    **Binding Effect**. This Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties hereto and their respective successors and assigns.

**8.4**    **Entire Agreement**. This Agreement and the TSA constitute the entire agreement and understanding of the parties with respect to the subject matter hereof and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

**8.5**    **Further Assurances**. Assignee agrees to execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably requested to give effect to the transactions contemplated hereby, including without limitation to enable the Foundation and the Assignor to comply with applicable laws and any other documents that (1) other unaffiliated purchasers of Tokens shall be required to execute and deliver, or (2) are requested by any digital asset exchanges or markets (including any specific or additional lock-up agreements or terms in connection with a listing or sale of Tokens).

      **8.6**    **Counterparts; Facsimile Signatures.** This Agreement may be executed in any number of counterparts, each of which will be deemed an original, and all of which together shall constitute one and the same agreement. This Agreement may be executed and delivered by facsimile or other means of electronic delivery and upon such delivery the facsimile signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties hereto, being authorized to do so and intending to be legally bound hereby, have duly executed and entered into this Agreement on the date first set forth above.

**ASSIGNOR:**

NEON MACHINE, INC.

By: _____

Name: Mark Long

Title: CEO

    **IN WITNESS WHEREOF**, the parties hereto, being authorized to do so and intending to be legally bound hereby, have duly executed and entered into this Agreement on the date first set forth above.

**ASSIGNEE:**

Name: Cort Javarone

| Number of SHRAP Tokens | Price per Token | Vesting Commencement Date |
|---|---|---|
| 15,000,000 | $0.00002616 | 11/08/2021 – Fully Vested Tokens |

      **IN WITNESS WHEREOF**, the parties hereto, being authorized to do so and intending to be legally bound hereby, have duly executed and entered into this Agreement on the date first set forth above.

**FOUNDATION:**

ARGON PROTOCOL FOUNDATION

By: _Diana Muñoz_____

Name: Diana Muñoz_____

Title: Director_____

13

DocuSign Envelope ID: 51FC4930-815A-4065-AA45-13907E944BA9

## **EXHIBIT A**

## **ELECTION UNDER SECTION 83(b) OF THE INTERNAL REVENUE CODE**

The undersigned Taxpayer hereby elects, pursuant to Section 83(b) of the Internal Revenue Code, as amended, to include in gross income for the Taxpayer's current taxable year the excess, if any, of the fair market value of the property described below at the time of transfer over the amount paid for such property, as compensation for services.

1.    TAXPAYER'S NAME:    _____

        TAXPAYER'S ADDRESS:    _____

        SOCIAL SECURITY NUMBER:    _____

2.    The property with respect to which the election is made is described as follows:  the right to receive from Argon Protocol Foundation, a Republic of Panama foundation (the "***Foundation***") [_____] SHRAP Tokens of the Foundation (the "***Tokens***").

3.    The date on which the right to receive the Tokens was transferred was [_____], 2021 and this election is made for calendar year 2021.

4.    The Tokens are subject to the following restrictions:  The Foundation may repurchase all or a portion of the Tokens at $[_____] per Token under certain conditions at the time of Taxpayer's termination of employment or services.

5.    The fair market value of the right to receive the Tokens (without regard to restrictions other than restrictions which by their terms will never lapse) was $[_____] per Token at the time of transfer.

6.    The amount paid for the right to receive the Tokens was $[_____] per Token.

7.    The Taxpayer has submitted a copy of this statement to the Foundation.

*THIS ELECTION MUST BE FILED WITH THE INTERNAL REVENUE SERVICE ("**IRS**"), AT THE OFFICE WHERE THE TAXPAYER FILES ANNUAL INCOME TAX RETURNS, <u>WITHIN 30 DAYS</u> AFTER THE DATE OF TRANSFER OF THE PROPERTY. THE ELECTION CANNOT BE REVOKED WITHOUT THE CONSENT OF THE IRS.*

Dated:    _____    _____
                                             Taxpayer's Signature

**<u>EXHIBIT C</u>**
**(Javarone Token Subscription Agreement 2)**

### ASSIGNMENT AND ASSUMPTION OF TOKEN SUBSCRIPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF TOKEN SUBSCRIPTION AGREEMENT (this "*Agreement*"), is made this 8th day of November, 2021 (the "*Effective Date*"), by and among Argon Protocol Foundation, a Republic of Panama foundation (the "*Foundation*"), Neon Machine, Inc., a Delaware corporation ("*Assignor*"), and the undersigned (the "*Assignee*"). Unless otherwise defined herein, all capitalized terms shall have the meanings assigned to such terms in that certain Token Subscription Agreement (the "*TSA*") dated on or about the date hereof between the Assignor and the Foundation.

**WHEREAS**, the Assignor and the Foundation previously entered into the TSA whereby Assignor purchased the right to receive 1,000,000 SHRAP Tokens (the "*Tokens*") from the Foundation.

**WHEREAS**, the Assignee is providing certain services to the Assignor in connection with the Foundation's mission to support the growth and development of the Protocol, the Tokens and the Network.

**WHEREAS**, in consideration of Assignee's services and payment of the aggregate purchase price set forth on the signature page hereto (the "*Aggregate Purchase Price*"), Assignor desires to transfer and assign to Assignee, and Assignee desires to purchase and assume, Assignor's rights, title and interests in and to the TSA in respect to the Tokens, all as further set forth in this Agreement.

**NOW, THEREFORE**, incorporating the foregoing recitals as a material part hereof, and in consideration of the covenants contained in this Agreement and in the TSA, Assignor and Assignee, each intending to be legally bound hereby, agree as follows:

1. **ASSIGNMENT**.

   1.1    On the Effective Date and subject to the terms and conditions of this Agreement, Assignor does hereby unconditionally and irrevocably assign, transfer, convey and deliver unto Assignee, and Assignee hereby purchases and accepts, all of Assignor's rights, title and interest in and to the TSA, including the right to receive, automatically and without any future payment, that number of SHRAP Tokens (the "*Tokens*") set forth on the signature page hereto from the Foundation. Assignee by this Agreement becomes entitled to the rights, title and interest of Assignor in and to the TSA in respect to the Tokens as if Assignee were an original party to the TSA.

   1.2    In consideration for Assignor's assignment of Assignor's rights, title and interest in and to the TSA in respect to the Tokens under the terms of this Agreement, Assignee hereby delivers, or has delivered, a duly executed copy of this Agreement to the Assignor and the Foundation, and payment of the Aggregate Purchase Price in USDC, USDT or any other U.S. Dollar-denominated stablecoin, ETH or BTC on as-converted to U.S. Dollar basis, or U.S. Dollars. In consideration for receipt of the Aggregate Purchase Price, the Assignor hereby delivers, or has delivered, to the Assignee and the Company a duly executed copy of this Agreement, and agrees to distribute, or cause to be distributed, the Tokens to the Assignee as soon as practicable after the date of the Token Launch.

**2.**    **REPRESENTATIONS AND WARRANTIES OF ASSIGNEE.** Assignee hereby represents and warrants to Assignor and the Foundation as follows:

**2.1**    **Entirely for Own Account.** Assignee is acquiring the right to receive the Token Interests entirely for Assignee's own account to hold for the long term, not as a nominee or agent, and not with a view to, or for sale in connection with, a distribution of the Token Interests within the meaning of the Securities Act of 1933, as amended (the "***1933 Act***"). Assignee has no present intention of selling or otherwise disposing of all or any portion of the Token Interests and no one other than Assignee has any beneficial ownership of any of the Token Interests. By executing this Agreement, Assignee further represents that Assignee does not presently have any contract, undertaking, agreement or arrangement with any individual, corporation, partnership, trust, limited liability company, association or other entity ("***Person***") to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Token Interests.

**2.2**    **Access to Information.** Assignee has had access to all information that Assignee reasonably considers important in making the decision to obtain the Token Interests, and Assignee has had ample opportunity to ask questions of the Foundation's representative concerning such matters and this transaction.

**2.3**    **Understanding of Risks.** Assignee is a founder, officer, director, employee, consultant, advisor, independent contractor, or other service provider of Assignor and fully aware of:  (a) the highly speculative nature of the Token Interests; (b) the financial hazards involved; (c) the lack of liquidity of the Token Interests and the restrictions on transferability of the Token Interests (e.g., that Assignee may not be able to sell or dispose of the Token Interests or use them as collateral for loans); and (d) the tax consequences of purchasing the Token Interests, including the tax consequences of receiving the Tokens in accordance with the terms of this Agreement and the TSA. Further, the Assignee understands that the Token Interests involve risks, all of which the Assignee fully and completely assumes, including, but not limited to, the risk that (i) the technology associated with the Protocol, the SHRAP Tokens and the Network will not function as intended; (ii) the Protocol and/or the Network will not be completed and the SHRAP Tokens will not be distributed; (iii) the Network will fail to attract sufficient interest from key stakeholders; (iv) the Network will not gain adoption and acceptance; and (v) the Foundation, Assignor and/or the Network may be subject to investigation and punitive actions from governmental authorities. The Assignee understands and expressly accepts that the Tokens will be delivered to the Assignee at the sole risk of the Assignee on an "AS IS" and "UNDER DEVELOPMENT" basis. The Assignee understands and expressly accepts that the Assignee has not relied on any oral or written statements, representations or warranties made by the Foundation, Assignor or any of their officers, directors, employees, consultants, advisors, equity holders, or other agents outside of this instrument, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE ASSIGNEE ASSUMES ALL RISK AND LIABILITY FOR THE RESULTS OBTAINED BY THE USE OF ANY SHRAP TOKENS AND REGARDLESS OF ANY ORAL OR WRITTEN STATEMENTS MADE BY ASSIGNOR OR THE FOUNDATION, BY WAY OF TECHNICAL ADVICE OR OTHERWISE, RELATED TO THE USE OF THE SHRAP TOKENS.

DocuSign Envelope ID: 8F733CB0-5CA0-46D4-895F-51F8C8DA4D99

**2.4** **Understanding and Experience**. Assignee has sufficient understanding of the functionality, usage, storage, transmission mechanisms and other material characteristics of cryptographic tokens, token wallets and other token storage mechanisms, public and private key management, blockchain technology, and blockchain-based software systems to understand the terms of this instrument. Assignee understands, acknowledges and agrees that such knowledge allows the Assignee to appreciate the implications and risks of acquiring the Tokens Interests herein.

**2.5** **Accredited Investor**. Assignee is either an accredited investor (as defined in Rule 501(a) of Regulation D promulgated under the 1933 Act); or Assignee is a sophisticated purchaser and has appointed a purchaser representative (as defined in Rule 501(i) of Regulation D promulgated under the 1933 Act).

**2.6** **Assignee's Qualifications.** Assignee has a preexisting personal or business relationship with Assignor and the Foundation and/or certain of their officers and/or directors of a nature and duration sufficient to make Assignee aware of the character, business acumen and general business and financial circumstances of Assignor and the Foundation and/or certain of their officers and/or directors. If Assignee is not an accredited investor, then the Assignee, alone or with its purchaser representative, has made its own independent investigation, review and analysis regarding the Assignor and the Foundation and the transactions contemplated hereby, which investigation, review and analysis were conducted by the Assignee, alone or with its purchaser representative, and together with other expert advisors that it has engaged for such purpose. By reason of their business or financial experience, Assignee and its purchaser representative, if applicable, is capable of evaluating the merits and risks of this transaction, has the ability to protect Assignee's own interests in this transaction and is financially capable of bearing a total loss of the value of this transaction.

**2.7** **Information Statement**. [1]    Assignee has received a confidential information statement from Assignor or the Foundation setting forth such information required to be provided under Rule 502(b) of Regulation D promulgated under the 1933 Act, and has had ample opportunity to review such documents with Assignee's purchaser representative (as defined in Rule 501(i) of Regulation D promulgated under the 1933 Act) and ask questions concerning such matters and this transaction.

**2.8** **No General Solicitation**. At no time was Assignee presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television or other form of general advertising or solicitation in connection with the offer, sale, purchase and assignment of the Token Interests.

**2.9** **Compliance with Securities Laws.** Assignee understands and acknowledges that, to the extent the Token Interests are considered securities, the Token Interests have not been, and are not expected to be, registered with the Securities and Exchange Commission ("*SEC*") under the 1933 Act or any applicable state securities law, but instead are being issued under an exemption or exemptions from the registration and qualification requirements of the 1933

---

[1] Note to draft: this paragraph is not required for 506(c) compliant offerings.

DocuSign Envelope ID: 8E733CB0-5CA0-46D4-895F-51F8C8DA4D9C

Act and other applicable state securities laws which impose certain restrictions on Assignee's ability to transfer the Token Interests.

**2.10    No Public Market**. The Assignee understands that no public market now exists for the Token Interests, and that neither Assignor nor the Foundation has made any assurances that a public market will ever exist for the Token Interests.

**2.11    Restrictions on Transfer.** The Token Interests may constitute securities in various jurisdictions, although Assignor and the Foundation do not concede this point in any jurisdiction. Accordingly, Assignee understands and agrees as follows:

> **Assignee may not transfer any Token Interests unless (1) such Token Interests are registered under the 1933 Act and qualified under other applicable state securities laws, (2) exemptions from such registration and qualification requirements are available, or (3) such Token Interests do not constitute securities under applicable law or SEC rules.**

Assignee understands that only the Foundation may file a registration statement with the SEC or other applicable state securities commissioners and that the Foundation is under no obligation to do so with respect to the Token Interests. Assignee has also been advised that exemptions from registration and qualification may not be available or may not permit Assignee to transfer all or any of the Token Interests in the amounts or at the times proposed by Assignee. Assignee further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Token Interests, and on requirements relating to the Foundation which are outside of the Assignee's control, and which the Foundation is under no obligation and may not be able to satisfy.

**2.12    Legends.** The Assignee understands that the Token Interests may bear any legend required by the securities laws of any state to the extent such laws are applicable to the Token Interests, to the extent they may contain a legend, and the following legend (and even without such legend the following restrictions apply):

> *"THE TOKEN INTERESTS GRANTED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED."*

**3.    LOCKUP.** The Token Interests and the Tokens issued to the Assignee in fulfillment of the Token Interests (as applicable as of the applicable date of determination, the "***Restricted Tokens***") shall be subject to the following restrictions (collectively, the "***Lockup Provisions***"):

**3.1    Lockup Period.** Prior to the twelve-month anniversary of the Effective Date, Assignee agrees that it will not, without the prior written consent of the Assignor, offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale of, or place any liens or security interests in, hypothecate, encumber or otherwise transfer or dispose of ("*Transfer*") any Restricted Tokens or any interest therein, any options to purchase any Restricted Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Restricted Tokens, including the Token Interests assigned to the Assignee herein, whether now or hereinafter acquired by the Assignee; *provided that*, subject to Section 2.9, on the twelve-month anniversary of the Effective Date, 1/3 of the Restricted Tokens shall be released from these Lockup Provisions, and 1/36th of the Restricted Tokens shall be released on each monthly anniversary thereafter, such that all Restricted Tokens will be released from these Lockup Provisions on the three-year anniversary of the Effective Date.

**3.2    Unvested Tokens.** Notwithstanding anything to the contrary herein, Assignee agrees that it will not, at any time, Transfer any Unvested Tokens (as defined below), any options to purchase any Unvested Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Unvested Tokens.

**3.3    Restrictions.** To ensure compliance with these Lockup Provisions, the Company and/or the Foundation may impose technological lockups or restrictions on the Restricted Tokens or withhold delivery of the Restricted Tokens until such restrictions expire or termination.

**4.    FOUNDATION'S REPURCHASE OPTION.** The Foundation and/or its assignees shall have the option to repurchase all or a portion of the Unvested Tokens on the terms and conditions set forth in this Section (the "*Repurchase Option*") if Assignee ceases to be employed by Assignor for any reason, or no reason, including without limitation Assignee's death, disability, voluntary resignation or termination by Assignor with or without cause.

**4.1    Definition of "Employed by Assignor"; "Termination Date".** For purposes of this Agreement, Assignee will be considered to be "*employed by Assignor*" if the Board of Directors of the Assignor (the "*Board*") determines that Assignee is rendering substantial services as a director, officer, employee, consultant, advisor or independent contractor to the Assignor or to any Affiliate thereof. In case of any dispute as to whether Assignee is employed by Assignor, the Board shall have sole discretion to determine whether Assignee has ceased to be employed by Assignor or its Affiliate and the effective date on which Assignee's employment or service relationship terminated (the "*Termination Date*"). An "*Affiliate*" means any entity that owns, directly or indirectly, stock representing more than 50% of the total combined voting power of all classes of stock of Assignor or any entity in which Assignor owns, directly or indirectly, equity interests representing more than 50% of the voting power of such entity.

**4.2    Unvested and Vested Restricted Tokens.**

**(a)**    Vesting Schedule. Restricted Tokens that are vested pursuant to the schedule set forth herein are "*Vested Tokens*". Restricted Tokens that are not vested pursuant to the schedule set forth herein are "*Unvested Tokens*". The "*Vesting Commencement Date*" is the date set forth on the signature page hereto. If Assignee has continuously been employed by

Assignor, at all times from the Vesting Commencement Date, and thereafter, for so long (and only for so long) as Assignee remains continuously employed by Assignor at all times from the Vesting Commencement Date, on the last business day of each month after the Vesting Commencement Date 1/36th of the Restricted Tokens will become Vested Tokens, such that if Assignee has been continuously employed by the Assignor during such period, all Restricted Tokens will be fully vested on the three-year anniversary of the Vesting Commencement Date. No Unvested Tokens will become Vested Tokens after the Termination Date.

(b)        Acceleration of Vesting Following Termination without Cause. Notwithstanding anything to the contrary set forth in Section 3, if Assignee's employment by the Assignor is terminated by the Assignor (or successor thereof) following the twelve (12) month anniversary of the Vesting Commencement Date but prior to the First Vesting Date, other than for Cause, and provided that the Assignee delivers to the Assignor and the Company a general release and non-disparagement agreement of claims in favor of the Assignor, the Company and certain related parties in a form satisfactory to the Assignor and the Company (the "*Release*") within sixty (60) days following such separation from service, and satisfy all conditions to make the Release effective, then, effective as of immediately prior to such termination, a number of Restricted Tokens equal to the product of (a) the number of Restricted Tokens, and (b) a fraction, the numerator of which is the number of whole calendar months that has elapsed between the Vesting Commencement Date and the Termination Date, and the denominator of which is thirty-six (36), will become Vested Tokens at the time of such termination.

As used in this Section 4.2(b): "*Cause*" means any of the following: (a) the Assignee's unauthorized misuse of the Company's trade secrets or proprietary information, (b) the Assignee's conviction of or plea of nolo contendere to a felony or a crime involving moral turpitude, (c) the Assignee's commission of an act of fraud against the Assignor, the Company or any Affiliate, (d) the Assignee's willful engagement in conduct that is in bad faith and materially injurious to the Assignor, the Company or any Affiliate, including but not limited to, misappropriation of trade secrets, fraud or embezzlement, (e) Assignee commits a material breach of any written agreement between Assignee and the Assignor that causes harm to the Assignor, which breach is not cured within thirty (30) days after receipt of written notice describing in detail such breach to Assignee from the Assignor, or (f) Assignee engages in material misfeasance or malfeasance demonstrated by a continued pattern of material failure to perform the essential job duties associated with Assignee's position, which breach is not cured within thirty (30) days after receipt of written notice describing in detail such breach to Assignee from the Assignor.

(c)        Acceleration of Vesting Following Insolvency of Assignor. In addition to any Restricted Tokens that have become Vested Tokens pursuant to Section 4.2(a) hereof, in the event of a voluntary or involuntary dissolution, liquidation or winding-up of the Assignor, the filing of a petition by or against the Assignor under Title 11 of the United States Code (as now and hereafter in effect, or any successor statute), the appointment of a receiver, trustee, custodian or liquidator of or for all or substantially all of the assets or property of the Assignor, or the execution by the Assignor of a general assignment for the benefit of creditors (in each case, an "*Insolvency Event*"), then, if Assignee has been continuously employed by the Assignor from the Effective Date until the date of such Insolvency Event, effective as of such Insolvency Event, 100% of the Restricted Tokens will become Vested Tokens at the time of such event.

**4.3**  **Exercise of Repurchase Option at Original Price.** At any time within ninety (90) days after the Termination Date, the Foundation and/or its assignee(s) may elect to repurchase any or all of the Unvested Tokens by giving Assignee written notice of exercise of the Repurchase Option; provided, however, that without requirement of further action on the part of either party hereto, the Repurchase Option shall be deemed to have been automatically exercised as to all Unvested Tokens as of 11:59 PM PT on the date that is ninety (90) days after the Termination Date, unless the Foundation declines in writing to exercise its Repurchase Option. Foundation and/or its assignee(s) will then repurchase (or be deemed to have repurchased) from Assignee (or from Assignee's personal representative as the case may be) any or all of the Unvested Tokens at a price of per Token equal to that set forth on the signature page hereto (the "**Repurchase Price**").

**4.4**  **Payment of Repurchase Price.** The Repurchase Price may be payable in Bitcoin, Ether or other forms of digital assets on an as-converted to U.S. dollars basis or in U.S. dollars, at the option of the Foundation and/or its assignee(s), as the case may be, by cash, wire transfer or check, or by cancellation of all or a portion of any outstanding indebtedness owed by Assignee to the Foundation (or to such assignee) or by any combination thereof, or any other forms of payment on an as-converted to U.S. dollars basis as determined by the Foundation in its sole discretion. The Repurchase Price will be paid without interest.

**4.5**  **Right of Termination Unaffected.** Nothing in this Agreement will be construed to limit or otherwise affect in any manner whatsoever the right or power of Assignor (or any Affiliate) to terminate Assignee's employment or service relationship with Assignor (or any Affiliate) at any time for any reason or no reason, with or without cause.

**5.**  **RIGHTS AS OWNER OF TOKEN INTERESTS AND TOKENS.** The Token Interests do not, and the Tokens will not following the Token Launch, entitle Assignee to vote or receive dividends or be deemed the holder of equity of Assignor or the Foundation for any purpose, nor will anything contained herein be construed to confer on the Assignee, as such, any of the rights of a stockholder of Assignor or the Foundation or any right to vote for the election of Assignor's Board or the Foundation's Board or upon any matter submitted to the stockholders of Assignor, Assignor's Board, Foundation's Board, or the council members of the Foundation, or at any meeting thereof, or to give or withhold consent to any corporate or foundation action or to receive notice of meetings, or to receive subscription rights or otherwise.

**6.**  **DISCLAIMER AND LIMITATION OF LIABILITY.** Neither the Assignor nor the Foundation shall be liable or responsible to the Assignee, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, including without limitation, launching, developing and maintaining the Protocol and/or the Network, launching the Tokens, selling the Token Interests, sending the Tokens to the smart contract address compatible with receiving Tokens, or distributing the Tokens, when and to the extent such failure or delay is caused by or results from acts beyond the affected party's commercially reasonable control, including, without limitation: (a) acts of God; (b) flood, fire, earthquake, pandemic or explosion; (c) war, invasion, hostilities (whether war is declared or not); terrorist threats or acts, or other civil unrest; (d) applicable law or regulations; or (e) action by any governmental authority. NEITHER THE ASSIGNOR NOR THE FOUNDATION MAKE ANY

WARRANTY WHATSOEVER WITH RESPECT TO THE TOKENS, INCLUDING ANY (A) WARRANTY OF MERCHANTABILITY; (B) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (C) WARRANTY OF TITLE; OR (D) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE. EXCEPT AS EXPRESSLY SET FORTH HEREIN, ASSIGNEE ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE ASSIGNOR OR THE FOUNDATION, OR ANY OTHER PERSON ON THE ASSIGNOR OR THE FOUNDATION'S BEHALF.

The Assignee understands that Assignee has no right against the Assignor or the Foundation or any other individual or legal entity except in the event of the Assignor's or the Foundation's material breach of this instrument or intentional fraud. THE ASSIGNOR'S AND THE FOUNDATION'S (OR ANY OTHER INDIVIDUAL'S OR LEGAL ENTITY'S) AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT OR OTHERWISE, SHALL NOT EXCEED US$1,000.00. NEITHER THE ASSIGNOR, THE FOUNDATION NOR THEIR REPRESENTATIVES SHALL BE LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS INSTRUMENT.

7.    **TAX CONSEQUENCES**. ASSIGNEE UNDERSTANDS THAT ASSIGNEE MAY SUFFER ADVERSE TAX CONSEQUENCES AS A RESULT OF ASSIGNEE'S RECEIPT, VESTING OR DISPOSITION OF ASSIGNOR'S RIGHTS UNDER THE TSA. ASSIGNEE REPRESENTS (a) THAT ASSIGNEE HAS CONSULTED WITH A TAX ADVISER THAT ASSIGNEE DEEMS ADVISABLE IN CONNECTION WITH THE RECEIPT, VESTING, AND DISPOSITION OF ASSIGNOR'S RIGHTS UNDER THE TSA, AND (b) THAT ASSIGNEE IS NOT RELYING ON ASSIGNOR, THE FOUNDATION, OR ANY AGENTS, REPRESENTATIVES, OR ADVISORS OF EITHER ASSIGNOR OR FOUNDATION FOR ANY TAX ADVICE. Assignee has been informed that unless Assignee files with the Internal Revenue Service (and, if necessary, the proper state taxing authorities) within 30 days after the Effective Date, electing pursuant to Section 83(b) of the Internal Revenue Code (and similar state tax provisions, if applicable) to be taxed currently on any difference between the fair market value of the Token Interests on the date of grant and the amount paid by the Assignee, there may be a recognition of taxable income to Assignee at each time the Repurchase Option lapses with respect to a portion of the Restricted Tokens, measured by the excess, if any, of the fair market value of such portion of the Restricted Tokens over the amount paid by the Assignor allocable to such portion of the Restricted Tokens. Assignee represents that Assignee has consulted any tax advisors Assignee deems advisable in connection with Assignee's receipt of Assignor's rights under the TSA and the filing of the election under Section 83(b) and similar tax provisions. A form of Election under Section 83(b) is attached hereto as Exhibit A for reference. ASSIGNEE HEREBY ASSUMES ALL RESPONSIBILITY FOR FILING SUCH ELECTION AND PAYING ANY TAXES RESULTING FROM SUCH ELECTION OR FROM FAILURE TO FILE THE ELECTION AND PAYING TAXES RESULTING FROM THE LAPSE OF THE REPURCHASE RESTRICTIONS ON THE UNVESTED TOKENS.

DocuSign Envelope ID: 85733CB0-5CA0-46D4-895F-51F8C8DA4D9

THE FAIR MARKET VALUE OF ASSIGNOR'S RIGHTS UNDER THE TSA HAS BEEN DETERMINED IN GOOD FAITH IN ACCORDANCE WITH A VALUATION REPORT RECEIVED BY THE FOUNDATION AND SHARED WITH ASSIGNOR, A COPY OF WHICH IS AVAILABLE TO ASSIGNEE UPON REQUEST. THERE IS NO GUARANTEE THAT SUCH DETERMINATION OF FAIR MARKET VALUE WILL NECESSARILY REFLECT OR EQUAL ANY DETERMINATION OF FAIR MARKET VALUE BY A TAXING AUTHORITY (SUCH AS THE INTERNAL REVENUE SERVICE). ASSIGNEE AGREES TO BE FULLY RESPONSIBLE FOR ANY TAXES RESULTING FROM THE RECEIPT, VESTING AND DISPOSITION OF ASSIGNOR'S RIGHTS UNDER THE TSA, INCLUDING ANY ADDITIONAL TAXES RESULTING FROM A DIFFERENT DETERMINATION OF FAIR MARKET VALUE.

## 8.    **MISCELLANEOUS**.

**8.1    Notices**. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, or (b) when sent, if sent by electronic mail or facsimile during normal business hours of the Assignor, and if not sent during normal business hours, then on the Assignor's next Business day, or (c) three (3) Business Days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries. All notices for delivery outside the United States will be sent by express courier. All notices for delivery will be sent by express courier. All notices not delivered personally will be sent with postage and/or other charges prepaid and properly addressed to the party to be notified at the address set forth below the signature lines of this Agreement or at such other address as such other party may designate by one of the indicated means of notice herein to the other party hereto. A "*Business day*" shall be a day, other than Saturday or Sunday, when the banks in the Republic of Panama are open for business.

**8.2    Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the jurisdiction set forth in the TSA, without giving effect to that body of laws pertaining to conflict of laws.

**8.3    Binding Effect**. This Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties hereto and their respective successors and assigns.

**8.4    Entire Agreement**. This Agreement and the TSA constitute the entire agreement and understanding of the parties with respect to the subject matter hereof and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

**8.5    Further Assurances**. Assignee agrees to execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably requested to give effect to the transactions contemplated hereby, including without limitation to enable the Foundation and the Assignor to comply with applicable laws and any other documents that (1) other unaffiliated purchasers of Tokens shall be required to execute and deliver, or (2) are requested by any digital asset exchanges or markets (including any specific or additional lock-up agreements or terms in connection with a listing or sale of Tokens).

**8.6** **Counterparts; Facsimile Signatures.** This Agreement may be executed in any number of counterparts, each of which will be deemed an original, and all of which together shall constitute one and the same agreement. This Agreement may be executed and delivered by facsimile or other means of electronic delivery and upon such delivery the facsimile signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

[SIGNATURE PAGE FOLLOWS]

10

**IN WITNESS WHEREOF**, the parties hereto, being authorized to do so and intending to be legally bound hereby, have duly executed and entered into this Agreement on the date first set forth above.

**ASSIGNOR:**

NEON MACHINE, INC.

By: *Mark Long*

Name: Mark Long

Title: CEO

**IN WITNESS WHEREOF**, the parties hereto, being authorized to do so and intending to be legally bound hereby, have duly executed and entered into this Agreement on the date first set forth above.

**ASSIGNEE:**

DocuSigned by:

*Cort Javarone*

066G102172D3417

Name: Cort Javarone

| Number of SHRAP Tokens | Price per Token | Vesting Commencement Date |
| --- | --- | --- |
| 1,000,000 | $0.00002616 | November 08, 2021 |

12

      **IN WITNESS WHEREOF**, the parties hereto, being authorized to do so and intending to be legally bound hereby, have duly executed and entered into this Agreement on the date first set forth above.

**FOUNDATION:**

ARGON PROTOCOL FOUNDATION

By: _Diana Muñoz_
     1F2ADEB61CF54CD...

Name: Diana Muñoz

Title: Director

## EXHIBIT A

## ELECTION UNDER SECTION 83(b) OF THE
## INTERNAL REVENUE CODE

The undersigned Taxpayer hereby elects, pursuant to Section 83(b) of the Internal Revenue Code, as amended, to include in gross income for the Taxpayer's current taxable year the excess, if any, of the fair market value of the property described below at the time of transfer over the amount paid for such property, as compensation for services.

1.    TAXPAYER'S NAME: _____

       TAXPAYER'S ADDRESS: _____

       SOCIAL SECURITY NUMBER: _____

2.    The property with respect to which the election is made is described as follows: the right to receive from Argon Protocol Foundation, a Republic of Panama foundation (the "**Foundation**") [_____] SHRAP Tokens of the Foundation (the "**Tokens**").

3.    The date on which the right to receive the Tokens was transferred was [_____], 2021 and this election is made for calendar year 2021.

4.    The Tokens are subject to the following restrictions: The Foundation may repurchase all or a portion of the Tokens at $[_____] per Token under certain conditions at the time of Taxpayer's termination of employment or services.

5.    The fair market value of the right to receive the Tokens (without regard to restrictions other than restrictions which by their terms will never lapse) was $[_____] per Token at the time of transfer.

6.    The amount paid for the right to receive the Tokens was $[_____] per Token.

7.    The Taxpayer has submitted a copy of this statement to the Foundation.

*THIS ELECTION MUST BE FILED WITH THE INTERNAL REVENUE SERVICE ("**IRS**"), AT THE OFFICE WHERE THE TAXPAYER FILES ANNUAL INCOME TAX RETURNS, <u>WITHIN 30 DAYS</u> AFTER THE DATE OF TRANSFER OF THE PROPERTY. THE ELECTION CANNOT BE REVOKED WITHOUT THE CONSENT OF THE IRS.*

Dated: _____    _____
                                         Taxpayer's Signature

**EXHIBIT D**
**(PROPOSED ORDER)**

**EXHIBIT D**
**(PROPOSED ORDER)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X

In re:

4D FACTORY, INC., et al.,

                         Debtors.[1]

               Chapter 11
             (Subchapter V)
      Case No.: 23-11618 (MEW)
       (Jointly Administered)

-------------------------------------------------------------------X

THE 4D FACTORY LLC,

             Plaintiff,

   -against-

MARK LONG, COLIN FORAN,
NAOMI LACKAFF, AARON NONIS,
DON NORBURY, MARK YEEND,
CALVIN ZHOU, GRIFFIN GAMING
PARTNERS II, L.P., GRIFFIN GAMING
PARTNERS II SIDE FUND, L.P., POLYCHAIN
VENTURES II LP, POLYCHAIN VENTURES II
(PARALLEL) LP, PIERRE-EDUOARD
PLANCHE, BENJAMIN PERSZYK,
JOSH ROSENTHAL,

             Defendants,
       and

NEON MACHINE, INC., ARGON PROTOCOL
FOUNDATION, ARGON ASSET VENTURES
CORP.

             Nominal Defendants.

Adv. Pro. No. 24-01319 (MEW)

-------------------------------------------------------------------X

GRIFFIN GAMING PARTNERS II, L.P., GRIFFIN
GAMING PARTNERS II SIDE FUND, L.P.,
POLYCHAIN VENTURES II LP, POLYCHAIN
VENTURES II (PARALLEL) LP,

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number, are 4D Factory Inc. (6770), and The 4D Factory LLC (8935).

Counterclaim-Plaintiffs, v.

THE 4D FACTORY LLC,

Counterclaim-Defendant.

------------------------------------------------------------------------X

GRIFFIN GAMING PARTNERS II, L.P., GRIFFIN
GAMING PARTNERS II SIDE FUND, L.P.,
POLYCHAIN VENTURES II LP, POLYCHAIN
VENTURES II (PARALLEL) LP,

Third-Party Plaintiffs,

v.

CORT JAVARONE, SCOTT HONOUR, and STEVE
HOROWITZ,

Third-Party Defendants.

------------------------------------------------------------------------X

### ORDER GRANTING MOTION AND AUTHORIZING THE 4D FACTORY LLC TO ENTER INTO AGREEMENT WITH MEP CAPITAL HOLDINGS III, LP and CORT JAVARONE

Upon the motion (the "Motion") of 4D Factory, Inc., and The 4D Factory LLC (the "Debtors") requesting entry of an order, pursuant to section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving the agreement attached to the Motion as **Exhibit A** (the "MEP Agreement"); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief sought in the Motion having been provided, with such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having found that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED to the extent set forth herein.

2.      Pursuant to Bankruptcy Rule 9019, the MEP Agreement is approved in all respects and the Parties are authorized to take all steps to effectuate and consummate the MEP Agreement.

3.      The settlements and compromises by the Parties within the MEP Agreement are fully incorporated herein, and all its provisions are approved.

4.      Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon entry hereof.

5.      This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or relating to the MEP Agreement and this or any other order of this Court entered in this bankruptcy case, including without limitation, all matters arising from or related to the implementation, interpretation and/or enforcement of this Order and the MEP Agreement.